UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| JLG INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) CASE NO. _____ |
| vs. | ) |
| | ) **JURY TRIAL DEMANDED** |
| POWERSCREEN USC INC., | ) |
| POWERSCREEN INTERNATIONAL PLC, | ) |
| and TEREX CORPORATION, | ) |
| | ) |
| Defendants. | ) |

---

### COMPLAINT

---

Plaintiff JLG INDUSTRIES, INC. ("JLG"), through its undersigned counsel, alleges the following for its Complaint against the defendants:

### THE PARTIES

1.    The plaintiff, JLG, is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania and maintains a principal place of business in McConnellsburg, Pennsylvania.

2.    Upon information and belief, defendant POWERSCREEN USC INC. ("POWERSCREEN") was and is a domestic corporation duly organized and existing under and by virtue of the laws of the State of Delaware and maintains a principal place of business in Louisville, Kentucky.

3.    Upon information and belief, defendant POWERSCREEN INTERNATIONAL PLC ("POWERSCREEN INTERNATIONAL") is a public limited company registered under the laws of England and Wales and maintains a principal place of business in Dungannon, Northern Ireland.

4.      Upon   information   and   belief,   defendant   TEREX   CORPORATION ("TEREX"), is a domestic corporation duly organized and existing under and by virtue of the laws of the State of Delaware and maintains a principle place of business in Westport, Connecticut.

5.      Upon   information   and   belief,   POWERSCREEN   and   POWERSCREEN INTERNATIONAL were acquired by TEREX in 1999.

<p align="center">JURISDICTION AND VENUE</p>

6.      This action is brought under an Asset Purchase Agreement ("APA") among POWERSCREEN, JLG, and POWERSCREEN INTERNATIONAL.  This Court has been designated by the parties as the proper venue to resolve disputes arising under the APA as described by section 9.18 of the APA.  A true and accurate copy of the APA is attached to this Complaint as Exhibit A.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship of the parties.  The amount in controversy exceeds $75,000 exclusive of interest and costs.

8.      This Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391.

<p align="center">FACTUAL BACKGROUND</p>

9.      On May 22, 1996, JLG and POWERSCREEN entered into the APA.

10.      By virtue of the APA, POWERSCREEN purchased substantially all of JLG's assets used solely or primarily in the operation of its Material Handling Division.

11.      Section 8.05 of the APA states in pertinent part that POWERSCREEN:

shall indemnify and hold [JLG] harmless from and against, and shall pay to [JLG] the full amount of, any loss, claim, damage, liability or expense (including reasonable attorneys' fees) resulting to [JLG], either directly or

indirectly, from... (c) any Assumed Liability; and (d) any product liability claim resulting from incidents or injuries occurring following the Closing.

12.    Section 1.01(f) of the APA defines "Assumed Liabilities" as "only those liabilities expressly set forth on Schedule 1.01(f)."

13.    The sixth Assumed Liability set forth on Schedule 1.01(f) states in pertinent part:

Liability for all claims, demands, expenses and actions in law or in equity at any time made or brought by anyone or any entity for damages of any nature or injuries of any kind arising from accidents or incidents occurring after the Closing Date and relating to the design, manufacture, assembly, sale, distribution or service of i) all unloaders and boom truck cranes and parts therefore which... are specified in the Stipulated Settlement Agreement (item 1, Schedule 1.01(k)).

14.    Item 1 of Schedule 1.01(k) is the "Stipulated Settlement Agreement between U.S. Truck Cranes, Inc., Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.) and JLG Industries, Inc."

15.    On or about November 25, 1992, JLG entered into the Stipulated Settlement Agreement with U.S. Truck Cranes, Inc. ("USTC"), HIAB Cranes and Loaders, Inc. ("HIAB") and Cargotec, Inc. ("Cargotec").   A true and accurate copy of the Stipulated Settlement Agreement is attached to this Complaint as Exhibit B.

16.    The Stipulated Settlement Agreement resolved litigation between USTC and HIAB and established the respective responsibilities of USTC and HIAB for defending claims, arbitrations, lawsuits and any and all court or other tribunal proceedings.

17.    Pursuant to paragraph 1 of the Stipulated Settlement Agreement, USTC was to be solely responsible for defending and/or satisfying any and all claims, judgments, orders or other judicial, tribunal and/or governmental imposed liability, resulting from or

pertaining to the manufacture, design, assembly, sale or distribution of, among other units/products, the Model K-146 TSE.

18.    Pursuant to paragraph 3 of the Stipulated Settlement Agreement, USTC and JLG agreed to defend, indemnify and hold harmless HIAB and Cargotec with respect to any loss, damage, liability, judgment, assessment, injunction, order and/or expense, including but not limited to court costs, attorneys' and experts' fees, on account of any and all manner of claim, lawsuit or cause of action or proceeding which relate to or concern in whole or in part the manufacture, design, assembly, sale or distribution of the units/products set forth in paragraph 1.

19.    On or about September 23, 2004, Scott D. Smith and Marsha Smith ["the Smiths"] commenced a civil action in the Circuit Court of Marshall County, West Virginia, bearing Civil Action No. 04-C-220K, ("Underlying Litigation") as a result of an accident occurring on August 25, 2003 ("Accident").

20.    On or about October 3, 2005, the Smiths filed a First Amended Complaint naming, among others, HIAB, Cargotec and JLG as defendants.  A true and accurate copy of the First Amended Complaint is attached to this Complaint as Exhibit C.

21.    In the Underlying Litigation, the Smiths allege that the Accident occurred when a boom on a Model K 146-TSE boom truck broke as Scott D. Smith was unloading the truck.  The Smiths claim that Scott D. Smith sustained personal injuries as a result of the Accident.

22.    In the Underlying Litigation, the Smiths claim that HIAB manufactured the boom and that USTC manufactured the hand control for the boom.  The Smiths brought strict liability causes of action against HIAB, Cargotec and JLG.

23.    A data plate attached to the machine at the time of the Accident identifies it as a Model 146-TSE manufactured by HIAB.  A copy of the data plate is attached as Exhibit D.

24.    In their Answer to the Smiths' First Amended Complaint, HIAB and Cargotec asserted a cross-claim against JLG.  A true and accurate copy of HIAB and Cargotec's Answer is attached as Exhibit E.

25.    On or about December 2, 2005, HIAB and Cargotec tendered defense and requested indemnification from JLG in the Underlying Litigation under the terms of the Stipulated Settlement Agreement.

### COUNT I
CONTRACTUAL INDEMNIFICATION FOR THE SMITHS' DIRECT CLAIMS
AGAINST JLG IN THE UNDERLYING LITIGATION

26.    JLG repeats and realleges paragraphs 1 through 25 as though fully set forth in this paragraph.

27.    Pursuant to section 8.05(d) of the APA, defendants agreed to indemnify and hold JLG harmless from and against, and to pay JLG the full amount of, any loss, claim, damage, liability or expense resulting to JLG, either directly or indirectly, from any product liability claim resulting from incidents or injuries occurring following the Closing.

28.    Pursuant to section 1.01(i) of the APA, the Closing was on May 22, 1996.

29.    The Accident in the Underlying Litigation occurred on August 25, 2003.

30.    The Smiths' strict liability cause of action against JLG in the Underlying Litigation is a "product liability claim" covered by section 8.05(d) of the APA.

31.    On or about October 14, 2005, JLG requested that POWERSCREEN, POWERSCREEN INTERNATIONAL and/or TEREX indemnify and hold JLG harmless in the Underlying Litigation in accordance with section 8.05 of the APA.

32.    Defendants have refused to indemnify and hold JLG harmless in the Underlying Litigation.

<div align="center">

**COUNT II**
CONTRACTUAL INDEMNIFICATION FOR HIAB AND CARGOTEC'S CROSS-CLAIM
AGAINST JLG IN THE UNDERLYING LITIGATION

</div>

33.    JLG repeats and realleges paragraphs 1 through 32 as though fully set forth herein.

34.    Pursuant to section 8.05(c) of the APA, defendants agreed to indemnify and hold JLG harmless from and against, and to pay JLG the full amount of, any loss, claim, damage, liability or expense resulting to JLG, either directly or indirectly, from any Assumed Liability.

35.    The sixth Assumed Liability set forth on Schedule 1.01(f) of the APA is liability for all claims specified in the Stipulated Settlement Agreement.

36.    The Stipulated Settlement Agreement specifies all claims resulting from the manufacture, design, assembly, sale or distribution of the Model 146-TSE.

37.    The boom involved in the Accident in the Underlying Litigation is a Model 146-TSE.

38.    On or about January 10, 2006, JLG requested that POWERSCREEN, POWERSCREEN INTERNATIONAL and/or TEREX indemnify and hold JLG harmless for HIAB and Cargotec's cross-claim in the Underlying Litigation in accordance with section 8.05 of the APA.

39.    Defendants have refused to indemnify and hold JLG harmless for HIAB and Cargotec's cross-claim in the Underlying Litigation.


## COUNT III
ATTORNEYS' FEES

40.    JLG repeats and realleges paragraphs 1 though 39 as though fully set forth herein.

41.    Section 8.05 of the APA states that defendants shall indemnify and hold JLG harmless from and against, and shall pay to JLG reasonable attorneys' fees resulting to JLG, either directly or indirectly, from "(c) any Assumed Liability; and (d) any product liability claim resulting from incidents or injuries occurring following the Closing."

42.    In the event that contractual indemnification is ultimately found against the defendants, then JLG is also entitled to recover reasonable attorneys' fees and all other costs and expenses incurred in defending the Underlying Litigation.

WHEREFORE, plaintiff JLG demands judgment: (a) granting JLG contractual indemnification against defendants for the Smiths' direct claims in the Underlying Litigation; (b) granting JLG contractual indemnification against the defendants for HIAB and Cargotec's cross-claim in the Underlying Litigation; and (c) granting JLG attorneys' fees and other litigation expenses, together with the costs and disbursements of this action.

DATED:        January 25, 2006

R. Montgomery Donaldson (DE ID No. 4367)
Montgomery, McCracken,
        Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, Delaware 19801
(302) 504-7840

and

Anthony J. Colucci, III, Esq.
COLUCCI & GALLAHER, P.C.
2000 Liberty Building
Buffalo, New York 14202
(716) 853-4080

*Attorneys for Plaintiff*

EXHIBIT A

ASSET PURCHASE AGREEMENT

dated as of May 22, 1996

between

POWERSCREEN USC INC.

and

JLG INDUSTRIES, INC.

joined in by

FULTON INTERNATIONAL, INC.

and by

POWERSCREEN INTERNATIONAL PLC

## TABLE OF CONTENTS

Page

Section 1 - Definitions . . . . . . . . . . . . . . . . . 2

    1.01 Definitions . . . . . . . . . . . . . . . . . . . 2
    1.02 Additional Terms . . . . . . . . . . . . . . . 9

Section 2 - Purchase and Sale . . . . . . . . . . . . . . 9

    2.01 Purchase of the Assets . . . . . . . . . . . . 9
    2.02 Assumption of Selected Liabilities . . . . . . 9
    2.03 Purchase Price . . . . . . . . . . . . . . . . 10
    2.04 Escrow . . . . . . . . . . . . . . . . . . . . 10
    2.05 Closing Financial Statements;
         Purchase Price Adjustment. . . . . . . . . . . 10
    2.06 Purchase Price Allocation . . . . . . . . . . 12
    2.07 Employees . . . . . . . . . . . . . . . . . . 13

Section 3 - Representations and Warranties of Seller . . . . 14

    3.01 Organization . . . . . . . . . . . . . . . . . 14
    3.02 Business . . . . . . . . . . . . . . . . . . . 15
    3.03 Authority . . . . . . . . . . . . . . . . . . 15
    3.04 Financial Statements . . . . . . . . . . . . . 17
    3.05 Title to Assets . . . . . . . . . . . . . . . 17
    3.06 Condition of Assets . . . . . . . . . . . . . 18
    3.07 Real Property . . . . . . . . . . . . . . . . 18
    3.08 Inventory . . . . . . . . . . . . . . . . . . 18
    3.09 Contracts . . . . . . . . . . . . . . . . . . 19
    3.10 Accounts Receivable. . . . . . . . . . . . . . 21
    3.11 Permits . . . . . . . . . . . . . . . . . . . 21
    3.12 Intellectual Property . . . . . . . . . . . . 22
    3.13 Litigation and Pending Proceedings;
         Compliance with Law . . . . . . . . . . . . . 22
    3.14 Tax Matters . . . . . . . . . . . . . . . . . 23
    3.15 Insurance . . . . . . . . . . . . . . . . . . 24
    3.16 Warranty Obligations . . . . . . . . . . . . . 24
    3.17 Proprietary Information . . . . . . . . . . . 25
    3.18 Working Relationships . . . . . . . . . . . . 25
    3.19 Customers . . . . . . . . . . . . . . . . . . 25
    3.20 Employees . . . . . . . . . . . . . . . . . . 25
    3.21 Labor Relations . . . . . . . . . . . . . . . 26
    3.22 Employee Benefit Plans . . . . . . . . . . . . 27
    3.23 Immigration Matters . . . . . . . . . . . . . 28
    3.24 Potential Competing Interests . . . . . . . . 28
    3.25 Environmental Matters . . . . . . . . . . . . 28
    3.26 Absence of Material Change . . . . . . . . . . 34
    3.27 Bulk Sales . . . . . . . . . . . . . . . . . . 36
    3.28 Completeness of Statements . . . . . . . . . . 37
    3.29 Fulton's Organization . . . . . . . . . . . . 38
    3.30 Fulton's Authority . . . . . . . . . . . . . . 38

3.31 Fulton's Litigation . . . . . . . . . . . . . . . 39
3.32 Fulton's Title  . . . . . . . . . . . . . . . . . 39

Section 4 - Representations and Warranties of
            Purchaser and Powerscreen International  . . . 40

4.01 Organization  . . . . . . . . . . . . . . . . . . 40
4.02 Authority . . . . . . . . . . . . . . . . . . . . 40
4.03 Litigation  . . . . . . . . . . . . . . . . . . . 41

Section 5 - Covenants of Seller and Fulton  . . . . . . . 42

5.01 Nonassignable Contracts; Consents . . . . . . . . 42
5.02 Publicity . . . . . . . . . . . . . . . . . . . . 43
5.03 Noncompetition  . . . . . . . . . . . . . . . . . 43
5.04 Records . . . . . . . . . . . . . . . . . . . . . 45
5.05 Accounts Receivable . . . . . . . . . . . . . . . 45
5.06 Supply of Cylinders . . . . . . . . . . . . . . . 45
5.07 JLG Cylinder Warranty . . . . . . . . . . . . . . 47
5.08 Transition Services . . . . . . . . . . . . . . . 48
5.09 Conveyance by Fulton  . . . . . . . . . . . . . . 48
5.10 JLG Trademark License . . . . . . . . . . . . . . 48

Section 6 - Covenants of Purchaser and Powerscreen
            Holdings  . . . . . . . . . . . . . . . . . . 48

6.01 Publicity . . . . . . . . . . . . . . . . . . . . 48
6.02 Records . . . . . . . . . . . . . . . . . . . . . 49
6.03 Spare Parts . . . . . . . . . . . . . . . . . . . 49
6.04 Use of Patent . . . . . . . . . . . . . . . . . . 50
6.05 Product Identification  . . . . . . . . . . . . . 51
6.06 Accounts Receivable . . . . . . . . . . . . . . . 51
6.07 Guaranty by Powerscreen International . . . . . . 51

Section 7 - The Closing . . . . . . . . . . . . . . . . . 51

7.01 Effective Time and Place. . . . . . . . . . . . . 51
7.02 Deliveries  . . . . . . . . . . . . . . . . . . . 51

Section 8 - Survival of Representations and
            Warranties--Indemnification . . . . . . . . . 52

8.01 Survival  . . . . . . . . . . . . . . . . . . . . 52
8.02 Indemnity by Seller . . . . . . . . . . . . . . . 52
8.03 Seller's Indemnification Limitations  . . . . . . 53
8.04 Environmental Indemnity by Seller . . . . . . . . 53
8.05 Indemnity by Purchaser  . . . . . . . . . . . . . 56
8.06 Purchaser's Indemnification Limitations . . . . . 56
8.07 Remedies; Right of Offset . . . . . . . . . . . . 57
8.08 Penalties and Interest  . . . . . . . . . . . . . 57

Section 9 - Miscellaneous . . . . . . . . . . . . . . . . 58

9.01 Notices . . . . . . . . . . . . . . . . . . . . . 58
9.02 Waivers . . . . . . . . . . . . . . . . . . . . . 59

(ii)

9.03 Expenses . . . . . . . . . . . . . . . . . . . 59
9.04 Headings; Interpretation . . . . . . . . . . . 59
9.05 Annexes and Schedules . . . . . . . . . . . . . 59
9.06 Entire Agreement . . . . . . . . . . . . . . . 59
9.07 Representations and Warranties . . . . . . . . 60
9.08 Currency . . . . . . . . . . . . . . . . . . . 60
9.09 Brokers . . . . . . . . . . . . . . . . . . . . 60
9.10 Counterparts . . . . . . . . . . . . . . . . . 61
9.11 Severability . . . . . . . . . . . . . . . . . 61
9.12 Benefit and Binding Effect . . . . . . . . . . 61
9.13 Risk of Loss . . . . . . . . . . . . . . . . . 61
9.14 Further Assurances . . . . . . . . . . . . . . 62
9.15 Sales and Transfer Taxes and Fees . . . . . . . 62
9.16 Prorations and Adjustments . . . . . . . . . . 63
9.17 Arbitration . . . . . . . . . . . . . . . . . . 63
9.18 Governing Law . . . . . . . . . . . . . . . . . 64

F:\USERS\09\POWERSCR\JLG-APAE.CLN
May 22, 1996 19:45am.

## ASSETS PURCHASE AGREEMENT

This is an Assets Purchase Agreement dated as of May 22, 1996 (the "Agreement"), between **POWERSCREEN USC INC.** ("Purchaser"), a Delaware corporation, and **JLG INDUSTRIES, INC.** ("Seller"), a Pennsylvania corporation. **FULTON INTERNATIONAL, INC.** ("Fulton"), a Delaware corporation, and **POWERSCREEN INTERNATIONAL PLC** ("Powerscreen International"), a public limited company registered under the laws of England and Wales, join in this Agreement for the limited purposes described herein.

## RECITALS

A.    The Material Handling Division of Seller (the "Division"), designs, manufactures, distributes, sells and services (i) a broad line of hydraulic materials-handling equipment which is mounted onto commercial truck chassis or trailers; and (ii) certain other equipment, all as more particularly described on Schedule A (the "Business"). The Division conducts its Business primarily through operations in York, Pennsylvania, and its principal product lines are classified as boom truck cranes and unloaders.

B.    Seller wishes to sell, and Purchaser wishes to purchase, upon the terms and conditions set forth in this Agreement, substantially all of Seller's assets which are used solely or primarily in the operation of the Business.

C.    Purchaser is a wholly owned subsidiary of Powerscreen Holdings USA Inc., a Delaware corporation, which in turn is a wholly owned subsidiary of Powerscreen International.

D.    Fulton is a wholly owned subsidiary of Seller and the owner of certain patents and other intellectual property to be conveyed hereunder.

E.    This Agreement is the definitive acquisition agreement contemplated by and superseding any prior verbal or written understanding or communication of the parties relating to the subject matter hereof.

NOW, THEREFORE, in consideration of the mutual benefits and covenants contained herein, and subject to the terms and conditions set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

## Section 1

### Definitions

1.01 **Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

(a)   "Accounts Receivable" shall mean all of the Division's notes and accounts receivable as reflected on the Closing Financial Statements, excluding intercompany receivables to the extent that such intercompany receivables are not trade receivables and excluding "other prepaids" as reflected on the Closing Financial Statements.

(b)   "Assets" shall mean all of Seller's assets, other than the Excluded Assets, used solely or primarily in the operation of the Business, including, without limitation, the Accounts Receivable, Assumed Contracts, Equipment, Vehicles, Inventory, transferable Permits, Real Property, Goodwill, Conveyed Intellectual Property as defined in Section 3.12 and further described in

- 2 -

Schedule 3.12, cash of $750,000, and all of the books and records of the Division.

(c)  "Assignment of Contracts" shall mean the Assignment of Assumed Contracts, substantially in the form attached hereto as Annex 1.01(c), pursuant to which Seller shall assign the Assumed Contracts to Purchaser.

(d)  "Assignment of Lease" shall mean the Assignment of Lease, substantially in the form attached hereto as Annex 1.01(d), pursuant to which Seller shall assign to Purchaser each lease of Assets utilized in the Business but not owned by Seller or any Affiliate of Seller.

(e)  "Assumed Contracts" shall mean those Contracts being assumed by Purchaser at Closing, which Assumed Contracts are listed on Schedule 1.01(e).

(f)  "Assumed Liabilities" shall mean only those liabilities expressly set forth on Schedule 1.01(f).

(g)  "Bills of Sale" shall mean the instruments of transfer, substantially in the form attached hereto as Annex 1.01(g)(1-3), pursuant to which Seller shall transfer to Purchaser the Accounts Receivable, Equipment, Vehicles, Inventory, transferable Permits, Goodwill, Conveyed Intellectual Property and the books and records of the Division.

(h)  "Closing" shall mean the consummation of the transactions contemplated in this Agreement in accordance with the provisions of Section 7.

(i)  "Closing Date" shall mean May 22, 1996, or such other date mutually acceptable to the parties.

- 3 -

(j) "Closing Financial Statements" shall mean the Division's unaudited pro forma balance sheet including notes and any schedules referred to therein as of the Closing Date (the "Closing Balance Sheet") and the Division's unaudited pro forma income statement including notes and any schedules referred to therein for the period beginning August 1, 1995, and ending as of the Closing Date (the "Closing Income Statement") prepared by Seller utilizing the practices and policies described in Schedule 1.01(j), which, except as specifically set forth in said Schedule, shall be consistent with the Current Financial Statements, and which statements shall be reviewed by Purchaser and be subject to adjustment pursuant to the terms and conditions of Section 2.05. For purposes of this provision, "pro forma" shall mean the adjustments made from the books and records of the Division as reflected in the notes to the Closing Financial Statements.

(k) "Contracts" shall mean all contracts, leases and commitments, other than the Excluded Assets, related solely or primarily to the conduct of the Business, whether written or oral, to which Seller is a party or otherwise obligated, all of which (excluding any invoices for Division products and any purchase orders by the Division in the ordinary course of business) are listed on Schedule 1.01(k).

(l) "Current Financial Statements" shall mean the Division's unaudited pro forma balance sheet including notes and any schedules referred to therein as of April 30, 1996, (the "Current Balance Sheet"), and the Division's related unaudited pro forma income statement including notes and any schedules referred

- 4 -

to therein for the nine month period ending April 30, 1996, (the "Current Income Statement"), copies of which are attached hereto as Annex 1.01(1). For purposes of this provision, "pro forma" shall mean the adjustments made from the books and records of the Division as reflected in the notes to the Current Financial Statements.

(m)   "Deed" shall mean the Special Warranty Deed substantially in the form attached hereto as Annex 1.01(m), pursuant to which Seller shall convey to Purchaser the Real Property.

(n)   "Entity" shall mean any person, firm, trust, partnership, corporation or other business entity.

(o)   "Equipment" shall mean all of Seller's furniture, fixtures, machinery, equipment and other tangible personal property, other than the Excluded Assets, used solely or primarily to conduct the Business, wherever situated, as described on Schedule 1.01(o), together with all manufacturers' warranties pertaining to the same, to the extent that such warranties may exist and be assignable.

(p)   "Excluded Assets" shall mean the cash in excess of $750,000, intercompany accounts and other assets of the Division and of Seller set forth on Schedule 1.01(p).

(q)   "Financial Statements" shall mean the unaudited pro forma balance sheets including notes and the unaudited pro forma income statements including notes of the Division as of and for the three most recent fiscal years ended July 31, 1995, 1994, 1993, respectively, copies of which are attached hereto as Schedule 1.01(q). For purposes of this provision, "pro forma" shall mean

- 5 -

the adjustments made from the books and records of the Division as reflected in the notes to the Financial Statements.

(r) "Goodwill" shall mean the Division's goodwill and names, other than the Excluded Assets, and the going concern value of the Business.

(s) "Intellectual Property" shall mean trade names, trademarks or service marks, together with the Goodwill associated therewith; copyrights; pending or issued registrations for any of the foregoing; patents and patent applications; unpatented inventions; trade secrets and other confidential or proprietary information; packaging designs; computer programs; processes; formulas and methods; and all other intangible property rights of any kind.

(t) "Inventory" shall mean the raw materials, manufacturing supplies, packaging materials, purchased products, finished and partly finished goods and all other goods, merchandise and materials of the Division, wherever situated, as more particularly described by category on Schedule 1.01(t).

(u) "Liabilities" shall mean all of Seller's accounts payable, notes payable, commitments, indebtedness, obligations or liabilities of any kind whatsoever, whether absolute, accrued, contingent, matured or unmatured, direct or indirect, related to the Business, or to which any of the Division's properties or assets are subject, all of which, to Seller's knowledge, are listed on Schedule 1.01(u) hereto.

(v) "Net Asset Value" shall mean the difference between (i) the value of the Assets, which value shall initially be

- 6 -

established by the Current Balance Sheet subject to the adjustments referred to in Schedule 1.01(y) and which value shall ultimately be established by the Closing Balance Sheet in accordance with Section 2.05 hereof, together with adjustments made on the same basis as the adjustments referred to in Schedule 1.01(y) excluding the premium of $554,000 but including cash of $750,000; and (ii) the value of the Assumed Liabilities, which value shall initially be established by the Current Balance Sheet subject to the adjustments set forth on Schedule 1.01(y), and which value shall ultimately be established by the Closing Balance Sheet in accordance with Section 2.05 hereof, together with adjustments made on the same basis as the adjustments referred to in Schedule 1.01(y) excluding the premium of $554,000 but including cash of $750,000. For the avoidance of doubt, in calculating Net Asset Value, with respect to the Assets no value shall be ascribed to Assumed Contracts, transferable Permits, Conveyed Intellectual Property or Goodwill. With respect to the Assumed Liabilities, value shall be ascribed only to accounts payable and warranty expense or accrual.

(w)   "Other Agreements" shall mean the Assignment of Contracts, Assignment of Lease, Bills of Sale, and Deed, and all other agreements, certificates, opinions, instruments or documents contemplated by, required by or referred to in, this Agreement for the consummation of the transactions contemplated hereby.

(x)   "Permits" shall mean all permits, licenses, franchises, approvals, certificates or authorizations of any foreign, federal, state or local governmental or regulatory body required

- 7 -

(cc) "Vehicles" shall mean the automobiles, trucks and other vehicles for which registrations are required listed on Schedule 1.01(cc).

1.02 __Additional Terms__.  Other capitalized terms used in this Agreement but not defined in __Section 1.01__ above shall have the meanings ascribed to them wherever such terms first appear in this Agreement.

## Section 2

### Purchase and Sale

2.01 __Purchase of the Assets__.  Subject to the terms and con- ditions of this Agreement, Seller and Fulton hereby agree to sell, transfer and deliver to Purchaser, and Purchaser hereby agrees to purchase, the Assets.

2.02 __Assumption of Selected Liabilities__.  Subject to the terms and conditions of this Agreement, Seller shall assign, and Purchaser shall accept, the Assumed Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume, and the parties do not intend for Purchaser to assume, pursuant to this Agreement or otherwise, any of the Liabilities.  The mere disclosure by Seller of Liabilities shall not in any way expand the nature or scope of the Assumed Liabilities which the Purchaser shall assume at the Closing.  Seller agrees and confirms that Seller is, and shall remain, responsible for and shall pay any and all of the Liabilities which are not expressly set forth on __Schedule 1.01(f)__, subject to Seller's right vis-a-vis third parties to contest in good faith and assert any legal or equitable defense.

2.03 <u>Purchase Price</u>. Subject to adjustment in accordance with <u>Section 2.05</u> hereof, the Purchase Price shall be the Net Asset Value plus $554,000, which sum, subject to the provisions of <u>Section 2.04</u> below, shall be paid by wire transfer in immediately available funds at the Closing. In no event, however, shall the Purchase Price, as adjusted pursuant to Section 2.05, exceed $13,250,000.

2.04 <u>Escrow</u>. At the Closing, Purchaser shall deposit $250,000 of the Purchase Price (the "Escrowed Funds") with PNC Bank, N.A. (the "Escrow Agent") to be held in escrow pursuant to the terms and conditions of an escrow agreement among Seller, Purchaser and the Escrow Agent (the "Escrow Agreement"), the form of which is attached hereto as <u>Annex 2.04</u>. Without limiting the foregoing, the Escrowed Funds and all accrued interest thereon shall be released from escrow following resolution of the matters set forth in Sections 2.05 and 5.05 of this Agreement and otherwise pursuant to the terms of the Escrow Agreement.

2.05 <u>Closing Financial Statements; Purchase Price Adjustment</u>.

(a)  Seller shall prepare and deliver to Purchaser, within 30 days following the Closing, the Closing Financial Statements. Following such delivery, Seller shall, upon request, deliver to Purchaser copies of accounting work papers, analyses, reports and other documents reviewed or created by Seller in connection with the preparation of the Closing Financial Statements. To confirm the accuracy of the amounts reflected in such Closing Balance Sheet in accordance with the accounting practices and policies set forth in Schedule 1.01(j), including the

methods and procedures set forth in the supporting schedules thereto. Purchaser and, at Purchaser's election, Purchaser's firm of certified public accountants shall complete a review of such Closing Balance Sheet within 60 days of Seller's delivery of the Closing Balance Sheet to Purchaser. Upon completion of such review, Purchaser shall, upon request, deliver and, if applicable, cause its certified public accountants to deliver to Seller copies of accounting work papers, analyses, reports, and other documents reviewed or created by or at the request of Purchaser or its certified public accountants in connection with the review of the Closing Balance Sheet contemplated by this Section 2.05.

(b) If the Net Asset Value, as determined by reference to the Closing Balance Sheet as reviewed and adjusted due to any inaccuracy identified by Purchaser in accordance with subparagraph (a) above, is greater than or less than $11,406,443, the Purchase Price set forth in Section 2.03 shall be increased or decreased, dollar for dollar, as the case may be, by the difference between $11,406,443, and the Net Asset Value (the "Purchase Price Adjustment").

(c) Unless Seller objects to the proposed Purchase Price Adjustment in accordance with subparagraph (d) below, the parties shall instruct the Escrow Agent to disburse that portion of the Escrowed Funds equal to the Purchase Price Adjustment. Should the Escrowed Funds be insufficient, the debtor party shall within seven days remit any additional funds due the creditor party under this Section 2.05.

- 11 -

(d)  If, upon completion of Purchaser's review of the
Closing Financial Statements, Purchaser submits a Purchase Price
Adjustment, Seller shall have 30 days to object to Purchaser's
proposed adjustment by delivery to Purchaser of Seller's written
notice of objection.  Such objection shall explain in reasonable
detail the basis of Seller's objection and shall be accompanied by
supporting documentation and evidence.  If Seller does not object
within such 30 day period, the Purchase Price Adjustment shall be
deemed to be approved by the parties and the Closing Financial
Statements accepted by the parties.  If Seller does object to the
proposed Purchase Price Adjustment, the parties shall seek to
resolve the dispute promptly through good faith negotiations.  If
Purchaser and Seller are unable to agree upon the Purchase Price
Adjustment within ten days after Purchaser's receipt of Seller's
objection despite good faith negotiations, the determination of the
Purchase Price Adjustment shall be submitted to arbitration with
the accounting firm of Coopers & Lybrand LLP in accordance with
Section 11.17 hereof, and any adjustment to the Purchase Price
following arbitration shall be made from the Escrowed Funds.
Should the Escrowed Funds be insufficient, the debtor party shall
remit within seven days any additional funds due to the creditor
party.

2.06  **Purchase Price Allocation.**  Subject to adjustment
pursuant to Section 2.05, Schedule 2.06 sets forth the allocation
of the Purchase Price among the Assets and the covenant of Seller
and Fulton not to compete contained in Section 5.09.  To the extent
permitted by law, Purchaser, Seller and Fulton shall report the

transactions contemplated herein for all tax purposes in accordance
with such allocation; and, in any proceeding related to the
determination of any tax, to the extent permitted by law, neither
Purchaser, nor Seller nor Fulton shall contend or represent that
such allocation is not a correct allocation.

   2.07  <u>Employees</u>.

      (a)  Seller has either laid off or terminated (as those
terms are utilized by the Worker Adjustment and Retraining
Notification Act ("WARN")) all of the employees of the Division
immediately prior to the Closing.  Seller assumes all
responsibility for providing advance notice of such layoff or
termination to the employees, if Seller has determined any such
notice is required under WARN.  If Seller incurs any WARN liability
in connection herewith, Purchaser shall indemnify Seller for one-
half of such WARN liability, excluding attorneys and other
professional fees, provided Seller has given Purchaser reasonable
opportunities to redress and limit such WARN liability.

      (b)  Except as expressly provided in this <u>Section 2.07</u>,
Purchaser shall not purchase, recognize, assume, adopt or otherwise
acquire any rights, obligations, assets or liabilities under,
arising from or resulting from any employment agreement or
arrangement in existence between Seller and any employee, or any
person employed to consult with or perform services for Seller or
arising from any collective bargaining agreement or union
arrangement, or otherwise.  Purchaser shall, prior to the Closing
Date, offer employment to the Division's employees, other than the
Division's general manager Larry Weber, at base salaries or at

hourly rates substantially equivalent to the then current base salaries or hourly rates for such employees, which offers of employment must be accepted on or before the Closing Date. Only the Division's employees who accept Purchaser's offer of employment on or prior to the Closing Date shall become Purchaser's employees upon and following the Closing.

(c)    Purchaser shall not be responsible to Seller or to any current or former employee who is or was employed by Seller at the Division for any employee benefits (whether earned, accrued or vested) due the Division's employees with respect to their employment prior to the Closing. Seller shall timely pay and discharge all of its obligations to the Division's employees, including, without limitation, the obligations described in Schedule 3.22 and salaries and related taxes up to and including the Closing Date.

(d)    Seller shall provide all necessary and appropriate notices to the Division's employees and their dependents upon the termination of employees' group health care coverage as required by the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA") due to the termination of employment. Seller specifically undertakes to provide any continuation coverage required under COBRA with respect to the Division's employees.

### Section 3

### Representations and Warranties of Seller

The Seller represents and warrants to Purchaser as follows:

3.01 <u>Organization</u>. Seller is a corporation duly organized and validly existing under the laws of the Commonwealth of

Pennsylvania. Seller has full corporate power and authority to (i) own, lease and operate the Division's properties as such properties are now owned, leased and operated, and (ii) to conduct the Division's business as and where its business is now conducted. Schedule 3.01 lists the jurisdictions in which Seller owns or leases real property used solely or exclusively by the Division or employs personnel on behalf of the Division.

True and complete copies, with all amendments, of the Certificate of Incorporation of Seller (certified as of a recent date by Pennsylvania Secretary of State) and the Bylaws of Seller (certified as of the date hereof by Seller's Secretary) are attached hereto as Schedule 3.01. Seller is not subject to any judgment, decree, writ, injunction, order, or award, which materially adversely affects, or might reasonably be expected to materially and adversely affect, the Division's assets or the earnings, operations or condition of the Business.

3.02 Business. Seller is not engaged in the Business other than through the Division.

3.03 Authority.

(a) Seller has the requisite corporate power, authority, and capacity to execute and deliver this Agreement and the Other Agreements to which it is a party, and to perform its obligations under this Agreement and the Other Agreements. This Agreement and the Other Agreements to which Seller is a party, when executed and delivered, will constitute valid and legally binding obligations of Seller, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization,

- 15 -

moratorium, fraudulent conveyance and similar laws affecting creditors' rights and subject to general equitable principles (whether in a proceeding at law or in equity).

(b)  The execution and delivery of this Agreement and the Other Agreements to which it is a party, the consummation of the transactions contemplated hereby and thereby, and the performance and fulfillment of its obligations and undertakings hereunder and thereunder by Seller, will not (i) violate any provision of, or result in the breach of or accelerate or permit the acceleration of any performance required by the terms of, the Certificate of Incorporation or Bylaws of Seller; any contract, agreement, arrangement or undertaking to which Seller is a party or by which Seller may be bound; any judgment, decree, writ, injunction, order or award of any arbitration panel, court or governmental authority; or any applicable law, ordinance, rule or regulation of any governmental body, except where such violation, breach or acceleration would not have a material adverse effect on the Assets or the Business; (ii) result in the creation of any claim, lien, charge or encumbrance upon any of the Assets (whether real or personal, tangible or intangible; or, (iii) terminate or cancel, or result in the termination or cancellation of, any agreement or undertaking to which Seller is a party, except where such termination or cancellation would not have a material adverse effect on the Assets or the Business.

(c)  The execution and delivery of, and the performance and consummation of the transactions contemplated by, this Agree-

ment and the Other Agreements to which Seller is a party have been duly authorized by all requisite corporate action of Seller.

    3.04 __Financial Statements__.  Seller has delivered to Purchaser, and there are attached hereto as __Schedules 1.01(l) and 1.01(q)__, respectively, true and complete copies of the Current Financial Statements and the Financial Statements.  Each of the Current Financial Statements and the Financial Statements (a) present fairly in all material respects the results of operations of the Division for the periods covered thereby and the financial condition of the Division as at the dates thereof in accordance with the accounting practices and policies described in the notes and schedules attached thereto; (b) have been prepared in accordance with the accounting practices and policies described in the notes and schedules attached thereto; (c) except as disclosed in the notes thereto, have been prepared in a manner consistent with each other; and (d) except as described therein, accurately reflect the books and records of account of Seller and the Division.

    3.05 __Title to Assets__.  Except as set forth on Schedule 3.05, which encumbrances other than those related to the Ford Motor Credit Company Agreement shall be removed prior to Closing, Seller has good and marketable title to all of the Assets, free and clear of any claims, liens, charges, mortgages, security interests or encumbrances whatsoever.  The execution and delivery of this Agreement by Seller, and the consummation by Seller of the transactions contemplated by this Agreement, will not result in the creation of any encumbrance on the Assets.

- 17 -

3.06 <u>Condition of Assets</u>.  The tangible real and personal property being conveyed to Purchaser pursuant hereto, including, without limitation, the plants, buildings, structures, equipment, machinery, and vehicles, owned or leased by Seller or used or employed by the Division in the Business, are (a) sufficient and adequate to carry on the Business as presently conducted;  (b) in operating condition and repair, ordinary wear and tear excepted and with due consideration for age and prior use; and (c) except as described on Schedule 3.08, located on the Real Property.

3.07 <u>Real Property</u>.  Except for matters of record at the Recorder of Deeds for York County, Pennsylvania, there are no instruments of record, easements, licenses, grants, applicable zoning or building laws, ordinances, administrative regulations, urban redevelopment laws which prohibit, interfere with, limit or impair, or would, if not permitted by any prior nonconforming use, prohibit, interfere with, limit or impair, the use, operation, maintenance of or access to, or adversely affect the value of, the Real Property.  No notice of any violation of any applicable zoning or building law or ordinance or administrative regulation has been received by Seller; and Seller does not know of the threat of any such notice.  No condemnation proceeding has been instituted or, to Seller's knowledge, is threatened with respect to any of the Real Property.

3.08 <u>Inventory</u>.  The value of the Inventory has been and is fairly reflected in all material respects on the Financial Statements and Current Financial Statements.  Except as described

on Schedule 3.08, all of the Inventory is located at the Real
Property in York, Pennsylvania.

    3.09 <u>Contracts</u>.

        (a)  Except as set forth on <u>Schedule 3.09</u>, Seller on
behalf of the Division is not a party to or bound by, and neither
the Business nor the Assets are bound or affected by, any written
or oral contract, agreement or commitment of any kind whatsoever,
including, but not limited to, any (i) employment agreement; (ii)
promotion or advertising agreement; (iii) agreement with any
shareholder, director or officer of Seller; (iv) agreement
containing covenants by Seller not to compete in any lines of
business or commerce; (v) franchise or distributorship agreement or
other agreement requiring payment of a royalty or commission; (vi)
loan, credit or financing agreement, including all agreements for
any commitments for future loans, credits or financing; (vii)
guarantee; (viii) mortgage or security agreement; or (ix) agreement
to purchase raw materials, packaging, supplies or services used
regularly in the Business, or to sell the products or services
provided by the Division; (x) agreement incapable of termination
without penalty on less than six months notice; and (xi) agreement
which commits the Division to a capital expenditure in excess of
$10,000.

        (b)  On behalf of the Division, Seller has exercised
reasonable commercial diligence in the performance of its currently
outstanding contractual obligations.  The Division is not in
material default under any contracts and commitments to which
Seller is a party that are related to the Division.  Seller does

- 19 -

not know that any other party is in material default (or would be in default on the giving of notice or the lapse of time or both) under any contract or commitment related to the Division to which Seller is a party.

(c) True and complete copies of all Assumed Contracts or Contracts which are listed on Schedule 3.09 or which are otherwise referred to in this Agreement, including any Schedule or Annex hereto, have been delivered to Purchaser or in the case of items 2, 4, 13, 20, 21, and 22 on Schedule 1.01(k) (the "Scheduled Items") made available for Purchaser's inspection. There are no amendments to or modifications of, or significant agreements of the parties relating to, any such contract, agreement or commitment which have not been disclosed to Purchaser or, in the case of the Scheduled Items, made available for Purchaser's inspection. Each of the Assumed Contracts is valid and binding on the parties thereto in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and similar laws affecting creditors' rights and subject to general equitable principles. To Seller's knowledge, Schedule 3.09 includes a true and complete description of the terms of any unwritten contract or commitment related to the Business to which Seller is a party or by which Seller is bound which Seller expects Purchaser to assume at the Closing that involves more than $10,000, other than purchase orders and sales orders.

(d) Except as set forth on Schedule 3.09, (i) none of the purchase orders or other customer contracts to be assumed by Purchaser at the Closing provide for a purchase price to be paid to

Seller which is less than the Division's cost of materials and production expenses (excluding selling, general and administrative expenses) related to the products involved; (ii) the prices which the Division shall receive or pay under all the Assumed Contracts with its customers, suppliers and others have been determined in accordance with the Division's established pricing principles; and (iii) to Seller's knowledge, there is no probable adverse change in the availability or cost of any of the Division's supplies that would materially and adversely affect the operation and financial performance of the Business following the Closing.

3.10 <u>Accounts Receivable</u>. All Accounts Receivable shown on the Current Balance Sheet or thereafter acquired by the Division and to be shown on the Closing Balance Sheet have been collected or will be collected within 120 days of the date of invoice at the aggregate recorded amounts thereof on the Division's books, less the bad debt reserves provided therefor on the Current Balance Sheet, as such reserves have been adjusted on Seller's books in the ordinary course of business and in accordance with this Agreement.

3.11 <u>Permits</u>. Seller has all Permits which are necessary for the conduct of the Business as presently conducted, and all such Permits are listed on <u>Schedule 1.01(x)</u>. All such Permits are currently in full force and effect; and, no misrepresentations or willful or negligent omissions were made of any material fact in obtaining any such Permits. No proceedings have been instituted or, to Seller's knowledge, threatened seeking the suspension, termination, modification, revocation, alteration or amendment of

any such Permits, or to declare any of them invalid in any respect.
Seller knows of no reason for any such revocation or limitation.

   3.12 <u>Intellectual Property</u>.  <u>Schedule 3.12</u> sets forth a true
and complete identification and summary description of the trade
names, trademarks, service marks, copyrights, any pending or issued
registrations  for  any  of  the  foregoing,  patents  and  patent
applications, other than the Excluded Assets, that are used solely
or primarily by the Division in the operation of the Business,
including a description of the nature of the Seller's or Fulton's
interest therein (the "Conveyed Intellectual Property").  Except as
set forth on Schedule 3.12, the Conveyed Intellectual Property is
free  and  clear  of  all  liens,  security  interests,  charges,
encumbrances, and other adverse claims; and except as set forth on
Schedule 3.12, neither Seller nor Fulton is a party to any license,
consent,  settlement  or  other  agreement  involving  the  Conveyed
Intellectual Property.  Except as set forth on Schedule 3.12, there
have been and there are no claims, actions or judicial or adver-
sarial proceedings involving the Conveyed Intellectual Property.
To Seller's and Fulton's knowledge, the Division's use of the
Conveyed Intellectual Property has not infringed upon, constituted
a misappropriation of, or otherwise violated the rights of any
other person in, any Intellectual Property.  Seller does not know
of any past or present occurrences of any probable infringement or
misappropriation of, or violation of Seller's rights in, any of the
Conveyed Intellectual Property.

   3.13 <u>Litigation and Pending Proceedings; Compliance with Law</u>.
Except as set forth on <u>Schedule 3.13</u>, there are no claims of any

kind or any actions, suits, proceedings, arbitrations or investigations pending or, to Seller's knowledge, threatened in any court or before any governmental agency or instrumentality or arbitration panel against, by or affecting the Division, the Business, or the Assets, or which would prevent the performance by Seller of this Agreement or the Other Agreements or any of the transactions contemplated hereby or thereby, or which declare the same unlawful or cause the rescission thereof. To Seller's knowledge, Seller on behalf of the Division has complied with and is not in default in any respect under (and has not been charged or, to the knowledge of Seller, has not been threatened with, and is not under an investigation with respect to, any charge concerning any violation of any provision of) any federal, state or local law, regulation, ordinance, rule or order (whether executive, judicial, legislative or administrative), or any order, writ, injunction or decree of any court, agency or instrumentality. To Seller's knowledge, the Division has not sold, supplied or provided any product or service which did not comply in all material respects with applicable laws, regulations, standards, customer specifications or contractual terms, express or implied, related to its sale.

    3.14 **Tax Matters**.

        (a)  There is no, and there shall not be at the time of the Closing any, tax lien on any of the Assets.

        (b)  Except for Taxes the payment of which the Seller is contesting in good faith through appropriate proceedings and for which there is an adequate reserve, (i) Seller has withheld and

paid all Taxes required to have been withheld and paid in connection with Seller's obligations to any of the Division's employees, creditors, independent contractors, or other third parties; and (ii) Seller has collected and paid all Taxes required to have been collected and paid in connection with any amounts received by the Division from any customer or other third party. To the extent that any of such Taxes have not been paid, Seller has properly accrued for such Taxes on the Current Financial Statements and shall continue to properly accrue for such Taxes on the Division's financial statements through the Closing.

3.15 **Insurance**.    The tangible real and personal property, whether owned or leased, which are utilized in the Business are insured against the hazards and in the amounts stated in the policies of insurance listed on <u>Schedule 3.15</u>.    Seller independently carries insurance against personal injury and property damage to third persons and in respect of the Division's services and operations and such other insurance as is stated in the policies of insurance listed on <u>Schedule 3.15</u>.    All such insurance is in full force and effect.    <u>Schedule 3.15</u> sets forth a true and complete list of all product liability, workers compensation, property and casualty insurance and any other insurance claims (excluding health related claims) in excess of $5,000 made by Seller on behalf of the Division during the past three years under any such policy.

3.16 **Warranty Obligations**.    <u>Schedule 3.16</u> sets forth (a) a complete list of the Division's warranty expenses incurred during its last three fiscal years; (b) the Division's pending warranty

claims; and (c) a description of the Division's current procedures for handling warranty claims. Seller has provided Purchaser a true and complete history of the Division's warranty claims since August 1, 1993.

3.17 <u>Proprietary Information</u>. Except for disclosures covered by a confidentiality agreement or in the ordinary course of the Business, within the last three years Seller has not disclosed, transferred or licensed to any other Entity any (i) customer list; (ii) trade secret; or (iii) other proprietary information used or developed by Seller in connection with the Business from which Seller derives economic value from not being generally known to, and not being readily ascertainable by proper means by, other Entities who can derive economic value from its disclosure or use.

3.18 <u>Working Relationships</u>. Schedule 3.18 lists all former sales representatives or distributors of Division products that have terminated such relationship with the Division within the past two years.

3.19 <u>Customers</u>. Listed on <u>Schedule 3.19</u> are the names of the Division's ten largest customers and suppliers in the year ended July 31, 1995, together with the amount of such business in the Division's last fiscal year. Seller does not know that any such customer or supplier has terminated or expects to terminate a material portion of its normal business with the Division.

3.20 <u>Employees</u>. <u>Schedule 3.20</u> sets forth by general job description the names and current base salary of all of the Division's employees, together with a summary of the basis on which each such person is compensated, if the basis is other than a fixed

salary rate, and any changes in any of the foregoing since July 31, 1995.

3.21 Labor Relations. Except as set forth on Schedule 3.21, with respect to the Division: (a) Seller is not a party to, or negotiating, and has no obligations under, any agreement, collective bargaining or otherwise, with any party relating to the compensation or working conditions of any group of Seller's employees; (b) Seller is not obligated under any agreement to recognize or bargain with any labor organization or union on behalf of its employees; (c) Seller does not know of any union organizational or representational activities underway among any of the Division's employees; and (d) Seller has not been charged or, to Seller's knowledge, threatened with a charge of any unfair labor practice; and (e) there are no, and within the past three years there have not been, existing or, to Seller's knowledge, threatened labor strikes, slowdowns, disputes, grievances or disturbances involving employees of the Division. Seller has no actual knowledge of any existing or threatened labor strike, slowdown, dispute, grievance or disturbance involving another Entity affecting operations at, or deliveries from or into, any facility operated or used by the Division. No work stoppage against the Division or the Business is pending or, to Seller's knowledge, threatened; no such work stoppage has occurred since January 31, 1990.

With respect to the Division, except for violations which singly or in the aggregate would not have a material adverse effect on the Business, Seller has not committed a material violation of

- 26 -

the National Labor Relations Act, as amended; Title VII of the Civil Rights Act of 1964, as amended; the Age Discrimination and Employment Act of 1967, as amended; WARN; the Rehabilitation Act of 1973, as amended; the Occupational Safety and Health Act, Executive Order 11246; the Fair Labor Standards Act, as amended; the Americans with Disabilities Act of 1990, as amended; the Family and Medical Leave Act of 1993, as amended; and all regulations under such Acts, and all other federal, state and local laws, regulations and executive orders relating to the employment of labor, including any provisions thereof relating to wages, hours, collective bargaining; the payment of Social Security and similar taxes; unemployment and worker's compensation laws; any labor relation laws; or any governmental regulations promulgated thereunder, as the same affect relationships or obligations of Seller with respect to any of the Division employees. There are no proceedings before any court, governmental agency, instrumentality or arbitrator relating to such matters, including any unfair labor practice claims, either pending or, to Seller's knowledge, threatened.

3.22 **Employee Benefit Plans**. As used in this Agreement, the term "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended; and the terms "employee welfare benefit plan" and "employee pension benefit plan" shall have the meanings ascribed to them in Sections 3(1) and 3(2) of ERISA, respectively.

With respect to each employee welfare benefit plan and employee benefit plan which is maintained by Seller or in which at least one of Seller's employees participates: (a) each such plan is listed on Schedule 3.22; and (b) a true and correct copy of each

such plan, and any trust instrument or insurance policy used in conjunction with such plan or to provide benefits thereunder, and any summary plan description, have been delivered by or on behalf of Seller to Purchaser.

    **3.23 Immigration Matters.**   With respect to the Division, Seller has complied with all relevant provisions of Section 274A of the Immigration and Nationality Act, as amended (the "Act"). Without limiting the foregoing, no monetary penalties have been assessed against Seller for violation of Section 274A of the Act with respect to the Division.

    **3.24 Potential Competing Interests.**   Except for interests of less than five percent in companies listed on a major U.S. or an internationally recognized securities exchanges, no officer, director or salaried employee of Seller has any direct or indirect interest in any Entity which competes with, is a supplier, customer or sales agent of, or is engaged in the Business; and except as set forth on Schedule 3.24, no officer, director or employee of Seller has any interest, direct or indirect, in any contract or agreement with, commitment or obligation of or to, or claim against, Seller related to the Business.  No real or personal property in which any officer, director or employee of Seller has an interest is used by the Division in the operation of the Business, or is located on or at any premises used in the Business; and no such property is significant to the operation of the Business.

    **3.25 Environmental Matters.**

        (a)   Definitions

As used in this Section 3.25, the term:

(1)  "Adverse Environmental Condition" shall mean any of the matters referred to in clauses (i), (ii) or (iii) of the definition of Environmental Claim, but excluding any Release of Hazardous Materials from a source other than the Real Property;

(2)  "Applicable Standards" shall mean, within the meaning of Pennsylvania Act 2 of 1995, Section 303(a), the existing numerical nonresidential health based standards adopted by the Pennsylvania Department of Environmental Protection and by the Federal Government by regulation or statute, and health advisory levels, for Hazardous Materials.

(3)  "Environmental Claim" shall mean any notice of violation, lien, claim, demand, abatement order or direction (conditional or otherwise) of any governmental authority or any person for personal injury (including sickness, disease or death), property damage, damage to the environment or natural resources, nuisance, pollution, contamination or other adverse effects on the environment, or for fines, penalties or restrictions, resulting from or based upon any of the following conditions existing on or before the Closing Date: (i) the release, or the existence or continued presence of a release (including, without limitation, sudden or non-sudden, accidental or non-accidental leaks or spills) of any Hazardous Material in, into, or onto the environment (including, without limitation, the air, groundwater, surface water, or soil) at, in, under, or from the Real Property in violation of any Environmental Law or exceeding Applicable

- 29 -

Standards; (ii) the environmental aspects of the transportation, storage, or disposal of Hazardous Materials on the Real Property in violation of any Environmental Law or exceeding Applicable Standards; or (iii) or any other violation of any Environmental Law;

(4) "Environmental Law" shall mean any federal, state or local statute, law, ordinance, rule, regulation or order (whether voluntary or not) relating to the environment, natural resources, applicable to the Business of Seller, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §§ 9601 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), and the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), as such laws have been amended through the Closing Date, and any similar state or local laws and ordinances and the regulations implementing such statutes or ordinances, but excluding any Safety Law.

(5) "Hazardous Materials" shall mean those materials which are regulated by or form the basis of liability under any Environmental Law including, without limitation, asbestos, petroleum and petroleum products, polychlorinated biphenyls ("PCBs"), and radioactive substances.

(6) "Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting,

escaping, leaching, dumping, or disposing of Hazardous Materials into the environment.

(7)   "Remedial Action" shall mean all actions required by Environmental Law or to comply with Applicable Standards to remediate Adverse Environmental Conditions existing on the Real Property as of the Closing Date, and the performance of related pre-remedial studies and investigations and related post-remedial monitoring and care.

(8)   "Safety Law" shall mean any federal, state or local statute, law ordinance, rule, regulation or order (whether voluntary or not) relating to health or human safety applicable to the Business as presently conducted, including, without limitation, the Hazardous Material Transportation Act (42 U.S.C. §§ 9601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.), but excluding any Environmental Law.

(b)   Except as set forth on Schedule 3.25 the Division has materially complied with, and, the Business and the Assets, including, without limitation, the Real Property, are in material compliance with the provisions of all Environmental Law and Safety Law, including, without limitation, reporting releases of Hazardous Materials and the registration, testing, upgrading and maintenance of underground storage tanks.

(c)   Except as set forth on Schedule 3.25 and described in "Draft Environmental Site Assessment and Remedial Activities Report" (May 14, 1996), Seller has been issued, and will maintain

- 31 -

until Closing, all required federal, state and local permits, licenses, certificates and approvals necessary or required in accordance with Environmental Law or Safety Law for the operation of the Business relating to (i) air emissions; (ii) discharges to surface water or ground water; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, treatment, storage, transportation or disposal of Hazardous Materials; and (vi) other environmental, health or safety matters other than permits, licenses, certificates or approvals, the failure of which to obtain would not have a material adverse effect on the Business or the Assets.   A true, accurate and complete list of such permits, licenses, certificates or approvals held by Seller related to the Business is set forth on Schedule 3.25.

        (d)   Except as set forth on Schedule 3.25, Seller has not received any notice of, or does not know of, any violations of any Environmental Law or Safety Law, relating to the use, ownership or occupancy of any of the Real Property.

        (e)   Except in a manner not in violation of any Environmental Law nor exceeding Applicable Standards, and as set forth on Schedule 3.25, there has been no emission, spill, release, disposal, discharge or threatened release into or upon (i) the air; (ii) the soils or any improvements located thereon; (iii) the surface water or groundwater; or (iv) the sewer, septic system or waste treatment, storage or disposal system servicing the Real Property, of any Hazardous Material in, into or onto the Real

Property, including the movement of Hazardous Materials through or in the air, soil, surface water or groundwater (hereafter referred to as a "Hazardous Discharge"). Notwithstanding the foregoing, Seller makes no representation concerning any emission, spill, release, disposal, discharge or threatened release into or upon the Real Property from a source outside of the Real Property.

(f) Except as set forth on Schedule 3.25, to Seller's knowledge, there has been no complaint, order, directive, claim, citation or notice by any governmental authority or any other Entity alleging violation of any Environmental Law or Safety Law with respect to (i) air emissions; (ii) spills, releases or discharges to soils or any improvements located thereon, surface water, groundwater or the sewer, septic system or waste treatment, storage or disposal systems servicing the Real Property; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, treatment, storage, transportation or disposal of Hazardous Materials; or (vi) other environmental, health or safety matters, affecting the Division's operations, the Assets, any of the Real Property, or any improvements located thereon or the business conducted thereon (any of which is hereafter referred to as an "Environmental Complaint"), which has not been fully resolved.

(g) Except as set forth in Schedule 3.25, Hazardous Materials generated by the Division or its agents disposed of, treated or stored on or off-site of the Real Property have been

disposed of, treated and stored in a manner not in violation of any Environmental Law or Applicable Standards. Schedule 3.25 identifies all underground storage tanks located on the Real Property and, to Seller's knowledge, includes for each storage tank:  (i) the size of the tank, (ii) the date the tank was removed, and (iii) the substance(s) stored in the tank.

(h)  Except as described on Schedule 3.25, (i) Seller has not stored, treated or disposed of any Hazardous Material on, in or under the Real Property, or any part thereof in such a way that would require a Permit under any Environmental Law, and (ii) Seller has not allowed the Real Property, or any part thereof, to be used for the storage, treatment or disposal of Hazardous Materials in such a way that would require a Permit under any Environmental Law.

(i)  Except in a manner not in violation of any Environmental Law or Safety Law through commercial transporters, Seller on behalf of the Division has not transported or accepted for transport any Hazardous Materials.

(j)  Prior to the Closing, if Seller learns of any Hazardous Discharge or a violation of Environmental Law or Safety Law, other than those disclosed on Schedule 3.25, Seller shall promptly notify Purchaser.

(k)  Seller has provided Purchaser with true, accurate and complete copies of any environmental audit or site assessment reports Seller has in its possession pertaining to the

- 34 -

environmental history of all of the Real Property. Seller shall also promptly furnish to Purchaser true, accurate and complete copies of all sampling and test results obtained from all environmental and/or health samples and tests taken at and around any of the Real Property to date of the Closing.

     3.26 <u>Absence of Material Change</u>. Except as set forth on Schedule 3.26:

     (a)  Since July 31, 1995, the business and affairs of the Division have been conducted only in the ordinary course.

     (b)  Since July 31, 1995, (i) there has been no change in the condition (financial or otherwise), assets, liabilities, or operations of the Division, other than minor changes in the ordinary course of business, none of which either singly or in the aggregate has been materially adverse; and (ii) there has been no damage, destruction, or loss or other occurrence or development (whether or not insured against), which either singly or in the aggregate materially adversely affects (and Seller does not know of any threatened occurrence or development which is reasonably expected to have a material adverse affect upon) the assets, liabilities, or operations of the Division.

     (c)  Since July 31, 1995, Seller has not (i) created or incurred any liability, commitment or obligation (absolute or contingent) with respect to the Division, except in the ordinary course of business or unsecured current liabilities incurred for other than money borrowed in the ordinary course of business; (ii) mortgaged, pledged or subjected to any lien or otherwise encumbered any of the Division's assets, tangible or intangible; (iii)

discharged or satisfied any lien, security interest or encumbrance against the Division, or paid any obligation or liability (absolute or contingent) of the Division, other than in the ordinary course of business; (iv) except for netting in the ordinary course of business of warranty claims against receivables, waived any rights of substantial value to the Division or canceled any debts or claims of the Division of over $5,000; (v) except in the ordinary course of business, terminated or amended, or suffered the termination or amendment of, any contract, lease, agreement or license to which Seller on behalf of the Division is or was a party; (vi) made any capital expenditures or any capital additions or betterments on behalf of the Division in excess of $10,000; (vii) sold or otherwise disposed of any of the Division's assets, tangible or intangible, except in the ordinary course of business; (viii) paid or agreed to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance pay to any of the Division's present or former officers, agents or employees except under any existing pension or other plan, or increased the compensation (including salaries, fees, commissions, bonuses, profit sharing, incentive, pension, retirement or other similar payments) being paid as of August 1, 1995, to any of the Division's management or other employees; (ix) renewed, amended, become bound by or entered into any contract, commitment or transaction on behalf of the Division other than in the ordinary course of business; or (x) except as disclosed therein, changed any accounting practice followed or employed in preparing the Financial Statements or the Current Financial Statements.

(d)   Since July 31, 1995, Seller has not made any changes in Division personnel at the manager level or above.

3.27 Bulk Sales.  The purchase and sale of the Assets and the other transactions contemplated in this Agreement shall be free and clear of any and all claims by creditors of Seller under any bulk sales or similar laws or statutes.   Seller shall, in accordance with Section 10 of this Agreement, indemnify and hold Purchaser harmless from and against, and shall pay to Purchaser the full amount of, any loss, claim, damage, liability or expense (including reasonable attorneys' fees) resulting to Purchaser from or in connection with any violation of applicable bulk sales or similar laws or statutes to the extent that the same may apply to the transactions contemplated herein; provided, however, that the provisions of this  Section 3.27 shall not relieve Purchaser of its obligations with respect to any Assumed Liability.

3.28 Completeness of Statements.  No factual information of Seller contained in the Agreement, including any Schedule or  Annex thereto, contains or will at Closing contain any untrue statement of a material fact, or, to Seller's of Fulton's knowledge, omits or will at Closing omit to state a material fact necessary in order to make a statement contained herein or therein not misleading.  No other written information furnished by or on behalf of Seller and/or Fulton to Purchaser or Powerscreen International or any of their agents in connection with the transactions contemplated in this Agreement or the Other Agreements, including, without limitation, the Peers & Co. JLG Material Handling Division Information Memorandum and Supplemental Information Package,

contains or will at Closing contain, when taken as a whole, any untrue statement of a material fact, or, to Seller's or Fulton's knowledge, omits or will at Closing omit to state a material fact necessary in order to make a statement contained herein or therein not misleading.  All representations and warranties of Seller and Fulton contained in this Agreement and in the Other Agreements are true and complete in all material respects as of the date hereof, and such representations and warranties will be true and complete in all material respects as of the Closing Date.

   3.29 <u>Fulton's Organization</u>.  Fulton is a corporation duly organized and validly existing under the laws of the State of Delaware.  Fulton has full corporate power and authority to own and lease its properties as such properties are now owned and leased and to conduct its business as and where its business is now conducted.

   3.30 <u>Fulton's Authority</u>.

      (a)  Fulton has the requisite corporate power, authority and capacity to execute and deliver this Agreement and the Other Agreements to which it is a party, and to perform its obligations under this Agreement and the Other Agreements.  This Agreement and the Other Agreements to which it is a party, when executed and delivered, constitute valid and legally binding obligations of Fulton enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and similar laws affecting creditors rights and subject to equitable principles (whether in a proceeding at law or in equity).

(b)   The execution and delivery of this Agreement and the Other Agreements to which it is a party, the consummation of the transactions contemplated hereby and thereby, and the performance and fulfillment of its obligations and undertakings hereunder and thereunder by Fulton will not violate any provision of, or result in the breach of or accelerate or permit the acceleration of any performance required by the terms of, the Certificate of Incorporation or Bylaws of Fulton; any contract, agreement, arrangement or undertaking to which Fulton is a party or by which Fulton may be bound; any judgment, decree, writ, injunction, order or award of any arbitration panel, court or governmental authority; or to Fulton's knowledge, any applicable law, ordinance, rule or regulation of any governmental body, except where such violation, breach or acceleration would not have a material adverse effect on Fulton's assets or business.

(c)   The execution and delivery of, and the performance and consummation of the transactions contemplated by, this Agreement and the Other Agreements to which it is a party have been duly authorized by all requisite corporate action of Fulton.

3.31 **Fulton's Litigation.**  There are no claims, actions, suits or proceedings pending or, to Fulton's knowledge, threatened which would prevent Fulton's performance under this Agreement.

3.32 **Fulton's Title.**  Except as set forth in Schedule 3.12, Fulton has good and marketable title to the Conveyed Intellectual Property, free and clear of all claims, liens, charges, mortgages, security interests or encumbrances whatsoever.  The execution and delivery of this Agreement by Fulton, and consummation by Fulton of

the transactions contemplated by this Agreement, will not result in the creation of any encumbrances on the Conveyed Intellectual Property.

## Section 4

### Representations and Warranties
### of Purchaser and Powerscreen International

Purchaser and Powerscreen International represent and warrant to Seller as follows:

4.01 <u>Organization</u>.  Purchaser is a corporation duly organized and validly existing under the laws of the State of Delaware and on the Closing Date will be qualified to do business in the Commonwealth of Pennsylvania.  Powerscreen International is a public limited company registered and validly existing under the laws of England and Wales.  Purchaser has full corporate power and authority to own and lease its properties as such properties are now owned and leased and to conduct its business as and where its business is now conducted.

4.02 <u>Authority</u>.

(a)  Each of Purchaser and Powerscreen International have the requisite corporate power, authority and capacity to execute and deliver this Agreement and the Other Agreements to which it is a party, and to perform its obligations under this Agreement and the Other Agreements.  This Agreement and the Other Agreements to which it is a party, when executed and delivered, constitute valid and legally binding obligations of each of Purchaser and Powerscreen International, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and similar laws

affecting creditors rights and subject to equitable principles (whether in a proceeding at law or in equity).

(b)  The execution and delivery of this Agreement and the Other Agreements to which it is a party, the consummation of the transactions contemplated hereby and thereby, and the performance and fulfillment of its obligations and undertakings hereunder and thereunder by each of Purchaser and Powerscreen International will not, violate any provision of, or result in the breach of or accelerate or permit the acceleration of any performance required by the terms of, the Certificate of Incorporation or Bylaws of Purchaser or Powerscreen International; any contract, agreement, arrangement or undertaking to which Purchaser or Powerscreen International is a party or by which Purchaser or Powerscreen International may be bound; any judgment, decree, writ, injunction, order or award of any arbitration panel, court or governmental authority; or to Purchaser or Powerscreen International's knowledge, any applicable law, ordinance, rule or regulation of any governmental body, except where such violation, breach or acceleration would not have a material adverse effect on Purchaser or Powerscreen International's assets or business.

(c)  The execution and delivery of, and the performance and consummation of the transactions contemplated by, this Agreement and the Other Agreements to which it is a party have been duly authorized by all requisite corporate action of each of Purchaser or Powerscreen International.

4.03 **Litigation**.  There are no claims, actions, suits or proceedings pending or, to Purchaser's or Powerscreen

International's knowledge, threatened which would materially impair Purchaser's or Powerscreen International's performance under this Agreement.

## Section 5

### Covenants of Seller and Fulton

5.01 <u>Nonassignable Contracts; Consents</u>.

(a)  To the extent that the assignment by Seller of any Assumed Contract at the Closing is not permitted without (i) the consent of the other party to the Assumed Contract; (ii) the approval by the other party of Purchaser as a source of the products or services called for by such Assumed Contract; or (iii) the approval by the other party of Purchaser as a lessee, then this Agreement shall not be deemed to constitute an assignment or an attempted assignment of the same, if such assignment or attempted assignment would constitute a breach thereof.  However, unless otherwise agreed as to any particular Contract, Seller shall act in good faith and use its reasonable efforts (which shall not include payment of any additional consideration or economic concessions to any party) to obtain any and all such consents, approvals and novations.

(b)  If any necessary consent, approval or novation is not obtained prior to the Closing, Seller shall cooperate with Purchaser following the Closing in any reasonable arrangement designed to provide Purchaser with all of the benefits under such Contract as if such consent, approval or novation had been obtained.  Such cooperation shall include subleases from Seller and undertakings by Purchaser of the work necessary to complete

Contracts as the agent of Seller, with the understanding that Seller shall then invoice the customer for services rendered and promptly transfer the receivable or remit the amount of the receivable to Purchaser upon payment to Seller. Nothing herein shall excuse Seller from responsibility for any of its representations and warranties or covenants hereunder.

5.02 <u>Publicity</u>. Without the prior written consent of Purchaser, except as required by applicable law or as necessary to enable Seller's legal and financial advisors to assist Seller in connection with its obligations under this Agreement, Seller shall not disclose or publish, and shall use reasonable efforts to prevent the disclosure or publication of, any information concerning the execution and delivery of this Agreement, or the transactions contemplated by this Agreement, to any third party. Formal announcement of the transactions contemplated by this Agreement shall occur at the opening of business on the first business day following the Closing.

5.03 <u>Noncompetition</u>. Without the prior written consent of Purchaser, for a period of five years following the Closing and on a worldwide basis, Seller and Fulton shall not, and shall cause their Affiliates not to, (i) directly or indirectly, as a shareholder, partner, member or principal, or as an agent or employee, engage in the Business (excluding any investment by Seller or its Affiliates of less than five percent (5%) of the equity of any Entity that is publicly traded on a major U.S. or internationally recognized securities exchange or ten percent (10%) of the equity of any Entity that is not publicly traded on a major

U.S. or internationally recognized securities exchange); (ii) solicit for employment any of the former employees of the Division or, except for the agreements with Messrs. Oakman, Keefer, Faust, Smith, and Lute referenced in Item 11 of Schedule 1.01(k), hire any of the former employees of the Division which Purchaser employs following Closing with respect to employment with any business or undertaking which is in competition with the Business; or (iii) except as required by law or by any court or governmental authority or except for any disclosures of the Division's pre-Closing financial information as a part of any financial disclosures required of Seller, disclose any confidential information of the Business.  In addition, except as permitted by clause (ii) above, for two years following the Closing, Seller and Fulton shall not, and shall cause their Affiliates not to, employ any former managerial or engineering employees of the Division, unless such employees have involuntarily terminated their employment with Purchaser.  Notwithstanding the foregoing, Seller may, subject to Section 6.04, design, develop, manufacture and/or market truck mounted, operator occupied elevating work platforms.  Seller and Fulton acknowledge that $100,000 of the Purchase Price shall be allocated to the covenant not to compete as set forth in this Section 5.03, and Seller and Fulton further acknowledge and accept the adequacy of same.  For purposes of this Section 5.03 and otherwise in this Agreement, the term "Affiliates" shall mean an Entity controlling, controlled by or under common control with such Entity.  Purchaser acknowledges that, should Seller not retain the services of the Division's general manager Larry Weber following

- 44 -

the Closing, Mr. Weber may seek and obtain employment with a third party in competition with the Business.

5.04 **Records**. For a seven-year period following the Closing, Seller shall grant to Purchaser and its representatives, at Purchaser's request (and subject to Purchaser's reimbursement of Seller's out-of-pocket expenses), access to and right to make or obtain copies of those records and documents related to the Business not transferred by Seller to Purchaser in connection with the Closing which are related to the pre-Closing Business or the Assets as may be reasonably necessary for Purchaser's tax, employee benefit or financial reporting obligations or other investigations required by law or for Purchaser's dealings with, handling or discharging of any Assumed Liability. If Seller elects to dispose of such records, Seller shall first give Purchaser sixty (60) days' written notice, during which period Purchaser shall have the right at Purchaser's expense to obtain the records without further consideration to Seller. Seller shall make its employees available to assist Purchaser as shall be reasonably necessary hereunder.

5.05 **Accounts Receivable**. Within five business days following a written request from Purchaser which request must be made within five business days following the day 120 days after the Closing, Seller shall repurchase at the same value ascribed in the sale to Purchaser hereunder any Accounts Receivable not collected within 120 days of the Closing. Upon such repurchase, Seller shall obtain from Purchaser title to any such Account Receivable, together with any security interest therein.

5.06 <u>Supply of Cylinders and Parts</u>.

(a) For four months following the Closing, Seller shall produce or secure for and sell and deliver to, and cause its Affiliates to produce or secure for and sell and deliver to, Purchaser the hydraulic telescopic cylinders specified on Schedule 5.06 as well as related spare parts. Such cylinders and spare parts shall be supplied by Seller at Seller's standard cost as of the Closing Date; and the cylinders and spare parts sold in excess of such specified quantity shall be priced at 135% of Seller's standard cost as of the Closing Date. Notwithstanding the foregoing, beyond the volume referenced on Schedule 5.06, Seller shall only be obligated to sell and deliver to Purchaser such cylinders and spare parts as are in accordance with Purchaser's actual production demands for said four month period.

(b) For three months following the Closing, Seller shall produce or secure for and sell and deliver to, or cause its Affiliates to produce or secure for and sell and deliver to, Purchaser, at Seller's standard cost as of the Closing Date, the parts and products Seller has supplied to the Division within the past twelve months; provided, however, that Purchaser's orders for such parts and products shall be based upon the demands of Purchaser's customers for such parts and products for such period. All sales to Purchaser pursuant to this Section 5.06 shall be subject to Seller's standard terms of sale; Seller's standard payment and credit terms and policies; and Seller's standard parts warranty. With respect to the cylinders, Seller must have at least a six week lead time for all orders. For parts, Seller must have

- 46 -

such lead times as Seller shall reasonably specify, recognizing
that time shall be of the essence in its performance.
Notwithstanding the foregoing, Seller's performance hereunder shall
be excused by force majeure. For purposes of this provision, the
term "force majeure" shall mean natural disasters, civil
disturbances or failures by suppliers of Seller which are of a
magnitude that objectively prevent Seller's performance of its
obligations hereunder, provided that Seller has not caused or
materially contributed to the disruption in component supply or is
not otherwise responsible for the event(s) triggering Seller's
nonperformance.

   5.07 JLG Cylinder Warranty. In relation to the reserve to be
established in the Closing Balance Sheet for the Potential Warranty
relating to the "J" Series Cranes - Telescope Cylinder Scoring for
a maximum of 164 units, Seller shall repair or replace any
telescope cylinder on such "J" Series Cranes which proves to be
defective due to scoring of the cylinder and for which JLG receives
notice of such within twelve (12) months from the date of sale of
the respective "J" Series Crane. For the first twenty-five (25)
cylinders so repaired or replaced by Seller, Seller shall bill
Purchaser at a fixed amount of $1,500 per cylinder; and, for any
cylinders repaired or replaced by Seller in excess of the first
twenty-five (25), Seller shall perform such repair or replacement
without charge to Purchaser. Seller's agreement as aforesaid shall
be subject to the following:

        1.   All repair and replacement shall be on an FOB
             McConnellsburg basis;

- 47 -

2.    Seller's standard payment and credit terms and policies; and

3.    Seller's standard warranty terms and procedures.

5.08 <u>Transition Services</u>.  For four months following the Closing, Seller shall provide to Purchaser the information services and accounting support described on Schedule 5.08 to facilitate the transition of the Business from a division of Seller to a freestanding subsidiary of Purchaser.  Purchaser's only costs for such services shall be to assume the specific expenses described on Schedule 5.08.  Seller shall use reasonable efforts to keep confidential any financial or other nonpublic information of Purchaser shared or obtained in the performance of Seller's obligations hereunder.

5.09 <u>Conveyance by Fulton</u>.  For the consideration referenced in Schedule 2.06, Fulton hereby agrees to transfer to Purchaser all right, title and interest in and to the Conveyed Intellectual Property of Fulton as identified in Schedule 3.12.

5.10 <u>JLG Trademark License</u>.  Fulton hereby grants Purchaser a limited right to use the JLG® trademark in connection with the Business for six months following the Closing (the "Use Period"). Such right shall be limited to (i) affixing such trademark to any current models of equipment reflected on Schedule A shipped to customers during the Use Period; and (ii) continued use of any marketing materials included in the Assets.

## Section 6

### Covenants of Purchaser and Powerscreen Holdings

    6.01 <u>Publicity</u>.  Without the prior written consent of Seller, except as required by applicable law, the regulations of the International Stock Exchange of the United Kingdom and the Republic of Ireland Limited, or as necessary to enable Purchaser's legal and financial advisors to assist Purchaser in connection with its obligations under this Agreement, Purchaser shall not disclose or publish, and shall use reasonable efforts to prevent the disclosure or publication of, any information concerning the execution and delivery of this Agreement, or the transactions contemplated by this Agreement, to any third party.

    6.02 <u>Records</u>.  For a seven-year period following the Closing, Purchaser shall grant to Seller and its representatives, at Seller's request (and subject to Seller's reimbursement of Purchaser's out-of-pocket expenses), access to and right to make or obtain copies of those records and documents transferred by Seller to Purchaser in connection with the Closing which are related to the pre-Closing Business or the Assets as may be reasonably necessary for Seller's tax, employee benefit or financial reporting obligations or other investigations required by law or for Seller's dealings with, handling or discharging of any debt, obligation or Liability not assumed by Purchaser at the Closing.  If Purchaser elects to dispose of such records, Purchaser shall first give Seller sixty (60) days' written notice, during which period Seller shall have the right at Seller's expense to obtain the records without further consideration to Purchaser.  Purchaser shall make

its employees available to assist Seller in gaining access to such records as shall be reasonably necessary hereunder.

6.03 **Spare Parts**. For a period of five years, so long as Purchaser deems it commercially viable, Purchaser shall continue to manufacture or supply certain spare parts for the product models described in Schedule 6.03; provided, however, that Seller shall timely make available to Purchaser the technical information and drawings in the possession of Seller or its Affiliates necessary to enable Purchaser to manufacture or supply these spare parts. Purchaser shall (i) notify Seller of accidents or incidents involving the foregoing products; and (ii) provided it receives similar cooperation, reasonably cooperate with Seller in connection with litigation involving such products. Purchaser shall assume responsibility in any product liability matter only for the parts and service it supplies, and Seller shall retain any and all responsibility for the underlying products in such cases.

6.04 **Use of Patents**. Purchaser hereby grants Seller effective at Closing a nonexclusive, nonassignable royalty-free, fully paid, perpetual license to use for purpose of its business the patents listed on Schedule 6.04; provided, however, that Seller shall not use such patents in a manner that enables Seller or any of its Affiliates to compete with Purchaser in any manner or at any time; and provided, further, that Purchaser shall be entitled promptly to terminate such license in the event of such prohibited use. In addition, Seller may not sublicense the use of such patent; provided, however, that, subject to continuation of the limitations on use set forth in this Section 6.06 and provided that at least 14

days written notice has been given to Purchaser, such license shall be freely assignable to any acquiror of all or substantially all of the assets of Seller. Nothing herein shall create any obligation on the part of Purchaser to renew or maintain the registrations of such patents or to defend such patents in any proceeding.

6.05 <u>Product Identification</u>. Immediately following the Closing, Purchaser shall make certain that the serial number plates of all products manufactured, shipped or sold by Purchaser in the conduct of the Business reflect the name "Powerscreen" or other tradename of Purchaser and do not reflect the name JLG Industries, Inc. or any trademark of Seller not included in the Assets.

6.06 <u>Accounts Receivable</u>. Purchaser shall exercise reasonable commercial diligence in the collection of Accounts Receivable within the first 120 days following the Closing.

6.07 <u>Guaranty by Powerscreen International</u>. Powerscreen International hereby unconditionally and irrevocably guarantees the complete and timely performance by the Purchaser of each and all of the Purchaser's obligations under this Agreement.

### Section 7

### The Closing

7.01 <u>Effective Time and Place</u>. The Closing shall occur in conjunction with the execution and delivery of this Agreement in the offices of Brown, Todd & Heyburn PLLC, 3200 Providian Center, Louisville, Kentucky, or at such other place or time as the parties may mutually agree. The Closing shall be deemed effective at 11:59 p.m. EDT on the Closing Date.

7.02 <u>Deliveries</u>.  At the Closing, the parties shall make all of the deliveries contemplated in this Agreement, including, without limitation, the deliveries set forth on <u>Schedule 7.02</u>.

### Section 8

### Survival of Representations and Warranties--Indemnification

8.01   <u>Survival</u>.   Each of the parties' representations and warranties set forth in this Agreement shall survive the Closing for a period of fifteen months, except as to any matter (a) for which a claim has been submitted in writing to Seller or Purchaser prior to such date and identified as a claim for indemnification pursuant to this Section 8; or (b)  which is related to Seller's title to the Assets, any Tax or environmental claim of any nature, for which any cause of action in favor of Purchaser shall expire only upon the expiration of the applicable statute of limitations. Each of the parties' covenants and agreements set forth in this Agreement shall survive the Closing for the maximum period permitted by law.

8.02   <u>Indemnity by Seller</u>.  Subject to the limitations set forth in <u>Section 8.03</u> and to the specific environmental indemnity provisions of Section 8.04, Seller shall indemnify and hold Purchaser harmless from and against, and shall pay to Purchaser the full amount of, any loss, claim, damage, liability or expense (including reasonable attorneys' fees) resulting to Purchaser, either directly or indirectly, from (a) any Liabilities not assumed by Purchaser at the Closing; (b) any litigation pending at the Closing against, by or affecting the Division, the Business or the Assets; (c) any claims against Purchaser for products liability

which result from incidents or injuries occurring prior to the Closing; (d) any inaccuracy in any representation or warranty by Seller contained in this Agreement or any of the Other Agreements; and (e) any breach of any covenant or agreement by Seller contained in this Agreement or in any of the Other Agreements.

8.03  **Seller's Indemnification Limitations**.  With respect to any indemnity claims pursuant to Section 8.02(d), Seller's liability shall be limited to losses, damages, costs and expenses (including reasonable attorneys' fees) incurred by Purchaser ("Losses") which, singly or when aggregated with other Losses, exceed $50,000; provided, however, that upon Purchaser's successful assertion of a claim or claims against Seller for at least $50,000 in aggregated Losses, Purchaser shall be entitled to recover the full amount of its claims for such aggregated Losses, including the $50,000 base amount.  Seller's indemnification obligations hereunder shall be limited to the equivalent of the Purchase Price (less cash of $750,000) plus any expenses of Purchaser in enforcing its rights under this Agreement.

8.04 **Environmental Indemnity by Seller**.  Without in any way limiting the indemnity obligations of Seller pursuant to Section 8.02:

(a)  The definitions in Section 3.25 shall apply to this Section 8.04.

(b)  Seller agrees to indemnify, defend and hold harmless Purchaser, and Purchaser's officers, directors, shareholders, employees, tenants, contractors, assigns, successors, and affiliate

- 53 -

corporations, from and against any and all Environmental Claims arising from, caused by, or related to any and all Adverse Environmental Conditions that are unknown and existing on or in the Real Property as of the Closing Date.

(c) The known Adverse Environmental Conditions existing on or in the Real Property prior to the Closing Date are set forth in Schedule 3.25.   Seller represents that these Adverse Environmental Conditions have been the subject of Remedial Action and are in compliance with applicable Environmental Law and Applicable Standards as described in "Draft Environmental Site Assessment and Remedial Activities Report, JLG Industries, Inc., York, Pennsylvania Site," Groundwater Sciences Corporation, (May 14, 1996), hereinafter the "Report".   Seller agrees to indemnify, defend and hold harmless Purchaser, and Purchaser's officers, directors, shareholders, employees, tenants, contractors, assigns, successors, and affiliate corporations, from and against any and all Environmental Claims arising from, caused by, or related to any failure of the actions described in the Report to remediate the Real Property to a condition that does not violate any Environmental Law or is not in excess of Applicable Standards. Purchaser does not assume from Seller any liability for the actions described in the Report.

(d) Without limiting the foregoing, the indemnification provided by this section shall specifically cover and include Remedial Action.   The performance of Remedial Action shall be

conducted, performed or arranged by Seller, and all Remedial Action shall be conducted in the name of Seller. Seller shall obtain all necessary licenses, manifests, permits and approvals to perform such Remedial Action. All Remedial Action, and the disposal of all waste generated by the Remedial Action, shall be performed in accordance with Environmental Law.

(e) If the performance of Remedial Action is required pursuant to this Section 8.03 after the Closing Date:

(1) Seller shall have the right to enter upon the Real Property to perform Remedial Action necessary to comply with the obligations of Seller hereunder. All access shall be during daylight hours except by agreement of the parties. Seller shall give at least 3 business days notice to Purchaser of its intent to enter the Real Property for the initial performance of Remedial Action. The notice shall describe the activities to be performed and the amount of time estimated to complete the activities;

(2) The activities of Seller shall be conducted in a manner to minimize interference with Purchaser's use of the Real Property in the conduct of its business to the extent practicable;

(3) Purchaser shall cooperate with Seller to make reasonable accommodations in its business activities to allow for performance of Remedial Action, to the extent that such cooperation does not require Purchaser to shut down any of its manufacturing activities;

(4) Purchaser may observe the performance of Remedial Action by Seller to determine that such Remedial Action is performed in conformance with applicable Environmental Law. Purchaser may split any samples taken by Seller.

(f) By entering into this Agreement, Purchaser does not assume from Seller any liability or responsibility for any Environmental Claim arising from any existing Adverse Environmental Conditions, whether known or unknown.

(g) The provisions of this Section 8.04 shall survive the Closing Date for a period equal to the applicable statute of limitations with respect any Environmental Claim.

8.05 Indemnity by Purchaser. Subject to the limitations set forth in Section 8.06, Purchaser shall indemnify and hold Seller harmless from and against, and shall pay to Seller the full amount of, any loss, claim, damage, liability or expense (including reasonable attorneys' fees) resulting to Seller, either directly or indirectly, from any (a) inaccuracy in any representation or warranty by Purchaser contained in this Agreement or in any of the Other Agreements; (b) any breach of any covenant or agreement by Purchaser contained in this Agreement or in any of the Other Agreements; (c) any Assumed Liability; and (d) any product liability claim resulting from incidents or injuries occurring following the Closing.

8.06 Purchaser's Indemnification Limitations. With respect to any indemnity claims pursuant to Section 8.05(a), Purchaser's liability shall be limited to losses, damages, costs and expenses

(including reasonable attorneys' fees) incurred by Seller ("Losses") which, singly or when aggregated with other Losses, exceed $50,000; provided, however, that upon Seller's successful assertion of a claim or claims against Purchaser for at least $50,000 in aggregated Losses, Seller shall be entitled to recover the full amount of its claim for such aggregated Losses, including the $50,000 base amount. Purchaser's indemnification obligations hereunder shall be limited to a total of $1,000,000, plus the amount of any Assumed Liabilities and the expenses of Seller in enforcing its rights under this Agreement.

8.07  **Remedies; Right of Offset.**  In the absence of fraud, the indemnification rights provided in this Section 8 shall be the sole and exclusive remedy available to each of the parties to this Agreement as against the other party for any misrepresentation, breach of warranty or failure to fulfill any covenant or agreement contained herein or in connection with any of the transactions contemplated by this Agreement or the Other Agreements; provided, however, that the Purchaser shall be entitled to specific performance of the sale of the Assets and to injunctive relief prohibiting or restricting violations of Sections 5.02, 5.03 5.04, 5.06, 5.07, and 5.08 of this Agreement; and Seller shall be entitled to any and all remedies at law or in equity with respect to any breach by Purchaser of its obligation to pay the Assumed Liabilities or of its obligation to pay the Purchase Price in accordance with the terms of this Agreement. Without limiting the foregoing, each party hereby agrees to pay promptly upon receipt of notice from the other party the amounts which such party may owe to

- 57 -

the other from time to time by reason of the provisions of this Agreement or otherwise.

8.08 **Penalties and Interest**. If any party fails to pay an amount when due under this Agreement, in addition to any other penalties or obligations, the defaulting party's debt shall accrue interest at the prime rate of PNC Bank plus 2%, as that rate is adjusted from time to time. For purposes of this Section 8.08, the Purchase Price Adjustment shall not be deemed due until mutually accepted by the parties or until completion of arbitration pursuant to Section 2.05 hereof.

## Section 9

### Miscellaneous

9.01 **Notices**. Any notices or other communications required or permitted hereunder shall be deemed to have been duly given (a) if delivered in person and a receipt is given; (b) if communicated by confirmed facsimile utilizing the fax numbers referenced below; (c) if sent by overnight delivery with a national overnight courier service, and addressed as set forth below; or (d) if sent by registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

      (a)   If to Seller or Fulton:

> JLG Industries, Inc.
> 1 JLG Drive
> McConnellsburg, Pennsylvania 17233-9533
> Attention: Thomas D. Singer
>
> Fax: 717-485-6462
>
> with a copy to:
>
> Covington & Burling
> 1201 Pennsylvania Avenue, N.W.
> Washington, D.C. 20044-7566

Attention: W. Andrew Jack

Fax: 202-662-6291

(b)    If to Purchaser or Powerscreen Holdings:

Powerscreen USC Inc.
c/o Powerscreen International PLC
Coalisland Road
Dungannon, Northern Ireland  BT71 4DR
Attention:  Shay McKeown/Barry Cosgrove

Fax:  011-441-86-874-8816

with a copy to:

Brown, Todd & Heyburn PLLC
3200 Providian Center
Louisville, Kentucky 40202-3363
Attention: Jay Middleton Tannon

Fax:  502-581-1087

or if sent to such substituted address as any party has given to the others in writing in accordance with this Section 9.01.

9.02  **Waivers**.  No waiver or failure to insist upon strict compliance with any obligation, covenant, agreement or condition of this Agreement shall operate as a waiver of, or an estoppel with respect to, any subsequent or other failure.

9.03  **Expenses**.  Each party shall assume its respective expenses incurred in connection with the transactions contemplated by this Agreement.  None of Seller's expenses related to the transaction contemplated in this Agreement (other than normal wages and salaries, but not overtime or bonuses, paid by Seller to the Division's employees) shall be charged against or paid by the Division.

9.04  **Headings; Interpretation**.  The headings in this Agreement have been included solely for ease of reference and shall not be considered in the interpretation or construction of this Agreement.

- 59 -

All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, as appropriate.

9.05 **Annexes and Schedules**. The Annexes and Schedules to this Agreement are incorporated herein by reference and expressly made a part hereof.

9.06 **Entire Agreement**. All prior negotiations and agreements by and among the parties hereto with respect to the subject matter hereof are superseded by this Agreement. There are no repre- sentations, warranties, understandings or agreements with respect to the subject matter hereof other than those expressly set forth herein or on an Annex or Schedule delivered in connection herewith.

9.07 **Representations and Warranties**. Except where a party has actual knowledge, the representations and warranties of each party contained herein shall not be deemed to be waived or otherwise affected by any investigation made by any other party hereto. As used in this Agreement, the term "Seller's knowledge" and all other references to matters which are known or to Seller, shall refer to matters which are known by David Black, Charles Diller, or Thomas Singer after consultation with Lawrence Weber, the General Manager of the Division, Jerry Lute, the Division's Director of Product Engineering, and Scott Smith, the Division Director of After Sales Service.

9.08 **Currency**. All amounts referenced in this Agreement have been stated in U.S. dollars.

9.09 **Brokers**. The parties covenant and agree with one another that, except for retention of Peers & Co. by Seller, they have not

dealt with any broker or finder in connection with any of the transactions contemplated in this Agreement; and, insofar as they know, no broker or other Entity is entitled to a commission or finders' fee in connection with these transactions. Seller shall be responsible for any and all fees and expenses of Peers & Co. Each party shall indemnify and hold the other parties harmless from and against any claim by any agent or broker claiming by or through it for any fee or other compensation due or allegedly due that broker or agent.

9.10 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

9.11 <u>Severability</u>. If any provision of this Agreement or its application will be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of all other applications of that provision, and of all other provisions and applications hereof, will not in any way be affected or impaired. If any court shall determine that any provision of this Agreement is in any way unenforceable, such provision shall be reduced to whatever extent is necessary to make such provision enforceable.

9.12 <u>Benefit and Binding Effect</u>. This Agreement shall be binding upon, and shall inure to the benefit of, Seller, Purchaser, Fulton, Powerscreen Holdings and each of their respective successors and assigns; <u>provided</u>, <u>however</u>, that no party to this Agreement shall assign its rights or obligations hereunder without the express written consent of the other party, which consent shall

- 61 -

not be unreasonably withheld; and provided further that no third party beneficiaries shall be created hereby.

9.13  **Risk of Loss.**  The risk of any loss or damage to any of the Assets by fire or any other casualty or cause shall be borne by Seller at all times through the Closing, and by Purchaser there-after.  If, prior to the consummation of the Closing, the Assets shall be damaged or destroyed to the extent that the Division's manufacturing capacity would be materially impaired for at least 30 days, either Seller or Purchaser may terminate this Agreement; and, upon such termination, no party to this Agreement shall have any further obligation hereunder to the others.  If neither Seller nor Purchaser elect to terminate this Agreement pursuant to this Sec-tion 9.13, upon the Closing, Purchaser shall be entitled to all insurance proceeds relating to the casualty to the Assets, and Seller shall not have any further liability to Purchaser as a result of such casualty.

9.14  **Further Assurances.**  Following the Closing, from time to time at another party's request and without further consideration, a party shall execute and deliver such further instruments of conveyance, assignment and transfer, and take such other actions as the requesting party may reasonably propose, in order more effec-tively to convey and transfer any of the Assets.  In addition, any monies collected by a party which are due and payable to another party shall be promptly remitted to such party upon receipt thereof.

9.15  **Sales and Transfer Taxes and Fees.**  Except for the 2% transfer tax on Real Property and Vehicle transfer taxes to be

shared equally by Purchaser and Seller, all sales and transfer taxes, and all recording, filing and other fees (including any penalties or interest), incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by Seller. The parties shall assist each other in the filing of all necessary tax returns and other documentation with respect to all such taxes and fees; and, if required by applicable law, the parties shall join in the execution of any such tax returns or other documentation.

9.16 **Prorations and Adjustments**. All ad valorem and property taxes pertaining to the Real Property, Equipment and Vehicles and all utility payments shall be prorated as of the Closing Date, so that, as between the Sellers and the Purchaser, the Sellers shall be responsible for all ad valorem property taxes allocable to the period ending on the Closing Date, and the Purchaser shall be responsible for all ad valorem property taxes allocable thereafter.

9.17 **Arbitration**. Should arbitration be required pursuant to Section 2.05 of this Agreement, the parties shall timely execute and deliver an engagement letter with Coopers & Lybrand LLP; but if the parties are unable to conclude such arrangement within 15 days of commencing the effort to obtain such engagement letter, the controversy, dispute or claim shall be submitted for arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association or any successor thereof. Arbitration shall take place at an appointed time and place in Wilmington, Delaware.

In the event the parties utilize the American Arbitration Association, each of Purchaser and Seller shall select one (1) arbitrator (who shall not be counsel for or otherwise associated with any such party); and the two (2) so designated shall select a third arbitrator.   If either party shall fail to designate an arbitrator within seven (7) calendar days after arbitration is requested, or if the two (2) arbitrators shall fail to select a third arbitrator within fourteen (14) calendar days after arbitration is requested, then such arbitrator shall be selected by the American Arbitration Association or any successor thereto upon application of either party.  Judgment upon any award of the majority of arbitrators shall be binding and shall be entered in a court of competent jurisdiction.   The arbitrators may grant any relief which might be granted by a court of general jurisdiction, including, without limitation, an award of damages and/or injunctive relief; and the arbitrators may in their discretion assess the cost of the arbitration, including the reasonable fees of the arbitrators and reasonable attorneys' fees, against either or both parties, in such proportions as the arbitrators shall determine.

9.18  Governing Law.  This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of Delaware.   Subject to the provisions of Section 9.17, the parties further consent to the exclusive jurisdiction of the U.S. federal courts within the State of Delaware in any action hereunder.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date set forth in the preamble hereto, but actually on the dates set forth below.

POWERSCREEN USC INC.

By_____

Title:_____

Date:_____

JLG INDUSTRIES, INC.

By_____

Title: Exec. V.P. & CFO_____

Date: May 22, 1996_____

FULTON INTERNATIONAL, INC.

By_____

Title: Secretary_____

Date: May 22, 1996_____

POWERSCREEN INTERNATIONAL PLC

By_____

Title:_____

Date:_____

SCHEDULE A

Current Models of Equipment

A.    Cranes:

Model 600BT Crane
Model 1000J Crane
Model 1250J Crane
Model 1400J Crane
Model 1500J Crane
Model 1700J Crane
Model 2000J Crane
Model 2250J Crane
Model 2300J Crane
Model 2800J Crane

B.    Unloaders:

Model 60-18 Unloader
Model 60-26E Unloader
Model 60-26C Unloader
Model 110-26 Unloader
Model 110-35 Unloader
Model M-26E Unloader
Model M-26C Unloader
Model M-21-8E Unloader
Model M-21-8C Unloader
Model PC-16E Unloader
Model PC-16C Unloader
Model 300-25 Unloader
Model 300-35 Unloader
Model KTS 146KTS Unloader
Model KTS 146BBH Unloader
Model KTS 146KBB Unloader
Model 300-45 Unloader
Model 55-26 Unloader
Model 150-26 Unloader
Model 50-15 Unloader

C.    Miscellaneous:

Taxi-King Swing Cab
TailGator mobile rough terrain forklift

SCHEDULE 1.01(e)

Assumed Contracts

1.    Stipulated Settlement Agreement between U.S. Truck Cranes, Inc., Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.) and JLG Industries, Inc. (to be assigned to Purchaser except to the extent of Hiab's obligation to indemnify Seller as specified therein for accidents and incidents occurring prior to the Closing Date)

2.    Distributor Sales & Service Agreements, with a listing of current Distributors dated as of May 13, 1996 and copies of Seller's standard form Agreements having been provided to Purchaser. Changes thereto will have been made from May 13, 1996 to the date hereof. The files containing the Agreements are available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania headquarters.

3.    Agreement dated May 1, 1979 by and between Frank Spalluto, Paul Baldasarre and Garden State Engine and Equipment Co., Inc.

4.    Security Agreements (Equipment and Inventory), with a listing dated as of May 14, 1996 of Distributors which have entered into the same and a copy of Seller's standard form Agreement having been provided to Purchaser. Changes thereto will have been made from May 14, 1996 to the date hereof. The files containing the Agreements are available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania headquarters.

5.    Purchase orders issued by Seller in the ordinary course of its business. As of May 17, 1996 those purchase orders having extended contract terms, fixed prices or other provisions have been issued to: Engine Distributors, Inc., Wire Rope Corporation of America, Custom Hydraulics, Inc., Y.E.I., Hydraulic Fitting Co., Inc., Lehigh Valley Plastics, Inc., Lindstrom Machine Shop, The James Walker Co., D.L. Metals, Inc., Bearings, Inc., Advanced Fluid Connectors, Inc., K-D Manitou, The Sherwin-Williams Company, 3M Co. Engineering Div. and Fairfax Environmental. In addition, joint purchasing arrangements with Seller's McConnellsburg operation for the purchases of certain items.

6.    Maintenance and service agreements with the following: Quark Xpress, Summagraphics Corporation, York Calculator Company, Hewlett-Packard Company, Phillips Office Products, Rasna Corporation, and Print-O-Stat, Inc.

7.    Agreement with Marlin Industrial Division, Inc. relating to employee communication service.

8.    Agreement with Quality Copy Products relating to a copier.

Schedule 1.01(j)

Practices and Policies

See Schedule 1.01(l)

SCHEDULE 1.01(f)

Assumed Liabilities

1.     Subject to Section 5.07, all warranty liabilities and obligations for products sold by the Division prior to the Closing Date.

2.     The liabilities and obligations reflected on the Closing Financial Statements, being specifically warranty and accounts payable (excluding any accounts payable relating to environmental consulting or remediation).

3.     All liabilities and obligations arising from or relating to the Assumed Contracts assigned to Purchaser.

4.     All liabilities and obligations expressly assumed by Purchaser pursuant to the terms of this Agreement.

5.     All liabilities and obligations arising from or related to any product retrofit, recall and other programs of a similar nature, including Field Service Bulletins and Field Service Changes and letter campaigns, issued prior to the Closing Date.

6.     Liability for all claims, demands, expenses and actions in law or in equity at any time made or brought by anyone or any entity for any damages of any nature or injuries of any kind arising from accidents or incidents occurring after the Closing Date and relating to the design, manufacture, assembly, sale, distribution or service of i) all unloaders and boom truck cranes and parts therefore which were manufactured and/or sold by either by Seller, U.S. Truck Cranes, Inc. or USTC Indiana, Inc., or which are specified in the Stipulated Settlement Agreement (item 1, Schedule 1.01(k)), excepting however those cranes being the models specifically identified in Schedule 6.03, and ii) any unloader or crane product manufactured and sold by Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.), Dico Company, Inc., Dyneer Corporation, York Stone, Side-O-Matic Unloader Corporation, Greater Iowa Corporation, Beloit Corporation or Elberfeld Manufacturing Company, Inc. as and to the extent only that Seller is alleged to have liability for the same.

7.     All liabilities and obligations arising from operation by Purchaser of the Business or ownership of the Assets after the Closing Date, including any claims, demands, expenses and actions in law or in equity at any time made or brought by anyone or any entity for damages of any nature or injuries of any kind arising from accidents or incidents occurring after the Closing Date and relating to the design, manufacture, assembly, sale, distribution and use of any part sold by Purchaser for or any service rendered by Purchaser for any product, including those cranes being the models specifically identified in Schedule 6.03.

SCHEDULE 1.01(k)

Contracts

1.      Stipulated Settlement Agreement between U.S. Truck Cranes, Inc., Hiab Cranes and
        Loaders, Inc. (now known as Cargotec, Inc.) and JLG Industries, Inc.

2.      Distributor Sales & Service Agreements, with a listing of Distributors dated as of
        March 7, 1996 and copies of Seller's standard form Agreements having been provided to
        Purchaser. Changes thereto will have been made from March 7, 1996 to the date hereof.
        The files containing the Agreements are available for inspection by Purchaser at Seller's
        McConnellsburg, Pennsylvania headquarters.

3.      Agreement dated May 1, 1979 by and between Frank Spalluto, Paul Baldasarre and
        Garden State Engine and Equipment Co., Inc.

4.      Security Agreements (Equipment and Inventory), with a listing dated as of February 23,
        1996 of Distributors which have entered into the same and a copy of Seller's standard
        form Agreement having been provided to Purchaser. Changes thereto will have been
        made from February 23, 1996 to the date hereof. The files containing the Agreements are
        available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania
        headquarters.

5.      Non-Qualified Stock Option Agreements dated July 25, 1995, July 21, 1994 and
        March 31, 1993 by and between JLG Industries, Inc. and Lawrence J. Weber.

6.      Non-Qualified Stock Option Agreements dated July 21, 1994 by and between JLG
        Industries, Inc. and Theodore C. Knox.

7.      Indemnification Agreement dated July 15, 1991 by and between JLG Industries, Inc. and
        Lawrence J. Weber.

8.      Deferred Compensation Benefit Agreement dated July 15, 1991 by and between JLG
        Industries, Inc. and Lawrence J. Weber.

9.      Restricted Stock Agreements dated September 6, 1995 by and between JLG Industries,
        Inc. and the following employees of the Division: Thomas Conrad, Milfred L. Keefer,
        Gerald E. Lute, Kenneth E. Michael, Harry S. Smith and Lawrence J. Weber; with the
        same are subject to an October 25, 1995 memorandum.

10.     Separation Provisions regarding Theodore C. Knox and Frederick R. Goode

11.     Letter Agreements dated October 25, 1995 with eleven (11) employees of the Division,
        namely Harry S. Smith, Milfred L. Keefer, David L. Bagley, Dennis D. Faust, Ronnie E.
        Riggs, Michael J. Mikita, Gerald E. Lute, Lynn L. Oakman, Bradley S. Buchter,

12.  Ford Motor Credit Company Agreement relating the 120 day floor plan financing (original agreement can not be located; Agreement is not assignable).

13.  Purchase orders issued by Seller in the ordinary course of its business. As of May 17, 1996 those purchase orders having extended contract terms, fixed prices or other provisions have been issued to: Engine Distributors, Inc., Wire Rope Corporation of America, Custom Hydraulics, Inc., Y.E.I., Hydraulic Fitting Co., Inc., Lehigh Valley Plastics, Inc., Lindstrom Machine Shop, The James Walker Co., D.L. Metals, Inc., Bearings, Inc., Advanced Fluid Connectors, Inc., K-D Manitou, The Sherwin-Williams Company, 3M Co. Engineering Div. and Fairfax Environmental. In addition, joint purchasing arrangements with Seller's McConnellsburg operation for the purchases of certain items.

14.  Maintenance and service agreements with the following: Quark Xpress, Summagraphics Corporation, York Calculator Company, Hewlett-Packard Company, Phillips Office Products, Rasna Corporation, and Print-O-Stat, Inc.

15.  Agreement with Marlin Industrial Division, Inc. relating to employee communication service.

16.  Agreement with Quality Copy Products relating to a copier.

17.  Agreement with International Business Machines Corporation for customized operational services.

18.  Software License Agreement with Rasna Corporation.

19.  Agreement with Parametric Technology Corporation for PTC licensed products.

20.  Sales orders issued by Seller for the sales of products and parts and quotations issued for the sales of products and parts.

21.  Recourse arrangements with various commercial financial companies and banks relating to equipment purchases and leases by distributors of Sellers.

22.  Seller's contracts for the service, maintenance and support of its computers and computer related equipment under which the Division's computers and computer related equipment is serviced, maintenanced and supported.

23.  Agreement with Micro Control, Inc. for CADAM maintenance dated March 9, 1996.

Annex  1.01(l)

Current Financial Statements

Attached and labeled as Annex 1.01(l) - Attachments A are the Current Financial Statements.

Material Handling Division
Unaudited Pro Forma Balance Sheet
April 30, 1996
(000's omitted)

## ASSETS
Current assets

| | |
|---|---:|
| Accounts receivable, less allowance for doubtful accounts of $25 | $4,209 |
| Inventories | 6,600 |
| Other prepaids | 17 |
| Total current assets | 10,826 |

Property, plant & equipment

| | |
|---|---:|
| Land & improvements | 421 |
| Buildings & improvements | 1,116 |
| Machinery & equipment | 3,021 |
| | 4,558 |
| Less allow for depr | (2,436) |
| Net property, plant & equipment | 2,122 |

Other assets

| | |
|---|---:|
| Total Assets | $12,948 |

## LIABILITIES & DIVISIONAL INVESTMENT

Included liabilities:

| | |
|---|---:|
| Accounts Payable | 1,655 |
| Warranty | 287 |
| Other | |
| | 1,942 |

Excluded Liabilities
Compensation and benefits:

| | |
|---|---:|
| Bonuses | 343 |
| Vacation | 60 |
| Pension | 85 |
| Workmens' compensation | 62 |
| Accrued Advertising | 61 |
| Prepaid medical | (39) |
| Product liability | 565 |
| Divisional Investment | 9,869 |
| Total Liabilities and Divisional Investment | $12,948 |

Notes to Unaudited Pro Forma Balance Sheet:
April 30, 1996

**Accounts Receivable**
The books and records of the Division include an allocation of the Company's total accounts receivable based on the Material Handling Division's sales to total Company sales. For this pro forma balance sheet presentation, accounts receivable has been adjusted to reflect all machine and service parts billings specifically relating to the Division, except for service parts billings that relate to customers common to both the Material Handling and Lift Divisions.

**Allowance for Doubtful Accounts**
The books and records of the Division include an allocation of the Company's total allowance for doubtful accounts based on the Division's sales to total Company sales. For this pro forma balance sheet presentation, the allowance for doubtful accounts was determined based on specific customer amounts which are considered uncollectible.

**Inventories**
Inventories are stated at cost using the FIFO method. A LIFO reserve included on the books and records of the Division has been excluded from this pro forma balance sheet. Also excluded from this pro forma balance sheet are certain inventory valuation reserves treated as a special deduction from net assets in determining the cash to be paid at closing. For a further discussion of Inventories, see the attached "Assumptions, Methods and Procedures Used in Valuing Inventories at January 31, 1996."

**Other Prepaids**
Includes prepaid property taxes, promotional items, and security deposits.

**Property, Plant & Equipment**
Property, plant and equipment is stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method, based on useful lives of 15 years for land improvements, 10 to 20 years for buildings and improvements, and 3 to 10 years for machinery and equipment.

**Liabilities and Accrued Expenses**
Certain liabilities, including accounts payable, compensation and benefit accruals, workmen's compensation claims, accrued advertising, as well as prepaid medical were not specifically identified by division on the Company's books and records, therefore they were not included on the books and records of the Division. However, amounts relating to these accounts were subsequently segregated and included in this pro forma balance sheet.

**Warranty**
The warranty accrual was calculated based on the historical claims experience of the Division as well as other subjective criteria. The pro forma balance sheet excludes certain warranty provisions treated as a special deduction from net assets in determining the cash to be paid at closing. For a further discussion of the warranty reserves, see the attached "Assumptions, Methods and Procedures Used in Establishing the Procedures Used in Establishing the Warranty Reserves at January 31, 1996."

Material Handling Division
Unaudited Pro Forma Income Statement
Nine Months Ended April 30, 1996
(in thousands of dollars)

|  |  | % |
|---|---:|---:|
| Revenues: |  |  |
| Boom truck cranes | $8,689 | 52.7 |
| Unloaders | 5,305 | 32.2 |
| Service parts | 2,420 | 14.7 |
| Other | 72 | 0.4 |
|  | 16,486 | 100.0 |
| Cost of sales: |  |  |
| Boom truck cranes |  |  |
| Material | 3,595 |  |
| Labor | 720 |  |
| Overhead | 2,300 |  |
|  | 6,615 |  |
| Unloaders |  |  |
| Material | 2,294 |  |
| Labor | 411 |  |
| Overhead | 1,283 |  |
|  | 3,988 |  |
| Service parts |  |  |
| Material | 814 |  |
| Labor | 77 |  |
| Overhead | 243 |  |
|  | 1,134 |  |
| Other |  |  |
| Material | (3) |  |
| Labor | - |  |
| Overhead | - |  |
|  | (3) |  |
| Total cost of sales |  |  |
| Material | 8,700 |  |
| Labor | 1,208 |  |
| Overhead | 3,826 |  |
|  | 11,734 |  |
| Gross Margin: |  |  |
| Boom truck cranes | 2,074 | 23.9 |
| Unloaders | 1,317 | 24.8 |
| Service parts | 1,286 | 53.1 |
| Other | 75 | 104.2 |
| Subtotal before production variances | 4,752 | 28.8 |
| Production variances | 199 |  |
|  | 4,553 | 27.6 |
| Other cost of sales: |  |  |
| Inventory reserves | 135 |  |
| Freight-in | 185 |  |
| Warranty & field service | 879 |  |
| Product liability | 35 |  |
| Other | - |  |
|  | 1,234 | 7.5 |
| Gross profit | 3,319 | 20.1 |
| Selling, general & administrative expenses: |  |  |
| Selling | 1,081 |  |
| General & administrative | 468 |  |
| Product development | 843 |  |
|  | 2,392 | 14.5 |
| Operating profit | $927 | 5.6 |

See the accompanying notes to this unaudited pro forma income statement.

**Notes to the Unaudited Pro Forma Income Statement:**
**Period Ended April 30, 1996**

**General**
The pro forma income statement includes certain rounding differences when compared
to the books and records of the Division.

**Production Variances**
The pro forma income statement includes certain adjustments relating to a vacation accrual
per an agreement made with the original USTC employees and an adjustment relating
to a prior year medical expense reimbursement.

**Inventory reserves**
The pro forma income statement excludes certain inventory valuation provisions which
are treated as a separate deduction from net assets in determining the cash to be paid
at closing.

**Warranty and Field Service**
The pro forma income statement excludes certain warranty provisions which are treated
as a separate deduction from net assets in determining the cash to be paid at closing.

**Product Liability**
Product liability was arbitrarily allocated to the books and records of the Division. The pro forma
income statement reflects cash paid and/or reserves established relative to certain incidents incurred
during fiscal 1996.

**Other**
The books and records of the Division include a LIFO provision for unloader products. Since
inventories as reflected on the pro forma balance sheet are on a FIFO basis, this provision was
excluded from the pro forma income statement.

**Selling**
The pro forma income statement has been adjusted to include a vacation accrual per the
agreement made with the original USTC employees and an adjustment made for a prior year
medical reimbursement.

**General & administrative**
The books and records of the Division do not reflect a bad debt expense. Additionally,
the allowance for doubtful accounts as of April 30, 1996 has not been included in this
pro forma income statement. Expenses of $6 on the books and records of the Division
have been inadvertently excluded from expense in presenting this pro forma income
statement.

**Product development**
The pro forma income statement includes an adjustment for a prior year medical reimbursement.

Material Handling Division
Assumptions, Methods and Procedures used in valuing inventories at January 31, 1996

| | G/L Bal 1-31-96 | Cost In Excess of NRV |
|---|---|---|
| Finished Machines | 43.0 | |
| Machines In Process | 1,086.0 | 153.2 |
| Consignment | | |
| Truck Chassis | 1,246.0 | 28.9 |
| Fab Parts - In Process | 270.0 | |
| Fab Parts - Stocked | 1,610.0 | 309.9 |
| Raw Material & Purchased Parts | 2,837.0 | |
| Subtotal | 7,092.0 | 492.0 |
| Less: Scrap recovery @ 5% | | (19.8) |
| Cost In Excess of NRV | | 472.2 |
| Inventory Valuation Reserve: | | |
| Charged directly to work order | (54.0) | |
| Contra-Account | (265.0) | |
| Overhead Spreadback | 253.0 | |
| G/L Balance @ 1-31-96 | 7,026.0 | |

The analysis and discussions attached hereto are an integral part of this summary schedule.

Material Handling - January 1996
Fab Parts - Stocked
Raw Materials & Purchased Parts

| | G/L Bal 1-31-96 | Cost in Excess of NRV | Explanation |
|---|---|---|---|
| Current production | 3,389.0 | | Production parts |
| Excess - Demand > 24 months | 183.3 | 45.8 | NRV @ 75% |
| 50-15 | 98.3 | | Good inventory. Product discontinued but saleable. |
| 55-26 | 13.9 | 13.9 | Obsolete. No FY 96 forecast |
| 150-26 | 10.9 | 10.9 | Obsolete. No FY 96 forecast |
| 150-45 | 6.9 | 6.9 | Obsolete. No FY 96 forecast |
| 300-25/35/45 | 110.0 | 20.0 | Product is salable.Some parts physically deteriorated |
| 1044 JP | 12.4 | 10.7 | Balance for service parts |
| DEICER | 1.3 | 1.3 | Balance for service parts |
| 1400 & 2300 JBT | 15.2 | 13.9 | Balance for service parts |
| Out of Production - Demand < 24 months | 223.3 | | Useable as service parts |
| Obsolete | 161.5 | 161.5 | No demand |
| Rusted Parts - All Machines | 10.0 | 10.0 | Parts physically deteriorated |
| McCbg Cylinders | 211.0 | 15.0 | No demand |
| Total | 4,447.0 | 309.9 | |

* Identifies machines and parts having no sales value except for scrap recovery at 6%.

aterial Handing - January 1996

| In Process | Machine Serial # | Truck Serial # | WiP Report | Truck Chassis | G/L Bal 1-31-96 | Cost In Excess of NRV | | | Explanation |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Machine | Truck | Total | |
| 1000JBT | 3200 | | 7.6 | | 7.6 | | | | |
| 1000JBT | 3201 | | 7.5 | | 7.5 | | | | |
| 1000JBT | 3209 | | 1.1 | | 1.1 | | | | |
| 1000JBT | 3210 | | 1.1 | | 1.1 | | | | |
| 1000JBT | 3211 | | 0.7 | | 0.7 | | | | |
| 1044JP | 2549 | 5282 | 38.9 | 27.5 | 68.4 | 32.9 | 10.0 | 42.9 | Has service parts value of 6.0 |
| 1410JBT | 3203 | 15722 | 6.2 | 28.1 | 34.3 | | | | |
| 1410JBT | 3204 | 16640 | 6.2 | 28.1 | 34.3 | | | | |
| 1410JBT | 3208 | | 1.3 | | 1.3 | | | | |
| 1500JBT | 3202 | 02563 | 7.9 | 39.9 | 47.8 | | | | |
| 1500JBT | 3205 | 77604 | 6.0 | 28.6 | 34.6 | | | | |
| 1500JBT | 3213 | | 0.9 | | 0.9 | | | | |
| 1500JBT | 3214 | | 0.9 | | 0.9 | | | | |
| 1500JBT | 3215 | | 0.9 | | 0.9 | | | | |
| 1700JBT | 3183 | | 21.6 | | 21.6 | | | | |
| 1700JBT | 3206 | 02567 | 1.4 | 45.3 | 46.7 | | | | |
| 2000JBT | 2996 | 30932 | 57.2 | 46.7 | 103.9 | | | | |
| 2250JBT | 3111 | 40750 | 53.5 | 55.4 | 108.9 | | | | |
| 2250JBT | 3158 | 7040 | 19.3 | 46.5 | 65.8 | | | | |
| 2250JBT | 3207 | 7041 | 1.4 | 46.5 | 47.9 | | | | |
| 2250JBT | 3212 | | 1.1 | | 1.1 | | | | |
| 2800JBT | 3087 | 36312 | 71.4 | 55.4 | 126.8 | | | | |
| 2800JBT | 3008 | | 30.4 | | 30.4 | | | | |
| 2800JBT | 3199 | | 25.2 | | 25.2 | | | | |
| DEICER | 3164 | | 7.2 | | 7.2 | | | | |
| DEICER | 3165 | | 7.4 | | 7.4 | | | | |
| SC | 2950 | 24008 | 104.7 | 46.7 | 151.4 | | | | |
| 110-26 | 943 | | 0.7 | | 0.7 | | | | |
| 110-26 | 945 | | 0.7 | | 0.7 | | | | |
| 110-35 | 629 | 303781 | 28.5 | 38.9 | 67.4 | 28.5 | 18.9 | 47.4 | Crane value at 0, truck at 20.0 |
| 110-35 | 938 | | 0.8 | | 0.8 | | | | |
| 110-35 | 939 | | 0.8 | | 0.8 | | | | |
| 110-35 | 940 | | 0.8 | | 0.8 | | | | |
| 110-35 | 944 | | 0.7 | | 0.7 | | | | |
| 110-35 | 946 | | 0.7 | | 0.7 | | | | |

Annex 1.01(1)
8 of 20

Handing - January 1996

| ocess | Machine Serial # | Truck Serial # | WIP Report | Truck Chassis | G/L Bal 1-31-96 | Cost in Excess of NRV | | | Explanation |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Machine | Truck | Total | |
| | 947 | | 0.7 | | 0.7 | | | | |
| | 395 | 14820 | 54.6 | 58.8 | 113.4 | | | | |
| | 942 | | 1.5 | | 1.5 | | | | Sold in Feb |
| | 451 | | 25.4 | | 25.4 | 25.4 | | 25.4 | Crane value at 0 |
| | 620 | | 15.3 | | 15.3 | 2.9 | | 2.9 | Rework to sell |
| | 621 | | 21.2 | | 21.2 | 2.9 | | 2.9 | Rework to sell |
| | 631 | | 18.7 | | 18.7 | 2.9 | | 2.9 | Rework to sell |
| | 632 | | 19.7 | | 19.7 | 2.9 | | 2.9 | Rework to sell |
| | 659 | | 10.1 | | 10.1 | 2.8 | | 2.8 | Rework to sell |
| | 617 | | 18.7 | | 18.7 | 2.8 | | 2.8 | Rework to sell |
| | 660 | | 9.5 | | 9.5 | 2.8 | | 2.8 | Rework to sell |
| | 937 | | 1.0 | | 1.0 | | | | |
| | 941 | | 0.9 | | 0.9 | | | | |
| | 933 | | 7.7 | | 7.7 | | | | |
| | 934 | | 7.6 | | 7.6 | | | | |
| | 935 | | 4.4 | | 4.4 | | | | |
| | 936 | | 4.5 | | 4.5 | | | | |
| | 890 | | 18.8 | | 18.8 | | | | |
| IG | 3095 | 38326 | 94.1 | 57.5 | 151.6 | 13.8 | | 13.8 | Rework to sell |
| | 1 | | 36.8 | | 36.8 | 19.3 | | 19.3 | Proto 1- write down for sale |
| | 2 | | 30.8 | | 30.8 | 13.3 | | 13.3 | Proto 2- write down for sale |
| | 3 | | 19.1 | | 19.1 | | | | |
| | 4 | | 16.5 | | 16.5 | | | | |
| | 5 | | 0.2 | | 0.2 | | | | |
| | 6 | | 0.2 | | 0.2 | | | | |
| | 7 | | 0.2 | | 0.2 | | | | |
| | 8 | | 0.2 | | 0.2 | | | | |
| | 9 | | 0.2 | | 0.2 | | | | |
| | 10 | | 0.2 | | 0.2 | | | | |
| | | 40751 | | 55.4 | 55.4 | | | | |
| | | 77606 | | 28.6 | 28.6 | | | | |
| | | 78912 | | 28.6 | 28.6 | | | | |
| | | 80149 | | 28.6 | 28.6 | | | | |
| | | 2828 | | 45.4 | 45.4 | | | | |
| | | 2829 | | 45.4 | 45.4 | | | | |

Handing – January 1996

| rocess | Machine Serial # | Truck Serial # | WIP Report | Truck Chassis | G/L Bal 1-31-96 | Cost in Ecess of NRV | | | Explanation |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Machine | Truck | Total | |
| | | 2830 | | 45.4 | 45.4 | | | | |
| | | 2831 | | 45.4 | 45.4 | | | | |
| | | 7042 | | 46.5 | 46.5 | | | | |
| | | 12723 | | 27.5 | 27.5 | | | | |
| | | 15725 | | 28.4 | 28.4 | | | | |
| | | 15721 | | 28.1 | 28.1 | | | | |
| | | 15726 | | 28.3 | 28.3 | | | | |
| | | 15728 | | 28.3 | 28.3 | | | | |
| | | 15729 | | 29.5 | 29.5 | | | | |
| | | 16642 | | 28.1 | 28.1 | | | | |
| | | 16641 | | 28.1 | 28.1 | | | | |
| ders | | | 124.5 | | 124.5 | | | | |
| l | | | 1,086.0 | 1,245.5 | 2,331.5 | 153.2 | 28.9 | 182.1 | |

ifies machines and parts having no sales value except for scrap recovery at 5%.

MATERIAL HANDLING
MANUFACTURING OVERHEAD SPREADBACK
JANUARY 96

OVERHEAD @ STANDARD

| INVENTORIES | ACCOUNTS | LAB | OH | RATE |
|---|---|---|---|---|
| UNSHIPPED PARTS | 11512-11513 | | | |
| FAB PARTS | 11531-11532 | | | |
| WIP | 11534-11535 | 304,782 | 933,057 | 3.061 |
| CONSIGNMENT | 11562-11563 | | | |
| FINISHED GOODS | 11565-11566 | | | |
| | | 304,782 | 933,057 | 3.061 |

CALCULATION OF ROLLING AVERAGE USING OH @ ACTUAL COST

| | LABOR $ | OH $ | OH RATE |
|---|---|---|---|
| DEC POOL | 362,478 | 1,395,540 | 3.85 |
| JAN | 79,507 | 321,632 | 4.05 |
| JAN AVG RATE | 441,985 | 1,717,172 | 3.89 |

| SPREADBACK | RATE | DIRECT LABOR | DIRECT OVERHEAD |
|---|---|---|---|
| JAN | 3.89 | 79,507 | 309,282 |
| DEC | 3.89 | 125,840 | 489,518 |
| NOV | 3.89 | 99,435 | 386,802 |
| | | 304,782 | 1,185,602 |
| | | 304,782 | |

| | | |
|---|---|---|
| LESS O/H @ STANDARD | | 933,057 |
| TOTAL MANUFACTURING O/H SPREADBACK | | 252,545 |
| LESS PRELIMINARY BALANCE ACCOUNT 11540 | | 272,660 |
| NET ADJUSTMENT INC/(EXP) | | (20,115) |

## ASSUMPTIONS, METHODS AND PROCEDURES
## USED IN VALUING INVENTORIES AT
## JANUARY 31, 1996

The following inventory valuations were determined based on the books and records of the Division, discussions and judgements made by the Division's personnel based on their knowledge of the products, the marketplace in which the products are sold and in certain instances the physical inspection of the inventory items. All costs reflected in this analysis are on a FIFO basis. Net realizable value (NRV) used in this analysis is the estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal.

**FINISHED GOODS** - Finished goods are those units which have a machine status of "Ready for Shipment". These machines are current production machines built to a customer order or built for stock. These units have no cost in excess of NRV.

**IN PROCESS MACHINES** - These are machines (excluding truck chassis) that are in various stages of completion. The majority of these machines are current production machines. Each machine with an identified serial number was examined and all except the following were established as having an NRV in excess of cost:

1044 JP (SN 2549) -- This machine is an R&D prototype which has salvageable service parts estimated at $6,000. The balance of $32,900 was established as an NRV reserve.

110-35 (SN 629) -- R&D prototype machine was determined to have no value and an NRV reserve of $28,500 was established.

50-15 (SN 451) -- R&D prototype. Machine determined to have no value, and an NRV reserve of $25,400 was established.

50-15 (SN 617, 620, 621, 631, 632, 659, 660) -- Machines are saleable after investing an estimated $20,000 in total for all seven machines for rework and repairs. This amount was established as an NRV reserve.

Taxi-King (SN 3095) -- Machine is saleable after investing an estimated $13,800 for rework and repairs. This amount was established as an NRV reserve.

TG's (Proto 1 and Proto 2) -- These machines are saleable at an estimated $35,000 in total for the two machines, resulting in a total NRV reserve of $32,600 for the two machines.

**TRUCK CHASSIS** -- Truck chassis were examined and their NRV was estimated based on their condition, age and mileage, resulting in the following NRV reserves:

93 Ford (SN 5282) -- Estimated realizable value is $17,500, resulting in an NRV reserve of $10,000.

87 Autocar (SN 303781) -- Estimated realizable value is $20,000, resulting in an NRV reserve of $18,900.

**FAB PARTS - IN PROCESS** -- Represents work in process orders for current products. These orders have no cost in excess of NRV.

**FAB PARTS - STOCKED AND RAW MATERIALS AND PURCHASED PARTS** -- All stock parts, including fabricated parts, raw materials and purchased parts, were reviewed with respect to their NRV based on the following criteria:

Current Production

--    Compared 24 months usage of active parts against existing inventory to generate a listing of parts in excess of 24 months supply ($469,100). The 24 months usage was determined by using actual usage for the period January 1, 1995 through February 29, 1996 (14 months) and extrapolating that into the equivalent of 24 months usage. Parts representing 24 months usage were categorized as "current production" and valued at cost.

--    From this excess listing, all parts relating to new products were excluded. These parts were also valued at cost and categorized as current production.

--    Customer Service reviewed the remaining parts and retained $45,800 as useable within 24 months and these were valued at cost and categorized as current production.

--    This balance in excess of 24 months usage ($183,300) was valued at an estimated NRV of 75%, or $137,500, resulting in a cost in excess of NRV reserve of $45,800.

Out of Production -- Parts relating to certain products not in current production were identified and valued as follows:

55-26, 150-26, 150-45 -- These are in-house production parts that have no forecasted demand and no service value. An NRV reserve at 100%, or $31,700, was established.

300-25/35/45 -- This is a saleable product but some parts are physically deteriorated from the weather. An NRV reserve of $20,000 was established for these parts representing the cost to rework these parts into useable condition.

1044JP, DEICER, 1400, 2300JBT -- These products will no longer be produced. Service has elected to retain $3,000 of the parts as saleable in the next 24 months. The balance of $25,900 was established as an NRV reserve.

Other -- All other out of production parts ($384,800) were reviewed and $223,300 was determined useable at full value as service parts over the next 24 months.

<u>Obsolete</u> -- The balance of $161,500 was determined not useable and an NRV reserve of $161,500 established.

## OTHER VALUATIONS

<u>Rusted Parts - All Machines</u> -- A visual inspection of all parts resulted in $10,000 of parts that had physical deterioration due to rust. An NRV reserve of $10,000 was established for these parts.

<u>McConnellsburg Cylinders</u> -- Certain parts are manufactured in McConnellsburg. These were reviewed as to useability within 24 months and an NRV reserve of $15,000 was established for these parts.

<u>SCRAP RECOVERY</u> -- All parts and machines not saleable for which an NRV was established ($396,700) was considered as scrap and an estimated recovery of 5%, or $19,800, was estimated.

<u>OVERHEAD SPREADBACK</u> -- Overhead for the current month at actual cost is added to the overhead pool at actual cost as of the beginning of the month in order to recalculate (using actual labor) an average actual overhead rate. The resulting actual overhead rate is then used to calculate the cost of goods sold for the current month and to revalue overhead in inventory at the end of the month at actual cost.

## ASSUMPTIONS, METHODS AND PROCEDURES USED IN ESTABLISHING THE WARRANTY RESERVES AT JANUARY 31, 1996

General Reserve

1.  The warranty experience of machines sold during the 12 month period 1/31/94 to 1/31/95 was examined.

2.  This time period represents the most recent 12 months of machine sales on which the warranty coverage has elapsed.

3.  A listing of these machines that includes warranty claims by machine (in dollars) and net sales of each machine is generated by product line.

4.  Total warranty claim dollars are divided into net sales dollars to develop a claim rate as a percent of sales; unloaders - 1.25%, cranes - .90%.

5.  These percentages are multiplied by the last 12 months of sales and then weighted by time remaining in the warranty period. The 12 months range from Jan. 96 through Feb. 95. Jan. 96 sales have a weighting factor of 12/12 or 1.0; Dec. 95, 11/12 or .9167; Nov. 95, 10/12 or .8333; continuing to Feb. 95 which is 1/12 or .0833.

6.  These calculations result in reserve amounts of $35,767 for unloaders and $58,733 for cranes. Total general reserve is $94,500.

5-Year Structural

The 5-year structural reserve of $40,500 was based on subjective discussions with Customer Service personnel at York concerning known problems in the field and the anticipated cost associated with the repairs. This amount was checked for reasonableness by reference to total annual structural claims for fiscal years 1995 and 1994.

JLG INDUSTRIES
MATERIAL HANDLING DIVISON
WARRANTY RESERVE ANALYSIS
QUARTER ENDING 1/27/96
EXPERIENCE 1/31/94 - 1/31/95

| iehine Factor | | Warranty as a % of Sales | |
|---|---|---|---|
| B | 0.0833 | UNLOADERS | 0.0125 |
| AR | 0.1667 | CRANES | 0.0090 |
| R | 0.2500 | | |
| AY | 0.3333 | | |
| N | 0.4167 | | |
| L | 0.5000 | | |
| JG | 0.5833 | | |
| P | 0.6667 | | |
| CT | 0.7500 | | |
| OV | 0.8333 | | |
| EC | 0.9167 | | |
| N | 1.0000 | | |

| MONTH | *******sales******* | | | *******PERCENT******* | | | | | |
| | UNLOADERS | CRANES | TOTAL | UNLOADERS | CRANES | FACTOR | UNLOADERS | CRANES | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| EB | 1,015,547 | 880,510 | 1,896,057 | 0.0125 | 0.0090 | 0.0833 | 1,058 | 660 | 1,718 |
| AR | 1,016,474 | 1,279,459 | 2,295,933 | 0.0125 | 0.0090 | 0.1667 | 2,118 | 1,919 | 4,037 |
| PR | 795,951 | 1,249,041 | 2,044,992 | 0.0125 | 0.0090 | 0.2500 | 2,487 | 2,810 | 5,298 |
| AY | 346,026 | 1,484,086 | 1,830,112 | 0.0125 | 0.0090 | 0.3333 | 1,442 | 4,452 | 5,894 |
| JN | 242,904 | 1,425,850 | 1,668,754 | 0.0125 | 0.0090 | 0.4167 | 1,265 | 5,347 | 6,612 |
| JL | 47,680 | 1,038,442 | 1,086,122 | 0.0125 | 0.0090 | 0.5000 | 298 | 4,673 | 4,971 |
| UG | 222,843 | 917,684 | 1,140,527 | 0.0125 | 0.0090 | 0.5833 | 1,625 | 4,818 | 6,443 |
| | 362,968 | 612,799 | 975,767 | 0.0125 | 0.0090 | 0.6667 | 3,025 | 3,677 | 6,702 |
| | 592,383 | 1,165,079 | 1,757,462 | 0.0125 | 0.0090 | 0.7500 | 5,554 | 7,864 | 13,418 |
| | 383,348 | 819,194 | 1,202,542 | 0.0125 | 0.0090 | 0.8333 | 3,993 | 6,144 | 10,137 |
| | 414,311 | 692,809 | 1,107,120 | 0.0125 | 0.0090 | 0.9167 | 4,747 | 5,716 | 10,463 |
| AN | 652,428 | 1,183,607 | 1,836,035 | 0.0125 | 0.0090 | 1.0000 | 8,155 | 10,652 | 18,808 |
| | 6,092,863 | 12,748,560 | 18,841,423 | | | | 35,767 | 58,733 | 94,500 |

Letter Campaigns and Potential Warranty.

Previously issued letter campaigns and field service bulletins are periodically reviewed to identify those for which future claims for reimbursement may be anticipated to be received pursuant to the reimbursement plan, if any, announced in conjunction with each such letter campaign and field service bulletin. This identification is based on among other things, the form of the letter campaign or field service bulletin, the facts concerning each and its issuance, date of issuance, date of last claim and intended follow up action, together with the prior history of letter campaigns and field service bulletins and the judgment of those individuals doing the review. Estimated costs for each such letter campaign or field service bulletin so identified are made using among other things the number of units affected, number of units completed, the estimated cost of completion, the number of units for which parts have been ordered, the estimated number of units for which claims for reimbursement are anticipated, and the facts concerning each.

Potential warranty is established based on the evaluation and review of matters involving field units by appropriate product safety personnel, with input from service, engineering, marketing and management personnel. Those matters cover field units for which action may be considered or is being taken by reason of safety/reliability related problems or concerns. They usually involved three (3) basic areas. The first is recently issued or recommended letter campaigns or field service bulletins. For each of these, an estimated cost is established which is based on the number of units affected, the nature of the action taken, an estimated cost of completion and an estimated completion percentage, which percentage is based on the form, the facts concerning each and its issuance, intended follow-up action, together with the prior history of letter campaigns and field service bulletins and the judgment of the product safety personnel involved. The second area is where no action is recommend, but it is anticipated that specified action may be taken for customer relation reasons. Costs are estimated in a manner similar to that discussed above, with the number of units for which the action may be taken to be based on an estimate using service and marketing input. The third area is where it is decided that action would be taken, but only in response to customer complaints or claims for field units. Estimated costs are made using among other things, the number of units affected, nature of the action taken, the estimated cost of completion and the estimated number of units for which the action is expected to be taken.

# LETTER CAMPAIGNS

BT Extend Chain/Rod Update:

100% Completion cost = $13,966.40
Affected units = 55
Completed = 7
Parts ordered = 4                                                    $2,793.00

Fiberglass Basket Attachment Replacement:

100% Completion cost = $4,960.62
Affected units = 42
Completed = 7
Parts ordered = 34                                                   $4,015.74

Update of the Brake Cylinder Attach Plate
Installed on the Platform:

100% Completion cost = $1,738.90
Affected units = 11
Completed = 2
Parts ordered = 9                                                    $1,423.74

Turntable Weldment Update:

100% Completion cost = $7,974.50
Affected units = 50
Completed = 4
Parts ordered = 46                                                   $7,336.54

**TOTAL:**                                                           **$15,569.02**

# POTENTIAL WARRANTY

Capacity Alert for Overload System - FSB #96-3-1 (Yellow Headline):

Total cost for 100% completion = $31,500.00
Average % of completion for FSB = 33%
Approx. amount required = 33% x $31,500.00 = $10,395.00                     $10,395.00

"J" Series Cranes - Telescope Cylinder Scoring:

Machines involved (manufactured 6/95 to present) = 164
Potential problems = 30% (49 machines)
24 machines already completed (changed telescope cylinder)
49 - 24 = 25 potential machines remain to be completed
Average cost of telescope cylinder = $1,500.00 per machine
Labor cost = 12 hours @ $45.00 per hour = $540.00 per machine
Travel cost = $265.00 per machine
Total cost parts/labor = $2,305.00 per machine
Total cost estimate = $2,305.00 per machine x 25 = $57,625.00
Total cost estimate for 100% (140 machines) =
$2,305.00 per machine x 140 = $322,700.00                                    $57,625.00

"J" Series Cranes - Telescope Cylinder Slow Retract Speed:

Machines involved = 73
Average cost of new telescope cylinders required = $1,866.00 per
machine
Travel/Labor cost = 18 hours @ $45.00 per hour = $810.00
Total cost parts/labor = $2,676.00 per machine
Total cost estimate for 100% (73 machines) =
$2,676.00 per machine x 73 = $195,348.00
No recommended action. Potentially replace cylinders on 5 machines
for customer relations = $2,676.00 per machine x 5 = $13,380.00              $13,380.00

# POTENTIAL WARRANTY

<u>50-15 Unloader - Boom Modification and Turntable Bolt Replacement</u>

Machines involved = 4
Parts cost = $150.00 per machine
Paint cost = $400.00 per machine
Labor cost = 11 hours @ $45.00 per hour = $495.00 per machine
Travel cost = 6 hours @ $53.00 per hour = $318.00 per machine
Total cost estimate = $1,363.00 per machine x 4 = $5,452.00

NOTE: If JLG personnel are required to travel to the machines and
complete the work, it is estimated to cost an additional $700.00 per
machine x 4 = $2,800.00 + $5,452.00 = $8,252.00.                     $8,252.00


<u>2200BT - Boom Eye-Bolt:</u>

Machines involved = 23
Travel/Labor cost to replace/rework eye-bolt mounting = $500.00 per
machine
Total cost estimate for approx. 75% (17 machines) =
$500.00 per machine x 17 = $8,500.00 ·
Total cost estimate for 100% (23 machines) =
$500.00 per machine x 23 = $11,500.00
Recommend Letter Campaign to repair all machines subject to design
verification.                                                        $8,500.00


<u>BT - Pedestal Cracks:</u>

Potential machines with low rear mount = 8
Material cost = $100.00 per machine
Labor cost = 32 hours @ $45.00 per hour = $1,440.00 per machine
Travel cost = $600.00 per machine
Total cost parts/labor = $2,040.00 per machine
Total cost estimate = $2,040.00 per machine x 8 = $16,320.00

Potential machines with front mount = 2
Total cost estimate = $1,780.00 per machine x 2 = $3,560.00          $19,880.00

# POTENTIAL WARRANTY

<u>755 Cranes - Brakes</u>

Machines involved = 108
Parts cost = $1,405.00 per machine
Labor cost = 24 hours @ $45.00 per hour = $1,080.00 per machine
Total cost parts/labor = $2,485.00 per machine

Potential Hertz machines involved = 24
Total cost estimate = $2,485.00 per machine x 24 = $59,640.00

Total cost estimate for 6 machines = $2,485.00 per machine x 6 =
$14,910.00

NOTE:  Hertz machines have already been done once; therefore, we
should not pay for them again.                                    $14,910.00


**TOTALS**                                                    **$132,942.00**

## SCHEDULE 1.01(o)

### Equipment

. Copy of Seller's Asset Status Report dated as of May 15, 1996 is attached and labeled as
Schedule 1.01(o) - Attachment A.

Schedule 1.01(o) – ...ment A

ESS LEVEL 0005    JLG INDUSTRIES    ASSET TYPE/SUBTYPE BLDGS 5201

| ET/ASSET NBR COE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 100496 FA 0001 IN PLANT OFFICE | 1/01/95-3 | 120 | 104.031 | STL | 6891.73 | 5974.58 | | 516.87 | 911.15 |
| 100496 FA 0001 CE REPAIRS | 7/02/95-3 | 120 | 110.014 | STL | 38464.00 | 35306.85 | | 2869.48 | 3157.15 |
| TYPE 5201 TOTAL | | | | | 45355.73 | 41281.43 | | 3386.35 | 4074.30 |
| 100396 FA 0001 RAL HEAT/AIR ERG. OFFICE | 5/31/92-1 | 120 | 78.962 | STL | 3550.00 | 2140.86 | | 264.08 | 1409.14 |
| TYPE 5203 TOTAL | | | | | 3550.00 | 2140.86 | | 264.08 | 1409.14 |
| 100381 FA 0001 ; - ACQUISITION | 1/29/90-1 | 240 | 163.951 | STL | 743053.94 | 507720.85 | | 27871.06 | 235333.09 |
| 100390 FA 0001 PETING IN OFFICES | 7/01/90-1 | 120 | 48.981 | STL | 7225.47 | 2981.23 | | 547.79 | 4244.24 |
| 100389 FA 0001 LDING ENCLOSURE | 8/01/90-1 | 120 | 50.000 | STL | 50475.00 | 21252.64 | | 3825.47 | 29222.36 |
| 100390 FA 0001 PRESSOR ROOM | 11/29/90-1 | 231 | 164.913 | STL | 5843.50 | 4173.46 | | 227.77 | 1670.04 |
| 100393 FA 0001 RHEAD DOOR & DOCK EXTENSION | 6/02/91-1 | 120 | 60.028 | STL | 2825.00 | 1426.24 | | 213.84 | 1398.76 |
| 100440 FA 0001 CURTAIN HD-14-13-5 #520 | 9/04/94-3 | 120 | 100.118 | STL | 6731.00 | 5615.78 | | 504.82 | 1115.22 |
| 100441 FA 0001 CURTAIN HD-14-13-5 #520 | 9/04/94-3 | 120 | 100.118 | STL | 6731.00 | 5615.78 | | 504.82 | 1115.22 |
| 100463 FA 0001 F REPAIRS | 7/02/95-3 | 120 | 110.014 | STL | 212464.00 | 194782.96 | | 15934.77 | 17681.04 |
| 100500 FA 0001 T PUMP RELOCATION | 10/02/95-3 | 120 | 113.004 | STL | 3950.00 | 3719.70 | | 230.30 | 230.30 |
| TYPE 5601 TOTAL | | | | | 1039298.91 | 747288.64 | | 49860.64 | 292010.27 |
| 100392 FA 0001 LDING ENCLOSURE - ASSBLY | 3/03/91-1 | 120 | 57.036 | STL | 8791.93 | 4218.28 | | 665.64 | 4573.65 |
| TYPE 5640 TOTAL | | | | | 8791.93 | 4218.28 | | 665.64 | 4573.65 |
| 100391 FA 0001 RHEAD DOOR | 3/03/91-1 | 120 | 57.036 | STL | 6540.00 | 3137.82 | | 495.14 | 3402.18 |
| TYPE 5650 TOTAL | | | | | 6540.00 | 3137.82 | | 495.14 | 3402.18 |

```
DATE 5/15/96                        COMPANY  1  JLG INDUSTRIES                                         PAGE  2
TIME 14:11:15                       BOOK BASIS ASSET STATUS REPORT

S LEVEL  0005    JLG INDUSTRIES                                    ASSET TYPE/SUBTYPE  BLDGS 5660
```

| COMP SRC / MBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 5511  FA 0001 | 2/01/96-3 | 120 | 117.051 | STL | 3398.89 | 3314.15 | | 84.74 | 84.74 |
| UNT OFFICE W/ A/C | | | | | | | | | |
| PE   5660 TOTAL | | | | | 3398.89 | 3314.15 | | 84.74 | 84.74 |
| 0508  FA 0001 | 2/01/96-3 | 120 | 117.051 | STL | 4216.93 | 4111.80 | | 105.13 | 105.13 |
| UNT OFFICE W/ A/C | | | | | | | | | |
| 1993  FA 0001 | 6/06/94-1 | 120 | 97.000 | STL | 4995.00 | 4037.62 | | 374.63 | 557.38 |
| OP A/C UNIT | | | | | | | | | |
| PE   5680 TOTAL | | | | | 9211.93 | 8149.42 | | 479.76 | 1062.51 |
| TYPE BLDGS TOTAL | | | | | 116147.39 | 809530.60 | | 55236.35 | 306616.79 |
| 00003  FA 0001 | 1/29/90- | | | | 185329.00 | 185329.00 | | | |
| - ACQUISITION | | | | | | | | | |
| PE   5601 TOTAL | | | | | 185329.00 | 185329.00 | | | |
| TYPE LAND TOTAL | | | | | 185329.00 | 185329.00 | | | |
| 00106  FA 0001 | 1/29/90-1 | 180 | 103.951 | STL | 83689.00 | 48346.77 | | 4185.82 | 35342.23 |
| 4P - ACQUISITION | | | | | | | | | |
| 00123  FA 0001 | 1/29/95-3 | 180 | 164.951 | STL | 3920.00 | 3592.26 | | 196.01 | 327.74 |
| ING LOT RESTRIPING-YORK | | | | | | | | | |
| 00132  FA 0001 | 7/02/95-3 | 180 | 170.014 | STL | 3625.00 | 3423.88 | | 181.26 | 201.12 |
| K PARKS & RECEIVING AREAS | | | | | | | | | |
| 00135  FA 0001 | 10/02/95-3 | 180 | 173.004 | STL | 40937.83 | 39952.22 | | 1585.61 | 1585.61 |
| IC SYSTEM | | | | | | | | | |
| 00141  FA 0001 | 3/05/96-3 | 180 | 178.040 | STL | 40638.35 | 40195.97 | | 442.38 | 442.38 |
| PAD WATER RECOVERY SYSTEM | | | | | | | | | |
| TYPE 5601 TOTAL | | | | | 172810.18 | 134911.10 | | 6591.08 | 37899.08 |
| 00110  FA 0001 | 12/03/90-1 | 36 | | STL | 2610.00 | 2610.00 | | | |
| AGE TANK PAD | | | | | | | | | |
| TYPE 5620 TOTAL | | | | | 2610.00 | 2610.00 | | | |
| 00124  FA 0001 | 1/29/95-3 | 180 | 164.951 | STL | 5200.00 | 4765.24 | | 260.01 | 434.76 |
| K WASHING STATION | | | | | | | | | |
| TYPE 5645 TOTAL | | | | | 5200.00 | 4765.24 | | 260.01 | 434.76 |
| 00109  FA 0001 | 9/30/90-1 | 180 | 111.973 | STL | 33206.54 | 20660.43 | | 1660.61 | 12546.11 |
| - EXPANSION & UPGRADE | | | | | | | | | |

```
DATE 5/15/96                        COMPANY - 1  JLG INDUSTRIES                                    PAGE   3
TIME 14:11:15                       BOOK BASIS ASSET STATUS REPORT

S LEVEL  0005    JLG INDUSTRIES              ASSET TYPE/SUBTYPE LDIMP 5650
```

| COMP NBR | SRC CDE | QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| .112 XPANSION & UPGRADE | FA | 0001 | 4/28/91-1 | 180 | 118.877 | STL | 6400.00 | 4229.90 | | 320.24 | 2170.10 |
| .114 . OF AREA AROUND INV BLDG | FA | 0001 | 8/01/92-1 | 180 | 135.000 | STL | 6066.00 | 4549.50 | | 303.30 | 1516.50 |
| .11B IOP & ROAD REPAIR MAI HAN | FA | 0001 | 9/04/94-3 | 180 | 160.118 | STL | 8975.00 | 7983.67 | | 448.74 | 991.33 |
| PE   5650  TOTAL | | | | | | | 54647.54 | 37423.50 | | 2732.89 | 11224.04 |
| TYPE LDIMP TOTAL | | | | | | | 235267.72 | 177099.84 | | 9583.98 | 58167.88 |
| 1899 DAD DYNAMOMETER C659 | FA | 0001 | 10/30/94-3 | 60 | 41.959 | STL | 2980.00 | 2083.95 | | 447.01 | 896.05 |
| PE   5203  TOTAL | | | | | | | 2980.00 | 2083.95 | | 447.01 | 896.05 |
| .186 HYDRAULIC IRONWORKER | FA | 0001 | 1/29/90-1 | 60 | | STL | 5500.00 | 5500.00 | | | 5500.00 |
| .1508 HD CRANES,2 5-T DB CRANES | FA | 0001 | 1/29/90-1 | 180 | 103.951 | STL | 84000.00 | 48526.44 | | 4201.38 | 35473.56 |
| .1533 ( SWEEPER, TENANT NO 42HD | FA | 0001 | 1/29/90-1 | 60 | | STL | 1600.00 | | | | 1600.00 |
| .1537 | FA | 0001 | 1/29/90-1 | 60 | | STL | 9500.00 | | | | 9500.00 |
| .1583 OMPRESSOR | FA | 0001 | 8/01/90-1 | 60 | | STL | 20288.03 | | | | 20288.03 |
| .1598 BOOM LIFT #0308012450 | FA | 0001 | 12/30/90-1 | 60 | | STL | 30906.48 | 30906.48 | | 2044.19 | 30906.48 |
| J1610 ATERIAL RACKS | FA | 0002 | 6/02/91-1 | 60 | | STL | 11225.59 | 11225.59 | | 1225.54 | 11225.59 |
| 01621 AGE BINS | FA | 0001 | 6/30/91-1 | 60 | | STL | 19348.00 | 19348.00 | | 3211.53 | 19348.00 |
| 01625 SYST - 2 AIR COMPRESSORS | FA | 0001 | 6/30/91-1 | 60 | | STL | 3312.50 | 3312.50 | | 549.84 | 3312.50 |
| 01674 AMT FLOOR SWEEPER MODEL186 | FA | 0001 | 6/28/92-1 | 60 | 13.803 | STL | 6882.29 | 1668.56 | 1668.56 | 1016.87 | 5313.73 |
| 01939 E GROUND STORAGE TANK-GAS | FA | 0001 | 1/29/95-3 | 60 | 44.951 | STL | 1864.00 | 1396.46 | | 279.61 | 467.54 |
| 01940 E GRND STOR.TANK-DIES.FUEL | FA | 0001 | 1/29/95-3 | 60 | 44.951 | STL | 1864.00 | 1396.46 | | 279.61 | 467.54 |

DATE 5/15/96  OODS  JLG INDUSTRIES                COMPANY - 1 JLG INDUSTRIES                                PAGE 4
TIME 14:11:15                                     BOOK BASIS ASSET STATUS REPORT

ASSET TYPE/SUBTYPE  M&E  5601

| S LEVEL<br>R MBR COE QTY | IN-SERV<br>DTE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 993  FA 0001<br>ORHER UPGRADE | 4/30/95-3 | 60 | 47.943 | STL | 6086.00 | 4862.98 | | 912.89 | 1223.02 |
| 994  FA 0001<br>METAL DRILL | 4/30/95-3 | 60 | 47.943 | STL | 1888.95 | 1509.36 | | 283.34 | 379.59 |
| 007  FA 0001<br>LAKE W/ USED MOIST | 4/30/95-3 | 60 | 47.943 | STL | 4995.00 | 3991.22 | | 749.25 | 1003.78 |
| 016  FA 0001<br>JIB CRANE | 6/04/95-3 | 60 | 49.094 | STL | 2510.00 | 2053.75 | | 376.49 | 456.25 |
| 2020  FA 0001<br>CONTAINMENT | 6/04/95-3 | 60 | 49.094 | STL | 3759.91 | 3077.36 | | 564.00 | 682.55 |
| 2047  FA 0001<br>R CART | 8/01/95-3 | 60 | 50.975 | STL | 1524.75 | 1295.42 | | 229.33 | 229.33 |
| 2099  FA 0001<br>LEVER RACK | 3/05/96-3 | 60 | 58.040 | STL | 6950.00 | 6723.03 | | 226.97 | 226.97 |
| 9999  FA 0001 1/28/95-<br>ASSET CLEARING 5000 | | | | | 52899.92 | 52899.92 | | | |
| 0088  FA 0001 6/01/95-1<br>OLDING FOR BOOBT | | 60 | | STL | 1716.80 | 1716.80 | | | 1716.80 |
| 0  FA 0001 10/01/88-1<br>N STUD WELDER #961464 | | 84 | | STL | 4172.30 | | | | 4172.30 |
| PE  5601  TOTAL | | | | | 282794.52 | 129300.96 | | 16650.84 | 153493.56 |
| 1481  FA 0001 1/29/90-1<br>JIB CRANE | | 60 | | STL | 554.00 | | | | 554.00 |
| 1490  FA 0001 1/29/90-1<br>L DRILL, TRH-1900 #3732 | | 60 | | STL | 11000.00 | | | | 11000.00 |
| 1491  FA 0001 1/29/90-1<br>, HERCULES AJAX, 20"566" | | 60 | | STL | 9000.00 | | | | 9000.00 |
| 1492  FA 0001 1/29/90-1<br>T LATHE, HES, #5911661 | | 60 | | STL | 2800.00 | | | | 2800.00 |
| 1493  FA 0001 1/29/90-1<br>T LATHE, GISHOLT, 6 HEADS | | 60 | | STL | 2000.00 | | | | 2000.00 |
| 1494  FA 0001 1/29/90-1<br>T LATHE, GISHOLT, #324933 | | 60 | | STL | 2000.00 | | | | 2000.00 |
| 1495  FA 0002 1/29/90-1<br>CENTER, WICKMAN,MODEL-14 | 120 | 43.951 | STL | 20000.00 | 7329.20 | | 1500.84 | 12670.80 |

DATE 5/15/96
TIME 14:11:15

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE 5

LEVEL 0005 JLG INDUSTRIES

ASSET TYPE/SUBTYPE MAC 5610

| COMP SRC NBR COE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 6   FA 0001 1/29/90-1 | | 60 | | STL | 3900.00 | | | | 3900.00 |
| 7   FA 0001 1/29/90-1 | | 60 | | STL | 1400.00 | | | | 1400.00 |
| 98  FA 0001 1/29/90-1 | | 60 | | STL | 12000.00 | | | | 12000.00 |
| 99  FA 0001 1/29/90-1 | | 60 | | STL | 4300.00 | | | | 4300.00 |
| 01  FA 0001 1/29/90-1 | | 120 | 43.951 | STL | 15400.00 | 5643.48 | | 1155.64 | 9756.52 |
| 02  FA 0001 1/29/90-1 | | 60 | | STL | 1100.00 | | | | 1100.00 |
| 03  FA 0001 1/29/90-1 | | 60 | | STL | 7700.00 | | | | 7700.00 |
| 04  FA 0001 1/29/90-1 | | 120 | 43.951 | STL | 35000.00 | 12826.09 | | 2626.46 | 22173.91 |
| 10  FA 0001 1/29/90-1 | | 60 | | STL | 6100.00 | | | | 6100.00 |
| 11  FA 0001 1/29/90-1 | | 60 | | STL | 4100.00 | | | | 4100.00 |
| 12  FA 0001 1/29/90-1 | | 60 | | STL | 6100.00 | | | | 6100.00 |
| 14  FA 0001 1/29/90-1 | | 60 | | STL | 1500.00 | | | | 1500.00 |
| 26  FA 0001 1/29/90-1 | | 60 | | STL | 3000.00 | | | | 3000.00 |
| 87  FA 0001 9/30/90-1 | | 60 | | STL | 1545.27 | | | 25.08 | 1545.27 |
| 88  FA 0001 9/30/90-1 | | 60 | | STL | 1545.27 | | | 25.08 | 1545.27 |
| 89  FA 0001 9/30/90-1 | | 60 | | STL | 37503.22 | | | 609.92 | 37503.22 |
| 94  FA 0001 11/28/90-1 | | 60 | | STL | 6540.57 | | | 318.25 | 6540.57 |
| 96  FA 0001 11/28/90-1 | | 60 | | STL | 3907.00 | | | 190.11 | 3907.00 |

DRILL, CINCINNATI
4ESS, PONEMATIC#220N66
LEBLOND #14NEL - 1677
CH. BRDGPRT #12BR-82314
CH. CINN #3J5PIZ-42
NE, FLOOR MOUNT, 1 TON
LATHE, GISNOLI#3J7KA10
ING MILL #42-36-12
PRESSES, SET OF 3 PNRMTC
RESSES, SET OF 2,PNRMTC
RESSES, SET OF 3,PNRMTC
, DELTA, NO11B-4705
LLNA200, #2835611
HOIST-ATTCHD TO #201594
HOIST
W S/N 90990208
JIB CRANE-INCL HOIST
L READOUT - LUCAS MILL

DATE 5/13/96
TIME 14:11:15

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE 6

.S LEVEL   DOOS      JLG INDUSTRIES              ASSET TYPE/SUBTYPE  MAE   5610

| COMP SRC NBR CUE QTY | IN-SERV DIE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 1718 FA 0001 | 1/31/93-1 | 60 | 20.000 | STL | 42096.86 | 14032.27 | | 6314.52 | 28064.53 |
| RIZ. SPINDLE MILLING MAC | | | | | | | | | |
| 1755 FA 0001 | 5/02/93-1 | 60 | 24.000 | STL | 6864.29 | 2785.72 | | 1044.64 | 4178.57 |
| JIB CRANE 5 HOIST | | | | | | | | | |
| 1806 FA 0001 | 12/06/93-1 | 60 | 31.000 | STL | 1438.38 | 743.16 | | 215.76 | 695.22 |
| DIGIROLLER/DIGITAL READOUT | | | | | | | | | |
| 1883 FA 0001 | 10/30/94-1 | 60 | 41.959 | STL | 5096.64 | 3564.16 | | 764.50 | 1532.48 |
| UTORIZED HOISTS-M.M. C639 | | | | | | | | | |
| 1937 FA 0001 | 1/29/95-3 | 60 | 44.951 | STL | 29054.90 | 21767.31 | | 4358.22 | 7287.59 |
| S CNC KNEE MILL | | | | | | | | | |
| 1972 FA 0001 | 4/02/95-3 | 60 | 47.022 | STL | 11861.27 | 9295.66 | | 1779.20 | 2565.61 |
| FOSDICK RADIAL DRILL | | | | | | | | | |
| 2063 FA 0001 | 10/02/95-3 | 60 | 53.004 | STL | 255110.78 | 225488.35 | | 29622.43 | 29622.43 |
| ORTAL SPINDLE MILL MACHN | | | | | | | | | |
| 0070 FA 0001 | 1/29/90-1 | 36 | | STL | 65100.00 | | | | 65100.00 |
| TOOLING, DIES | | | | | | | | | |
| PE  5610  TOTAL | | | | | 616798.39 | 303075.40 | | 50550.65 | 313322.99 |
| 1483 FA 0001 | 1/29/90-1 | 60 | | STL | 1300.00 | | | | 1300.00 |
| HOME CANTILEVER J906FCT | | | | | | | | | |
| 1487 FA 0001 | 1/29/90-1 | 60 | | STL | 1300.00 | | | | 1300.00 |
| HOIST W/TROLLEY | | | | | | | | | |
| 1505 FA 0001 | 1/29/90-1 | 60 | | STL | 2200.00 | | | | 2200.00 |
| KG POSITIONER, 36*30 TOP | | | | | | | | | |
| 1517 FA 0001 | 1/29/90-1 | 60 | | STL | 1200.00 | | | | 1200.00 |
| RANE 1-T CAPACITY | | | | | | | | | |
| 1520 FA 0001 | 1/29/90-1 | 60 | | STL | 1840.00 | | | | 1840.00 |
| F BURNING TABLES | | | | | | | | | |
| 1521 FA 0001 | 1/29/90-1 | 60 | | STL | 1400.00 | | | | 1400.00 |
| ING POSITIONER | | | | | | | | | |
| 1527 FA 0001 | 1/29/90-1 | 120 | 43.951 | STL | 55000.00 | 20155.30 | | 4127.28 | 34844.70 |
| R, PACIFIC #5-10356 | | | | | | | | | |
| 1528 FA 0001 | 1/29/90-1 | 60 | | STL | 1100.00 | | | | 1100.00 |
| RANE 1-T CAPACITY | | | | | | | | | |
| 1530 FA 0001 | 1/29/90-1 | 120 | 43.951 | STL | 60000.00 | 21987.60 | | 4502.48 | 38012.40 |
| , BRAKE, CIN #37594 | | | | | | | | | |

DATE 5/15/96
TIME 14:11:15

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

ASSET TYPE/SUBTYPE  MAE  5620

PAGE  7

SS LEVEL   0005   JLG INDUSTRIES

| T COMP SRC<br>ER NBR COE QTY | IN-SERV<br>DTE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 1531    FA  0001 1/29/90-1<br>., HYDRAULIC, DAKE #17084 | | 60 | | STL | 1400.00 | | | | 1400.00 |
| 1532    FA  0001 1/29/90-1<br>ULIC LIFT TABLE 30"X72" | | 60 | | STL | 2300.00 | | | | 2300.00 |
| 01535   FA  0001 1/29/90-1<br>CRANE 1 TON CAPACITY | | 60 | | STL | 1300.00 | | | | 1300.00 |
| 01563   FA  0001 7/01/90-1<br>AWELD 651 #018504 W/BOOM | | 60 | | STL | 4580.00 | | | | 4580.00 |
| 01564   FA  0001 7/01/90-1<br>AWELD 651 #026390 W/BOOM | | 60 | | STL | 4580.00 | | | | 4580.00 |
| 01565   FA  0001 7/01/90-1<br>AWELD 651 #026392 W/BOOM | | 60 | | STL | 4580.00 | | | | 4580.00 |
| 01567   FA  0001 7/01/90-1<br>AWELD 451 #330965 W/FEED | | 60 | | STL | 2898.00 | | | | 2898.00 |
| 01568   FA  0001 7/01/90-1<br>AWELD 451 #051952 W/FEED | | 60 | | STL | 2898.00 | | | | 2898.00 |
| 01569   FA  0001 7/01/90-1<br>AWELD 451 #058996 W/FEED | | 60 | | STL | 2899.00 | | | | 2899.00 |
| 01593   FA  0001 11/28/90-1<br>KG SYSTEM - CUTTING MACH | | 60 | | STL | 16446.67 | | | 800.27 | 16446.67 |
| 01595   FA  0001 11/28/90-1<br>CRANE | | 60 | | STL | 6540.58 | | | 318.25 | 6540.58 |
| 01597   FA  0001 11/28/90-1<br>O AMP FEEDS-CUTTING MACH | | 60 | | STL | 18513.00 | | | 900.81 | 18513.00 |
| 01607   FA  0001 3/03/91-1<br>M MODEL 26 AIR CLEANER | | 60 | | STL | 2379.50 | | | 244.87 | 2379.50 |
| 01616   FA  0001 4/08/91-1<br>ING POSITIONER | | 60 | | STL | 5900.00 | | | 776.74 | 5900.00 |
| 01677   FA  0001 6/28/92-1<br>UE BOX WELDER & CONVEYOR | | 60 | 13.803 | STL | 131133.72 | 29887.14 | | 19375.11 | 101246.58 |
| 01678   FA  0001 6/28/92-1<br>MSION TO BURN TABLE | | 60 | 13.803 | STL | 26629.57 | 6069.24 | | 3934.53 | 20560.33 |
| 01691   FA  0001 10/04/92-1<br>IABLE VACUUM LIFTER | | 60 | 17.000 | STL | 14149.39 | 4008.99 | | 2122.41 | 10140.40 |
| 01719   FA  0001 1/31/93-1<br>ER DUAL SWINGARC BOOM | | 60 | 20.000 | STL | 4595.00 | 1531.67 | | 689.25 | 3063.33 |

DA DATE 5/15/96
TIME 14:11:15

SS LEVEL  0005   JLG INDUSTRIES

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

ASSET TYPE/SUBTYPE  M&E   5620

PAGE  8

| AT COMP SRC / DESCRIPTION | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 11757 FA 0001 — .R SWINGARC BOOM ASSEMBLY. | 5/02/93-1 | 60 | 24.000 | STL | 4919.00 | 1967.60 | | 737.85 | 2951.40 |
| J174 FA 0001 — ER DIAL SWINGARC WELD BOOM | 7/04/93-1 | 60 | 26.000 | STL | 3533.00 | 1530.97 | | 529.95 | 2002.03 |
| J1784 FA 0001 — SWINGARC BOOM WELD SET | 9/05/93-1 | 60 | 28.000 | STL | 5210.90 | 2431.74 | | 781.65 | 2179.16 |
| 01930 FA 0001 — STANDING JIB CRANE | 4/04/94-1 | 60 | 35.000 | STL | 6759.00 | 4109.43 | | 1056.70 | 2649.57 |
| 01931 FA 0001 — TRIC CHAIN HOIST & FESTOON | 4/04/94-1 | 60 | 35.000 | STL | 1740.00 | 1015.01 | | 261.00 | 724.99 |
| 01932 FA 0001 — LYNX ELECTRIC HOIST | 4/04/94-1 | 60 | 35.000 | STL | 1260.00 | 735.01 | | 189.00 | 524.99 |
| 01933 FA 0002 — TAGLINE FESTOONS | 4/04/94-1 | 60 | 35.000 | STL | 348.86 | 203.51 | | 52.33 | 145.35 |
| 01934 FA 0002 — DUFF LYNX ELECTRIC HOISTS | 4/04/94-1 | 60 | 35.000 | STL | 2780.00 | 1621.67 | | 417.00 | 1158.33 |
| 01935 FA 0002 — BRACKET JIB CRANE | 4/04/94-1 | 60 | 35.000 | STL | 1330.00 | 775.83 | | 199.51 | 554.17 |
| 01962 FA 0001 — ARIZED 3 TON HOIST | 4/02/95-3 | 60 | 47.022 | STL | 2497.00 | 1956.89 | | 374.56 | 540.11 |
| 01963 FA 0001 — LR WELDING EQUIPMENT | 4/02/95-3 | 60 | 47.022 | STL | 16012.00 | 12548.58 | | 2401.81 | 3463.42 |
| 01970 FA 0001 — GRITS & 2 DEEP CELL BATTS | 4/02/95-3 | 60 | 47.022 | STL | 3110.20 | 2437.45 | | 466.54 | 672.75 |
| 01992 FA 0001 — IERY POWERED LIFTING MAGNET | 4/30/95-3 | 60 | 47.943 | STL | 3819.61 | 3052.03 | | 572.94 | 767.58 |
| 02093 FA 0001 — SWING ARC WELDERS | 3/05/96-3 | 60 | 58.040 | STL | 16471.00 | 15933.10 | | 537.90 | 537.90 |
| 500079 FA 0001 — S TOOLING, DIES | 1/29/90-1 | 36 | | STL | 65100.00 | | | | 65100.00 |
| 016038 FA 0001 — 4512 THERMAL CUTTING MACH | 3/03/91-1 | 60 | | STL | 181916.50 | | | 18720.49 | 181916.50 |
| 016040 FA 0001 — WATER TABLES - TCM 4512 | 3/03/91-1 | 60 | | STL | 37262.86 | | | 3834.61 | 37262.86 |
| 03101 FA 0001 — TING MACHINE COMPTER SYST | 3/03/91-1 | 60 | | STL | 8650.14 | | | 890.16 | 8650.14 |

DATE 5/15/96
TIME 14:11:15

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE 9

LEVEL 0005   JLG INDUSTRIES

ASSET TYPE/SUBTYPE   M&E   5620

| COMP NBR / SRC CDE / QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 02  FA 0001 — MACH INSTALL & OTHER | 3/03/91-1 | 60 | | STL | 5765.04 | | | 593.26 | 5765.04 |
| 01  FA 0001 — ABLE EURODRIVE GEARMOTOR | 3/31/91-1 | 60 | | STL | 3120.79 | | | 362.22 | 3120.79 |
| FA 0001 — EQUIPMENT | 1/03/94-1 | 60 | 32.000 | STL | 10030.00 | 5349.33 | | 1504.51 | 4680.67 |
| FA 0001 — LD PLASMA CUTTING SYST. | 1/03/94-1 | 60 | 32.000 | STL | 4975.00 | 2653.33 | | 746.26 | 2321.67 |
| 5620 TOTAL | | | | | 765673.33 | 141961.42 | | 73022.25 | 623711.91 |
| 506 FA 0001 — 8'X16' WITH LADDER | 1/29/90-1 | 60 | | STL | 3000.00 | | | | 3000.00 |
| 509 FA 0001 — RAKE, 1 15-T D8,1 5-TOB | 1/29/90-1 | 180 | 103.951 | STL | 90000.00 | 51992.60 | | 4501.49 | 38007.40 |
| 515 FA 0001 — HOMEMADE 3'X24' CYLINDE | 1/29/90-1 | 60 | | STL | 1000.00 | | | | 1000.00 |
| 516 FA 0001 — NIT AUGGOR STRATON ENG | 1/29/90-1 | 60 | | STL | 2300.00 | | | | 2300.00 |
| 592 FA 0001 — G CABINET | 9/30/90-1 | 60 | | STL | 1755.70 | | | 28.49 | 1755.70 |
| 683 FA 0001 — TIC TORQUE WRENCH | 8/01/92-1 | 60 | 15.000 | STL | 3510.00 | 877.50 | | 526.50 | 2632.50 |
| 845 FA 0001 — MACHINES & PUMP | 7/04/94-1 | 60 | 38.000 | STL | 10545.00 | 6578.51 | | 1581.75 | 3966.49 |
| 846 FA 0001 — JT HORIZONTAL DRILL | 7/04/94-1 | 60 | 38.000 | STL | 3044.11 | 1941.12 | | 459.73 | 1102.99 |
| 918 FA 0001 — G CABINET | 9/30/90-1 | 60 | | STL | 1755.69 | | | 28.49 | 1755.69 |
| E 5630 TOTAL | | | | | 116910.50 | 61489.73 | | 7126.45 | 55420.77 |
| 482 FA 0001 — COLIFT SR02300039 | 1/29/90-1 | 60 | | STL | 1500.00 | | | | 1500.00 |
| 524 FA 0001 — SSURE CLEANER, KARCHER | 1/29/90-1 | 60 | | STL | 1860.00 | | | | 1860.00 |
| 561 FA 0001 — G EQUIPMENT | 7/01/90-1 | 60 | | STL | 4845.50 | | | | 4845.50 |

| RUN DATE 5/15/96 | | | | | | | | | | | | PAGE 10 |

| TIME 14:11:15 | | | | | | | | | | | |

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

CLASS LEVEL  0005     JLG INDUSTRIES                                           ASSET TYPE/SUBTYPE  MAE  5640

| ASSET NBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 201562  FA  0001 CONCRETE TEST PAD | 7/01/90-1 | 60 | | STL | 9257.58 | | | | 9257.58 |
| 201749  FA  0001 50 DR TORQUE WRENCH | 5/02/93-1 | 60 | 24.000 | STL | 1409.07 | 563.63 | | 211.36 | 845.44 |
| 201750  FA  0001 LE PREPPER 45-725 | 5/02/93-1 | 60 | 24.000 | STL | 1915.00 | 765.99 | | 287.26 | 1149.01 |
| 201782  FA  0001 CHER MOS 890 PRESSURE WASHE | 9/05/93-1 | 40 | 28.000 | STL | 3887.00 | 1813.94 | | 583.05 | 2073.06 |
| 202021  FA  0001 D CELLS | 6/04/95-3 | 60 | 49.094 | STL | 14102.00 | 11538.56 | | 2115.27 | 2563.44 |
| TYPE   5640  TOTAL | | | | | 38876.15 | 14682.12 | | 3196.94 | 24094.03 |
| 201602  FA  0001 EL BLAST CLEANING MACHINE | 1/27/91-1 | 60 | | STL | 142655.84 | | | 11647.23 | 142655.84 |
| 201605  FA  0001 DOWNDRAFT PAINT BOOTH | 3/03/91-1 | 60 | | STL | 89674.70 | | | 9228.16 | 89674.70 |
| 201606  FA  0001 OBLAST & DOWNDRAFT PIT | 3/03/91-1 | 60 | | STL | 29600.00 | | | 3046.05 | 29600.00 |
| 201838  FA  0001 CK WASH MEZZANINE | 4/04/94-1 | 60 | 35.000 | STL | 7125.00 | 4156.26 | | 1068.75 | 2968.74 |
| 1602 01  FA  0001 ST MACHINE INSTALLATION | 3/03/91-1 | 60 | | STL | 26531.37 | | | 2730.27 | 26531.37 |
| 1605 01  FA  0001 NYEYOR SYSTEM - PAINT BOOTH | 3/03/91-1 | 60 | | STL | 49366.22 | | | 5080.13 | 49366.22 |
| 1605 02  FA  0001 PAIR & RELOC - PAINT BOOTH | 3/03/91-1 | 60 | | STL | 12024.30 | | | 1237.39 | 12024.30 |
| TYPE   5645  TOTAL | | | | | 356977.43 | 4156.26 | | 34037.98 | 352821.17 |
| 201484  FA  0001 YOTA FORKLIFT SN 10701 | 1/29/90-1 | 60 | | STL | 5000.00 | | | | 5000.00 |
| 201485  FA  0001 ISUN FORKLIFT SN545 | 1/29/90-1 | 50 | | STL | 7400.00 | | | | 7400.00 |
| 201519  FA  0001 ACTOR, J.DEERE, #J489451 | 1/29/90-1 | 60 | | STL | 14000.00 | | | | 14000.00 |
| 201529  FA  0001 RK TRUCK, CAT,#JVT0033J | 1/29/90-1 | 60 | | STL | 6300.00 | | | | 6300.00 |

DATE 5/15/96
TIME 14:11:15

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE 11

LEVEL 0005    JLG INDUSTRIES

ASSET TYPE/SUBTYPE   MAE   5650

| COMP SRC MBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 34   FA 0001 1/29/90-1 UCK, TOT #A03FC25-10701 | | 60 | | STL | 9400.00 | | | | 9400.00 |
| 18   FA 0001 1/29/90-1 AINS, SHELVES | | 60 | | STL | 31843.00 | | | | 31843.00 |
| 84   FA 0001 8/01/90-1 | | 60 | | STL | 11318.68 | | | | 11318.68 |
| 90   FA 0001 9/30/90-1 FORKLIFT SN 11588 | | 60 | | STL | 16049.46 | | | 260.46 | 16049.46 |
| 39   FA 0001 12/01/91-1 PROTO #1 SN 5801 | | 60 | 6.979 | STL | 10500.00 | 1221.82 | | 1575.63 | 9278.18 |
| 20   FA 0001 1/31/93-1 L SHEET LIFTER | | 60 | 20.000 | STL | 6225.24 | 2075.08 | | 933.79 | 4150.16 |
| 21   FA 0001 1/31/93-1 L SPREADER BEAM | | 60 | 20.000 | STL | 1190.57 | 396.86 | | 178.58 | 793.71 |
| 22   FA 0001 1/31/93-1 IIC DOOR OPNRS & RADIOS | | 60 | 20.000 | STL | 1090.00 | 363.33 | | 163.51 | 726.67 |
| 847  FA 0001 7/04/94-1 FORK TRUCK SN 75730 | | 60 | 38.000 | STL | 21499.00 | 13616.03 | | 3224.86 | 7882.97 |
| 939  FA 0001 1/01/95-3 LINE SHELVING #640 | | 60 | 44.031 | STL | 3159.12 | 2318.29 | | 473.86 | 840.83 |
| 927  FA 0001 1/29/95-3 FRONIK FLOOR SCALE | | 60 | 44.951 | STL | 1975.00 | 1479.62 | | 296.26 | 495.38 |
| 960  FA 0001 3/05/95-3 ANE W/ 1 TON HOIST | | 60 | 46.102 | STL | 3315.00 | 2547.11 | | 497.25 | 767.89 |
| 996  FA 0001 4/30/95-3 STRIP DOOR | | 60 | 47.943 | STL | 1632.40 | 1304.35 | | 244.87 | 328.05 |
| 061  FA 0001 10/02/95-3 ROCK CAB S/N OOCL2275 | | 60 | 53.004 | STL | 2977.18 | 2630.04 | | 347.14 | 347.14 |
| 02   FA 0001 3/31/91-1 -) YARD CRANE | | 30 | | STL | 71255.09 | | | | 71255.09 |
| 018  FA 0001 9/02/90-1 - Y7 YARD CRANE | | 60 | | STL | 6437.00 | | | 5.84 | 6437.00 |
| E  5650 TOTAL | | | | | 232566.74 | 27952.53 | | 8202.05 | 204614.21 |
| 507  FA 0001 1/29/90-1 R, INTERNAL, #35655631 | | 60 | | STL | 3500.00 | | | | 3500.00 |

RUN DATE 5/15/96  JLG INDUSTRIES    COMPANY - 1  JLG INDUSTRIES    PAGE 12
TIME 14:11:15    BOOK BASIS ASSET STATUS REPORT

SS LEVEL  0005  JLG INDUSTRIES    ASSET TYPE/SUBTYPE MAE  5660

| T COMP SRC MBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 2009 FA 0001 ABLE WELDER | 4/30/95:3 | 60 | 47.943 | STL | 1590.00 | 1274.77 | | 238.80 | 315.23 |
| PE 5660 TOTAL | | | | | 5090.00 | 1274.77 | | 238.80 | 3815.23 |
| J1891 FA 0001 TEST PAD-YORK C611 | 10/30/94:3 | 60 | 41.959 | STL | 16850.00 | 11783.47 | | 2527.49 | 5066.53 |
| PE 5680 TOTAL | | | | | 16850.00 | 11783.47 | | 2527.49 | 5066.53 |
| T TYPE MAE TOTAL | | | | | 2435417.06 | 698160.61 | | 196000.46 | 1732256.45 |
| J1977 FA 0001 PC-MAT'L HANDLING C614 | 10/30/94:3 | 60 | 41.959 | STL | 5296.36 | 3703.83 | | 794.45 | 1592.53 |
| J1978 FA 0001 MS OFFICE PRO V4.3 C614 | 10/30/94:3 | 60 | 41.959 | STL | 569.00 | 397.92 | | 85.35 | 171.08 |
| J1981 FA 0001 UPGRADE PHONE SYSTEM C516 | 10/30/94:3 | 60 | 41.959 | STL | 9040.74 | 6322.32 | | 1356.12 | 2718.42 |
| J1990 FA 0001 MOVEABLE PLANT OFFICE #562 | 1/01/95:3 | 60 | 44.031 | STL | 8109.00 | 5950.68 | | 1216.35 | 2158.32 |
| J2139 FA 0001 590/XM PC W/MONITOR | 4/02/95:3 | 60 | 47.022 | STL | 3622.63 | 2839.04 | | 543.41 | 783.59 |
| J2149 FA 0001 5100/XM W/MONITOR | 4/02/95:3 | 60 | 47.022 | STL | 4303.06 | 3312.30 | | 645.47 | 930.76 |
| J2155 FA 0001 THINKPAD MOBILE KIT | 4/30/95:3 | 60 | 47.943 | STL | 7385.94 | 5901.67 | | 1107.90 | 1484.27 |
| J2240 FA 0001 A RING MAU | 11/01/95:3 | 60 | 54.014 | STL | 2475.10 | 2227.36 | | 247.74 | 247.74 |
| TYPE 5201 TOTAL | | | | | 40801.83 | 30715.12 | | 5996.79 | 10086.71 |
| J0214 FA 0001 MODEL 56 SN23FGN11 PC | 4/26/92:3 | 60 | 11.011 | STL | 4028.00 | 792.91 | | 604.20 | 3235.09 |
| J0123 FA 0001 INKJET PLOTTER PC16531R | 6/28/92:1 | 60 | 13.803 | STL | 8682.86 | 1978.94 | | 1282.91 | 6703.92 |
| J0124 FA 0001 M SOFTWARE | 6/28/92:1 | 60 | 13.803 | STL | 20405.00 | 4650.58 | | 3014.85 | 15754.42 |
| J0125 FA 0001 M INSTALLATION | 6/28/92:1 | 60 | 13.803 | STL | 17997.70 | 4101.92 | | 2659.18 | 13895.78 |
| J0126 FA 0001 MODEL 90 PC SN 23THDI2 | 6/28/92:1 | 60 | 13.803 | STL | 8511.97 | 1939.98 | | 1257.66 | 6571.99 |

DATE 5/15/96    COMPANY - 1 JLG INDUSTRIES    PAGE 13
TIME 14:11:15    BOOK BASIS ASSET STATUS REPORT

S LEVEL  0005  JLG INDUSTRIES    ASSET TYPE/SUBTYPE 0166  5203

| COMP SRC<br>R NBR CDE QTY | IN-SERV<br>DIE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 1727  FA 0001<br>MODEL 90 SN231TD13 | 6/28/92-1 | 60 | 13.803 | STL | 8511.97 | 1939.98 | | 1257.66 | 6571.99 |
| 1728  FA 0001<br>MODEL 90 PC SN231TD02 | 6/28/92-1 | 60 | 13.803 | STL | 8511.97 | 1939.98 | | 1257.66 | 6571.99 |
| 1729  FA 0001<br>MODEL 90 SN231TF00 | 6/28/92-1 | 60 | 13.803 | STL | 8511.97 | 1939.98 | | 1257.66 | 6571.99 |
| 1730  FA 0001<br>MODEL 90 SERVER SN231WKN8 | 6/28/92-1 | 60 | 13.803 | STL | 12281.99 | 2799.24 | | 1814.67 | 9482.75 |
| 1731  FA 0001<br>SS TOKENRING SN23XPPH3 | 6/28/92-1 | 60 | 13.803 | STL | 4706.40 | 1072.65 | | 695.38 | 3633.75 |
| 1732  FA 0001<br>SS TOKENRING SN23XPXX9 | 6/28/92-1 | 60 | 13.803 | STL | 4706.40 | 1072.65 | | 695.38 | 3633.75 |
| 1738  FA 0001<br>X 4960033 | 10/04/92-1 | 60 | 17.000 | STL | 2133.73 | 604.56 | | 320.05 | 1529.17 |
| 1855  FA 0001<br>466 COMPUTER & EQUIP. | 10/04/93-1 | 60 | 29.000 | STL | 6470.00 | 3088.60 | | 958.53 | 3381.40 |
| 1856  FA 0001<br>466 COMP. & RELATED EQUIP | 10/04/93-1 | 60 | 29.000 | STL | 6471.00 | 3089.09 | | 958.68 | 3381.91 |
| 1857  FA 0001<br>466 COMP. & RELATED EQUIP | 10/04/93-1 | 60 | 29.000 | STL | 6471.00 | 3089.09 | | 958.68 | 3381.91 |
| 1858  FA 0001<br>TEK MAU 82RAT-5 | 10/04/93-1 | 60 | 29.000 | STL | 1297.00 | 626.80 | | 194.56 | 670.12 |
| 1859  FA 0003<br>) SOFTWARE | 10/04/93-1 | 36 | 5.000 | STL | 27518.63 | 3822.02 | | 6879.67 | 23696.61 |
| 2032  FA 0001<br>MONITOWER W/MONITOR&SFTWR | 1/29/95-3 | 60 | 44.951 | STL | 9755.98 | 7308.97 | | 1463.40 | 2447.01 |
| 2033  FA 0001<br>) CADAM SOFTWARE-TK ENG. | 1/29/95-3 | 36 | 20.951 | STL | 7597.00 | 4421.19 | | 1899.24 | 3175.81 |
| 2243  FA 0001<br>JORKSTATION | 11/01/95-3 | 60 | 54.014 | STL | 25094.96 | 22592.06 | | 2502.90 | 2502.90 |
| 2248  FA 0001<br>5100/XH PC | 12/04/95-3 | 60 | 55.040 | STL | 4280.61 | 3927.31 | | 353.30 | 353.30 |
| 2268  FA 0001<br>ECHANICA STRUCTURE SFTWRE | 2/01/96-3 | 36 | 33.051 | STL | 16000.00 | 14670.32 | | 1329.68 | 1329.68 |
| 2269  FA 0001<br>NGINEERING CAD SOFTWARE | 2/01/96-3 | 36 | 33.051 | STL | 17000.00 | 15587.21 | | 1412.79 | 1412.79 |

A DATE 5/15/96
TIME 14:11:15

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

PAGE 14

SS LEVEL 0005    JLG INDUSTRIES

ASSET TYPE/SUBTYPE 01AE 5203

| T .COMP SRC ER MBR CDE QTY | IN-SERV DTE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 2272 FA 0001 RESTORE EXT. DRIVE - CAD | 2/01/96-3 | 60 | 57.051 | STL | 1092.67 | 1038.19 | | 54.48 | 54.48 |
| 5 THER 2303-2 COPIER | 1/03/94-1 | 60 | 32.000 | STL | 1590.00 | 848.01 | | 238.50 | 741.99 |
| PE 5203 TOTAL | | | | | 23928.81 | 108942.31 | | 35321.67 | 130686.50 |
| J1901 FA 0001 466/MHV PC | 6/06/94-1 | 60 | 37.000 | STL | 3158.56 | 1947.79 | | 473.78 | 1210.77 |
| 2249 FA 0001 5100/XM PC | 12/04/95-3 | 60 | 55.048 | STL | 4280.61 | 3902.70 | | 377.91 | 377.91 |
| PE 5204 TOTAL | | | | | 7439.17 | 5850.49 | | 851.69 | 1588.68 |
| 01472 FA 0001 IE CONTROLLER #59746 | 2/01/89-3 | 60 | | STL | 5002.98 | | | | 5002.98 |
| 01590 FA 0001 (ERMINAL & 100 CPS PRINTER | 1/29/90-1 | 60 | | STL | 920.00 | | | | 920.00 |
| 01591 FA 0001 UTER EQUIP - MODEM | 1/29/90-1 | 60 | | STL | 2300.00 | | | | 2300.00 |
| 01593 FA 0001 PRINT MACHINE | 1/29/90-1 | 60 | | STL | 1400.00 | | | | 1400.00 |
| 01594 FA 0001 H FAX M35 | 1/29/90-1 | 60 | | STL | 1800.00 | | | | 1800.00 |
| 01587 FA 0001 A PHONE SYSTEM NO IV | 1/29/90-1 | 120 | 43.951 | STL | 15000.00 | 5495.89 | | 1125.63 | 9503.11 |
| 01588 FA 0001 OF TYPEWRITERS | 1/29/90-1 | 60 | | STL | 3300.00 | | | | 3300.00 |
| 101590 FA 0001 WRITER, CANON, HP 200X | 1/29/90-1 | 60 | | STL | 2600.00 | | | | 2600.00 |
| 101591 FA 0001 I. MACH, PITNEY BONES #1746 | 1/29/90-1 | 60 | | STL | 1100.00 | | | | 1100.00 |
| 101593 FA 0001 IER, CANON NP-270F | 1/29/90-1 | 60 | | STL | 3000.00 | | | | 3000.00 |
| 101596 FA 0001 40BA FAX MACHINE | 1/29/90-1 | 60 | | STL | 2200.00 | | | | 2200.00 |
| 101598 FA 0001 OFFICE FURNITURE | 1/29/90-1 | 60 | | STL | 23925.00 | | | | 23925.00 |

DATE 5/15/96
TIME 14:11:15                    JLG INDUSTRIES

.S LEVEL 0005    JLG INDUSTRIES

COMPANY - 1 JLG INDUSTRIES
BOOK BASIS ASSET STATUS REPORT

ASSET TYPE/SUBTYPE OFIE 5601                    PAGE 15

| COMP SRC<br>R NBR COE QTY | IN-SERV<br>DTE-OPT | ASSET<br>LIFE | REM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 631 FA 0001<br>50 #23967/764 | 7/01/90-1 | 60 | | STL | 3237.24 | | | | 3237.24 |
| 632 FA 0001<br>30 #232739328 | 7/01/90-1 | 60 | | STL | 1889.98 | | | | 1889.98 |
| 634 FA 0001<br>000 TERMINAL SR 2550 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 635 FA 0001<br>000 TERMINAL SR 2551 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 636 FA 0001<br>000 TERMINAL SR 2554 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 637 FA 0001<br>000 TERMINAL SR 2553 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 638 FA 0001<br>000 TERMINAL SR 2554 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 639 FA 0001<br>000 TERMINAL SR 2555 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 640 FA 0001<br>000 TERMINAL SR2556 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 641 FA 0001<br>000 TERMINAL SR2557 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 642 FA 0001<br>000 TERMINAL SR2558 | 7/01/90-1 | 60 | | STL | 1768.74 | | | | 1768.74 |
| 643 FA 0001<br>50 TERMINAL SR 799 | 7/01/90-1 | 60 | | STL | 706.64 | | | | 706.64 |
| 644 FA 0001<br>000 CONTROLLER #0081824 | 7/01/90-1 | 60 | | STL | 826.80 | | | | 826.80 |
| 662 FA 0001<br>IE CONTROLLER #0081824 | 8/01/90-1 | 60 | | STL | 4552.70 | | | | 4552.70 |
| 678 FA 0001<br>DISPLAY STATION | 8/01/90-1 | 60 | | STL | 973.65 | | | | 973.65 |
| 2073 FA 0001<br>590/JM PC W/ MONITOR | 1/29/95-3 | 60 | 44.951 | STL | 4811.34 | 3604.55 | | 721.71 | 1206.79 |
| 2074 FA 0001<br>590/SP SCSI BASE | 1/29/95-3 | 60 | 44.951 | STL | 10595.10 | 7937.63 | | 1589.26 | 2657.47 |
| 2075 FA 0001<br>4KER II MR KIT PC FLATBED | 1/29/95-3 | 60 | 44.951 | STL | 1097.27 | 822.05 | | 164.60 | 275.22 |

DATE 5/15/96    COMPANY - 1 JUG INDUSTRIES        PAGE 16
TIME 14:11:15    BOOK BASIS ASSET STATUS REPORT

S LEVEL 0005    JUG INDUSTRIES    ASSET TYPE/SUBTYPE OFAE 5601

| COMP SRC R NBR COE QTY / Description | IN-SERV DIE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 79B FA 0001 OASIS PRINTER 11898 | 6/01/87-1 | 60 | | STL | 6871.00 | | | | 6871.00 |
| 108B FA 0001 RT SN BO797 | 6/01/88-1 | 60 | | STL | 948.70 | | | | 948.70 |
| 83B FA 0001 102 PRINTER | 3/03/91-1 | 60 | | STL | 5988.52 | | | | 5988.52 |
| 85B FA 0001 4G DEVICE #90D82 | 3/03/91-1 | 60 | | STL | 1174.86 | | | 120.90 | 1174.86 |
| 96B FA 0001 C CONTROLLER #67331 | 3/03/91-1 | 60 | | STL | 4951.41 | | | 509.54 | 4951.41 |
| PE 5601 TOTAL | | | | | 127091.85 | 17861.12 | | 4231.64 | 109230.73 |
| 626B FA 0001 CRI SN M6170 | 6/03/90-1 | 60 | | STL | 1038.29 | | | | 1038.29 |
| PE 5640 TOTAL | | | | | 1038.29 | | | | 1038.29 |
| 160B FA 0001 102 PRINTER #GY730 | 3/03/91-1 | 60 | | STL | 5988.51 | | | 616.26 | 5988.51 |
| 2213 FA 0001 5100/XMT PC | 7/02/95-3 | | 50.014 | STL | 4654.46 | 3879.78 | | 698.17 | 774.68 |
| PE 5650 TOTAL | | | | | 10642.97 | 3879.78 | | 1314.43 | 6763.19 |
| 163D FA 0001 D SO #237685802 | 7/01/90-1 | 60 | | STL | 5540.62 | | | | 5540.62 |
| 174I FA 0001 02B LASERPRINTER | 10/04/92-1 | | 17.000 | STL | 6035.72 | 1710.12 | | 905.36 | 4325.60 |
| 624B FA 0001 CRI SN M6162 | 6/03/90-1 | 60 | | STL | 1038.29 | | | | 1038.29 |
| 627B FA 0001 PRINTER 400 CPS SN D1159 | 6/03/90-1 | 60 | | STL | 6360.55 | | | | 6360.55 |
| PE 5653 TOTAL | | | | | 18975.18 | 1710.12 | | 905.36 | 17265.06 |
| J1595 FA 0001 LRIRE. 1ANDOM | 1/29/90-1 | 60 | | STL | 3500.00 | | | | 3500.00 |
| J1840 FA 0001 ICAM PROD MILLING SOFTWARE | 9/05/93-1 | 36 | 4.000 | STL | 3430.00 | 381.10 | | 857.51 | 3048.90 |
| J1846 FA 0001 433/L PC | 9/05/93-1 | 60 | 29.000 | STL | 2908.64 | 1357.35 | | 436.31 | 1551.29 |

```
DATE 5/15/96                      COMPANY - 1 JLG INDUSTRIES                                    PAGE  17
TIME 14:11:15                     BOOK BASIS ASSET STATUS REPORT
```

S LEVEL 0005    JLG INDUSTRIES                         ASSET TYPE/SUBTYPE OFSE 5680

| COMP SRC<br>R MBR CDE QTY | IN-SRV<br>DTE-OPT | ASSET<br>LIFE | RCM<br>LIFE | DEPR<br>METH | ASSET<br>COST(BASIS) | BOOK<br>VALUE | CURRENT PER<br>DEPRECIATION | YEAR TO DATE<br>DEPRECIATION | ASSET TO DATE<br>DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 961  FA  0001 | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| D STATION C#491 | | | | | | | | | |
| 962  FA  0001 | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| M CAD STATION C#491 | | | | | | | | | |
| 963  FA  0001 | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| M CAD STATION C#491 | | | | | | | | | |
| 964  FA  0001 | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| M CAD STATION C#491 | | | | | | | | | |
| 965  FA  0001 | 10/30/94-3 | 60 | 41.959 | STL | 3044.60 | 2129.14 | | 456.69 | 915.46 |
| M CAD STATION C#491 | | | | | | | | | |
| 993  FA  0001 | 1/01/95-3 | 60 | 44.031 | STL | 12312.37 | 9079.32 | | 1855.83 | 3293.05 |
| D STATION #615 301999 | | | | | | | | | |
| 015  FA  0001 | 1/29/95-3 | 60 | 44.951 | STL | 3067.64 | 2298.20 | | 460.16 | 769.44 |
| 33/L PC -D. MCMILLAN | | | | | | | | | |
| 085  FA  0001 | 1/29/95-3 | 60 | 44.951 | STL | 6507.77 | 4875.49 | | 976.16 | 1632.20 |
| LL 590/XM PC W/MONITOR | | | | | | | | | |
| 106  FA  0002 | 3/05/95-3 | 60 | 46.102 | STL | 3720.84 | 2858.94 | | 558.12 | 861.90 |
| CAN ZIFS MONITOR (2) | | | | | | | | | |
| 134  FA  0001 | 4/02/95-3 | 60 | 47.022 | STL | 3911.03 | 3065.07 | | 586.66 | 845.96 |
| D'L MEMORY & MO SPACE | | | | | | | | | |
| 166  FA  0001 | 4/30/95-3 | 60 | 47.943 | STL | 4211.79 | 3365.40 | | 631.77 | 846.39 |
| 100/XM PC | | | | | | | | | |
| 177  FA  0001 | 4/30/95-3 | 60 | 47.943 | STL | 5904.38 | 4603.56 | | 883.31 | 1220.82 |
| RKSTATION | | | | | | | | | |
| 178  FA  0001 | 4/30/95-3 | 60 | 47.943 | STL | 6076.82 | 4855.64 | | 911.52 | 1221.18 |
| .NER UPGRADE | | | | | | | | | |
| 189  FA  0001 | 6/04/95-3 | 60 | 49.094 | STL | 4905.14 | 4013.50 | | 735.76 | 891.64 |
| 90/XM PC | | | | | | | | | |
| 214  FA  0001 | 7/02/95-3 | 60 | 50.014 | STL | 4654.49 | 3879.81 | | 698.17 | 774.60 |
| .100/XMT PC | | | | | | | | | |
| -C   5680 TOTAL | | | | | 80393.91 | 55359.08 | | 11874.73 | 25034.83 |
| TYPE OFSE TOTAL | | | | | 526012.01 | 224310.02 | | 60496.31 | 301693.99 |
| EVEL 0005 TOTAL | | | | | 4498173.18 | 2094438.07 | | 321317.10 | 2403735.11 |
| T    1 TOTAL | | | | | 4498173.18 | 2094438.07 | | 321317.10 | 2403735.11 |

* REPORT COMPLETED *******

OA DATE 5/15/96
TIME 9:10:03

COMPANY - 7 EQUIPMENT SERVICES
BOOK BASIS ASSET STATUS REPORT

PAGE 1

ESS LEVEL 0005    JLG INDUSTRIES

ASSET TYPE/SUBTYPE OFAE 5253

| ET COMP SRC SER NBR COE QTY | IN-SERV DIE-OPT | ASSET LIFE | REM LIFE | DEPR METH | ASSET COST(BASIS) | BOOK VALUE | CURRENT PER DEPRECIATION | YEAR TO DATE DEPRECIATION | ASSET TO DATE DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| 01716  FA 0001 4/26/92-3 PC MODEL S6 5R23FGC09 PC | 4/26/92-3 | 60 | 11.811 | STL | 4028.00 | 792.91 | | 604.20 | 3235.09 |
| 01718  FA 0001 5/31/92-3 60X SPIRIT 61 P.C. | 5/31/92-3 | 60 | 12.962 | STL | 1378.00 | 297.68 | | 206.71 | 1080.32 |
| 101902  FA 0001 6/06/94-1 4100/MXV PC | 6/06/94-1 | 60 | 37.000 | STL | 3687.50 | 2273.95 | | 553.14 | 1413.55 |
| 102175  FA 0001 4/30/95-3 590/XM PC | 4/30/95-3 | 60 | 47.943 | STL | 3407.40 | 2722.73 | | 511.11 | 684.75 |
| 102515  FA 0001 7/02/95-3 5100/XMF PC | 7/02/95-3 | 60 | 50.014 | STL | 4654.49 | 3879.81 | | 698.17 | 774.68 |
| TYPE 5253 TOTAL | | | | | 17155.47 | 9967.08 | | 2573.33 | 7188.39 |
| 501586  FA 0001 1/29/90-1 CAMERA - PANASONIC | 1/29/90-1 | 60 | | STL | 1875.00 | | | | 1875.00 |
| 101597  FA 0001 1/29/90-1 C OFFICE FURNITURE | 1/29/90-1 | 60 | | STL | 7975.00 | | | | 7975.00 |
| 016208  FA 0001 6/03/90-1 4-12 DOT BARD PRINTER | 6/03/90-1 | 60 | | STL | 12555.17 | | | | 12555.17 |
| 016238  FA 0001 6/03/90-1 6 CRT SB M4493 | 6/03/90-1 | 60 | | STL | 1038.29 | | | | 1038.29 |
| TYPE 5250 TOTAL | | | | | 23443.46 | | | | 23443.46 |
| 302176  FA 0001 4/30/95-3 L 590/XM PC | 4/30/95-3 | 60 | 47.943 | STL | 3407.40 | 2722.73 | | 511.11 | 684.75 |
| 302224  FA 0001 9/04/95-3 ROFICHE READER/PRINTER | 9/04/95-3 | 60 | 52.053 | STL | 5079.52 | 4386.42 | | 693.10 | 693.10 |
| 302284  FA 0001 3/05/96-3 L 5133/GXM 5/N 67MMB | 3/05/96-3 | 60 | 58.040 | STL | 3521.53 | 3406.53 | | 115.00 | 115.00 |
| 302285  FA 0001 3/05/96-3 L 5133/GXM 5/N 67MMG | 3/05/96-3 | 60 | 58.040 | STL | 3521.53 | 3406.53 | | 115.00 | 115.00 |
| 302286  FA 0001 3/05/96-3 L 5133/GXM 5/N 67MML | 3/05/96-3 | 60 | 58.040 | STL | 3521.52 | 3406.52 | | 115.00 | 115.00 |
| TYPE 5692 TOTAL | | | | | 19051.50 | 17328.73 | | 1549.21 | 1722.85 |
| AET TYPE OFAE TOTAL | | | | | 59650.51 | 27295.81 | | 4122.54 | 32354.10 |
| AC LEVEL 0005 TOTAL | | | | | 59650.51 | 27295.81 | | 4122.54 | 32354.70 |

A DATE 5/15/96
TIME 9:10:03

COMPANY - 7 EQUIPMENT SERVICES
BOOK BASIS ASSET STATUS REPORT

PAGE 2

SS LEVEL 0005    JLG INDUSTRIES

ASSET TYPE/SUBTYPE OFAE 5692

| T COMP SRC | IN-SERV | ASSET | REM | DEPR | ASSET | BOOK | CURRENT PER | YEAR TO DATE | ASSET TO DATE |
| ER NBR CDE QTY | DTE-OPT | LIFE | LIFE | METH | COST(BASIS) | VALUE | DEPRECIATION | DEPRECIATION | DEPRECIATION |
|---|---|---|---|---|---|---|---|---|---|
| ANY    7 TOTAL | | | | | 59650.51 | 27295.81 | | 4122.54 | 32354.70 |

*** REPORT COMPLETED *******

mpany 1 Total    4,498,173.18    2,094,438.07    324,317.10    2,403,735.11

Total    4,571,823.69    2,121,733.88    326,439.64    2,436,089.81

JLG Industries, Inc.
Materials-handling Division Assets
April 30, 1996

Assets conveying to MHD, on Lift Division books:

| Asset # | Description | Book Value |
|---------|-------------|------------|
| 301756 | IBM PS/2 56SLC  S/N 23-FGX70 | 992 |
| 201640 | CM2558 Proto #1 S/N 5803 | 1,454 |
| 301433 | NEC Multispeed HD  S/N 7Y01215HA | 0 |
| | Total | $2,446 |

SCHEDULE 1.01(p)

Excluded Assets

1.    Cash in excess of $750,000.

2.    The computer and computer related equipment listed on the attached schedule dated
      January 27, 1996 and labeled Schedule 1.01(p) - Attachments A.

3.    Employee Benefit Plans identified in Schedule 3.22.

4.    Insurance Policies identified in Schedule 3.15, item A.

5.    The name JLG Industries, Inc. and any trade names and trademarks of Seller not
      expressly set forth in Schedule 3.12.  (See Section 5.10).

6.    Other Prepaids as reflected on the Current and Closing Financial Statements.

7.    Accounts Receivable, which as of the Closing Date have not been paid within 120 days of
      the invoice date, together with the applicable reserve.

8.    All software which execute on the McConnellsburg based AS/400 system.
      McConnellsburg based server software AS/400 emulation licenses, such as Rumba and
      Elite products.

9.    Cray TIE-12AC Multiplexor.

Schedule 1.01(p) - Attachment A

JLG Industries, Inc.
Materials-handling Division Assets
April 30, 1996

Assets on MHD's books, not conveying (unless AS/400 solution is installed within 6 months):

| Asset # | Description | Book Value |
|---|---|---|
| 301408B | IBM 3196 Workstation  S/N 88-BD797 | 0 |
| 301678 | IBM 3476 Workstation  S/N 88-G7087 | 0 |
| 301623B | IBM 3476 Workstation S/N 88-M4493 | 0 |
| 301626B | IBM 3476 Workstation  S/N 88-M6170 | 0 |
| 301684 | IBM 4224 - 102 IPDS Printer  S/N 11-GV738 | 0 |
| 301627B | IBM 4224 - 102 IPDS Printer S/N 11-DY159 | 0 |
| 301683B | IBM 4224 - 102 IPDS Printer S/N 11-GA188 | 0 |
| 301620B | IBM 4234 - 012 IPDS Printer S/N 41-D2274 | 0 |
| 301741 | IBM 4028 - AS1 Laser Printer S/N 01-A4329 | 1,710 |
| 301472 | IBM 5394 - O1B Remote Wkstn Controller S/N 23-59746 | 0 |
| 301686B | IBM 5394 - O1B Remote Wkstn Controller S/N 23-67331 | 0 |
| 301662 | IBM 5394 - O1B Remote Wkstn Controller S/N 23-59745 | 0 |
| 301685B | MTS354 Modem Sharing Device  S/N 9008 | 0 |
| | Total | $1,710 |

SCHEDULE 1.01(q)


Financial Statements

Attached and labeled as Schedule 1.01(q) - Attachment A are the Financial Statements.

Material Handling Division
Unaudited Pro Forma Balance Sheets
As of July 31,
(in thousands of dollars)

| | 1995 | 1994 | 1993 |
|---|---|---|---|
| ASSETS | | | |
| Current assets | | | |
| Accounts receivable | $3,003 | $2,602 | $2,207 |
| Inventories | 7,180 | 6,898 | 4,964 |
| Other prepaids | 51 | 54 | 21 |
| Total current assets | 10,234 | 9,554 | 7,192 |
| | | | |
| Property, plant & equipment | | | |
| Land & improvements | 339 | 317 | 317 |
| Buildings & improvements | 1,101 | 834 | 828 |
| Machinery & equipment | 2,624 | 2,365 | 2,191 |
| | 4,064 | 3,516 | 3,336 |
| Less allow for depreciation | (2,135) | (1,699) | (1,270) |
| Net property, plant & equipment | 1,929 | 1,817 | 2,066 |
| | | | |
| Total Assets | $12,163 | $11,371 | $9,258 |
| | | | |
| LIABILITIES & DIVISIONAL INVESTMENT | | | |
| Warranty | 301 | 202 | 155 |
| Product liability | 655 | 808 | 1,109 |
| Divisional Investment | 11,207 | 10,361 | 7,994 |
| | | | |
| Total Liabilities and Divisional Investment | $12,163 | $11,371 | $9,258 |

See the accompanying notes to these unaudited pro forma balance sheets.

Notes to Unaudited Pro Forma Balance Sheets:
Fiscal Years 1993 through 1995

## Accounts Receivable

For 1994 and 1995, the books and records of the Division included an allocation of the Company's total accounts receivable based on the Material Handling Division's sales to total Company sales. In 1993, the books and records of the Division did not include any allocation for accounts receivable. For this pro forma balance sheet presentation prior to 1995, accounts receivable includes specific machines and service parts billings for all Material Handling Division customers, except those common to both the Material Handling and Lift Divisions. Also included is an estimate of machine billings for common customers. Service parts billings for common customers could not be determined, therefore no such amounts are included in accounts receivable.

In 1995, accounts receivable includes machine and service parts billings for all Material Handling Division customers, except for service parts billings relating to customers common to both Divisions. Service parts billings relating to common customers could not be determined, therefore no amounts are included in accounts receivable.

## Allowance for Doubtful Accounts

In 1993, no allowance for doubtful accounts was reflected on the books and records of the Division. For 1994 and 1995, the books and records of the Division included an allocation of the Company's total allowance for doubtful accounts based on the Division's sales to total Company sales. For these pro forma balance sheets, no allowance for doubtful accounts have been provided.

## Inventories

Inventories are stated at cost using the FIFO method. A LIFO reserve included on the books and records of the Material Handling Division has been excluded from these pro forma balance sheets.

## Other Prepaids

Includes prepaid property taxes, promotional items, and security deposits.

## Property, Plant & Equipment

Property, plant and equipment is stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method, based on useful lives of 15 years for land improvements, 10 to 20 years for buildings and improvements, and 3 to 10 years for machinery and equipment. The pro forma balance sheets for fiscal years 1993 through 1995 include small adjustments for office equipment physically located at the Material Handling Division but erroneously included as assets of the Lift Division.

## Other Assets

In 1993, the books and records of the Division included a $38 investment in USTC of Indiana, a discontinued operation, and therefore has been excluded from these pro forma balance sheets. The pro forma balance sheets also exclude certain miscellaneous clearing accounts included on the books and records of the Division.

## Liabilities and Accrued Expenses

The books and records of the Division included miscellaneous other accrued expenses which erroneously relate to the Lift Division, therefore they were excluded from these pro forma balance sheets.

## Warranty

The warranty accrual was calculated based on the historical claims experience of the Division, as well as other subjective criteria.

Material Handling Division
Unaudited Pro Forma Income Statements
Fiscal Years Ended July 31,
(in thousands of dollars)

| | 1995 | % | 1994 | % | 1993 | % | |
|---|---|---|---|---|---|---|---|
| Revenues: | | | | | | | |
| Boom truck cranes | $12,462 | 55.7 | $9,742 | 53.2 | $5,584 | 44.2 | |
| Unloaders | 6,079 | 27.2 | 5,552 | 30.3 | 4,372 | 34.6 | |
| Service parts | 3,808 | 17.0 | 2,964 | 16.2 | 2,491 | 19.7 | |
| Other | 34 | 0.2 | 51 | 0.3 | 181 | 1.4 | |
| | 22,383 | 100.0 | 18,309 | 100.0 | 12,628 | 100.0 | |
| Cost of sales: | | | | | | | |
| Boom truck cranes | | | | | | | |
| Material | 5,081 | | 4,188 | | 2,477 | | |
| Labor | 1,019 | | 875 | | 487 | | |
| Overhead | 3,198 | | 2,954 | | 1,614 | | |
| | 9,298 | | 8,017 | | 4,578 | | |
| Unloaders | | | | | | | |
| Material | 2,504 | | 2,262 | | 1,748 | | |
| Labor | 474 | | 475 | | 367 | | |
| Overhead | 1,440 | | 1,624 | | 1,255 | | |
| | 4,418 | | 4,361 | | 3,370 | | |
| Service parts | | | | | | | |
| Material | 1,262 | | 1,042 | | 979 | | |
| Labor | 134 | | 102 | | 86 | | |
| Overhead | 409 | | 349 | | 287 | | |
| | 1,805 | | 1,493 | | 1,352 | | |
| Other | | | | | | | |
| Material | | | 10 | | 150 | | |
| Labor | | | 5 | | 8 | | |
| Overhead | | | 11 | | 20 | | |
| | | | 26 | | 178 | | |
| Total cost of sales | | | | | | | |
| Material | 8,847 | | 7,502 | | 5,354 | | |
| Labor | 1,627 | | 1,457 | | 948 | | |
| Overhead | 5,047 | | 4,938 | | 3,176 | | |
| | 15,521 | | 13,897 | | 9,478 | | |
| Gross Margin: | | | | | | | |
| Boom truck cranes | 3,164 | 25.4 | 1,725 | 17.7 | 1,006 | 18.0 | |
| Unloaders | 1,661 | 27.3 | 1,191 | 21.5 | 1,002 | 22.9 | |
| Service parts | 2,003 | 52.6 | 1,471 | 49.6 | 1,139 | 45.7 | |
| Other | 34 | 100.0 | 25 | 49.0 | 3 | 1.7 | |
| Subtotal before production variances | 6,862 | 30.7 | 4,412 | 24.1 | 3,150 | 24.9 | |
| Production variances | 110 | | (604) | | 453 | | |
| | 6,752 | 30.2 | 5,016 | 27.4 | 2,697 | 21.4 | |
| Other cost of sales: | | | | | | | |
| Inventory reserves | 142 | | 208 | | 168 | | |
| Freight-in | 252 | | 187 | | 121 | | |
| Warranty & field service | 1,178 | | 854 | | 478 | | |
| Product liability | 59 | | 145 | | 77 | | A |
| Other | 41 | | 2 | | (1) | | B |
| | 1,672 | 7.5 | 1,396 | 7.6 | 843 | 6.7 | |
| Gross profit | 5,080 | 22.7 | 3,620 | 19.8 | 1,854 | 14.7 | |
| Selling, general & administrative expenses: | | | | | | | |
| Selling | 1,103 | | 1,095 | | 1,019 | | |
| General & administrative | 573 | | 412 | | 356 | | C |
| Product development | 1,221 | | 1,022 | | 787 | | |
| | 2,897 | 12.9 | 2,529 | 13.8 | 2,162 | 17.1 | |

Notes to Unaudited Pro Forma Income Statements:
Fiscal Years 1993 through 1995

A) Product liability expense was arbitrarily allocated to the books and records of the Division. For these pro forma income statements, product liability expense is determined based on cash paid during the period as well as provisions for outstanding cases, all relating to claims and incidents incurred during the period.

B) The books and records of the Division included a LIFO accrual for unloader products. Since inventories for balance sheet purposes are presented on a FIFO basis, this provision was excluded from this pro forma income statement.

C) The books and records of the Division do not reflect a bad debt expense. These pro forma income statements reflect actual bad debt experience incurred during the relevant years.

SCHEDULE 1.01(t)

Inventory

Attached and labeled as Schedule 1.01(t) - Attachment A an Inventory  Summary as of April 30, 1996.

Material Handling Division
Inventory Summary
April 30, 1996
(in thousands)

| | Cranes McCbg | Cranes York | Unloaders | Total |
|---|---|---|---|---|
| Machines | | 43 | | 43 |
| - In Process | | 560 | 513 | 1,073 |
| - Consignment | | | | |
| Truck Chassis | | 608 | | 608 |
| Fabricated Parts - In Process | | 122 | 89 | 211 |
| | | | | |
| Stock Parts | | | | |
| - Raw Material & Purchased Parts | 169 | 1,801 | 1,360 | 3,330 |
| - Fabricated Parts | | 865 | 653 | 1,518 |
| | 169 | 3,999 | 2,615 | 6,783 |
| | | | | |
| Production Variances | | | | 107 |
| Inventory Valuation Reserves | | | | (290) |
| | | | | 6,600 |

SCHEDULE 1.01(u)

Liabilities

1.   All warranty liabilities and obligations for products sold by the Division.

2.   All liabilities and obligations reflected on the financial statements for the Division.

3.   All liabilities and obligations arising from or relating to the Contracts identified in Schedule 1.01(k).

4.   Liabilities and obligations to employees of the Division, including those arising from or relating to the Employee Benefit Plans identified in Schedule 3.22.

5.   Liabilities and obligations arising from or relating to the Environmental Matters identified in Schedule 3.25.

6.   All liabilities and obligations arising from or related to any product retrofit, recall and other programs of a similar nature, including Field Service Bulletins, Field Service Changes, and letter campaigns.

7.   Liabilities and obligations arising from accidents or incidents relating to the design, manufacture, assembly, sale, distribution or service of i) unloaders, boom truck cranes, including those cranes being the models specifically identified in Schedule 6.03 and parts therefore which were manufactured and/or sold by either by Seller, U.S. Truck Cranes, Inc. or USTC Indiana, Inc. or which are specified in the Stipulated Settlement Agreement (item 1, Schedule 1.01(k)), and ii) any unloader or crane product manufactured and sold by Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.) Dico Company, Inc., Dyneer Corporation, York Stone, Greater Iowa Corporation, Beloit Corporation Elberfeld Manufacturing Company, Inc. and any other company which manufactured and sold a product related to Seller's Business, as and to the extent only that Seller is alleged to have liability for the same.

8.   Liabilities and obligations for workers compensation claims.

SCHEDULE 1.01(x)

Permits

1.    Permit for Installation of Sewage Disposal System Dated 9/8/95 (Application L 49442).

2.    Permit for Source & Air Cleaning Device: Eight Wheel Rotoblast Machine dated July 1, 1993 and Permit No. 67-323-026.

3.    Storage Tank Certificate, No. 223284.

4.    General Permit For Discharges of Storm Water From Industrial Activities, NPDES Permit No. PAR 113539.

5.    Acknowledgment of Notification of Hazardous Waste Activity, EPA I.D. Number PAD 031395346.

6.    Four (4) Occupancy Permits, Commonwealth of Pennsylvania, Department of Labor and Industry.

7.    Pennsylvania Department of Transportation - Vehicle Dealers License.

8,    Federal excise tax permit.

9.    Pennsylvania sales and use tax license.

10.   Pennsylvania unemployment tax registration.

11.   Federal I.D. number.

12.   Pennsylvania registration for payroll taxes.

Copies of items 1, 2, 3, 4, 5, and 6 has been provided to Purchaser.
None of the Permits are transferable.

## SCHEDULE 1.01(y)
## CALCULATION OF PURCHASE PRICE

Purchase Price Calculation Based on 4/30/96 Balance Sheet:

| | | |
|---|---:|---:|
| Assets to be purchased | | 12,948,542 |
| Less included liabilities | | 1,941,310 |
| Net assets per balance sheet | | 11,007,232 |
| | | |
| Less other adjustments: | | |
| Inventory costs in excess of NRV | | |
| at 1/31/96 per Annex 1.01(l) | 472,200 | |
| Book reserves at 4/30/96 | 289,858 | |
| | | ( 182,342) |
| | | |
| Warranty provisions at 1/31/96 | | |
| per Annex 1.01(l) | | |
| - General | 94,500 | |
| - Structural | 40,500 | |
| - Specific issues | 132,942 | |
| - Letter campaign | 15,569 | |
| | 283,511 | |
| Book reserve at 4/30/96 | 286,966 | |
| | | |
| | | 3,455 |
| Accounts receivable in excess of 120 days, | | |
| net of related allowance for doubtful | | |
| account | | ( 154,936) |
| Excluded other prepaids | | ( 16,966) |
| Adjusted net asset value | | 10,656,443 |
| Premium | | 554,000 |
| | | 11,210,443 |
| Cash to be deposited in purchaser's account at closing | | 750,000 |
| Cash to be paid to seller at closing | | 11,960,443 |

SCHEDULE 1.01(z)

Real Property

ALL that certain property situate, lying and being in Jackson Township, York County, Pennsylvania, bounded, limited and described as follows, to wit:

BEGINNING at a point formed by the intersection of the centerline of Township Road No. 482 and the centerline of the sixty (60) foot wide right of way of the Western Maryland Railway Co.; and running thence along the centerline of the sixty (60) foot wide right of way of the Western Maryland Railway Co. N 83 degrees 44 minutes 00 seconds East 1122.43 feet to a point at lands now or formerly of Charles H. Klingensmith; and running thence along said last mentioned lands South 12 degrees 03 minutes 00 seconds East 303.83 feet to a point; and running thence along same South 26 degrees 38 minutes 00 seconds West 506.57 feet to a point; and running thence by a newly made dividing line along lands of Medusa Portland Cement Co. due west 952.06 feet to a point in the centerline of Township Road No. 482; and running thence along the centerline of Township Road No. 482 due north 627.43 feet to a point on the centerline of the sixty (60) foot wide right of way of the Western Maryland Railway Co. and the place of BEGINNING. Containing 17.3353 acres. Being the same premises which the York County Industrial Development Authority by its Deed dated July 21, 1993 and recorded in the Office of the Recorder of Deeds and for York County, Pennsylvania in Record Book 0720, Page 0966, granted and conveyed unto JLG Industries, Inc.

SCHEDULE 1.01(aa)

Required Consents

None

SCHEDULE 1.01(cc)

Vehicles

1987 Chevrolet Truck, s/n 1GCDR14H9HF310881
1987 Plymouth Sedan, s/n 1P3BJ46K7HC226259
Ford Trucks in the Division's Inventory for which Manufacturers Statement of origin may or
    may not have been received.
1984 Western-Star, s/n 2WKPDCJG8EK909904
1987 Autocar, s/n 1WBUCCCE1HU303781
1985 Hobbs, s/n 1H5PO4528FN001208 (Title held by seller by reason of warranty dispute with
    the Division)

## SCHEDULE 2.06

### Preliminary Allocation of Purchase Price

Price = Net Asset Value Plus $554,000 Plus $750,000

Price = $10,656,443    Plus $554,000  Plus $750,000

Price = $11,960,443


Asset / Liability Values

| | |
|---|---:|
| Cash | 750,000 |
| Accounts Receivable | 4,054,000 |
| Inventories | 6,600,000 |
| Prepaid Assets | 0 |
| Machinery & Equipment | 935,000 |
| Land & Improvements | 355,000 |
| Building & Improvements | 1,037,400 |
| Intangible Assets (Excl. Noncompete Agreement) | 250,000 |
| Covenant Not To Compete | 100,000 |
| | |
| Extra Inventory Reserve | (182,000) |
| Accounts Payable | (1,655,000) |
| Warranty Reserve | (284,000) |
| | |
| Price Paid | 11,960,400 |

SCHEDULE 3.01

Foreign Qualifications

1.   Jurisdiction in which Seller owns or leases real property used solely or exclusively by the Division:

     Pennsylvania

2.   Jurisdiction in which Seller employs personnel on behalf of the Division:

     Pennsylvania.  Regional managers employed by the Division reside in Utah, Pennsylvania, Georgia, Arizona and Oregon

3.   Certificate of Incorporation of Seller (Attached)

4.   Bylaws of Seller (Attached)

SCHEDULE 3.05

Liens

Liens, based on lien searches dated January 12, 1996 (York County) and January 29, 1996 (Secretary of the Commonwealth, Pennsylvania), are to Department of Commerce (MELF) and Ford Motor Credit Company.  Copies of said lien searches have been provided to Purchaser.

SCHEDULE 3.08

Inventory

Division's Inventory and Assets are located at:

- York, Pennsylvania
- McConnellsburg, Pennsylvania
- on consignment
- with the Division's regional managers
- various locations for tooling, jigs and fixtures in possession of vendors and for work in process in possession of subcontractors
- various locations for display and/or show purposes

SCHEDULE 3.09

Contracts and Purchase Orders

1.    Contracts identified in Schedule 1.01(k) and invoices and sales orders for Division products and parts and purchase orders by the Division in the ordinary course of business.

2.    To extent that reserves have been established for such as reflected in the Current Financial Statements and except for certain discontinued and certain R&D/prototype units, as reflected in the Inventory valuation included in the Schedules.

3.    As to (d)(iii) Joint purchasing arrangements with Seller and parts and components sourced by the Division from the Seller. Termination of the service, maintenance and support of the Division's computers and computer related equipment under the Seller's contracts for such service, maintenance and support. Termination of Ford Motor Credit Company Agreement.

SCHEDULE 3.12

Intellectual Property

Patents

| Exhibit | Case No. | Title | Country | Registration/ Application No. | Issue Date | Expiration Date |
|---------|----------|-------|---------|-------------------------------|------------|-----------------|
| A* | 113 | Channel & Plate Telescopic Crane Boom | Italy | 1059156 | 4/15/76 | |
| B* | 123 | Telescopic Boom Construction | U.S. Canada | 4,406,375 1,182,076 | 9/27/83 2/5/85 | 9/27/00 2/5/02 |
| C* | 125 | Boom Limit Safety Control System (with Back-Up System) | Canada S. Africa | 1,201,793 81/3798 | 3/11/86 6/30/82 | 3/11/03 6/8/01 |
| D* | 201 | Truck Mounted Crane and Method of Constructing Same | U.S. Canada | 4,194,639 1,096,818 | 3/25/80 3/3/81 | 5/12/97 3/3/98 |
| E* | 202 | Design for Truck Mounted Crane | U.S. | 251,239 | 3/6/79 | 5/12/97 |
| F* | 203 | Design for Crane Upper Works | U.S. Benelux | 251,242 0376802 | 3/6/79 6/14/78 | 5/12/97 |
| G* | 205 | Outrigger Beam and Jack Construction | U.S. Canada | 4151786 1,078,810 | 5/1/79 6/3/80 | 5/12/97 6/3/97 |
| H* | 206A | Industrial Crane | U.S. Canada | 4216869 1,117,075 | 8/12/80 1/26/82 | 9/21/97 1/26/99 |
| I* | 206B | Industrial Crane Housing Configuration | Canada | 1,151,601 | 8/9/83 | 8/9/00 |
| J | 701 | Crane Having Boom Rest | U.S. Canada | 5,402,898 1382649 | 4/4/95 | 7/21/12 |
| K | 701 Div 1 | Swing Away Hoist Mount | U.S. | 08/326,920 | | |
| L* | | Remote Control Apparatus for a Machine Such as a Crane | U.S. | 4508014 | 4/2/85 | 4/2/02 |
| M* | | Rolling Base for Truck Crane | U.S. | 4599032 | 7/8/86 | 7/8/03 |

## Trademarks

| Exhibit | Title | Country | Registration/ Application No. | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| N* | Jiffy-Lift Eagle | U.S. | 1,301,274 | 10/23/84 | 10/23/04 |
| O* | Shock Guard | U.S. | 1,366,472 | 10/22/85 | 10/22/05 |
| P* | Side-o-Matic | U.S. | 1,261,485 | 12/20/83 | 12/20/03 |
| Q | Tail-Gator | U.S. | | | |
| R | Taxi-King | U.S. | | | |
| S* | Versa-Tel | U.S. | 938/074 | 7/18/72 | 7/18/02 |
| | Panoview | U.S. | 1,114,391 | 3/6/79 | 3/6/99 |
| | | Canada | 254,790 | 1/16/81 | 1/16/11 |
| | | Japan | 78418 | | |
| | | Switzerland | 306,484 | | |
| | | Venezuela | 101.800-F | 4/6/83 | 4/6/98 |
| | | Venezuela | 101.799-F | 4/6/83 | 4/6/98 |

*Held by Fulton International, Inc.                                          As of 3/5/96

Copies of each of these registrations or applications have been provided to Purchaser. The files for these are available for inspection by Purchaser at Seller's McConnellsburg, Pennsylvania headquarters.

Pursuant to the terms of its Distributor Sales and Service Agreements, Seller licenses to its distributors the right to use Seller's Trademarks.

Agreement dated May 1, 1979 by and between Frank Spallute, Paul Baldasarre and Garden State Engine and Equipment Co., Inc.

SCHEDULE 3.13

Litigation and Pending Proceedings

1.    The matters identified in Schedule 1.01(u) Liabilities, Schedule 3.15 Insurance and
      Schedule 3.25 Environmental Matters.

2.    <u>JLG Industries, Inc. v. United Truck Rental & Equipment Leasing, Inc.</u>, which is pending
      in the U. S. District Court for the District of Hawaii.

SCHEDULE 3.15

Insurance

A.  Insurance Policies

| TYPE | INSURER | LIMITS |
|---|---|---|
| Business Auto/Trucks | Royal Insurance Company of America | $1,000,000 |
| General Liability | Royal Insurance Company of America | $10,000,000 |
| Workers' Compensation & Employer's Liability | Royal Insurance Company of America | Statutory/ $1,000,000 |
| Foreign Liability | Great Northern Insurance Company | $1,000,000 |
| Umbrella Liability | Federal Insurance Company | $4,000,000 |
| Excess Liability | Zurich RE(UK) Ltd | $10,000,000 |
| Excess Liability | Chubb Atlantic Indemnity Ltd. | $10,000,000 |
| Property/Business Interruption | Protection Mutual Insurance Company | All risk |
| Ocean Marine & Transit | INA | $1,000,000/ $250,000 |
| Fiduciary Liability | Federal Insurance Company | $10,000,000 |
| Crime Coverage | Federal Insurance Company | $3,000,000 |
| Directors & Officers Liability | Old Republic Insurance Company | $10,000,000 |
| Directors & Officers Liability | Federal Insurance Company | $5,000,000 |
| Travel Accident | Federal Insurance Company | $250,000/ $1,250,000 |

(POLICY TERM:  August 1, 1995-July 31, 1996)

B.  Workers Compensation Claims.  PMA Group loss runs as of November 2, 1995 for the policy years 90-91, 91-92, 92-93, 93-94 and 94-95 and Royal Insurance Company claim listing as of March 8, 1996 for the policy year 95-96 having been provided to Purchaser.  In addition thereto, there would be claims and incidents occurring since said dates.

C. Attached and labeled Schedule 3.15 - Attachment A is a listing dated as of March 15, 1996 of all accidents, claims and lawsuits against Seller and/or involving the Seller's boom truck crane and unloader product lines, which have an occurrence date after January, 1990 and which were reported to Seller after January, 1990, excluding however those cranes being the models specifically identified in Schedule 6.05. Attachment A includes all accidents, claims and lawsuits against Seller and involving the products listed in paragraph 1 of the Stipulated Settlement Agreement item 1 of Schedule 1.01(k), which have an occurrence date after January, 1990 and which were reported to Seller after January, 1990.

SCHEDULE 3.15 - ATTACHMENT A

| DATE | NAME | MODEL | SERIAL NO | STATE | A&S | I&RT | NO PCIR | CLAIM NO | E&T | A/L | O/R |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/5/90 | HYDRO CONDUIT CORP. | M-21 | ? | TX | 3/5/90 | X | | | | A | R |
| 3/23/90 | SMITH, WILLIAM | 1218BT | 0408901863 | CA | | | | | 89.90 | L | R |
| 4/24/90 | BAKER, WARREN | 1250BT | 0408901677 | NC | | 5/7/90 | | | | A | R |
| 5/10/90 | SMITH, JAMES | m-21 | 7C00356 | PA | 6/6/90 | X | | | | A | R |
| 5/18/90 | SEAY, JAMES L. | M21-8 | 3-2378 | TN | 7/10/90 | X | | | | A | R |
| 5/30/90 | HALVERSON, GREGORY D. | SIDE-O-MATIC | 8B0124 | ME | 7/10/90 | X | | | | A | R |
| 7/9/90 | SCRANTON CRAFTSMEN | 110-35 | 8A0058 | PA | | | | | 91-92 | L | R |
| 7/12/90 | WAELENS, DANA | B4520 | 7F0081 | MI | | | | | 91-92 | L | R |
| 7/24/90 | RICHBOURG SALES | 800DT | 0408600752 | SC | | | | | 89.90 | L | R |
| 8/18/90 | MAJOR, RANDY W. | 110-35 | 9D0090 | IN | | | | | 90-91 | L | R |
| 8/72/90 | ANDERSON, CHUCK | TE7035 | 8D0130 | MI | | | | | 90-91 | L | R |
| 10/7/90 | MCCOY, TONY (MD CASUALTY CO.) | 1700BT | 0408701211 | GA | | | | | 90-91 | L | R |
| 10/7/90 | MD CASUALTY CO. (MCCOY, TONY) | 1700BT | 0408701211 | GA | | | | | 90-91 | L | R |
| 10/11/90 | ROSA v. FLA POWER & LIGHT | 60-21 | 8666 | FL | NO | NO | | | N/A | A | R |
| 11/29/90 | MATTES ELECTRIC | 800BT | 0408400147 | DE | 7/12/91 | ? | | ? | N/A | A | R |
| 12/1/90 | ALICE ROOFING & SHEET | 1218BT | 0408701217 | TX | 12/20/91 | ? | | | N/A | A | R |
| 2/6/91 | SZATIMARY SUPPLY CO. | 146KTS | ? | NJ | 5/2/91 | NO | | | N/A | A | O |
| 2/19/91 | PFEIFFER, CHRIS | 60-26 | 8L0165 | PA | 4/2/91 | 4/2/91 | | 339 L30071 | 90-91 | L | O |
| 3/25/91 | DIAS (MIDDLESEX INS. CO) | 300-25 | 8C0155 | MA. | 5/2/91 | 5/2/91 | | 326 L.63741 | 90-91 | L | O |
| 4/12/91 | MILLER, FRED P. | M21 | 810016E | TX | | | | | 91-92 | A | R |
| 4/17/91 | JACKSON, LONNIE | DICO TR4025 | 7D0119 | KY | 7/12/91 | NO | | | N/A | A | O |
| 5/9/91 | ROTHROCK, CHARLES | M2111FFY | 9277 | PA | | | | | 92-93 | A | R |
| 7/19/91 | STAR RENTALS (NO INJURY) | 1000BT | 0409002060 | WA | 7/31/91 | NO | | | N/A | A | O |
| 7/19/91 | SZAFRANSKI, ROBERT | 60-21TR | 7G0123Y | FL | | | | | 91-92 | L | R |
| 8/12/91 | COTE/ST. CEAN | 1500BT | 0408600813 | MA | 9/5/91 | 9/5/91 | | ? | 91-92 | A | O |
| 8/16/91 | EWING, JOE | M21-8 | 0800000007 | IL | 9/5/91 | 9/5/91 | | | 91-92 | A | O |
| 8/17/91 | BROYLES v. HOLSTON ELECT. | DICO | ? | TN | N/A | N/A | X | N/A | 91-92 | L | O |
| 8/18/91 | FERRARA, GEORGE | 800BT | 0408901620 | CA | 12/10/91 | 12/10/91 | | ? | 91-92 | A | O |
| 9/9/91 | WARWICK INS. CO. | - | - | NJ | | | | | 91-92 | L | R |
| 9/12/91 | REED, ROGER J. | 1250BT | 610188 | PA | | | | | 91-92 | L | R |
| 9/24/91 | ERBY, JAMES | DICO B4520 | 610188 | MO | 11/2/91 | NO | | | N/A | A | O |

4/15/96

SCHEDULE 3.15- ATTACHMENT A

| DATE | NAME | MODEL | SERIAL NO. | STATE | A.A. | HART | NO FOIR | CLAIM NO. | TTT | ADJ. | O/R |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/7/91 | BULLOCK, DONNIE | 1250BT | 0408901377 | FL | 1/14/92 | 1/1/92 | | 6271 L 26552 | 91-92 | L | O |
| 11/21/91 | FORD, STEVEN | 1250BT | 0409001831 | IL | 1/14/92 | 1/1/92 | | 6341 L 21547 | 91-92 | < | O |
| 11/23/91 | REDDY/SANTMYER | 1000BT | 0409002113 | MD | 3/1/92 | NO | | | N/A | < | O |
| 12/9/91 | BONNER, FLOYD W. | DICO | ? | MA | TDS | TDS | | 721 L 96624 | 94-95 | L | O |
| 1/29/92 | LISTAL ERECTION CORP. | 1500BT | 0408701045 | MN | 2/11/92 | NO | | | N/A | < | O |
| 2/15/92 | BETHLEHEM STEEL | 800BT | 0408700993 | IN | 4/9/92 | NO | | | N/A | < | O |
| 3/8/92 | KELLY, MELVIN | 1700BT | 0408801181 | VA | 4/9/92 | 4/9/92 | | ? | 91-92 | < | O |
| 3/9/91 | AMERICAN EQUIPMENT CO. | 1000BT | 0409000037 | OH | 4/9/92 | NO | | | N/A | < | O |
| 3/25/92 | HOGAN, LEE | 1400BT | 0408901553 | WA | 4/9/92 | NO | | | N/A | < | O |
| 4/1/92 | PENDER, BILL | 3018 | ? | IA | 7/30/92 | 7/30/92 | | | 91-92 | < | O |
| 4/17/92 | DIETCH, DAN | 40-21 | c10329 | IA | 7/30/92 | 7/30/92 | | | 91-92 | < | O |
| 5/5/92 | McCRACKEN, RICHARD | 45-17 | 3140 | MO | N/A | N/A | | | 91-92 | < | O |
| 5/19/92 | DORMIRE v. DETROIT EDISON | DICO | 7H0042Y | MI | N/A | N/A | X | N/A | N/A | < | O |
| 7/9/92 | CMI | 1700ABT | 040902347 | AK | NO | NO | | | N/A | < | O |
| 7/23/92 | AMERICON | 1000/BT | 0409002344 | IN | NO | NO | | | N/A | < | O |
| 8/5/92 | MILZ, MICHAEL | M-26 | ? | MN | 8/26/93 | 8/26/93 | X | ? | N/A | L | O |
| 9/1/92 | ROBERT R. OLDHAM, INC. | PC16E | 0800000217 | OH | 11/9/92 | NO | | | N/A | < | O |
| 9/25/92 | HARDY, WARREN | UNLOADER | ? | IL | TDS | TDS | | 6611 L 2636 | 94-95 | L | O |
| 9/29/92 | PAIKIN EQUIPMENT | 1250BT | 0408701038 | CANADA | 1/14/93 | NO | | | N/A | < | O |
| 10/26/92 | STRACUSE LADDER & SCAFF. | 1500BT | 0408901547 | NJ | NO | NO | | | N/A | < | O |
| 11/5/92 | HESELL, RODNEY | 1400BT | 0408901656 | NV | 1/14/93 | 8/26/93 | | ? | 92-93 | < | O |
| 11/14/92 | INQUIPCO | 1250BT | 0408901637 | NV | NO | NO | | | N/A | < | O |
| 11/14/92 | MCLELLAND, RAY | 1700BT | 0408901595 | CA | NO | NO | | | N/A | < | O |
| 11/16/92 | STAR RENTALS | 1000BT | 0400002479 | WA | NO | NO | | | N/A | < | O |
| 1/13/93 | HOXWORTH, KEVIN | M21-8 | 8100353 | MO | 3/2/93 | NO | | | N/A | < | O |
| 4/15/93 | HERTZ EQUIPMENT RENTAL | 1250BT | 0408901515 | FL | 7/2/93 | NO | | | N/A | < | O |
| 5/27/93 | CIANBRO CORPORATION | 1250BT | 0408901349 | MA | 7/2/93 | NO | | | N/A | < | O |
| 6/8/93 | LOWES OF MAITLAND | 146KTS | 8100846 | FL | 7/2/93 | NO | | | N/A | < | O |
| 7/12/93 | HERTZ EQUIPMENT RENTAL | 800DT | 0408901477 | OH | 7/2/93 | NO | | | N/A | < | O |
| 8/12/93 | DEARE, MARTIN | 800DT | 0408701015 | OH | 10/12/93 | NO | | | N/A | < | O |
| 8/18/93 | ATLANTIC CRANE | 1218BT | 0408901824 | NJ | 12/17/93 | 12/17/93 | | 6671 L 61412 | 93-94 | < | O |

Page 2

4/15/96

SCHEDULE 3.1.5 - ATTACHMENT A

| DATE | NAME | MODEL | SERIAL NO | STATE | A&A | U.A.T. | NO POIR | CLAIM NO | FY | M. | O/R |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/7/93 | BUILDING ERECTION SERVICES | 2200BT | ? | MO | NO | NO | X | | N/A | A | O |
| 11/4/93 | KRAHN, TERRY | 2250BT | 0400002330 | CANADA | 12/17/93 | 12/17/93 | | 944 L 60183 | 93-94 | L | O |
| 11/4/93 | KOMRO, LAWRENCE | PC16 | 8D0088E | WI | 12/17/93 | NO | | | N/A | A | O |
| 1/5/94 | BRUDER, INC. | 110-35 | 9C0080 | OH | TDS | TDS | | 734 LP 73338 | 93-94 | L | R |
| 2/28/94 | HERRERA, PEDRO | 1250TT | 0408901521 | TX | 4/7/94 | 4/7/94 | | ? | 93-94 | A | O |
| 4/16/94 | JOANN TRUCKING | 1500BT | 0400002641 | CANADA | 6/8/94 | 6/8/94 | | 944 L 67689 | 93-94 | A | O |
| 5/27/94 | RICHBOURG SALES | 800BT | 0408901614 | MS | 7/28/94 | NO | | | N/A | A | O |
| 7/21/94 | STAR RENTALS | 1400BT | 0400002167 | WA | 7/28/94 | NO | | | N/A | A | O |
| 8/1/94 | WEBER CO., INC. | 800BT | 0408400495 | PA | TDS | TDS | | 734 LP 73028 | 94-95 | L | O |
| 8/26/94 | PACO | 1500BT | 0400002501 | WA | 9/14/94 | NO | | | N/A | A | O |
| 9/27/94 | RICHBOURG SALES | 2250BT | 0400002502 | SC | 11/8/94 | NO | | | N/A | A | O |
| 10/20/94 | HARSHFIELD CONCRETE | PC16C | 0800000358 | IN | 12/1/94 | NO | X | | N/A | A | O |
| 10/23/94 | CANWEST CRANE | 1500BT | 0400001590 | CANADA | 11/8/94 | NO | | | N/A | A | O |
| 12/1/94 | MOORE'S LUMBER | 146KTSM | 810137 | VA | NO | NO | X | | N/A | A | O |
| 12/8/94 | WEST MAIN RENTALS | 800BT | 0408600783 | OR | NO | NO | X | | N/A | A | O |
| 12/17/94 | CANWEST CRANE | 2250BT | 0400002531 | CANADA | 1/10/95 | NO | | | N/A | A | O |
| 4/12/95 | BORG'S CONCRETE SERVICES | PC-16 | 8C0099E | LA | 5/17/95 | NO | | | N/A | A | O |
| 4/26/95 | NYEHOLT STEEL CO. | 1500BT | 0400001800 | MI | 6/9/95 | NO | | | N/A | A | O |
| 5/31/95 | STAR RENTALS | 1400BT | 0400002033 | WA | 6/9/95 | NO | | | N/A | A | O |
| 7/21/95 | UNITED CRANE & SHOVEL | 2200BT | 0400001921 | NJ | 2/5/96 | NO | | | | A | O |
| 7/26/95 | BRAMBLES EQUIPMENT | 1250BT | 0408801130 | LA | 7/31/95 | NO | | | N/A | A | O |
| 8/8/95 | EQUIPCO RENTALS | 1400BT | 0400001779 | VA | 9/11/95 | NO | | | N/A | A | O |
| 8/26/95 | D.C. BATES EQUIPMENT | 20-33 | 7C0193Y | MA | 9/11/95 | NO | | | N/A | A | O |
| 8/29/95 | BELCHER ROOFING | IGGB1010 | 0408700930 | NJ | 10/9/95 | NO | | | N/A | A | O |
| 9/28/95 | B & B ELECTRIC | 1500BT | 0400002290 | KY | 11/8/95 | NO | | | N/A | A | O |
| 10/6/95 | CLAPP, THOMAS | 2250BT | 0400003073 | MI | 11/8/95 | 11/8/95 | | 788 L 01972 | 95-96 | A | O |
| 10/25/95 | GIBBS ELECTRIC | 1500BT | 0400002832 | SC | 11/8/95 | NO | | | N/A | A | O |
| 10/31/95 | MERCER EQUIPMENT | 1500BT | 0400002486 | NC | 2/6/96 | NO | | | N/A | A | O |
| 11/1/95 | PACO | 1250BT | 0400002337 | WA | 3/14/96 | NO | | | N/A | A | O |
| 11/6/95 | GIUFFRE BROS. CRANES | 1500BT | 0400002673 | WI | 3/14/96 | NO | | | N/A | A | O |
| 12/18/95 | CORAM, LOREN | 2200BT | 0409001917 | KS | 2/9/96 | 2/9/96 | | 788 L 02396 | 95-96 | A | O |

SCHEDULE 3.15 - ATTACHMENT A

4/15/96

| DATE | NAME | MODEL | SERIAL NO | STATE | A.A.X | H.ART | NO POR | CLAIM NO | FY | AL | OR |
|------|------|-------|-----------|-------|-------|-------|--------|----------|-----|-----|-----|
| 1/16/96 | YOCH, JOHN ROBERT | PC-16 | 8FU098E | IL | 2/9/96 | 2/9/96 | | 788 L 02398 | 95-96 | A | O |
| 2/6/96 | EISENHART, JAMES | 121-26 | 8L0022 | PA | 3/14/96 | NO | | | N/A | A | O |
| 2/20/96 | BABST, LANCE | 1500JIT | 0400002796 | TX | 3/14/96 | NO | | | N/A | A | O |
| 2/23/96 | PIERCE, KEITH | 2800JIT | 400002781 | NJ | 3/14/96 | 3/14/96 | | | 95-96 | A | O |

Page 4

SCHEDULE 3.16

Warranty Obligations

(a)    Division's Warranty expenses
    8/1/93 - 7/31/94    $854,000
    8/1/94 - 7/31/95    $1,178,000
    8/1/95 - 4/30/96    $916,000

(b)    Pending Warranty Claims: Information relative to warranty claims outstanding at any particular date is not available, however, warranty claims paid for the month of April, 1996 were $26,099.50.

(c)    The Division's current procedures for handling warranty claims are reflected in the Division's standard form warranties for each of its three (3) product lines and its Service and Parts Policies Handbook; copies of which have been provided to Purchaser.

SCHEDULE 3.18

Working Relationships

Set forth below and dated as of May 14, 1996 are all distributors of the Division, which have
been terminated within the past two years:

Primeco, Inc.
Great Northern Equipment, Inc.
American High Reach, Inc.
Crest Truck Equipment Co., Inc.
Truck Hydraulic Equipment
Northern Truck Equipment Corp.
Fontaine Truck Equipment Company
CanWest Crane & Equipment Ltd.
Mi-Jack Products, Inc.
Rylan, Inc.
Sisco Equipment Rental and Sales, Inc.
Brambles Equipment Services, Inc.
Lancaster Automobile Spring Co., Inc.
W. H. Green & Sons, Inc.
Coast Crane of Utah, Inc.
V&H, Inc.
Anthony Crane Rental, L.P. (as respects Distributor Sales & Service Agreement for Georgia
APR only)
Hi-Tech Pump & Crane, Inc.

SCHEDULE 3.19

Customers and Suppliers

A.    Division's Ten Largest Customers - Unloaders (FY1995)

|     | Company | Machines and Service Parts |
|-----|---------|---------------------------|
| 1.  | Fallsway Equipment | $1,652,242.64 |
| 2.  | Busey Truck Equipment | $1,219,629.01 |
| 3.  | Garden State Equipment | $ 969,947.21 |
| 4.  | Smith Truck Cranes | $ 706,531.66 |
| 5.  | American Truck Crane | $ 630,555.64 |
| 6.  | Truck Service Center | $ 541,073.08 |
| 7.  | MacQueen Equipment | $ 468,454.75 |
| 8.  | DC Bates | $ 458,900.32 |
| 9.  | Twin States | $ 237,458.40 |
| 10. | Owsley & Sons | $ 220,305.93 |

B.    Division's Ten Largest Customers - Boom Trucks (FY1995)

| 1.  | Prime Equipment | $1,775,952.18 |
|-----|-----------------|---------------|
| 2.  | American Equipment | $1,115,562.31 |
| 3.  | Anthony Crane Rental | $1,040,255.66 |
| 4.  | Hertz Equipment | $ 978,938.67 |
| 5.  | Richbourg Sales | $ 966,667.39 |
| 6.  | KMH Equipment | $ 667,413.82 |
| 7.  | Perfection Equipment | $ 548,735.09 |

| 8.  | Art's Equipment Rental    | $ 458,470.93 |
| 9.  | Great Pacific Equipment   | $ 440,427.34 |
| 10. | Siems Rental & Sales      | $ 363,612.70 |

C.    Division's Ten Largest Suppliers (FY1995)

| 1.  | Keystone Ford      | $4,133.938.00 |
| 2.  | Robinson Steel     | $ 748,908.00  |
| 3.  | Olympic Steel      | $ 733,471.00  |
| 4.  | Texas Hyd.         | $ 628,700.00  |
| 5.  | Braden Winch       | $ 527,265.00  |
| 6.  | Kaydon Bearing     | $ 512,298.00  |
| 7.  | Marmom/Keystone    | $ 323,106.00  |
| 8.  | Commercial Int.    | $ 311,944.00  |
| 9.  | Eskridge Eng.      | $ 228,166.00  |
| 10. | Wireco             | $ 206,454.00  |

In addition to the foregoing, parts and components are sourced by the Division from the Seller. The parts and components involved and the dollar amount involved have been provided to Purchaser.

D.    As to suppliers, sourcing by the Division from Seller of parts and components will terminate following the Closing subject to Section 5.06 and joint purchasing arrangements with Seller will terminate following the Closing. Anthony Crane Rental, Hertz Equipment Rental Corporation, and Prime Equipment have indicated an intention to reduce their levels of purchases of the Division's products. As to other customers, the business of each customer with the Division is a function of the requirements of the customer, market conditions and competitive conditions and would be subject to the effect, if any, of the Seller's sale of the Assets of the Purchaser.

SCHEDULE 3.20

Employees

Attached is a listing as of May 14, 1996 setting forth the name of each employee of the Division, their current base salary/hourly rate and their base salary/hourly rate as of July 31, 1995.  In addition, the regional managers receive commissions under a commission policy.

NR170 DATE  5/14/96                    HR ARCHER REPORT GENERATION
TIME  13:45.00

AUTHOR: BECKY          TITLE: YORK EMPLOYEES

| EMPLOYEE NUMBER | EMPLOYEE NAME | HIRE DATE | PAY RATE | 1/21/95 Rate |
|---|---|---|---|---|
| 5020 | ANKNEY, KEITH W | 08/15/88 | 13.7300 | 13.20 |
| 5148 | ANKNEY, RONALD L | 08/26/91 | 13.9000 | 13.10 |
| 5313 | AUCHEY, JOSEPH A | 03/13/95 | 33000.0000 | 31080. |
| 7039 | BAGLEY, DAVID L | 09/12/83 | 58080.0000 | 58080. |
| 5086 | BECKER, SCOTT M | 12/17/84 | 38232.0000 | 38232. |
| 5039 | BELCHER, ROGER L | 01/21/85 | 13.4000 | 12.95 |
| | | | | |
| 5252 | BERGER, SHELDON E | 03/14/94 | 13.9400 | 13.28 |
| 5329 | GILLETT, DAVID P | 06/19/95 | 8.4500 | 8.45 |
| 5037 | GOSLEY, PRESTON E | 04/18/83 | 15.2500 | 14.56 |
| 5278 | GOYLE, LYNN A | 06/20/94 | 8.3700 | 8.45 |
| 5345 | GRADY, PETER A | 02/05/96 | 8.7900 | — |
| 5357 | GRICKNER, GARY W | 03/04/96 | 8.5000 | — |
| 5305 | GRISSOM, LLOYD S | 11/21/94 | 8.3700 | 8.45 |
| 5176 | GROHN, THOMAS L | 08/03/92 | 13.1600 | 12.06 |
| 5313 | BUCHTER, BRADLEY S | 02/13/95 | 41520.0000 | 38400. |
| 5113 | CALDWELL, DURRELL K | 04/19/95 | 10.7500 | — |
| 5144 | CHESHIER, JAMES A | 08/27/91 | 10.3900 | 10.09 |
| 5720 | CONRAD, THOMAS | 09/10/82 | 47711.0000  51600 | 49920. |
| 5367 | CRANE, THOMAS H | 03/18/96 | 9.1500 | — |
| 5027 | CROHE, STANLEY R | 02/12/90 | 14.0000 | 13.45 |
| 7086 | DENNIS, SHENDRA L | 04/20/92 | 9.8000 | 9.40 |
| 5401 | DETHILER, RICHARD A | 03/06/95 | 10.5700 | 10.26 |
| 5314 | DIFFENDERFER, JR. JAMES A | 03/06/95 | 10.3500 | 10.00 |
| 5234 | DOLHEINER, ROBERT L | 09/12/94 | 9.5000 | 8.30 |
| 5274 | DOLL, KENNETH L | 04/06/94 | 10.2200 | 9.92 |
| 5408 | DOLL JR., STERLING S | 03/26/90 | 11.3600 | 10.93 |
| 5007 | DOLL SR., STERLING S | 06/09/83 | 14.6700 | 14.02 |
| 5273 | EICHOLTZ, RICHARD E | 05/31/94 | 12.0100 | 10.66 |
| 7115 | EHRICH, BRIAN K | 04/03/95 | 34344.0000 | 34.344. |
| 5298 | EVANS, DAVID C | 10/19/94 | 11.3600 | 10.04 |
| 5159 | FAUST, DENNIS P | 09/10/79 | 46560.0000 | 43920. |
| 5110 | FISSEL, GARRY L | 05/10/82 | 41280.0000 | 41280. |
| 5363 | FOGLE, KEITH A | 03/11/96 | 8.4500 | — |
| 5353 | FRANTZ, JEFFREY L | 02/20/96 | 8.4500 | — |
| 5156 | GABRIEL, JOSEPH J | 09/23/91 | 43659.0000 | 41580. |
| 5285 | GEISELMAN, BRUCE A | 06/13/83 | 14.9100 | 14.62 |
| 5366 | GENTZLER, TOBIAS W | 03/11/96 | 8.4500 | — |
| 5350 | GERRICK, SCOTT A | 02/20/96 | 11.9000 | — |
| 5195 | GIBBONS, JONATHAN M | 09/20/91 | 12.2900 | 12.29 |
| 5016 | GILBERT, GARY S | 05/02/83 | 13.7800 | 13.38 |
| 7054 | GINGRICH, STEPHANIE D | 08/19/91 | 27600.0000 | 24960. |
| 5034 | GLADFELTER, MICHAEL R | 01/07/91 | 11.2500 | 10.92 |
| 5102 | GODFREY III, JAMES E | 03/11/85 | 14.5700 | 14.15 |
| 5339 | GOHN, JR. JOHN L | 12/13/95 | 10.0000 | — |
| 7115 | GOODE, FREDERICK B | 09/17/91 | 99999.0000 | |
| 5197 | GOODWILL, GARY L | 04/20/92 | 12.0900 | 10.74 |
| 5115 | GRISSINGER, DANIEL W | 04/04/90 | 11.2600 | 10.93 |
| 5131 | GROVE, JEFFREY L | 05/28/91 | 9.7100 | 9.47 |
| 5711 | GROVE, LESTER L | 03/04/85 | 34992.0000 | 34992. |
| 5990 | HALSTED, THOMAS J | 08/15/88 | 39840.0000 | 39840. |

AUTHOR LIBRARY          TITLE: YORK EMPLOYEES

| EMPLOYEE NUMBER | EMPLOYEE NAME | HIRE DATE | PAY RATE | 7/31/95 Rate |
|---|---|---|---|---|
| 5105 | HEGEL, GERALD E | 03/07/93 | 30900.0000 | — |
| 5120 | HERBST III, FREDERICK H | 05/25/89 | 19864.0000 | 39864. |
| 5172 | HERBST IV, FREDERICK H | 06/15/92 | 11.8000 | 11.27 |
| 5389 | HILT, EARL L | 12/19/94 | 10.0900 | 9.80 |
| 5183 | HIRSCHHORN, MICHAEL D | 05/20/91 | 12.3000 | 11.70 |
| 5215 | HOKE, RONNY S | 10/14/93 | 11.2700 | 10.84 |
| 5303 | HOKE, STEPHEN H | 05/10/82 | 14.4700 | 14.26 |
| 5254 | HUNTER, DAVID A | 03/25/96 | 11.0000 | 10.76 |
| 5255 | ICKES, DAVID A | 03/21/94 | 13.2900 | 11.51 |
| 5263 | ILGENFRITZ, GRANT E | 04/18/94 | 9.4700 | 9.19 |
| 5101 | ILGENFRITZ, MARTIN L | 02/24/93 | 11.0100 | 10.64 |
| 5351 | INGRAM, ROBERT L | 02/20/96 | 9.0000 | — |
| 7093 | JAGOE, JR., GEORGE D | 06/13/94 | 33600.0000 | 53600. |
| 5175 | JONES, PHILIP A | 07/27/92 | 10.7600 | 10.125 |
| 5107 | KEARNEY, SCOTT L | 04/09/90 | 10.8100 | 10.50 |
| 7087 | KEEFER, WILFRED L | 09/20/76 | 49776.0000 | 46080. |
| 5127 | KELLY, GEORGE E | 05/20/91 | 10.1900 | 9.80 |
| 5369 | KENT SR, DAVID M | 04/15/96 | 8.4500 | — |
| 5184 | KEPNER, ALLAN D | 03/01/93 | 11.0300 | 10.76 |
| 7116 | KING, BEVERLY G | 05/15/95 | 33600.0000 | 33600. |
| 5095 | KINNEMAN, DANA S | 03/04/85 | 13.5400 | 13.15 |
| 5304 | KIRKENDALL, JR., WILLIAM S | 11/21/94 | 8.7000 | 8.45 |
| 5247 | KLEIMAN, SCOTT E | 02/22/94 | 9.6800 | 9.40 |
| 5355 | KREBS, BRUCE A | 02/26/96 | 8.3500 | — |
| 5296 | KREBS, MICHAEL H | 10/05/94 | 9.1600 | 8.85 |
| 7099 | KRIMER, TERRY L | 05/24/93 | 29568.0000 | 29568. |
| 5231 | KUNKEL, SCOTT D | 11/15/93 | 9.4200 | 9.15 |
| 5182 | KURTZ, JOSEPH C | 03/10/93 | 10.6000 | 10.29 |
| 5173 | KURTZ, ROBERT E | 07/20/92 | 10.1400 | 9.83 |
| 7017 | LAMB, KATHLEEN R | 05/10/82 | 32400.0000 | 30508. |
| 7100 | LANDSPERGER, CHERYL A | 09/19/94 | 9.2500 | 9.25 |
| 5349 | LAUCKS, STEVEN H | 02/12/96 | 28008.0000 | — |
| 5217 | LEATHERY, MARK D | 03/11/85 | 13.8700 | 13.47 |
| 5251 | LEINHEISER, NOE D | 03/09/94 | 9.2900 | 9.11 |
| 5295 | LEKKER, KEITH R | 10/17/94 | 10.0000 | 8.45 |
| 5204 | LEFFO, TODD E | 05/10/93 | 31800.0000 | 31800. |
| 5348 | LOMBARDO, JOHN H | 02/12/96 | 9.0000 | — |
| 5277 | LOOKINGBILL, JAMES A | 06/09/94 | 9.3300 | 9.15 |
| 5239 | LUNDBERG, RICHARD D | 01/03/94 | 43440.0000 | 41760. |
| 1220 | LUTE, GERALD E | 06/25/79 | 58800.0000 | 56400. |
| 5114 | MARKS, PHILLIP A | 05/08/90 | 14.6500 | 14.33 |
| 5163 | MAZUREK, SR., JOSEPH R | 03/23/92 | 47280.0000 | 45408. |
| 5342 | McCUE, MARK B | 01/22/96 | 8.4500 | — |
| 5112 | McMASTER, THOMAS M | 03/07/91 | 36000.0000 | 36000 |
| 5203 | McMILLAN, DAVID C | 05/03/93 | 50400.0000 | 39000 |
| 5371 | MEADOR, JOHN M | 04/29/96 | 8.4500 | — |
| 5097 | MESSINA, WILLIAM F | 05/10/91 | 15.0000 | 14.63 |
| 7018 | MICHAEL, KENNETH E | 05/10/82 | 46800.0000 | 43296. |
| 5316 | NIKITA, MICHAEL J | 03/15/95 | 47760.0000 | 45000 |
| 5325 | MILLER, ANDREW J | 04/24/95 | 44040.0000 | 44040. |
| 7093 | MILLER, CHARLES J | 07/15/91 | 53040.0000 | 53040. |
| 5019 | MILLER, DAVID E | 08/15/83 | 12.3900 | 12.58 |
| 5040 | MILLER, DONN A | 04/10/89 | 14.0900 | 13.55 |

| EMPLOYEE NUMBER | EMPLOYEE NAME | DATE | PAY RATE | 7/3/95 |
|---|---|---|---|---|
| 5335 | MILLER, JOSHUA A | 10/16/95 | 8.2500 | |
| 5165 | MILLER, ROBALIE | 10/11/93 | 9.6400 | 9.40 |
| 5179 | MILLER II, ROBERT E | 10/05/92 | 11.0000 | 10.65 |
| 5308 | MINEXBERG, JOHN J | 12/28/94 | 11.5800 | 10.15 |
| 5208 | MOONEY, RICHARD W | 06/04/93 | 44065.0000 | 43872. |
| 5152 | MOREHEAD, JR., TERRY R | 08/26/91 | 13.0000 | 12.25 |
| 5162 | ADDERBROOK, KENNETH H | 01/23/92 | 43920.0000 | 42312. |
| 5015 | MUESSELMAN, JAMES H | 01/10/83 | 15.1600 | 14.56 |
| 5229 | MYERS, MARK K | 05/17/82 | 37200.0000 | 372.00 |
| 5354 | NACE, JEFFREY A | 02/16/96 | 20400.0000 | |
| 5170 | NEES, STEPHEN A | 06/01/92 | 12.2300 | 11.07 |
| 5245 | NEWCOMER, SCOTT A | 02/01/94 | 28000.0000 | 246.96. |
| 7019 | NOEL, BARRY L | 05/17/82 | 39360.0000 | 378 00. |
| 7124 | O'DONNELL, ROBERT D | 05/31/83 | 14.0000 | 13.32 |
| 5299 | O'NEILL, III, GEORGE J | 10/18/94 | 9.5200 | 9.20 |
| 636 | OAKMAN, LYNN L | 09/07/76 | 41360.0000 | 40008.00 |
| 5347 | OBERDICK, MARK H | 02/05/96 | 11.0000 | |
| 5340 | PAULEY, JAMES B | 01/29/96 | 11.0000 | |
| 5238 | POPE, EDWARD H | 01/03/94 | 12.1600 | 10.82 |
| 5344 | RENTZEL, RALPH H | 03/11/96 | 11.0000 | |
| 5352 | REYNOLDS, MICHAEL H | 02/20/96 | 11.0000 | |
| 7092 | RISES, RONNIE L | 06/01/94 | 58080.0000 | 58080. |
| 5302 | RILEY, DONALD L | 11/14/94 | 9.1600 | 8.45 |
| 5991 | ROHRER, MICHAEL H | 04/18/89 | 35520.0000 | 33720. |
| 5287 | RUDISILL, JR., ELI S | 09/26/94 | 10.4000 | 10.00 |
| 5207 | RUTH, JEFFREY L | 06/23/86 | 10.4600 | 10.14 |
| 5233 | RUTH, MICHAEL S | 11/15/93 | 10.3800 | 9.15 |
| 5185 | RUTH, RICHARD H | 03/08/93 | 11.5200 | 11.08 |
| 5213 | RUTH, ROBIN L | 10/04/93 | 12.6000 | 11.62 |
| 7057 | SALE, JENNIFER L | 02/22/93 | 52080.0000 | 52080. |
| 5294 | SANMILLER, WILLIAM C | 10/03/94 | 9.0000 | 8.70 |
| 5322 | SCHWARTZ, KENNETH E | 07/05/93 | 14.1600 | 13.88 |
| 5145 | SCHWARTZ, ROBERT C | 08/27/91 | 12.0400 | 11.69 |
| 5297 | SCHWANK, BARRY B | 10/05/94 | 9.1600 | 8.45 |
| 5356 | SEARS JR., STANLEY D | 03/04/96 | 10.0000 | |
| 5198 | SEALS, JAMES T | 05/24/93 | 9.4300 | 9.20 |
| 1872 | SEDUNK, GARY H | 04/01/85 | 33480.0000 | 31656. |
| 5120 | SHADLE, ROY A | 07/16/90 | 13.6200 | 13.10 |
| 5708 | SHAFFER, KAREN | 05/10/82 | 14.0000 | 13.47 |
| 5125 | SHARP, RANDY L | 02/25/85 | 15.6100 | 15.01 |
| 5281 | SHILDT, LAMONT F | 08/24/94 | 11.7600 | 10.04 |
| 5341 | SHUE, GLEN A | 01/11/96 | 8.4500 | |
| 5256 | SHULTZ, BYRON D | 03/28/94 | 9.7000 | 9.33 |
| 7108 | SILL, BRIAN D | 12/06/94 | 33000.0000 | 30000. |
| 5346 | SIMPSON, JOHN E | 02/05/96 | 11.0000 | |
| 5327 | SMITH, BARBARA A | 06/05/95 | 8.4000 | 8.00 |
| 5336 | SMITH, DANIEL L | 10/16/95 | 8.4500 | |
| 7023 | SMITH, HARRY S | 03/11/85 | 78000.0000 | 62400. |
| 5219 | SMITH, KEVIN E | 10/25/93 | 9.7900 | 9.41 |
| 5293 | SMITH, RANDY S | 09/28/94 | 9.0000 | 8.50 |
| 5221 | SMITH, JR., MARSHALL V | 11/01/93 | 11.6700 | 10.34 |
| 5361 | SNYDER, MATTHEW E | 03/04/96 | 8.4500 | |
| 5701 | SPRAUL, AUBREY C | 05/04/93 | 14.4800 | 12.66 |

ACTIVE LIST:   TITLE: DRY EMPLOYEES

| EMPLOYEE NUMBER | EMPLOYEE NAME | HIRE DATE | PAY RATE | 7/31/95 Rate |
|---|---|---|---|---|
| 5145 | ESREHELE, LARRY E | 05:14:9- | 13.1000 | 9.44 |
| 5154 | STAUM, CLIFFORD K | 10/16/95 | 13.7500 | |
| 5090 | STEIGH, RUSSELL A | 01/21/85 | 14.0000 | 13.55 |
| 5409 | STERNER, JOHN W | 03/26/90 | 13.8000 | 13.00 |
| 5230 | STERNER, JR., JOHN H | 11/14/93 | 10.0000 | 9.31 |
| 5151 | STOWER, CHRISTOPHER L | 09/09/91 | 11.2100 | 10.37 |
| 5159 | STOUGH JR, LARRY E | 03/05/96 | 10.0000 | |
| 5345 | STRAYER, RAYMOND E | 03/14/95 | 10.8000 | 10.00 |
| 5275 | STREETT, SCOTT H | 06/13/94 | 11.0000 | 10.45 |
| 5140 | STRONSKY, JOHN E | 07/29/91 | 13.0000 | 14.90 |
| 5249 | SUMMERS, ROY N | 06/16/86 | 13.5200 | 13.03 |
| 5292 | SWIFT, JR., ARCHER E | 09/26/94 | 11.9600 | 11.50 |
| 5260 | TORE, ANGELA L | 02/28/94 | 9.6000 | 8.56 |
| 5260 | TREAT, PENNY L | 03/09/87 | 12.6500 | 12.65 |
| 5200 | VAUGHN, III, EDWARD R | 07/18/94 | 9.1000 | 8.45 |
| 5146 | WAGNER, WAYNE W | 08/26/91 | 12.6700 | 11.97 |
| 5349 | WALTERS, RICHARD L | 01/29/96 | 8.8500 | |
| 5093 | WARFEL IV, LEARY | 01/21/85 | 12.6700 | 12.30 |
| 5139 | WEBER, LAWRENCE J | 07/15/91 | 140010.0000 | 13,003.8 |
| 5105 | WESTERHOLD, ROBERT G | 04/10/89 | 12.8000 | 12.43 |
| 7078 | WHETSELL, DONALD E | 08/16/93 | 32400.0000 | 32,400. |
| 5370 | WHETZEL JR, DAVID E | 04/15/96 | 8.4500 | |
| 7138 | WILDASIN, KEITH N | 02/18/85 | 12.1000 | 11.80 |
| 5257 | WILLIS, SCOTT H | 03/28/94 | 10.3200 | 10.02 |
| 5268 | WIRE JR, HAROLD L | 08/16/88 | 14.7500 | 14.24 |
| 5100 | WOLF, WILLIAM G | 05/06/91 | 14.1100 | 12.97 |
| 5240 | WOOD, JOSEPH N | 01/03/94 | 34416.0000 | 32,400. |
| 5032 | WRIGHT, JAMES E | 02/26/90 | 13.0300 | 12.49 |
| 5312 | YINGLING, NEAL G | 02/13/95 | 9.1100 | 8.50 |
| 5372 | Darlene Fearson | 5/13/96 | 8.90 | |
| 5373 | Brandy Norwood | 5/13/96 | 8.45 | |

SCHEDULE 3.21

Labor Relations

Complaint of Kimberly Anne Lenken with the Pennsylvania Human Relations Commission, Docket No. E73338D. (Has been settled).

SCHEDULE 3.22

Employee Benefit Plans

1.    JLG Industries, Inc. Employees' Retirement Savings Plan

2.    JLG Industries, Inc. Group Life Insurance Plan (including employee supplemental and dependent)

3.    Medical and Dental Plan for Employees of JLG Industries, Inc.

4.    Short-Term Disability Plan for Employees of JLG Industries, Inc.

5.    JLG Industries, Inc. Travel Accident Plan

6.    JLG Industries, Inc. Long-Term Disability Plan

7.    JLG Industries, Inc. Stock Incentive Plan, as amended and restated

8.    JLG Industries, Inc. Executive Medical Reimbursement Plan

9.    JLG Industries, Inc. Employee Stock Purchase Program

10.   JLG Industries, Inc. Relocation Policy

11.   The Profitability and Productivity Improvement Award Program

12.   Management Incentive Plan

13.   In accordance with the three (3) Highlights of Employee Benefits attached

14.   Accrued vacation obligation to certain employees for service prior to January 29, 1990 and in accordance with the attached listing

# JLG INDUSTRIES, INC.
## HIGHLIGHTS OF EMPLOYEE BENEFITS
### SALARY PERSONNEL

<u>SCHEDULE</u>   (Monday-Friday)

Morning - 8:00 am - 12:15 pm      Lunch - 12:15 pm - 1:00 pm      Afternoon - 1:00 pm - 4:45 pm

<u>PAY PERIODS</u>   (Semi-Monthly) - 15th and Last Day of the Month

<u>BENEFITS</u>   (Eligibility starts after 30 days)

<u>Group Life Insurance</u>

Employee coverage-premium paid by Company:

| | |
|---|---|
| Group Life Insurance | 1 x Annual Base Salary |
| Accidental Death and Dismemberment | 1 x Annual Base Salary |

<u>Supplemental Life Insurance</u>

Option to purchase additional life insurance for employee, spouse and eligible dependents. Employee pays group premium rate through payroll deduction.

<u>Comprehensive Medical Coverage</u> - Company provided coverage based on the following schedule:

| | |
|---|---|
| Maximum Insured Benefit | $1,000,000 per individual insured |
| Individual deductible | $150 |
| Family deductible | $300 |
| Co-payment | 85% Company/ 15% employee |
| Individual Stop Loss | $500 |
| Family Stop Loss | $1,000 |

Note:   Coverage to include hospitalization, surgery, maternity, physician office visits, and other valid medical charges as noted in plan provisions.

<u>Prescription Drug Plan</u> - Company pays 85% of prescription drug cost; mail order prescriptions available at no cost.

<u>Dental Insurance Coverage</u> - Company payment is based on the following schedule of services:

| | |
|---|---|
| Preventative | 100% |
| Oral Surgery, Periodontics | 85% |
| Crowns, Inlays, Onlays & Prosthetics | 50% |
| Orthodontic (w/dep coverage only) $50 ded/$850 max | 50% |
| Note:   Individual deductible (does not include preventative) | $50 |
| Maximum annual benefit per insured | $1,000 |

<u>Vision</u>

| | |
|---|---|
| Eye Exam and Glaucoma Screening (19 years of age and older, once per 24 months, under age 19, once per 12 months). | 100% |

Eyewear discounts - Eye Care Plan of America

<u>Employee Insurance Contribution</u> (JLG Flex Plan option is available through payroll deduction):

| | |
|---|---|
| Employee coverage (required) | $ 5.16 |
| w/One Dependent medical, dental & prescription (voluntary) | $20.65 |
| w/Two or more Dependents medical, dental & prescription (voluntary) | $24.12 |

<u>Disability Insurance Coverage</u> - Company pays for the following:

Salary Continuation Schedule: 30 days 100% / 31-60 days 75% / 61-90 days 60%

Long Term Disability - Replaces 60% of monthly earnings after 90 days and is coordinated with Social Security Disability. Premiums for supplemental benefits and benefit for spouse, if disabled. 50/50 co-pay basis. Employee cost is $.0703 per week per $1,000 of annual pay. Participation is voluntary.

<u>Travel Accident Insurance</u> - Premium paid by Company.                                          $250,000
                                                    (Immediate Eligibility)

<u>Holidays</u> (Paid)
    New Years Day                    Memorial Day                    Thanksgiving Day
    Washington's Birthday            July 4                          Friday after Thanksgiving
    Good Friday                      Labor Day                       Christmas Day
    plus:   Two Floating Holidays - Dates announced annually.

<u>Vacation</u> (Paid)
    Up to 1 year                     .8 hrs. pay per week of service (40 hrs. max)
    After 1 year                     1.6 hrs. pay per week of service (80 hrs. max)
    After 10 or more years           2.4 hrs. pay per week of service (120 hrs. max)
    After 15 or more years           3.2 hrs. pay per week of service (160 hrs. max)

<u>Tuition Aid</u> - 50% advance for approved courses, balance up to 100% based on grade attainment.

<u>Military Pay</u> - Difference between normal rate and military rate for 2 weeks Reserve Duty.

<u>Direct Deposit</u> - Deposit of payroll directly to employee bank accounts. Funds also directed to Individual Savings Plan, Christmas Club and Individual Retirement Account.

<u>Payroll Deduction Services</u> - Purchase of work related equipment.

<u>Stock Purchase Program</u> - Opportunity for employees to purchase JLG stock through payroll deduction, which is through The Fulton County National Bank. Commissions are charged to participants.

<u>JLG Merit Scholarship</u> - Opportunity for sons and daughters of JLG employees to apply for Company sponsored college scholarships through the National Merit Scholarship Corporation. Applications to be completed during junior year of high school.

<u>PPI Award</u> - The Profitability and Productivity Improvement Award program provides a cash award opportunity and recognizes employees' participation in our continuous improvement efforts. At the start of each fiscal year, a profitability target is set for the following year. You must be hired at least six months before the end of the fiscal year, and be employed by JLG on the date that the awards are paid.

<u>Retirement Savings Plan</u> - (Requires 1,000 hours of service for participation) The Company offers a 401(k) Savings Plan which provides an annual Company discretionary profit sharing contribution of up to 5% of regular compensation and up to 5% of regular compensation over the social security wage base. The Plan allows voluntary before tax contributions of up to 14% of pay and the Company will match 50% of the first 5% of voluntary contribution. Company contribution and match are subject to a 4 year vesting schedule. Employees are provided investment options. Loans are available.

(Salary) Revised 01-15-96

JLG INDUSTRIES, INC.
## HIGHLIGHTS OF EMPLOYEE BENEFITS
## PRODUCTION HOURLY PERSONNEL

SCHEDULE          *SHIFT OPERATIONS*

| | | |
|---|---|---|
| 1st Shift | 7:00 am - 3:00 pm |
| 2nd Shift | 3:00 pm - 11:00 pm |
| 3rd Shift | 11:00 pm - 7:00 am |

PAY PERIODS  (Weekly)  First Shift - Friday; Second and Third Shifts - Thursday

BENEFITS    (Eligibility starts after 30 days)

Group Life Insurance

Employee coverage - premium paid by Company:

| | |
|---|---|
| Group Life Insurance | 1 × Annual Base Salary |
| Accidental Death and Dismemberment | 1 × Annual Base Salary |

Supplemental Life Insurance

Option to purchase additional life insurance for employee, spouse and eligible dependents. Employee pays group premium rate through payroll deduction.

Comprehensive Medical Coverage - Company provided coverage based on the following schedule:

| | |
|---|---|
| Maximum Insured Benefit | $1,000,000 per individual insured |
| Individual deductible | $150 |
| Family deductible | $300 |
| Co-payment | 85% company/15% employee |
| Individual Stop Loss | $500 |
| Family Stop Loss | $1,000 |

Note: Coverage to include hospitalization, surgery, maternity, physician office visits and other valid medical charges as noted in plan provisions.

Prescription Drug Plan - Company pays 85% of prescription drug cost; mail order prescriptions available at no cost.

Dental Insurance Coverage - Company payment is based on the following schedule of services:

| | |
|---|---|
| Preventative | 100% |
| Oral Surgery, Periodontics | 85% |
| Crowns, Inlays, Onlays & Prosthetics | 50% |
| Orthodontic (w/dep coverage only) $50 ded/$850 max. | 50% |

Note: Individual deductible (does not include preventative) — $50
Maximum annual benefit per insured — $1,000

Vision

| | |
|---|---|
| Eye Exam and *Glaucoma Screening* (19 years of age and older, once per 24 months; under age 19, once per 12 months) | 100% |
| Eyewear discounts - Eye Care Plan of America | |

Employee Insurance Contribution - (JLG Flex Plan option is available through payroll deduction):

| | |
|---|---|
| Employee coverage (required) | $ 2.38 |
| w/ One dependent medical, dental & prescription (voluntary) | $ 9.53 |
| w/ Two or more dependents medical, dental & prescription (voluntary) | $11.13 |

Disability Insurance Coverage - Company pays for the following:

Short Term Disability - 60% of your pay up to 90 days.

Long Term Disability - Replaces 60% of monthly earnings after 90 days and is coordinated with Social Security Disability. Premiums for supplemental benefit and benefit for spouse if disabled. 50/50 co-pay basis. Employee cost is $.0703 per week per $1,000 of annual pay.

Travel Accident Insurance - Premium paid by Company:                     $250,000
                           (Immediate eligibility)

Holidays (Paid)
        New Years Day                Memorial Day                 Thanksgiving Day
        Washington's Birthday        July 4                       Friday after Thanksgiving
        Good Friday                  Labor Day                    Christmas Day
        Plus:  Two Floating Holidays - Dates announced yearly.

Vacation (Paid)
        Up to 1 year                 .8 hours pay per week of service (40 hrs. max)
        After 1 year                 1.6 hours pay per week of service (80 hrs. max)
        After 10 or more years       2.4 hours pay per week of service (120 hrs. max)
        After 15 or more years       3.2 hours pay per week of service (160 hrs. max)

Personal Time Off With Pay - One day of personal leave is earned for each four (4) months worked.  Up
                           to five (5) days may be accumulated.

Tuition Aid - 50% advance for approved courses, balance up to 100% based on grade attainment.

Funeral Pay - Immediate family - 3 days, other family members - 1 day (Monday-Friday).

Military Pay - Difference between normal rate and military rate for 2 weeks Reserve Duty.

Shift Differential - Night shift premium - $.35 per hour.

Overtime - Time and one half for time worked over 8 hours per day, 40 hours per week.

Safety Glasses - (Prescription) Selected frames are available at cost - employee pays for examination.

Lunch and Rest Periods - 30 minute paid lunch period.

Orientation Period - 180 Calendar days.

Work Clothing - A uniform and coverall service is offered at cost to production employees who elect to
                enroll.

Direct Deposit - Deposit of payroll directly to employee bank accounts.  Funds also directed to Individual
                 Savings Plan, Christmas Club and Individual Retirement Account.

Payroll Deduction Service - Purchase of work related equipment, uniform and coverall services.

Stock Purchase Program - Opportunity for employees to purchase JLG stock through payroll deduction, which is
through the The Fulton County National Bank.  Commissions are charged to participants.

JLG Merit Scholarship - Opportunity for sons and daughters of JLG employees to apply for Company sponsored
college scholarships through the National Merit Scholarship Corporation.  Applications to be completed during junior
year of high school.

PPI Award - The Profitability and Productivity Improvement Award program provides a cash award opportunity and
recognizes employees' participation in our continuous improvement efforts.  At the start of each fiscal year, a
profitability target for the following year.  You must be hired at least six months before the end of the fiscal year, and
still be employed by JLG on the date that the awards are paid.

Retirement Savings Plan - (Requires 1,000 hours of service for participation) The Company offers a 401(k) Savings
Plan which provides an annual Company discretionary profit sharing contribution of up to 5% of regular
compensation.  The Plan allows voluntary before tax contributions of up to 14% of pay and the Company will match
50% of the first 5% of voluntary contribution.  Company contribution and match are subject to a 4 year vesting
schedule.  Employees are provided investment options.  Loans are available.

# JLG INDUSTRIES, INC.
## HIGHLIGHTS OF EMPLOYEE BENEFITS
### OFFICE HOURLY PERSONNEL

SCHEDULE - (Monday - Friday)
Morning - 8:00 am - 12:15 pm          Lunch - 12:15 pm - 1:00 pm          Afternoon - 1:00 pm - 4:45 pm

PAY PERIODS - Weekly (Friday)

BENEFITS - (Eligibility starts after 30 days)

Group Life Insurance
    Employee coverage - premium paid by Company
    Group Life Insurance                                    1 x Annual Base Salary
    Accidental Death and Dismemberment                      1 x Annual Base Salary

Supplemental Life Insurance
    Option to purchase additional life insurance for employee, spouse and eligible dependents. Employee pays
    group premium rate through payroll deduction.

Comprehensive Medical Coverage - Company provided coverage based on the following schedule:

Maximum Insured Benefit          $1,000,000 per individual insured
Individual deductible            $150
Family deductible                $300
Co-payment                       85% Company/15% employee
Individual Stop Loss             $500
Family Stop Loss                 $1,000
    Note:  Coverage to include hospitalization, surgery, maternity, physician office visits and
    other valid medical charges as noted in plan provisions.

Prescription Drug Plan - Company pays 85% of prescription drug cost; mail order prescriptions
    available at no cost.

Dental Insurance Coverage - Company payment is based on the following schedule of services:

    Preventative                                                        100%
    Oral Surgery, Periodontics                                           85%
    Crowns, Inlays, Onlays & Prosthetics                                 50%
    Orthodontic (w/dep coverage only) $50 ded/$850 max                   50%
    Note:  Individual deductible (does not include preventative)        $50
    Maximum annual benefit per insured                                  $1,000

Vision
    Eye Exam and Glaucoma Screening (19 years of age and older, once per 24 months;    100%
    under age 19, once per 12 months)
    Eyewear discounts - Eye Care Plan of America

Employee Insurance Contribution - (JLG Flex Plan option is available through payroll deduction)

    Employee coverage (required)                                        $ 2.38
    w/ One dependent medical, dental & prescription (voluntary)         $ 9.53
    w/ Two or more dependents medical, dental & prescription (voluntary) $11.13

Disability Insurance Coverage - Company pays for the following:

    Short Term Disability - 60% of your pay up to 90 days

Long Term Disability - Replaces 60% of monthly earnings after 90 days and is coordinated with Social Security Disability. Premiums for supplemental benefit and benefit for spouse if disabled. 50/50 co-pay basis. Employee cost is $.0703 per week per $1,000 of annual pay, participation is voluntary.

Travel Accident Insurance - Premium paid by Company                    $250,000
(Immediate eligibility)

Holidays (Paid)
New Years Day                    Memorial Day                    Thanksgiving Day
Washington's Birthday            July 4                          Friday after Thanksgiving
Good Friday                      Labor Day                       Christmas Day
Plus - Two Floating Holidays - Dates announced yearly

Vacation (Paid)
Up to 1 Year                     8 hours pay per week of service (40 hrs. max)
After 1 year                     1.6 hours pay per week of service (80 hrs. max)
After 10 or more years           2.4 hours pay per week of service (120 hrs. max)
After 15 or more years           3.2 hours pay per week of service (160 hrs. max)

Personal Time Off With Pay - One day of personal leave is earned for each four (4) months worked. Up to five (5) days may be accumulated.

Tuition Aid - 50% advance for approved courses, balance up to 100% based on grade attainment.

Funeral Pay - Immediate family - 3 days, other family members - 1 day (Monday-Friday).

Military Pay - Difference between normal rate and military rate for 2 weeks Reserve Duty.

Overtime - Time and one half for time worked over 8 hours per day, 40 hours per week.

Direct Deposit - Deposit of payroll directly to employee bank accounts. Funds also directed to Individual Savings Plan, Christmas Club and Individual Retirement Account.

Payroll Deduction Service - Purchase of work related equipment, uniform and coverall services.

Stock Purchase Program - Opportunity for employees to purchase JLG stock through payroll deduction, which is through The Fulton County National Bank. Commissions are charged to participants.

JLG Merit Scholarship - Opportunity for sons and daughters of JLG employees to apply for Company sponsored college scholarships through the National Merit Scholarship Corporation. Applications to be completed during junior year of high school.

PPI Award - The Profitability and Productivity Improvement Award program provides a cash award opportunity and recognizes employees' participation in our continuous improvement efforts. At the start of each fiscal year a profitability target is set for the following year. You must be hired at least six months before the end of the fiscal year, and be employed by JLG on the date that the awards are paid.

Retirement Savings Plan - (Requires 1,000 hours of service for participation). The Company offers a 401(k) Savings Plan which provides an annual Company discretionary profit sharing contribution of up to 5% of regular compensation. The Plan allows voluntary before tax contributions of up to 14% of pay and the Company will match 50% of the first 5% of voluntary contributions. Company contribution and match are subject to a 4 year vesting schedule. Employees are provided investment options. Loans are available.

Hourly
Pay Rate    To: Jeann~

| 5105 | Robert Westerhold...1 Week | 12.43 | 497.20 |
| 5046 | Donn Miller.........1 Week | 13.55 | 542.00 |
| | | | |
| 5020 | Keith Ankney........2 Weeks | 13.20 | 1056.00 |
| 5080 | Scott Becker........2 Weeks | 38,232.00 annual | 1470.40 |
| 5089 | Roger Belcher.......2 Weeks | 12.95 | 1036.00 |
| 5037 | Preston Bosley......2 Weeks | 14.56 | 1164.80 |
| 5007 | Sterling Doll, Sr...2 Weeks | 14.02 | 1121.60 |
| 5285 | Bruce Geiselman.....2 Weeks | 14.62 | 1169.60 |
| 5016 | Gary Gilbert........2 Weeks | 13.38 | 1070.90 |
| 5102 | James Godfrey,III...2 Weeks | 14.15 | 1132 |
| 5711 | Lester Grove........2 Weeks | 34,992.00 annual | 1345.60 |
| 5220 | Fred Herbst, III....2 Weeks | 39,864.00 annual | 1532.80 |
| 5095 | Dana Kinneman.......2 Weeks | 13.15 | 1052. |
| 5147 | Mark Leathery.......2 Weeks | 13.47 | 1077.60 |
| 5092 | Rock Lefevre........2 Weeks | 12.65 | 1012 |
| 5330 | Rick Metzger........2 Weeks | 32,784.00 annual | 1260.80 |
| 5019 | David Miller........2 Weeks | 12.52 | 1001.60 |
| 5016 | James Musselman.....2 Weeks | 14.56 | 1164.80 |
| 5702 | Raymond Myers.......2 Weeks | 9.58 | 766.40 |
| 5224 | Robert O'Donnell....2 Weeks | 13.72 | 1097.60 |
| 5707 | Jeffrey Ruth........2 Weeks | 10.16 | 812.80 |
| 5322 | Ken Schwartz........2 Weeks | 13.88 | 1100.40 |
| 5125 | Randy Sharp.........2 Weeks | 15.01 | 1200.80 |
| 5701 | Audrey Sorano.......2 Weeks | 13.66 | 1092.80 |
| 5090 | Russell Steich......2 Weeks | 13.55 | 1084 |
| 5249 | Roy Summers.........2 Weeks | 13.03 | 1042.40 |
| 5240 | Penny Treat.........2 Weeks | 12.65 | 1012 |
| 5093 | Leary Warfel........2 Weeks | 12.30 | 984 |
| 5111 | Keith Wildasin......2 Weeks | 11.80 | 944 |
| 5268 | Harold Wire.........2 Weeks | 14.24 | 1139.20 | 31,983.06 |
| | | | |
| 5720 | Thomas Conrad.......3 Weeks | 49,920.00 annual | 2880 |
| 5110 | Barry Fissel........3 Weeks | 41,280.00 annual | 2380.80 |
| 5363 | Stephen Hoke........3 Weeks | 14.26 | 1711.20 |
| 7017 | Kathleen Lamb.......3 Weeks | 32,400.00 annual | 1868.40 |
| 7013 | Kenneth Michael.....3 Weeks | 43,296.00 annual | 2497.20 |
| 5705 | Karen Shaffer.......3 Weeks | 13.47 | 1616.40 |
| 5015 | James Musselman.....3 Weeks | 14.56 | 1747.20 |
| 7018 | Barry Noel..........3 Weeks | 37,800.00 annual | 2180.40 | 16,881.6 |

Not sure of Vada Mummert..She was only part time in 1990. She
may receive 20 hours which was normal for part time employees
at USTC.

Total

50,004.40    2080

SCHEDULE 3.24

Potential Competing Interests

1.    Items 5, 6, 7, 8, 9, 10 and 11 on Schedule 1.01(k) Contracts.

2.    Schedule 3.22 Employee Benefit Plans.

3.    Compensation due Employees as of the Closing Date.

4.    Severance Payment obligations to Alex M. Belote.

SCHEDULE 3.25

Environmental Matters

1.  Applicable environmental permits are listed in Schedule 1.01(x), items 1 through 6.

2.  Since January 29, 1990, Seller has caused the remediation of a condition with a chip storage container and a condition with a wash area. Soil Sampling and Analysis Report by Gannett Fleming, Inc. and dated December 1995.

3.  Since January 29, 1990, the only complaint, order, directive, claim, citation or notice are the permits listed in Schedule 1.01(x), items 1 through 6 and item 4 below.

4.  HSCA Notice from the Commonwealth of Pennsylvania Department of Environmental Resources regarding the Industrial Solvents and Chemical Company Site, Newbury Township, York County, Pennsylvania.

5.  There are currently no underground storage tanks located on the Real Property.

6.  The Hazardous Materials on the Real Property are identified on the attached Hazardous Substance Survey Form.

7.  The only underground pipelines on the Real Property are water and sewer.

8.  Phase I Environmental Site Assessment by Gannett Fleming, Inc., Environmental Compliance Audit by Gannett Fleming, Inc., and OSHA Compliance Audit by Fairfax Environmental.

9.  Preliminary Environmental Assessment by APT Engineering, Inc. and dated November 22, 1989.

10. As reflected in the public records in the Recorder of Deeds Office of York County, Pennsylvania.

11. Asbestos Survey dated March 1996 and by Gannett Fleming, Inc.

12. Proposal for Environmental Services, York, Pennsylvania Facility by Groundwater Sciences Corporation and dated April 10, 1996.

13. Draft Preliminary Environmental Site Assessment and Remedial Activities Report JLG Industries, Inc., York, Pennsylvania Site by Groundwater Sciences Corporation and dated April 29, 1996.

14. Draft Environmental Site Assessment and Remedial Activities Report JLG Industries, Inc., York, Pennsylvania Site by Groundwater Sciences Corporation dated May 14, 1996.

15.    JLG Industries, Inc. Phase II Environmental Site Assessment, York County, Pennsylvania Plant by Gannett Fleming, Inc. and dated May 1996.

16.    Letter Agreement between JLG Industries, Inc. and Powerscreen USC Inc. and dated May 21, 1996.

```
                                    RTK USE ONLY
                           Facility: _____
                           Doc. Code: _____ Date: _____
```

### HAZARDOUS SUBSTANCE SURVEY FORM
#### Worker and Community Right to Know Program

```
         Name of Company: JLG Industries, Inc.
    Federal Employer ID #: _____
   ivision or Plant Name: Material Handling Division
       Workplace Covered: Entire Facility
          Street Address: RD 6, Box 34-B
                          York, PA  17404-9806
         Mailing Address: SAME AS ABOVE
        Telephone Number: (717) 792-9731
             County Name: York                    County Code: 67
          Representative: _____
                   Title: _____
         Signers Address: SAME AS ABOVE
        Reporting Period: From 01/01/95 Thru 12/31/95

             Signature: _____    Date: 03/04/96
```

| CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|
| | | FIR | REL | REA | ACU | CHR |
| | **00711 PENETRANT-LUBRICANT** | | | | | |
| 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| 74-98-6 | PROPANE | X | X | | X | X |
| | **07961 CATERPILLAR ANTIFREEZE 535** | | | | | |
| 107-21-1 | ETHYLENE GLYCOL | | | X | X | X |
| | **2 TON CLEAR EPOXY - HARDENER** | | | | | |
| 111-40-0 | 1,2-ETHANEDIAMINE, N-(2-AMINOETHYL) | | | | X | X |
| | **3M BRAND TYPE 148 TONER** | | | | | |
| 1333-86-4 | CARBON BLACK | | | | X | X |
| 7631-86-9 | SILICA | | | | X | |
| | **3M BRAND TYPE 152 DEVELOPER PREMIX** | | | | | |
| 7631-86-9 | SILICA | | | | X | |
| | **3M TYPE 164 TONER** | | | | | |
| 1333-86-4 | CARBON BLACK | | | | X | X |
| 7631-86-9 | SILICA | | | | X | |
| | **3M TYPE 264 DEVELOPER** | | | | | |
| 1333-86-4 | CARBON BLACK | | | | X | X |

```
                                              RTK USE ONLY
                                    Facility: _____
                                    Doc. Code: _____ Date: _____

        Name of Company: JLG Industries, Inc. _____
Workplace Covered By Form: Entire Facility _____
     Federal Employer ID #: ___-_____    Date: 03/04/96 _____
```

|   |   | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CHR |
|---|---|-------|------|-----|-----|-----|-----|-----|
|   |   |       | **50CC 515** |   |   |   |   |   |
| E |   | 79-10-7 | ACRYLIC ACID | X | X | X | X | X |
| E |   | 80-15-9 | CUMENE HYDROPEROXIDE | X |   |   | X | X |
|   |   |       | **7070 ODC CLEANER** |   |   |   |   |   |
|   |   | 124-38-9 | CARBON DIOXIDE |   |   |   | X | X |
|   |   |       | **ABC DRY CHEMICAL** |   |   |   |   |   |
|   |   | 12001-26-2 | MICA-GROUP MINERALS |   |   |   | X | X |
|   |   | 7631-86-9 | SILICA |   |   |   | X |   |
|   |   |       | **ABRASION RESISTANT CAST IRON** |   |   |   |   |   |
| E | S | 7440-47-3 | CHROMIUM |   |   |   | X | X |
|   |   | 7440-50-8 | COPPER | X |   | X | X | X |
|   |   | 7439-96-5 | MANGANESE | X |   | X | X | X |
|   |   | 7439-98-7 | MOLYBDENUM | X |   |   | X |   |
| E | S | 7440-02-0 | NICKEL | X |   |   | X | X |
| E |   | 7723-14-0 | PHOSPHORUS | X |   |   | X | X |
|   |   | 7440-21-3 | SILICON | X |   |   | X |   |
|   |   | 7704-34-9 | SULFUR |   |   |   |   |   |
|   |   |       | **ACETYLENE** |   |   |   |   |   |
|   |   | 74-86-2 | ACETYLENE | X | X | X | X |   |
|   |   |       | **ACRYLIC ALKYD GLOSS ENAMEL** |   |   |   |   |   |
| E |   | 108-88-3 | TOLUENE | X |   |   | X | X |
| E |   | 1330-20-7 | XYLENE (MIXED ISOMERS) | X |   |   | X | X |
|   |   |       | **ACRYLIC-ALKYD HIGH GLOSS** |   |   |   |   |   |
| E |   | 108-88-3 | TOLUENE | X |   |   | X | X |
| E |   | 1330-20-7 | XYLENE (MIXED ISOMERS) | X |   |   | X | X |
|   |   |       | **ACRYLIC-ALKYD HIGH GLOSS GREY** |   |   |   |   |   |
| E |   | 108-88-3 | TOLUENE | X |   |   | X | X |
| E |   | 1330-20-7 | XYLENE (MIXED ISOMERS) | X |   |   | X | X |
|   |   |       | **ACTIVATOR 81669** |   |   |   |   |   |
| E |   | 7429-90-5 | ALUMINUM | X |   | X | X |   |
|   |   |       | **ADHESIVE 81669** |   |   |   |   |   |
|   |   | 79-10-7 | ACRYLIC ACID | X | X | X | X | X |

* Special Hazardous Substance

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
orkplace Covered By Form: Entire Facility
Federal Employer ID #:   -              Date: 03/04/96

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | **ADHESIVE 81669 (cont.)** | | | | | |
| | 7429-90-5 | ALUMINUM | X | X | X | | |
| | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| | | **ADHESIVE/SEALANT 242** | | | | | |
| | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| S | 81-07-2 | SACCHARIN | | | | X | X |
| | 7631-86-9 | SILICA | | | | X | |
| | | **ADHESIVE/SEALANT 262** | | | | | |
| | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| S | 81-07-2 | SACCHARIN | | | | X | X |
| | 7631-86-9 | SILICA | | | | X | |
| | | **AIR CARBON ARC GOUGING ELECTRODES** | | | | | |
| | 7782-42-5 | GRAPHITE | | | | | X |
| | | **ALCLEAN 200A** | | | | | |
| | 34590-94-8 | PROPANOL, (2-METHOXYMETHYLETHOXY)- | X | | | | |
| | | **ALKYD AIR-DRY 3.0 VOC PRIMER, BUFF** | | | | | |
| | 110-43-0 | 2-HEPTANONE | X | | | X | |
| | 7727-43-7 | BARIUM SULFATE | | | | X | X |
| | 108-10-1 | METHYL ISOBUTYL KETONE | X | | | X | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **ALKYD SPECIAL PURPOSE COATINGS** | | | | | |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **ALL CARBOLOY (R) CARBIDE GRADES EXCEPT 6** | | | | | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| | 7440-48-4 | COBALT | X | | | X | X |
| | | **ARCAIR (R) PROTEX (R) EXTRA** | | | | | |
| | 141-43-5 | ETHANOL, 2-AMINO- | X | | | X | X |
| | | **ARGOMIX 218, 225** | | | | | |
| | 7440-37-1 | ARGON | | | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |

RTK USE ONLY
Facility: ______
Doc. Code: ______ Date: ______

Name of Company: JLG Industries, Inc.
Workplace Covered By Form: Entire Facility
Federal Employer ID #: - Date: 03/04/96

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CHR |
|---|---|---|---|---|---|---|---|
| | | ARGON | | | | | |
| | 7440-37-1 | ARGON | | | | X | X |
| | | ARGON, COMPRESSED | | | | | |
| | 7440-37-1 | ARGON | | | | X | X |
| | | ARGOSHIELD GAS #8C, #25C | | | | | |
| | 7440-37-1 | ARGON | | | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | ATRAX CARBIDE GRADES AND BRAZED TOOLS AN | | | | | |
| | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| S | 7440-43-9 | CADMIUM | X | | | X | X |
| | 7440-48-4 | COBALT | X | | | X | X |
| | 7440-50-8 | COPPER | X | | X | X | X |
| | 7440-02-0 | NICKEL | X | | | X | X |
| S | 7440-02-0 | NICKEL | X | | | X | X |
| | 7440-22-4 | SILVER | X | | | X | |
| | 7440-66-6 | ZINC | X | | X | X | X |
| | | AVITROL | | | | | |
| | 7647-01-0 | HYDROCHLORIC ACID | | X | | X | X |
| | 504-24-5 | PYRIDINE, 4-AMINO- | | | | X | X |
| | | BALL PAINT MARKERS - ALL COLORS | | | | | |
| | 107-98-2 | 2-PROPANOL, 1-METHOXY- | X | | | X | |
| | | BOND "SUPER TOILEX" | | | | | |
| | 7647-01-0 | HYDROCHLORIC ACID | | X | | X | X |
| | | BRAZO FLUX | | | | | |
| | 1303-96-4 | SODIUM BORATE DECAHYDRATE | | | X | X | X |
| | | BRUNING PD ACTIVATOR | | | | | |
| | 107-41-5 | 2,4-PENTANEDIOL, 2-METHYL- | | | | X | |
| | 112-80-1 | 9-OCTADECENOIC ACID (Z)- | | | | | |
| | 100-51-6 | BENZENEMETHANOL | | | | | |
| | 141-43-5 | ETHANOL, 2-AMINO- | X | | | X | X |
| | 107-21-1 | ETHYLENE GLYCOL | | | X | X | X |

Hazardous Substance S = Special Hazardous Substance

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
Workplace Covered By Form: Entire Facility _____
Federal Employer ID #: __-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CHR |
|---|-------|-----------------------------------------|-----|-----|-----|-----|-----|
| | | **CARBOLOY (R) CARBIDE GRADE 616** | | | | | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| S | 7440-02-0 | NICKEL | X | | | X | X |
| | | **CARBON DIOXIDE** | | | | | |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | **CARBON DIOXIDE, GAS** | | | | | |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | **CENTARI (R) ACRYLIC ENAMEL** | | | | | |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **CENTARI (R) BASEMAKERS** | | | | | |
| | 108-83-8 | 4-HEPTANONE, 2,6-DIMETHYL- | X | | | X | |
| | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | | **CLEANING SOLVENT 755 (AEROSOL)** | | | | | |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | X | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | 109-87-5 | METHANE, DIMETHOXY- | | | | X | X |
| | 75-65-0 | TERT-BUTYL ALCOHOL | X | | | X | |
| | | **COATED ABRASIVE PRODUCT - ADALOX & METAL** | | | | | |
| E | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | | **COATED ABRASIVE PRODUCT - NORZON** | | | | | |
| E | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | | **COATED ABRASIVE PRODUCT - NORZON F826** | | | | | |
| E | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | | **COLD SOLVENT DEGREASER** | | | | | |
| E S | 75-09-2 | DICHLOROMETHANE | X | | | X | X |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 8002-05-9 | PETROLEUM | | | | X | X |
| | 79-01-6 | TRICHLOROETHYLENE | | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
orkplace Covered By Form: Entire Facility
Federal Employer ID #: ___-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | CROSSLINKER | | | | | |
| | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | CSM-1 DEGREASER | | | | | |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | X | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | DAR-2 | | | | | |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | DAZ-L FLUORESCENT (ALL COLORS) | | | | | |
| | 75-09-2 | DICHLOROMETHANE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | DECO BRITE AEROSOL SPRAY PAINT | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 8030-30-6 | BENZIN | X | | | X | X |
| | 110-54-3 | HEXANE | X | X | | X | X |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | DECO BRITE GLOSS YELLOW AEROSOL SPRAY | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 8030-30-6 | BENZIN | X | | | X | X |
| | 110-54-3 | HEXANE | X | X | | X | X |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | DTR602 | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |

RTK USE ONLY

```
                                   Facility: _____
                                   Doc. Code: _____ Date: _____

          Name of Company: JLG Industries, Inc._____
Workplace Covered By Form: Entire Facility_____
      Federal Employer ID #: ___-_____    Date: 03/04/96___
```

| E S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND<br>HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | **DUCTILE IRON** | | | | | |
| E | 7429-90-5 | ALUMINUM | X | | X | X | |
| E S | 7440-47-3 | CHROMIUM | | | | X | X |
| E | 7440-50-8 | COPPER | X | | X | X | X |
| | 7439-95-4 | MAGNESIUM | | | | | |
| E | 7439-96-5 | MANGANESE | X | | X | X | X |
| | 7439-98-7 | MOLYBDENUM | X | | | X | |
| E S | 7440-02-0 | NICKEL | X | | | X | X |
| E | 7723-14-0 | PHOSPHORUS | X | | | X | X |
| | 7440-21-3 | SILICON | X | | | X | |
| | 7704-34-9 | SULFUR | | | | | |
| | | **DURACELL** | | | | | |
| | 1310-58-3 | POTASSIUM HYDROXIDE (K(OH)) | | | X | X | X |
| | 7440-66-6 | ZINC | X | | X | X | X |
| | | **DXR80** | | | | | |
| E | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | | **DYKEN SPRAY STEEL BLUE SP-1100** | | | | | |
| E | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | 106-97-8 | BUTANE | X | X | | X | |
| | 64-17-5 | ETHANOL | X | | | X | X |
| E | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | | **ENAMEL REDUCERS** | | | | | |
| | 108-83-8 | 4-HEPTANONE, 2,6-DIMETHYL- | X | | | X | |
| E | 141-78-6 | ACETIC ACID ETHYL ESTER | X | | | X | X |
| E | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| E | 67-64-1 | ACETONE | X | | | X | X |
| E | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| E | 7439-92-1 | LEAD | X | | | X | X |
| E | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| E | 108-88-3 | TOLUENE | X | | | X | X |
| E | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **EPOXY** | | | | | |
| | 110-43-0 | 2-HEPTANONE | X | | | X | |
| | 25551-13-7 | BENZENE, TRIMETHYL- | X | | | X | |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
Workplace Covered By Form: Entire Facility _____
Federal Employer ID #: __-_____    Date: 03/04/96 _____

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CHR |
|---|---|---|---|---|---|---|---|
| | | EPOXY (cont.) | | | | | |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| S | 50-00-0 | FORMALDEHYDE | X | X | X | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | EPOXY HARDENER | | | | | |
| | 108-10-1 | METHYL ISOBUTYL KETONE | X | | | X | |
| | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | | F-100 INK | | | | | |
| | 64-17-5 | ETHANOL | X | | | X | X |
| | | FABSHIELD 4 | | | | | |
| | 1309-48-4 | MAGNESIUM OXIDE (MGO) | | | | | X |
| | 7439-96-5 | MANGANESE | X | | X | X | X |
| | 7440-02-0 | NICKEL | X | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | FAST DRY INHIBITING PRIMER | | | | | |
| | 8030-30-6 | BENZIN | X | | | X | X |
| | | FAST DRY PRIMER | | | | | |
| | 8032-32-4 | LIGROINE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | FLAME RETARDANT FLOOR COVERING - WHITE | | | | | |
| | 7783-20-2 | AMMONIUM SULFATE (SOLUTION) | | | | X | |
| | | FLEETWOOD 37 | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 1314-13-2 | ZINC OXIDE (ZNO) | | | | X | X |
| | | FORM-A-GASKET (R) #1 | | | | | |
| | 1309-37-1 | IRON OXIDE (FE2O3) | | | | X | |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | 1332-58-7 | KAOLIN | | | | X | |
| | | FORM-A-GASKET (R) #2 | | | | | |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | 1332-58-7 | KAOLIN | | | | X | |

RTK USE ONLY

Facility: _____
Doc. Code: _____  Date: _____

Name of Company: <u>JLG Industries, Inc.</u>
rkplace Covered By Form: <u>Entire Facility</u>
Federal Employer ID #: ___-_____    Date: <u>03/04/96</u>

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND<br>HEALTH HAZARD(S) | | | | |
|---|-------|------------------------------------------|------|------|------|------|------|
|   |       |                                          | FIR | REL | REA | ACU | CHR |
|   |       | **FORMULA 707** | | | | | |
|   | 1310-58-3 | POTASSIUM HYDROXIDE (K(OH)) | | | X | X | X |
|   |       | **G-G F.D. METAL SHOP PRIMER** | | | | | |
|   | 78-83-1 | 1-PROPANOL, 2-METHYL- | X | | X | X | X |
|   | 100-41-4 | ETHYLBENZENE | X | | | X | X |
|   |       | **GASKET ELIMINATRO (R) 515 SEALANT** | | | | | |
|   | 79-10-7 | ACRYLIC ACID | X | X | X | X | X |
|   | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| S | 81-07-2 | SACCHARIN | | | | X | X |
|   | 7631-86-9 | SILICA | | | | X | |
|   |       | **GLASS CLEANER (AEROSOL)** | | | | | |
|   | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
|   | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
|   |       | **GLID-GUARD ALKYD INDUSTRIAL ENAMEL - IMP** | | | | | |
|   | 1317-80-2 | RUTILE (TIO2) | | | | | |
|   |       | **GLID-GUARD ALKYD INDUSTRIAL ENAMEL - PAS** | | | | | |
|   | 1317-80-2 | RUTILE (TIO2) | | | | | |
|   |       | **GLID-GUARD ALKYD INDUSTRIAL ENAMEL - WHI** | | | | | |
|   | 1317-80-2 | RUTILE (TIO2) | | | | | |
|   |       | **GLID-GUARD GLID-SHIELD - DEEP TINT BASE** | | | | | |
|   | 1317-80-2 | RUTILE (TIO2) | | | | | |
|   |       | **GLID-GUARD INDUSTRIAL MAINTENANCE COLORA** | | | | | |
|   | 1333-86-4 | CARBON BLACK | | | | X | X |
|   | 1309-37-1 | IRON OXIDE (FE2O3) | | | | X | |
|   | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
|   |       | **GLID-GUARD MACH GRAY** | | | | | |
|   | 1317-80-2 | RUTILE (TIO2) | | | | | |
|   |       | **GLID-GUARD MED YELLOW** | | | | | |
|   | 1317-80-2 | RUTILE (TIO2) | | | | | |

```
                                              RTK USE ONLY
                                Facility: _____
                                Doc. Code: _____ Date: _____
```

Name of Company: JLG Industries, Inc.
Workplace Covered By Form: Entire Facility
     Federal Employer ID #: ___-_____     Date: 03/04/96

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CER |
| | | **GLID-GUARD SPEEDENAMEL Q.D. ENAMEL** | | | | | |
| | 1317-65-3 | LIMESTONE | | | | X | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| ⊇ | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **GLID-GUARD SPEEDENAMEL QUICK-DRY CLEAR T** | | | | | |
| ⊇ | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **GOOD GULF LEADED GASOLINE** | | | | | |
| ⊇ S | 71-43-2 | BENZENE | X | | X | X | X |
| ⊇ | 110-82-7 | CYCLOHEXANE | X | | | X | X |
| ⊇ | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| — | 110-54-3 | HEXANE | X | X | | X | |
| | 1634-04-4 | METHYL TERT-BUTYL ETHER | X | | | X | |
| | 91-20-3 | NAPHTHALENE | X | X | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **GRAPHITE GUN** | | | | | |
| | 7782-42-5 | GRAPHITE | | | | | X |
| | | **GRAY AIR DRY PRIMER** | | | | | |
| ⊒ | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| ⊒ | 108-88-3 | TOLUENE | X | | | X | X |
| ⊒ | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **GRAY IRON CASTING** | | | | | |
| ⊒ | 7429-90-5 | ALUMINUM | X | | X | X | |
| ⊒ S | 7440-47-3 | CHROMIUM | | | | X | X |
| ⊒ | 7440-50-8 | COPPER | X | | X | X | X |
| ⊒ | 7439-96-5 | MANGANESE | X | | X | X | X |
| | 7439-98-7 | MOLYBDENUM | X | | | X | |
| ⊒ S | 7440-02-0 | NICKEL | X | | | X | X |
| ⊒ | 7723-14-0 | PHOSPHORUS | X | | | X | X |
| | 7440-21-3 | SILICON | X | | | X | |
| | 7704-34-9 | SULFUR | | | | | |
| | | **GRAY IRON CASTING** | | | | | |
| ⊽ | 7429-90-5 | ALUMINUM | X | | X | X | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| ⊔ | 7440-50-8 | COPPER | X | | X | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
orkplace Covered By Form: Entire Facility _____
Federal Employer ID #: _____-_____  Date: 03/04/96

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CER |
| | | **GRAY IRON CASTING (cont.)** | | | | | |
| | 7439-96-5 | MANGANESE | X | | X | X | X |
| | 7439-98-7 | MOLYBDENUM | X | | | X | |
| S | 7440-02-0 | NICKEL | X | | | X | X |
| | 7723-14-0 | PHOSPHORUS | X | | | X | X |
| | 7440-21-3 | SILICON | X | | | X | |
| | 7704-34-9 | SULFUR | | | | | |
| | | **HI-GLOSS ENAMEL** | | | | | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **HIGH SOLIDS ACRYLIC ENAMEL** | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 100-42-5 | STYRENE | X | | | X | X |
| | | **HIGH TECH ELECTRONIC CLEANER** | | | | | |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | X | | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | |
| | | **HOSE ASSEMBLY LUBRICANT** | | | | | |
| | 8002-05-9 | PETROLEUM | | | | X | X |
| | | **I-M COLORANT CHROME YELLOW** | | | | | |
| : S | 7440-47-3 | CHROMIUM | | | | X | X |
| : | 7439-92-1 | LEAD | X | | | X | X |
| | | **I-M COLORANT LAMPBLACK** | | | | | |
| | 1333-86-4 | CARBON BLACK | | | | X | X |
| | 8032-32-4 | LIGROINE | X | | | X | X |
| | | **I-M COLORANT MOLY ORANGE** | | | | | |
| : S | 7440-47-3 | CHROMIUM | | | | X | X |
| : | 7439-92-1 | LEAD | X | | | X | X |
| | | **I-M COLORANT PHTHALO BLUE** | | | | | |
| | 8032-32-4 | LIGROINE | X | | | X | X |
| | | **I-M COLORANT WHITE** | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |

RTK USE ONLY

Facility: _____

Doc. Code: _____ Date: _____

Name of Company: <u>JLG Industries, Inc.</u> _____

orkplace Covered By Form: <u>Entire Facility</u> _____

Federal Employer ID #: __-_____     Date: <u>03/04/96</u> _____

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CER |
|---|-------|----------------------------------------|-----|-----|-----|-----|-----|
| | | **I-M COLORANT, CHROME YELLOW, MEDIUM** | | | | | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| | 7439-92-1 | LEAD | X | | | X | X |
| | | **IMRON (R) POLYURETHANE ENAMEL** | | | | | |
| : | 141-78-6 | ACETIC ACID ETHYL ESTER | X | | | X | X |
| : | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| : | 7429-90-5 | ALUMINUM | X | | X | X | |
| | 1333-86-4 | CARBON BLACK | | | | X | X |
| : S | 18454-12-1 | LEAD CHROMATE, BASIC | | | | X | X |
| : | 78-93-3 | METHYL ETHYL KETONE | X | | · | X | X |
| : | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **INHIBITED ETHYLENE GLYCOL** | | | | | |
| ᴱ | 107-21-1 | ETHYLENE GLYCOL | | | X | X | X |
| | | **JON-DRAW 700** | | | | | |
| ᴱ S | 50-00-0 | FORMALDEHYDE | X | X | X | X | X |
| | | **KOAL PLASMA QUENCH NO. 617** | | | | | |
| | 7631-99-4 | SODIUM(I) NITRATE (1:1) | X | | X | X | X |
| | | **KOAL PLASMA QUENCH NO. 617.2** | | | | | |
| | 7631-99-4 | SODIUM(I) NITRATE (1:1) | X | | X | X | X |
| | | **LACQUER THINNER** | | | | | |
| ᴱ | 67-64-1 | ACETONE | X | | | X | X |
| ᴱ | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| ᴱ | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| ᴱ | 108-88-3 | TOLUENE | X | | | X | X |
| | | **LATEX FLOOR, PORCH & TRIM ENAMEL** | | | | | |
| ᴱ | 107-21-1 | ETHYLENE GLYCOL | | | X | X | X |
| | | **LED-PLATE NO. 250 ANTI-SEIZE SEALING COM** | | | | | |
| — | 7439-92-1 | LEAD | X | | | X | X |

RTK USE ONLY

Facility: _____

Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____

orkplace Covered By Form: Entire Facility _____

Federal Employer ID #: ___-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | 102-71-6 | LENOX BAND-ADE MACHINE CLEANER ETHANOL, 2,2',2"-NITRILOTRIS- | | | | | |
| | 74-98-6 | LIQUEFIED PETROLEUM GAS OR PROPANE PROPANE | X | X | | X | X |
| | 74-99-7 | LIQUIFIED PETROLEUM GAS W/METYL ACETYLEN 1-PROPYNE | X | | | X | |
| | 71-55-6 | LOCQUIC (R) PRIMER T 1,1,1-TRICHLOROETHANE | | | X | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | 107-21-1 | LUX-REE LAT. FLAT WHITE & TINTS ETHYLENE GLYCOL | | | X | X | X |
| | 111-76-2 | M-60 GLASS CLEANER, CLEAR THRU, C-CLEAR, ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | 137-05-3 | M-BOND 200 ADHESIVE 2-PROPENOIC ACID, 2-CYANO-, METHYL | | | | X | |
| | 71-55-6 | M-BOND 200 CATALYST 1,1,1-TRICHLOROETHANE | | | X | X | X |
| | 92-50-2 | ETHANOL, 2-(ETHYLPHENYLAMINO)- | | | | | |
| | 7664-38-2 | M-PREP CONDITIONER A PHOSPHORIC ACID | | | | X | X |
| | 1336-21-6 | M-PREP NEUTRALIZER 5 AMMONIUM HYDROXIDE ((NH4)(OH)) | | | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | 57-55-6 | MARKAL BALL PAINT MARKERS 1,2-PROPANEDIOL | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| S | 75-09-2 | MARSH SPRAY MARKOVER TAN & WHITE DICHLOROMETHANE | X | | | X | X |
| | 68476-85-7 | LIQUEFIED PETROLEUM GAS | | | | | |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
orkplace Covered By Form: Entire Facility _____
Federal Employer ID #: ___-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | **MARSH SPRAY MARKOVER TAN & WHITE (cont.)** | | | | | |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | **METAL SHOP PRIMER** | | | | | |
| | 78-83-1 | 1-PROPANOL, 2-METHYL- | X | | X | X | X |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | 1309-37-1 | IRON OXIDE (FE2O3) | | | | X | |
| | 14808-60-7 | QUARTZ (SIO2) | | | | X | |
| | 14807-96-6 | TALC | | | | X | X |
| | | **MINT DISINFECTANT, PH, COEF. 7.5** | | | | | |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | **NATURAL GAS** | | | | | |
| | 106-97-8 | BUTANE | X | X | | X | |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | 74-84-0 | ETHANE | | | | | |
| | 110-54-3 | HEXANE | X | X | | X | X |
| | 7783-06-4 | HYDROGEN SULFIDE (H2S) | X | X | | X | X |
| | 74-82-8 | METHANE | X | X | | X | |
| | 109-66-0 | PENTANE | X | X | | X | X |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | | **NATURAL GRAPHITE MICRO MESH** | | | | | X |
| | 7782-42-5 | GRAPHITE | | | | X | |
| | 14808-60-7 | QUARTZ (SIO2) | | | | | |
| | | **NICKEL BASED CAST STEELS** | | | | | |
| : S | 7440-47-3 | CHROMIUM | | | | X | X |
| : | 7440-48-4 | COBALT | X | | | X | X |
| : | 7440-50-8 | COPPER | X | | X | X | X |
| : | 7439-96-5 | MANGANESE | X | | X | X | X |
| | 7439-98-7 | MOLYBDENUM | X | | | X | |
| : S | 7440-02-0 | NICKEL | X | | | X | X |
| | 7440-21-3 | SILICON | X | | | X | |
| | | **NISSEN FELTIP PAINT MARKER** | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc.
orkplace Covered By Form: Entire Facility
Federal Employer ID #: - _____    Date: 03/04/96

| S | CAS # | PRODUCT NAME<br>HAZARDOUS INGREDIENT(S) | PHYSICAL AND<br>HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | NITROGEN LIQUID BULK | | | | | |
| | 7727-37-9 | NITROGEN | | | | | |
| | | NITROGEN, COMPRESSED GAS | | | | | |
| | 7727-37-9 | NITROGEN | | | | | |
| | | OXYGEN, COMPRESSED GAS | | | | | |
| | 7782-44-7 | OXYGEN | | | | | |
| | | PIGMENT DISPERSION | | | | | |
| | 25551-13-7 | BENZENE, TRIMETHYL- | X | | | X | |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | 8052-41-3 | STODDARD SOLVENT | X | | | X | |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | PIPE SEALANT WITH TEFLON | | | | | |
| | 111-87-5 | 1-OCTANOL | | | | | |
| | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| | 9002-84-0 | ETHENE, TETRAFLUORO-, HOMOPOLYMER | | | | X | X |
| | 12001-26-2 | MICA-GROUP MINERALS | | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | POLY SPRAY JET | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | POLYOL | | | | | |
| | 110-43-0 | 2-HEPTANONE | X | | | X | |
| | 110-19-0 | ACETIC ACID, 2-METHYLPROPYL ESTER | X | | | X | |
| | 123-86-4 | ACETIC ACID, BUTYL ESTER | X | | | X | X |
| | 108-10-1 | METHYL ISOBUTYL KETONE | X | | | X | |
| | | PRIMER N 7649 (4.5 OZ) | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | | PROTECT-O-METAL NO. 2 | | | | | |
| | 1317-65-3 | LIMESTONE | | | | X | |
| | | PROTEX SPRAY | | | | | |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
Workplace Covered By Form: Entire Facility _____
Federal Employer ID #: ___-_____    Date: 03/04/96

| E S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | **PROTEX SPRAY (cont.)** | | | | | |
| E S | 75-09-2 | DICHLOROMETHANE | X | | | X | X |
| | | **PST (R) H TEMP ANTI-GALLING PIPE SEALANT** | | | | | |
| E | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| E S | 81-07-2 | SACCHARIN | | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **PST (R) PIPE SEALANT** | | | | | |
| E | 80-15-9 | CUMENE HYDROPEROXIDE | X | | | X | X |
| E S | 81-07-2 | SACCHARIN | | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **PURPLE K DRY CHEMICAL** | | | | | |
| | 12001-26-2 | MICA-GROUP MINERALS | | | | X | X |
| | | **QUAL (AND OTHER BRANDS)** | | | | | |
| E | 7664-93-9 | SULFURIC ACID | X | | X | X | X |
| | | **QUICK 'N EASY SPRAY ENAMEL** | | | | | |
| E | 110-19-0 | ACETIC ACID, 2-METHYLPROPYL ESTER | X | | | X | |
| E | 67-64-1 | ACETONE | X | | | X | X |
| E | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| E | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| E | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| E | 108-88-3 | TOLUENE | X | | | X | X |
| E | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **REDUCERS** | | | | | |
| E | 95-63-6 | 1,2,4-TRIMETHYLBENZENE | X | | | X | X |
| E | 98-82-8 | CUMENE | X | | | X | X |
| S | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| E | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **REGULAR STARTING FLUID** | | | | | |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| E | 60-29-7 | ETHANE, 1,1'-OXYBIS- | X | X | X | X | X |
| | 142-82-5 | HEPTANE | X | X | | X | X |
| | 110-54-3 | HEXANE | X | X | | X | X |

```
                                              RTK USE ONLY
                                    Facility: _____
                                    Doc. Code: _____ Date: _____
        Name of Company: JLG Industries, Inc. _____
  rkplace Covered By Form: Entire Facility _____
     Federal Employer ID #: __-_____    Date: 03/04/96 _____
```

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|---|---|---|---|---|---|---|
| | | | FIR | REL | REA | ACU | CHR |
| | | **REL. AGENT 81669** | | | | | |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | X | X | X |
| | 124-38-9 | CARBON DIOXIDE | | | | X | X |
| | | **RESINOID BONDED GRINDING WHEELS** | | | | | |
| | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | 409-21-2 | SILICON CARBIDE (SIC) | | | | X | |
| | | **RM 81** | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 1310-58-3 | POTASSIUM HYDROXIDE (K(OH)) | | | X | X | X |
| | | **RUST VETO 2109** | | | | | |
| | 8008-20-6 | KEROSENE | | | | | |
| | | **RUST-O-LENE OIL 110** | | | | | |
| | 92-52-4 | BIPHENYL | | | | X | X |
| | 8008-20-6 | KEROSENE | | | | | |
| | 91-20-3 | NAPHTHALENE | X | X | | X | X |
| | | **RUSTMASTER SPRAY - CLEAR GLOSS** | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | **RUSTMASTER SPRAY - FLAT WHITE** | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| | 71-36-3 | N-BUTYL ALCOHOL | X | | X | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **SAFETY-KLEEN 105 PARTS WASHING SOLVENT** | | | | | |
| ; | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | X | X | X |
| ; | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| ; S | 127-18-4 | TETRACHLOROETHYLENE | | | X | X | X |
| ; | 108-88-3 | TOLUENE | X | | | X | X |
| ; | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **SAVOGRAN STRYPEEZE SEMI PASTE** | | | | | |
| | 67-64-1 | ACETONE | X | | | X | X |
| . S | 75-09-2 | DICHLOROMETHANE | X | | | X | X |
| | 67-56-1 | METHANOL | X | | X | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
Workplace Covered By Form: Entire Facility _____
Federal Employer ID #: ____-_____  Date: 03/04/96 _____

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) FIR REL REA ACU CH |
|---|---|---|---|

PHYSICAL AND HEALTH HAZARD(S)

| S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CH |
|---|---|---|---|---|---|---|---|
| | | **SAVOGRAN STRYPEEZE SEMI PASTE (cont.)** | | | | | |
| | 8002-74-2 | PARAFFIN WAXES AND HYDROCARBON WAXE | | | | X | |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | **SEAMLESS STEEL TUBING & STEEL BARS** | | | | | |
| S | 7440-47-3 | CHROMIUM | | | | X | X |
| | 7439-98-7 | MOLYBDENUM | X | | | X | |
| S | 7440-02-0 | NICKEL | X | | | X | X |
| | | **SENTRY GU SAFETY SOLVENT** | | | | | |
| | 71-55-6 | 1,1,1-TRICHLOROETHANE | | | X | X | X |
| | | **SPEAR-O-SAN GERMICIDAL CLEANER** | | | | | |
| | 7722-88-5 | DIPHOSPHORIC ACID, TETRASODIUM SALT | X | | | X | X |
| | | **SPRAOL CLOTH MOP DRESSING** | | | | | |
| | 106-97-8 | BUTANE | X | X | | X | |
| | 74-98-6 | PROPANE | X | X | | X | X |
| | 75-28-5 | PROPANE, 2-METHYL- | | | | | |
| | | **SPRED - FLAT BLACK** | | | | | |
| | 1333-86-4 | CARBON BLACK | | | | X | X |
| | 8032-32-4 | LIGROINE | X | | | X | X |
| | | **STOP SEIZE** | | | | | |
| | 7440-50-8 | COPPER | X | | X | X | X |
| | 7782-42-5 | GRAPHITE | | | | | X |
| | | **SUPER COACH H/G BLACK** | | | | | |
| | 8030-30-6 | BENZIN | X | | | X | X |
| | | **SUPERBONDER(R) 430 INSTANT ADHESIVE** | | | | | |
| | 137-05-3 | 2-PROPENOIC ACID, 2-CYANO-, METHYL | | | | X | |
| | | **SUPERFLEX(TM) SILICONE ADHESIVE/SEALANT** | | | | | |
| | 64-19-7 | ACETIC ACID | X | | | X | X |
| | | **TOP COAT** | | | | | |
| | 111-76-2 | ETHANOL, 2-BUTOXY- | X | | | X | X |
| | 78-93-3 | METHYL ETHYL KETONE | X | | | X | X |
| | 100-42-5 | STYRENE | X | | | X | X |

RTK USE ONLY

Facility: _____
Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____
Workplace Covered By Form: Entire Facility _____
Federal Employer ID #: ___-_____    Date: 03/04/96 _____

| E S | CAS # | PRODUCT NAME / HAZARDOUS INGREDIENT(S) | FIR | REL | REA | ACU | CHR |
|---|---|---|---|---|---|---|---|
| | | **TOP COAT (cont.)** | | | | | |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | | **TRAFFIC PAINT YELLOW** | | | | | |
| | 110-54-3 | HEXANE | X | X | | X | X |
| E S | 7758-97-6 | LEAD CHROMATE | | | | X | X |
| E | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | **TUNGSTEN CARBIDE PRODUCT WITH COBALT BIN** | | | | | |
| E | 7440-48-4 | COBALT | X | | | X | X |
| | | **TURCO DY-CHEK DEVELOPER NA PSU** | | | | | |
| E | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| E | 76-13-1 | FREON 113 | | X | | X | X |
| | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | **TURCO DY-CHEK PENETRANT (PSU)** | | | | | |
| E | 84-74-2 | DIBUTYL PHTHALATE | X | | | X | X |
| E | 76-13-1 | FREON 113 | | X | | X | X |
| | 8002-05-9 | PETROLEUM | | | | X | X |
| | | **TURCO DY-CHEK REMOVER LS (PSU)** | | | | | |
| | 64-17-5 | ETHANOL | X | | | X | X |
| E | 76-13-1 | FREON 113 | | X | | X | X |
| | 8002-05-9 | PETROLEUM | | | | X | X |
| | | **ULTRA BLACK(R) RTV SILICONE** | | | | | |
| E | 7429-90-5 | ALUMINUM | X | | X | X | |
| | 1333-86-4 | CARBON BLACK | | | | X | X |
| | | **VCI METAL PROTECTIVE PAPER** | | | | | |
| | 141-43-5 | ETHANOL, 2-AMINO- | X | | | X | X |
| E | 7632-00-0 | SODIUM NITRITE | X | X | X | X | X |
| | | **VISIONAID RAINBOW ANTI-FOG, ANTI-STAT LI** | | | | | |
| E | 67-63-0 | ISOPROPYL ALCOHOL | X | | | X | X |
| | | **VITRIFIED BONDED - ABRASIVE PRODUCTS** | | | | | |
| E | 1344-28-1 | ALUMINUM OXIDE | | | | X | X |
| | 409-21-2 | SILICON CARBIDE (SIC) | | | | X | |
| | 7704-34-9 | SULFUR | | | | | |

RTK USE ONLY

Facility: _____

Doc. Code: _____ Date: _____

Name of Company: JLG Industries, Inc. _____

Workplace Covered By Form: Entire Facility _____

Federal Employer ID #: ___-_____    Date: 03/04/96

| S | CAS # | PRODUCT NAME HAZARDOUS INGREDIENT(S) | PHYSICAL AND HEALTH HAZARD(S) | | | | |
|---|-------|--------------------------------------|-----|-----|-----|-----|-----|
| | | | FIR | REL | REA | ACU | CER |
| | | **WD-40 SPRAY CANS** | | | | | |
| | 68476-85-7 | LIQUEFIED PETROLEUM GAS | | | | | |
| | 8052-41-3 | STODDARD SOLVENT | X | | | X | |
| | | | | | | | |
| S | | **WHITE STENCIL INK #7083** | | | | | |
| | 75-09-2 | DICHLOROMETHANE | X | | | X | X |
| | 13463-67-7 | TITANIUM OXIDE (TIO2) | | | | X | X |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | | | | | | | |
| | | **WINDSHIELD WASHER** | | | | | |
| | 67-56-1 | METHANOL | X | X | | X | X |
| | | | | | | | |
| | | **X-L CONCENTRATE** | | | | | |
| | 7722-88-5 | DIPHOSPHORIC ACID, TETRASODIUM SALT | X | | | X | X |
| | | | | | | | |
| | | **XAGRA- 7021AEROSOL** | | | | | |
| | 108-88-3 | TOLUENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |
| | | | | | | | |
| | | **XYLENE** | | | | | |
| | 100-41-4 | ETHYLBENZENE | X | | | X | X |
| | 1330-20-7 | XYLENE (MIXED ISOMERS) | X | | | X | X |

| Customer No. | Customer Name | Invoice Date | Invoice No. | Amount |
|---|---|---|---|---|
| 10622 | US Rentals Inc. | 4/3/96 | 224477 | (11,605.92) |
| 10911 | Clarklift of Ft. Worth, Inc, | 4/10/96 | 225886 | (35,786.00) |
| 9512 | Busey Truck Equipment | 4/16/96 | 227294 | (6,528.00) |
| 10622 | US Rentals Inc. | 4/16/96 | 227286 | (11,605.92) |
| 10895 | US Rentals | 4/16/96 | 227288 | (11,605.92) |
| 9544 | Fallsway Equipment Co., Inc. | 4/26/96 | 230320 | (6,169.25) |

SCHEDULE 5.06

Supply of Cylinders

Attached and labeled as Schedule 5.06 - Attachment A are the hydraulic cylinders to be sold and delivered by Seller pursuant to Section 5.06.

Schedule 5.06 – Attachment A

## MHD – TRUCK CRANE LINE
### HYDRAULIC CYLINDER REQUIREMENTS/ANALYSIS TO END OF SEPT '96

PRODUCTION CYLINDERS

| PART # | DESCRIPTION | PRESENT SUPPLIER | 5/14/96 QTY ON HAND MHD | 5/14/96 QUANTITY AT MCB | ADDITIONAL QTY NEEDED FROM MCB BY SEPT '96 |
|---|---|---|---|---|---|
| 1681745 | VERT DROP | MCB | 5 | | 8 |
| 1681753 | LIFT DEICER | MCB | 2 | | 8 |
| 1681758 | OUTRIGGER | MCB | 6 | | 8 |
| 1681763 | 28" TELE DEICER | MCB | 2 | | 3 |
| 1681783 | 44" TELE 900BT | MCB | 1 | | 2 |
| 1681831 | O & D | MCB | 3 | | 25 |
| 1681969 | OUTRIGGER | MCB | | | 7 |
| 1682026 | JACK | MCB | 3 | | 12 |
| 1682126 | | MCB | 10 | | 12 |
| 1682467 | FRONT BUMPER | MCB | 3 | | 13 |
| 1682484 | A FRAME | MCB | 20 | | 56 |
| 1682605 | 31" TELE | MCB | 0 | | 1 |
| 1682623 | 47" TELE (1683332) | MCB | 6 | | 3 |
| 1682832 | JACK | MCB | 12 | | 20 |
| 1682834 | O&D EXTEND | MCB | 4 | | 12 |
| 1683000 | JACK | MCB | 2 | | 15 |
| 1683001 | O&D EXTEND | MCB | 2 | | 10 |
| 1683041 | 38" TELE | MCB | 2 | | 8 |
| 1683226 | 85" TELE | MCB | 5 | | 20 |
| 1683228 | 70" TELE | MCB | 2 | | 36 |
| 1683231 | 65" TELE | MCB | 1 | | 10 |
| 1683233 | 114" TELE | MCB | 0 | | 4 |
| 1683235 | 94" TELE | MCB | 0 | 2 | 6 |
| 1683305 | 61" TELE | MCB | 4 | | 30 |
| 1683322 | 56" TELE | MCB | 2 | | 23 |
| 1683336 | 77" TELE | MCB | 1 | 1 | 4 |
| 1683942 | 59"g" TELE | MCB | 2 | | 20 |
| 1683344 | 47" TELE | MCB | 0 | | 3 |
| 1683374 | SWING CAB TELE | MCB | 1 | | 10 |
| | | | 101 | 3 | 374 |

## SERVICE CYLINDERS

| PART # | DESCRIPTION | PRESENT SUPPLIER | 5/14/96 QTY ON HAND MHD | 5/14/96 QUANTITY AT MCB | ADDITIONAL QTY NEEDED FROM MCB BY SEPT '96 |
|---|---|---|---|---|---|
| 1680264 | O/R. JACK | MCB | 0 | | 1 |
| 1680398 | CYL. STEER | MCB | 0 | | 2 |
| 1680266 | O/R. JACK | MCB | 0 | | 1 |
| 1681288S | ROD ASSM (SERV) | MCB | 0 | | 1 |
| 1681629S | ROD ASSM (SERV) | MCB | 0 | | 1 |
| 1682062 | TELE | MCB | 0 | | 1 |
| 1682063 | TELE | MCB | 0 | | 3 |
| 1682067 | 75" TELE. 1700BT | MCB | 0 | | 2 |
| 1682068 | TELE | MCB | 0 | | 3 |
| 1682473S | BARREL WELD | MCB | 0 | | 1 |
| 1682770S | ROD WELD | MCB | 0 | | 1 |
| 1683026 | LIFT 2500J | MCB | 0 | | 1 |

18

SCHEDULE 5.08

Transition Services

Purpose

To document current information systems and general accounting support requirements and responsibilities of JLG Industries, Inc. and the Purchaser of the Material Handling Division during the transition period.

The Purchaser shall assume actual costs ($1,438 per month) for the installed T1 communication line between JLG Corporate Headquarters in McConnellsburg, Pennsylvania and the Material Handling Division located near York, Pennsylvania, beginning the day following closing and transfer of ownership.

The Purchaser shall assume actual costs for maintenance contracts covering installed PC's, printers ($364 per month) and Data Net data collection terminals ($48 per month) at the Material Handling Division, beginning the day following closing and transfer of ownership.

JLG will give the service providers notice of termination by JLG of the above services in accordance with the related contracts. Purchaser will be responsible for arranging its own support thereafter. JLG will bill Purchaser for expenses relating to these contracts thereof through the termination period.

Accounting services will be prepared on JLG's current time schedule. JLG will use its chart of accounts numbering scheme. JLG will give Purchaser access to JLG's systems for only Material Handling Division records.

TIME FRAME

The transition period shall begin on the date of closing and shall end 120 days later.

INFORMATION SYSTEMS SUPPORT DEFINITION

Support includes:

- Computer Operator support and hard copy reports as currently being provided to the Division.
- Conversion of JLG file information to Purchaser's file requirements will be provided in a "flat file" format provided by the Purchaser, with the exception of payroll information which will be provided via hard copy.
- JLG and the Purchaser shall each provide a "point-of-contact" person for questions during the entire transition period.

Support does not include:

- Any support for new application development.
- Technical support for the installation of new devices, or the relocation of existing devices, except those devices that will be returned to JLG Industries, Inc.

## GENERAL ACCOUNTING SUPPORT DEFINITION

Support includes:

- **Payroll** - JLG will provide Purchaser with employee time records or a check register that details employee data. JLG will provide Purchaser with information to make payroll tax deposits.

- **Accounts Payable** - JLG will provide Purchaser a report of open invoices and, upon request, a cash requirements report detailing payment requirements. JLG will process invoices and provide Purchaser a list of invoices posted. Unless otherwise notified, JLG will follow its normal procedures in processig invoices for payment.

- **Accounts Receivable** - JLG will provide Purchaser a weekly aging. JLG will generate customer invoices and post cash receipts information provided by Purchaser.

- **General Ledger** - JLG will provide Purchaser a monthly trial balance and supporting detail. For information that is not provided by JLG's systems, Purchaser will provide journal entries in JLG's format. JLG will print departmental expense reports in JLG's current format.

- **Fixed Assets** - JLG will not maintain a detailed fixed assets register. JLG will supply the Purchaser with a list of assets as of the closing date.

- **After Services End** - JLG will provide Purchaser general ledger detail for the time period JLG maintained records for the Material Handling Division.

Support does not include:

- Collecting cash
- Payment of payroll and vendor disbursements
- Preparation of financial statements
- All tax calculations, support or deposits

SCHEDULE 6.03

Product Models

Model 1000P Crane
Model 1500P Crane
Model 1200T Crane
Model 1450T Crane
Model 1500T Crane
Model 2000T Crane
Model 1500SD Crane
Model 1500UC Crane
Model 2200UC Crane
Model 685 Crane
Model 686 Crane
Model 755 Crane (also referred to as Model 85M Crane)
Model 886 Crane
Model 8812 Crane
Model 8875 Crane

SCHEDULE 6.04

Intellectual Property

**Patents**

| Case No. | Title | Country | Registration/ Application No. | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| 123 | Telescopic Boom Construction | U.S. Canada | 4,406,375 1,182,076 | 9/27/83 2/5/85 | 9/27/00 2/5/02 |
| 125 | Boom Limit Safety Control System (with Back-Up System) | Canada S. Africa | 1,201,793 81/3798 | 3/11/86 6/30/82 | 3/11/03 6/8/01 |

## SCHEDULE 7.02

Closing Deliveries

See attached Closing Checklist

F:\USERS\545\POWERSCR\CHK.LST

POWERSCREEN USC INC.

Acquisition of Assets of
the Materials Handling Division
of JLG Industries, Inc.

CLOSING CHECKLIST

1.    Assets Purchase Agreement to be signed by:

      Powerscreen USC Inc. ("Powerscreen")
      Powerscreen International PLC ("International")
      JLG Industries, Inc. ("JLG")
      Fulton International, Inc. ("Fulton")

2.    Bill of Sale to be signed by:

          *    JLG

          Attachments:

          *    Schedule A    - Equipment
          *    Schedule B    - Inventory
          *    Schedule C    - Permits

3.    Vehicle transfer documents for the Vehicles to be signed by:

          *    JLG; and
          *    Powerscreen.

4.    Assignments of Conveyed Intellectual Property to be signed by:

          *    JLG/Fulton; and
          *    Powerscreen.

5.    Assignment of Assumed Contracts to be signed by:

          *    JLG; and
          *    Powerscreen.

          Attachment:

          *    Exhibit A      -      List of Assumed Contracts.

6.    Requests for Consents to Assignment from:

          *    Rasna;
          *    Print-O-Stat;
          *    Marlin Industrial Division, Inc.;
          *    Quality Copy Products; and
          *    IBM

7.    Certificates of Amendment of the Certificates of Incorporation
      of USTC, USTC Indiana, Inc. and US Truck Cranes, Inc.
      amending name.

8.    Pennsylvania Assumed Name filings to be signed by:

    *    Powerscreen.

9.    Environmental Permits and Licenses.

10.   Opinions of Brown, Todd & Heyburn PLLC re Powerscreen and of
    Andrew Harris re International.

11.   Officers' Certificate of Powerscreen to be signed by:

    *    Barry Cosgrove as President; and
    *    Shay McKeown as CEO.

12.   Certified Resolution of Powerscreen to be signed by:

    *    Shay McKeown as CEO;
    *    Barry Cosgrove as President;
    *    Patrick Devlin as Secretary/Treasurer; and
    *    Jay Tannon as Assistant Secretary.

13.   Delaware Certificate of Good Standing for Powerscreen.

14.   Pennsylvania Certificate of Authority for Powerscreen.

15.   Opinion of Covington & Burling re JLG and Fulton.

16.   Officers' Certificate of JLG to be signed by:

    *    Tom Singer as VP, Gen Counsel & Secretary; and
    *    David Black as Chairman, President & CEO.

17.   Certified Resolution of JLG to be signed by:

    *    Tom Singer.

18.   Pennsylvania Certificate of Good Standing for JLG.

19.   Pennsylvania Certificate of No Tax Due for JLG.

20.   UCC-3 Termination Statements from:

    *    Department of Commerce: 036140;
    *    Department of Commerce: 93-ST-01238-01.

22.   Escrow Agreement to be signed by:

    *    JLG;
    *    Powerscreen; and
    *    PNC Bank

23.  Indenture to be signed by:

        *    JLG; and
        *    Powerscreen.

24.  Tax Exemption Certificates.

25.  Agreements regarding soil disposal and NPDES.

26.  Wire to JLG account at First National Bank of Maryland $10,954,341.80 (Preliminary Purchase Price less adjustment for escrow of $250,000.00, cash requirement of $750,000.00 and real estate transfer and ad valorem taxes).

27.  $750,000 wire to Powerscreen account at PNC Bank, York.

28.  $250,000 wire to PNC Bank, Kentucky as escrow agent.

29.  IISA filing for Powerscreen and International.


*    Resolve division of motor vehicle taxes post-closing.

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

U.S. TRUCK CRANES, INC.,          :
                                  :    CIVIL ACTION
            Plaintiff,            :
                                  :    NO. 1:CV-90-0127
      v.                          :
                                  :    (Hon. James F. McClure, Jr.)
HIAB CRANES AND LOADERS,          :
INC.,                             :
                                  :
            Defendant.            :

## *STIPULATED SETTLEMENT AGREEMENT*

**Whereas**, U.S. Truck Cranes, Inc. ("U.S. Truck") and Hiab
Cranes and Loaders, Inc. ("Hiab"), (now known as Cargotec, Inc.
("Cargotec") as the result of a plan and agreement of merger of
Dunbar Manufacturing Inc. with and into Hiab Cranes & Loaders, Inc.
dated August 15, 1991), parties in the above action ("the
Litigation") have asserted various claims and defenses against one
another; and

**Whereas**, U.S. Truck and Hiab have previously entered into an
Amended and Restated Asset Purchase Agreement Between Hiab Cranes
and Loaders, Inc. And U.S. Truck Cranes, Inc. dated as of December
31, 1981 as amended on June 2, 1982 ("Purchase Agreement"); and

**Whereas**, U.S. Truck and Hiab intend by this Stipulated
Settlement Agreement ("Agreement") to resolve their disputes and to
establish their respective responsibility for defending claims,
arbitrations, lawsuits and any and all court or other tribunal
proceedings including governmental regulatory actions arising out

of pending claims, and incurred but not reported claims, and all claims and liabilities which may arise or become known in the future resulting from or pertaining to each unit/product set forth on the Discontinued Models list and the Nondisputed Models list, both of which are attached to this Agreement as Exhibits "A" and "B" respectively, and their respective responsibility for any judgments or other court, tribunal or governmental orders resulting from or pertaining to the manufacture, design, assembly, sale or distribution of the units/products identified on Exhibits "A" and "B"; and

Whereas, U.S. Truck and Hiab wish to settle, discontinue and end the Litigation;

Now therefore U.S. Truck, Hiab, Cargotec and JLG Industries, Inc. ("JLG") agree as follows:

1.    As between U.S. Truck and Hiab, U.S. Truck will be solely responsible for defending and/or satisfying any and all claims, judgments, orders or other judicial, tribunal and/or governmental imposed liability, resulting from or pertaining to the manufacture, design, assembly, sale or distribution of the following units/products:  TR 30-12; TE 70-26; TE 70-35; TE 70-45; TR 60-18 NE; TR 100-56; TE 200-25; TE 200-35; TE 200-45; K-146 T-Scope Manual (146 TSM); K-146 T-Scope Electric (146 TSE); 30-18 TRE; 55-26 TRT; 60-18 CNE; 60-26 TRE; 70-26 TRT; 70-35 TRT; 146 KBB; 146 KTS M; 146 KTSE; 100-56 TEC (TE 100-56); 200-25 TEC; 200-35 TEC (erroneously designated on the Nondisputed Models list attached as Exhibit "B" as 200-325 TEC) and 200-45 TEC and, in addition, any

unit/product (other than those units/products specified in paragraph 2) which has been manufactured and/or sold by U.S. Truck after January 1, 1982.

2. As between U.S. Truck and Hiab, Hiab will be solely responsible for defending and/or satisfying any and all claims, judgments, orders or other judicial, tribunal and/or governmental imposed liability, resulting from or pertaining to the manufacture, design, assembly, sale or distribution of the following units/products: TR 100-20; TE 30-13; "S4" Series, including S4F, S4R, S4SL, S4R Traveller, S4RB and S4S; TE 30-13 RB; TE 30-13 SL; TE 30-13 F; TE 30-13 FFTO; TR 4018 (erroneously referred to on the Discontinued Models list as a TE40-18); TR 4025; TR 60-21; K-64 345°; K-64 Continuous; K-146 FM; K-146 SM; K-146 KK; K-156 TM; K-156 SM; K-156 KK; K-156 SME; K-186 Ton/P.H.; K-186 Ton; K-196 Upper; K-127 Trash Grabber; K-138 FM; K-138 RM; "D"; "E"; Utility Unloader; 10-50 T-Scope; 45-16T; "T" Series; 45-18 T; 60-16 T; Mobileer; 45-18 TSP; 45-25 T-Scope; Hi-Lift Series; HL Series; 35-17 Compact; 40-15 Compact; 45-17 HL; 45-17 HLSP; 45-21 HL; K-166 SP; K-166 TM; TR 60-17; TR 40-17; TR 40-24; S 10; B 3500; S 15; MVJ 400; G 15; B 2000; G 10 (T-4500); S-7 (T-3000); H 15; H 18; H 10; 40-14; B 4500 Series; B4520 ("4520"); B 6022; B-6024; B4018; TR5521 and TR7521.

3. U.S. Truck and JLG agree to defend, indemnify and hold harmless Hiab and Cargotec and all of Hiab's and Cargotec's assigns, officers, directors, agents and employees and their respective heirs, administrators and executors with respect to any

-3-

loss, damage, liability, judgment, assessment, injunction, order and/or expense, including but not limited to court costs, attorneys' and experts' fees, on account of any and all manner of claim, law suit or cause of action or proceeding which relate to or concern in whole or in part the manufacture, design, assembly, sale or distribution of the units/products set forth in paragraph 1 above and any unit/product which U.S. Truck itself has manufactured, designed, assembled, sold or distributed since January 1, 1982.

4.    Upon receiving notice of any incident, occurrence or claim which involves in whole or in part an assertion that a unit/product set forth in paragraph 1 caused an injury or damage or may result in a liability to a governmental entity and in any event no more than 30 days after so learning of such an incident, occurrence or claim, Hiab shall notify U.S. Truck and JLG in writing of the existence of such incident, occurrence or claim and shall tender in writing U.S. Truck's and JLG's responsibility to defend such incident, occurrence or claim.

5.    Hiab and Cargotec agree to defend, indemnify and hold harmless U.S. Truck and JLG and all of U.S. Truck's and JLG's assigns, officers, directors, agents and employees and their respective heirs, administrators and executors with respect to any loss, damage, liability, judgment, assessment, injunction, order and/or expense, including but not limited to court costs, attorneys' and experts' fees, on account of any and all manner of claim, law suit or cause of action or proceeding which relate to or

-4-

concern in whole or in part the manufacture, design, assembly, sale or distribution of the units/products set forth in paragraph 2 above and any unit/product which Hiab itself actually manufactured, designed, assembled, sold or distributed since January 1, 1982.

6.  Upon receiving notice of any incident, occurrence or claim which involves in whole or in part an assertion that a unit/product set forth in paragraph 2 caused an injury or damage or may result in a liability to a governmental entity and in any event no more than 30 days after so learning of such an incident, occurrence or claim, U.S. Truck and JLG shall notify Hiab and Cargotec in writing of the existence of such incident, occurrence or claim and shall tender in writing Hiab's and Cargotec's responsibility to defend such incident, occurrence or claim.

7.  The parties do not intend by this Agreement to create or impose any liability to each other for any incident, occurrence or claim which pertains to the units/products listed in paragraphs 1 and 2 which have been finally adjudicated, resolved, settled or satisfied prior to the execution of this Agreement. Nor shall this Agreement create or grant any rights or benefits to Dico Company, Inc., Dyneer Corporation, or any other third party unless specifically so provided herein.

8.  Hiab, Cargotec, U.S. Truck and JLG agree that Section 1.02 of the Purchase Agreement shall be amended such that the word "Buyer" shall be deemed to include JLG each time it appears in that Section.

9.  Except as provided herein, this Agreement shall not alter, amend, cancel or nullify the Purchase Agreement which Purchase Agreement shall remain in full force and effect in accordance with its terms.

10.  This Agreement shall not alter, amend, modify, cancel or nullify the Declaratory Judgment Order dated November 14, 1988 entered in the action entitled <u>Hiab Cranes and Loaders, Inc. v. U.S. Truck Cranes Inc. and Alexander & Alexander, Inc.</u>, Civil Action No. 85-0902 (M.D. Pa.), a copy of which is attached as Exhibit "C", and that Order shall continue to remain in full effect.

11.  The parties shall provide to one another a verified list of all known incidents, occurrences and claims, including all legal actions, which have not been finally adjudicated, resolved or settled and which involve any of the units/products set forth in paragraphs 1 and 2 above.

12.  All notices required by this Agreement shall be sent by certified mail, return receipt requested as follows:

If to U.S. Truck:

    U.S. Truck Cranes, Inc.
    Attn: Thomas Singer, Esquire
    R.D. 6, Box 34-B
    York, PA 17404

        and

    Joseph M. Donley, Esq.
    Kittredge, Donley, Elson, Fullem & Embick
    421 Chestnut Street
    Philadelphia, PA 19106

-6-

If to JLG:

    JLG Industries, Inc.
    Thomas Singer, Esq.
    JLG Drive
    McConnellsburg, PA 17233

       and

    Joseph M. Donley, Esq.
    Kittredge, Donley, Elson, Fullem & Embick
    421 Chestnut Street
    Philadelphia, PA 19106

If to Hiab and Cargotec:

    Hiab Cranes and Loaders, Inc.
    c/o Richard J. Abrams, Esq.
    Richards, Layton & Finger
    One Rodney Square
    P.O. Box 551
    Wilmington, DE 19899

       and

    John M. Phelan, Esq.
    Phillips and Phelan
    Suite 1600
    121 South Broad Street
    Philadelphia, PA 19107

13. It is understood that this Agreement is the compromise of disputed claims and that the entering into this Agreement shall not be construed as an admission of liability on the part of either party which liability is expressly denied.

14. It is understood and agreed that this Agreement is executed in connection with the settlement of the claims set forth in the Litigation, which action is to be marked as discontinued, settled and ended.

15. This Agreement shall be binding upon and inure to the

-7-

benefit of the undersigned, their successors and assigns.

16. It is further understood and agreed that this is the complete Agreement between the parties and that there are no written or oral understandings directly or indirectly connected with this Agreement and settlement that are not fully incorporated in this Agreement.

17. The undersigned declare that the terms of this Agreement have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final compromise in settlement of any and all claims.

18. This Agreement shall be governed as to its validity, interpretation and effect by the laws of the Commonwealth of Pennsylvania. U.S. Truck, JLG, Hiab and Cargotec agree and consent to the vesting of exclusive jurisdiction for any claims arising under this Agreement in the United States District Court for the Middle District of Pennsylvania.

19. U.S. Truck, Hiab, JLG and Cargotec agree to execute any further documentation which may be needed to carry out the terms and conditions of this Agreement.

20. This Agreement may be signed in counterparts.

IN WITNESS HEREOF, U.S. Truck, Hiab and JLG have set their
hands and seals.

Witnesses:                              U.S. Truck Cranes, Inc.

_____          By: _____
                                        Title: PRESIDENT
                                        Date: NOVEMBER 25, 1992


                                        JLG Industries, Inc.

_____          By: _____
                                        Title: PRESIDENT & CHIEF EXECUTIVE OFFICER
                                        Date: NOVEMBER 25, 1992


                                        Hiab Cranes and Loaders, Inc.


_____          By: _____
                                            Lennart T. Brelin, President
                                            Cargotec, Inc.


                                        Cargotec, Inc.


_____          By: _____
                                            Lennart T. Brelin, President


-9-

IN WITNESS HEREOF, U.S. Truck, Hiab and JLG have set their hands and seals.

Witnesses:                          U.S. Truck Cranes, Inc.


_____           By: _____
                                        Title:
                                        Date:


                                    JLG Industries, Inc.


_____           By: _____
                                        Title:
                                        Date:


                                    Hiab Cranes and Loaders, Inc.


_____           By: _____
                                        Lennart T. Brelin, President
                                        Cargotec, Inc.


                                    Cargotec, Inc.


_____           By: _____
                                        Lennart T. Brelin, President


-9-

## DISCONTINUED MODELS

| MODEL NUMBER | DATE DISCONTINUED | MODEL NUMBER (YORK) | PRODUCTION END (YORK) | MODEL NUMBER (PRESIDENT) | PRODUCTION END (PRESIDENT) |
|---|---|---|---|---|---|
| TR 30-12 | 1/1/80 | "D" | April 3, 1958 | 810 | April 1, 1963 |
| TR 100-20 | 1/1/80 | "F" | June 24, 1960 | G 3500 | May 1, 1965 |
| TE 30-13 80 | 1/1/80 | Utility Unloader | May 21, 1963 | 9 15 | June 1, 1965 |
| TE 30-13 SL | 1/1/80 | 10-15 T-Scope | June 4, 1965 | HVJ 400 | June 1, 1965 |
| TE 30-13 P | 1/1/80 | 45-16 "T" | February 3, 1968 | G 15 | May 1, 1966 |
| TE 30-13 PPTU | 1/1/80 | 45-18 T | July 25, 1969 | B 2000 | March 1, 196 |
| TE 70-26 | 1/1/80 | 60-16 T | August 8, 1969 | G 10 (T 4500) | October 1, |
| TE 70-35 | 1/1/80 | Mobileer | October 13, 1969 | S 7 (T-3000) | October 1, |
| TE 70-45 | 1/1/80 | 45-10 TSP | May 8, 1970 | 11 15 | January 1, |
| TE 40-18 | 1/1/80 | 45-25 T-Scope | July 21, 1970 | 11 18 | October 1, |
| TR 40-25 | 1/1/80 | Ill-Lift Series | September 22, 1971 | 11 10 | November 1, |
| TR 60-18 IIE | 1/1/80 | 35-17 Compact | October 15, 1971 | 40-14 | January 1, |
| TR 60-21 | 1/1/80 | 40-15 Compact | August 23, 1971 | B 4500 | February 1, |
| TR 100-56 | 1/1/80 | 45-17 Ill. | December 29, 1971 | B 6022 | February 1, |
| TE 200-25 | 1/1/80 | 45-17 Ill.SP | April 3, 1972 | B 6024 | March 1, |
| TE 200-35 | 1/1/80 | 45-21 Ill. | May 23, 1972 | | |
| TE 200-45 | 1/1/80 | K 166 SP | September 15, 1976 | | |
| K-64 345' | 1/1/80 | K 166 TH | January 6, 1977 | | |
| K-64 Continuous | 1/1/80 | TR 60-17 | February 16, 1977 | | |
| K-146 T-Scope Manual | 12/1/79 | TR 40-17 | March 18, 1977 | | |
| K-146 FH | 12/1/79 | TR 40-24 | April 27, 1977 | | |
| K-146 BM | 12/1/79 | | | | |
| K-146 KX | 12/1/79 | | | | |
| K-156 TH | 12/1/79 | | | | |
| K-156 BH | 12/1/79 | | | | |
| K-156 KK | 12/1/79 | | | | |
| K-156 SHE | 12/1/79 | | | | |
| K-186 Trav/P.H. | 12/1/79 | | | | |
| K-186 Ton | 12/1/79 | | | | |
| K-196 Upper | 12/1/79 | | | | |
| K-146 T-Scope Elect. | 12/1/79 | | | | |
| K-127 Trash Grabber | 12/1/79 | | | | |
| K-138 FM | 12/1/79 | | | | |
| K-138 FH | 12/1/79 | | | | |

EXHIBIT



NONDISPUTED MODELS

MODEL NUMBER

30-18 TRC
60-18 ONE
60-26 TRC
70-26 TNT
70-35 TNT
146 RBB
146 KTS M
146 KTSE
100-56 TEC
200-25 TEC
200-525 TEC
200-45 TEC

EXHIBIT "1

*Judge* (signature)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HIAB CRANES & LOADERS, INC.,          :
          Plaintiff                    :
                                       :
                                       :          CIVIL ACTION NO. 85-0902
          vs.                          :
                                       :
U. S. TRUCK CRANES, INC., and          :
ALEXANDER & ALEXANDER, INC.,           :          F I L E D
          Defendants                   :          HARRISBURG PA

                                                  NOV 14 1988

### DECLARATORY JUDGMENT ORDER

AND NOW, this 14th day of November, 1988, upon consideration of the parties' requests to have this court declare their certain respective rights under the terms and conditions of the Restated and Amended Asset Purchase Agreement ("Hiab/U. S. Truck Agreement") and after trial of this action and answers of the jury to special interrogatories, dated September 27, 1988, it is hereby ordered and declared that judgment is entered in favor of U. S. Truck Cranes, Inc. ("U. S. Truck") and against Hiab Cranes & Loaders, Inc. ("Hiab"), as follows:

1.   Pursuant to Section 1.02(a)(i)(ii) of the Hiab/U. S Truck Agreement, and concerning incidents occurring on or after June 2, 1984, U. S. Truck has no duty or obligation to indemnify and/or defend Hiab for claims based on units/products which had been discontinued prior to January 1, 1982.

2.   Under Section 1.02(a)(i)(ii) of the Hiab/U. S. Tru Agreement, U. S. Truck's obligation to cause Hiab to be named as

an additional insured is limited to providing insurance to cover the scope of U. S. Truck's indemnity obligation.

3.   U. S. Truck has no duty or obligation to indemnify and/or defend Hiab based upon Hiab's contractual obligations to DICO or Dyneer Corporation under the Dico/Hiab purchase agreement, dated December 18, 1979.

4.   U. S. Truck has no duty to defend and/or indemnity Hiab with respect to the lawsuits of Kenneth and Barbara Anders v. DICO Company, Inc., et al., Circuit Court of Jefferson County, Alabama, No. CV 85-1632; and Peggy Kay, et al. v. DICO Company, Inc., et al., Circuit Court of Jefferson County, Alabama, No. CV 85-7049.

5.   Except to the extent specifically addressed herein, this order shall not affect any rights or obligations of Hiab or U. S. Truck under the terms and conditions of the Hiab/U. S. Truck Agreement.

William W. Caldwell
United States District Judge

2

Commonwealth of Pennsylvania     :
                            :
County of Fulton                 :

## AFFIDAVIT OF THOMAS D. SINGER

Thomas D. Singer being duly sworn states:

1. He is the Assistant Secretary of U.S. Truck Cranes, Inc.

2. The lists attached to this Affidavit entitled Potential Claims Known to U.S. Truck Cranes, Inc. and Past & Present Litigation Known to U.S. Truck Cranes, Inc. delineate all known incidents, occurrences, claims and legal actions which involved the units/products listed in paragraphs 1 and 2 of the Stipulated Settlement Agreement between U.S. Truck Cranes, Inc. and Hiab Cranes and Loaders, Inc. (now known as Cargotec, Inc.).

 

_____
Thomas D. Singer

Sworn to and Subscribed before me this 5th day of January, 1993

Notarial Seal
Sandra K. Keefer, Notary Public
Ayr Twp., Fulton County
My Commission Expires Oct. 7, 1996
Member, Pennsylvania Association of Notaries

## POTENTIAL CLAIMS KNOWN TO U.S. TRUCK CRANES, INC.

| CLAIMANT | DATE OF ACCIDENT | LOCATION | MODEL | SERIAL # |
|---|---|---|---|---|
| Rowe, William | 12/21/86 | West Virginia | TR40-18 | 710025 |
| Daily, Samual | 09/22/87 | Murray, KY | 60-26 | 8J0143 |
| Bascadynski | 05/12/88 | North Carolina | K146TS | Unknown |
| Meyemhoffer, Dan | 10/11/88 | Burlington, WI | TR4025 | 7G0169 |
| Foster Masonry | 07/89 | Massachusetts | 60-18CNE | Unknown |
| Magestic Bldg. Pro. | 07/89 | Missouri | 60-22 | Unknown |
| Williams Brothers | 08/89 | Atlanta, GA | 60-26TRT | 8A0087 |
| Hydro Conduit | 02/05/90 | Alvarado, TX | M-21 | Unknown |
| Smith, James | 05/10/90 | Honesdale, PA | 60-21 | 7G0055Y |
| Seay, James | 05/18/90 | Chadmawsboro, TN | M21-8 | 3-2378 |
| Halverson, Greg | 05/30/90 | Millinocket, ME | 110-35 | 8B0124 |
| Anderson, Chuck | 08/27/90 | Grand Blanc, MI | TE70-35 | 8D0130 |
| Szathmary Supply | 02/06/91 | Wildwood, NJ | 146KTS | Unknown |
| Pfeiffer, Chris | 02/19/91 | Tullytown, PA | 60-26 | 8L0165 |
| Diaz, Kenny | 03/25/91 | Tiverton, RI | 300-25 | 8G0155 |
| Jackson, Lonnie | 04/17/91 | Louisville, KY | TR4025 | 7D0119 |
| Wyoming Concrete | ? | Maryland | TTTAN Hi-Lo | Unknown |
| Ewing, Joe | 08/16/91 | Equality, IL | M21-8 | 08000...7 |
| Erby, James | 09/24/91 | St. Louis, MO | B4520 | 6I0388 |
| Affordable Bricks | 04/92 | Dubuque, IA | Unknown | Unknown |
| Dietch, Dan | 04/17/92 | Conrad, IA | Unknown | C-50329 |
| Rosa, Maria | Unknown | Miami, FL | 60-21 | Unknown |
| McCracken, Richard | 05/05/92 | Savannah, MO | 45-17 | 3140 |
| Oldham, Robert | 09/92 | Sydney, OH | DC16 | 0800000217 |
| Rothrock, Charles | 05/09/91 | Williamsport, PA | M21 Jiffy | Unknown |

## PAST & PRESENT LITIGATION KNOWN TO U.S. TRUCK CRANES, INC.

| CLAIMANTS | DATE OF ACCIDENT | MODEL & SERIAL # | COURT TERM & NO. |
|---|---|---|---|
| Brenda J. Bruso (Thomas J. Bruso) | 6/19/86 | Model 6021 S/N Unknown | Bennington Superior Court Bennington County, VT, Docket No. S142-88BC |
| John Boucher Deborah Boucher | 8/14/87 | Model 60-21 S/N 7G0139Y | Superior Court of New Jersey, Morris County, Docket No. MRS-L-3080-89 |
| Joseph A. Dolan Judy Dolan | 10/5/87 | Model 300-35 S/N 8F0186 | State of New York Supreme Court, County of Saratoga |
| Rebecca Pea (Jerry Pea) | 3/2/89 | Model B4520 S/N 7G0092 | Circuit Court of Third Judicial District Ill., Madison County, Docket No. 91-L-141 |
| Dana Waelens Catherine Waelens | 7/12/90 | Model B4520 S/N 7F0081 | State of Michigan, Circuit Court County of St. Clair, Docket No. 91-0849 |
| Robert Szafranski Susan Szafranski | 7/19/91 | Model 60-21 S/N 7G01234 | Circuit Court for Pinellas County Florida, Docket No. 92-1862-CI-07 |
| Scranton Craftsman, Inc. | 7/9/90 | Model 110-35 S/N Unknown | Court of Common Pleas, Lackawanna County, PA, Docket No. 91-Civil-5178 |

| NAME OF PARTY | DATE OF ACCIDENT~ SUIT | MODEL | COURT TERM AND NUMBER |
|---|---|---|---|
| Kenneth Anders | 12/26/84 3/18/85 | K-146 | Circuit Court for the Judicial Circuit of Jefferson County, Alabama, No. CV85-1632 |
| Raymond Augenstine | 6/16/79 12/2/80 | TR 40-25 | Circuit Court of Cook County IL, County Dept. |
| Virginia Baker | 2/3/81 | 11-65(?) | Circuit Court in and for Orange County, Florida, No. 81-9912 |
| Laughten T. Brower | 2/21/74 | 40-24 | |
| Robert Butler, Sr. | 6/24/78 1/15/80 | TR 60-21 | Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, No. 80-292 |
| T. Burchart | 4/83 | TR 60-22 | |
| Robert Butler, Jr. | 6/24/78 12/14/79 | TR 60-21 | Circuit Court of the 17th Judicial Circuit, Broward County, Florida No. 79-18925 |
| Causey | 6/20/79 | 45-21 | Superior Court for Glynn, Georgia, No. 20113 |
| Jolene Cramer | 12/4/79 9/2/75 | 60-24 | U.S. District Court for 'the District of Nebraska, Civil No. 75-0--337 |
| John Al Creech | 8/7/79 5/28/81 | 60-22 | State of Indiana, Circuit Court of Ripley County, No. C-80-171 |
| Mary Grace Curtis | 12/10/69 12/16/70 | 45-21 | Circuit Court of Hamilton County, Tennessee No. 14791-J |
| Glen Dahlbeck | 7/2/74 | TR 40-25 | District Court, Eighth Judicial Dist., State of Minnesota, County of Swift File No. 23,887 |
| Davey | 12/29/75 | | Superior Court, Fairfield County of Bridgeport, Conn. No. 163-3757 |

| NAME OF PARTY | DATE OF ACCIDENT-SUIT | MODEL | COURT TERM AND NUMBER |
|---|---|---|---|
| Charlotte Davidson | 3/3/79 8/27/79 | 30-18 | District Court, Cherokee County, Texas, 2nd Judicial Dist. No. 79-8-488 |
| Julio DeBello | 10/29/81 | 40-25 | Pasco County Circuit Court, Florida, No. CA-82-2191 |
| Douglas | 9/29/77 | 40-24 | Circuit Court for Green County, MO No. 85-348-1 |
| Farmer | 4/7/83 | TR40-25 | Circ. Ct. of Pasco County Florida CV 85-2292CA |
| James Ferfecki | 6/21/74 6/09/77 | 60-22 | Circuit Court for Brown County, Wisconsin, Case No. 77-262 |
| Garrett | 8/4/77 | 45-21 | USTC for Eastern District of MO, 77-O-854-C |
| Dennis Gibson | 12/9/83 1/21/87 | TR40-25 | Circuit Court of the Thirteenth Judicial Circ. of Florida, Hillsborough County, No. 87-622 |
| Carol Gray | 10/27/77 | 40-25 | District Court, Seventh Judicial Dist. State of Minnesota, County of Otter Trail |
| Grant | 1/9/81 | 45-21 | USDC for Southern District of Georgia, Brunswick Division No. 280-131 |
| Grimes/Whitfield | 4/1/87 | 4520 | 160th Judicial District Court at Dallas County, Texas 89-681 |
| Helen Marie Haferkamp | 6/19/72 5/23/75 | 60-24 | Circuit Court for the County of Berrien, Michigan, File No. 7514-11NP |
| Rita Hard | 6/23/77 | Unknown | District Court 150th Judicial District, Bexar County, TX, No. 77-CI-14448 |

| NAME OF PARTY | DATE OF ACCIDENT- SUIT | MODEL | COURT TERM AND NUMBER |
|---|---|---|---|
| Alan Hatley-Fowler | 8/2/79 | TR40-25 | District Court 150th Judicial District, Bexar County, Texas No. 81-CI-11801 |
| Arla Hemphill | 12/8/78 5/13/80 | 60-22 | Superior Court of the State of Washington for the County of Thurston, No. 80-2-00574-7 |
| Alan Henke | 6/20/79 6/13/85 | 60-22 | District Court of the State of Minnesota, County of Olmstead, Third Judicial District |
| Janie Hernandez | 6/30/71 8/25/72 | 30-18 | United States District Western District of Texas Austin Div., No. A72CA110 |
| Joyce E. Higdon | 10/18/75 11/16/77 | 45-20 | Circuit Court for the Tenth Judicial Circuit of Illinois, Peoria County, No. 77L4193 |
| Darryl Hoppel Leonore Hoppel | 9/27/77 9/21/79 | 60-24 | Circuit Court of Hancock County, West Virginia, C.V. No. 79-C-583-SP and 79-C-584-SP |
| Johnson | 12/4/78 | 40-24 | Circuit Court, 19th Judic. Circuit of Florida, Okeechobee County, No. 78-311-Ca |
| Leroy Jones | 9/16/75 1/17/77 | 45-20 | District Court of Jefferson County, Texas 60th Judicial District No. B-104, 428 |
| Loyd D. Jones | 6/30/77 5/1/78 | | Circuit Court of Hawkins County, Tenn. No. 297D |
| Wilbert Jones | 8/22/79 8/22/80 | 30-18 | Fifteenth Judicial District Court, Parish of Acadia, Louisianna |
| Peggy Kay | 4/25/85 | B45-20 | Circuit Court for Jefferson County, Alabama No. CV85-7049 |

| NAME OF PARTY | DATE OF ACCIDENT-SUIT | MODEL | COURT TERM AND NUMBER |
|---|---|---|---|
| Lester Kotrla | 6/24/77 | TR40-25 | District Court of Harris County, Texas 80th Judic. Dist. No. 81-00216 |
| Roxine Kruger | 11/10/75 2/27/77 | 30-19(?) | U.S.D.C., Dist. of Minnesota Fourth Div., No. 4-77-73 |
| Eugene Lane | 1/26/74 1/26/74 | Unknown | U.S.D.C., District of Delaware |
| Law | | 60-21 | U.S.D.C., District of Delaware, No. 76-43 |
| Lawson | 11/2/78 | 45-21 | U.S.D.C., Middle Dist. of Tenn. 78-3507 |
| Layton | 3/29/77 | 45-17 | Circuit Court of Jefferson County, FL CV-77-00759 |
| William F. Lipscomb | 5/4/78 5/6/81 | 30-18 | U.S.D.C., District of Maryland C.V. No. J81-1131 |
| Leroy Lockhart | 6/18/79 6/10/81 | 45-20 | Circuit Court of Marion County, West Virginia, No. 81-C-446 |
| Lee Jeffrey Lucas | 6/8/78 9/9/81 | 60-22 | U.S.D.C., Middle Dist. of Louisiana, No. C.A. 79-344 |
| Robert Macon | 4/10/79 4/28/82 | 35-17 | Gen'l. Court of Justice Superior, Court Div., Wake County, N.C. No. 82-CVS-2373 |
| Daniel L. Mannel | 10/18/73 12/4/78 | 30-18 | Circuit Court of Cook County, Illinois, No. 75L16007 |
| Waymon Martin | 5/23/83 | TR100-56 | Superior Ct. of Fulton County, State of Georgia No. D-8454 |
| Edward Meadows | 5/4/81 6/82 | B60-24 | Cmwlth. of Kentucky, Bracken Circuit Court, No. 82-CI-020 |

| NAME OF PARTY | DATE OF ACCIDENT-SUIT | MODEL | COURT TERM AND NUMBER |
|---|---|---|---|
| Mellott | 4/19/78 1982 | B60-21 | Common Pleas Court of Wayne County, Ohio No. 80-C1-026 |
| Jose Mircles | 6/6/83 5/86 | TR40-25 | 167th Dist. Court Pending of Travis County, Texas No. 363,631 |
| Virgil L. Morrall | 6/22/79 3/4/82 | TR60-21 | Circuit Court for Allegheny County, Maryland No. 15489 |
| Clarence Morss | 11/8/81 9/26/83 | TR40-25 | Circuit Ct. of the Eleventh Circuit in and for Dade County, Florida, No. 83-32919 (CA-16) |
| Nelacliff | 3/23/77 | 40-24 | Circuit Court for Hillsboro County, FL, No. 76-2103 |
| Ortega | 12/17/86 | K146TS | Circuit Ct. for the 17th Judic. Circ. of Florida, Broward No. 88-11345 |
| Diego Padillo | 9/11/81 11/83 | TR40-25 | District Court of Dallas County, Texas, No. 83-6709 |
| Ernest Peck | 4/8/74 3/31/76 | 60-22 | District Court of Iowa for Wapello County, No. 400-1076 |
| Gilbert Perwitz | 9/28/83 7/19/84 | B60-22 | State of New York, Supreme Ct. County of Onondago |
| Phillips | 2/21/74 7/19/74 (refiled) | 60-21 | U.S.D.C. for District of Vermont, Superior Ct., Chittenden County, VT No. C422-74 CNC |
| Herbert Randolf | 7/5/77 7/2/79 | ? | C.C.P., York County, Pennsylvania, No. 79-S-2248 |
| Gerald Robertson | 3/22/83 5/17/85 | B 60-22 | State of Wisconsin, Circ. Dodge Cnty., No. 85-CV-208 |

| NAME OF PARTY | DATE OF ACCIDENT-SUIT | MODEL | COURT TERM AND NUMBER |
|---|---|---|---|
| Bishop Robinson | 4/1/74 3/30/77 | 60-21 | Circuit Court of the 19th Judicial Circ. of Florida, Martin County, Florida  No. 76-163 CA |
| Terry Lee Robison | 3/8/84 11/21/84 | 45-21 | C.C.P., Allegheny Cnty, PA, No. OD34-20925 |
| Rowe | 12/21/86 | TR4018 | Circuit Court of Cable County, West Virginia  CA No. 87 G 1095 |
| Owen B. Rumble | 11/11/71 11/3/72 | 60-24 | District Court of Iowa for Crawford County, No. 23747 |
| Susan E. Selvage | 7/2/72 7/3/74 | 45-20 | Circuit Court of Cook County, Illinois No. 74L10729 |
| Ronald Smith | 1/22/81 | 40-17 | Dist. Ct. for the District of South Carolina, Charleston Division, No. 2:84-2093-8 |
| George Allen Stanford | 10/9/75 3/21/77 | 100-25(?) | Superior Court of Washington, Chelan County No. 30088 |
| James Stoner | 10/15/83 7/25/84 | TR 75-12 | Circ. Ct. for Tenth Judicial Circuit, Jefferson County, Alabama No. CV84-3990 |
| Suffolk Bldrs Supply | 12/15/82 | K146TS | Superior Ct, Suffolk County, Mass |
| Violla C. Tibbetts | 10/23/71 9/13/73 | 30-18 | District Ct. for Iowa for Pottawattanie County, No. Unknown |
| Rowena Tucker | 8/23/86 | Unknown | District Ct. Dallas County Texas, 14th Judicial Dist. No. 78-7097-A |
| Ricky Vermillion | 10/13/81 10/5/83 | B 60-22 | Iowa District Court for Polk County, No. CL-54-31561 . |

| NAME OF PARTY | DATE OF ACCIDENT-SUIT | MODEL | COURT TERM AND NUMBER |
|---|---|---|---|
| Vitt | 11/16/80 | 40-24 | Iowa District Court for Polk County CO-032-18491 |
| Weems | 9/12/77 | 45-17 | Circuit Court of Jefferson, Florida, No. CV-77-02743 |
| Kimberly Wiles | 7/22/81 12/7/81 | 60-24 | C.C.P., Summit County Ohio, No. CV81112967 |
| Shirley Fayola Wilson | 2/12/75 1/17/77 | 30-18 | U.S.D.C., Eastern Dist. of Arkansas, Western Div. No. LR-75C0237 |
| Scalici v. Alimak | 2/10/82 | | Unknown |

EXHIBIT C

IN THE CIRCUIT COURT OF MARSHALL COUNTY, WEST VIRGINIA

SCOTT D. SMITH & MARSHA SMITH  :
individually, and as guardians of the minor  :
children, Dakota Scott Smith (d.o.b. 9/30/98);  :
Christian A. Smith (d.o.b. 9/15/99); Dustin S.  :
Riggs (d.o.b. 1/6/94); Sierra A. Riggs (d.o.b.  :
2/4/96); and Marissa D. Maynard,  :
(d.o.b. 10/25/92),  :
                                  :

       Plaintiffs,  :

                                  :

vs.  :  CIVIL ACTION NO.  04-C-220K
                                  :

COOK BROTHERS TRUCKING, INC.,  :  JUDGE: MARK A. KARL
                                  :

84 LUMBER COMPANY  :
(a/k/a 84 LUMBER CO.),  :
d/b/a 84 LUMBER COMPANY  :
LIMITED PARTNERSHIP[1],  :
                                  :

JAMES HARDIE SIDING PRODUCTS  :
a/k/a    JAMES HARDIE BUILDING  :
PRODUCTS, INC.,  :
                                  :

McCLURE-JOHNSTON COMPANY,  :
                                  :

BABCOCK LUMBER COMPANY,  :
                                  :

CARGOTEC, INC.,  :
       c/o Atty: Christopher A. Brumley  :
       Flaherty Sensabaugh &  :
       Bonasso, PLLC  :
       200 Capitol Street  :
       P. O. Box 3843  :
       Charleston, WV  :
       25338-3843  ;

HIAB (f/k/a PARTEC CARGOTEC; aka  :
HIAB AB),  :
                                    :

JLG INDUSTRIES, INC.  :

---

[1] Plaintiffs reserve all rights to sue the general partners of  84 Lumber Company (a/k/a 84 Lumber Co.) d/b/a 84 Lumber Company Limited Partnership (hereinafter referred to as "84 Lumber").

1

<div style="padding-left: 2em;">

**c/o L. David Black, President**                    :
**1 JLG Dr.**                                        :
**McConnellsburg, PA.**                              :
**17233**                                            :
                                                     :
**RACE MOTOR HYDRAULIC SALES**                       :
**& SERVICE f/k/a RACE MOTOR**                       :
**PRENTICE SALES ,**                                 :
   **340 South Street**                :
   **Oxford, PA**                      :
   **19363**                           :
                                                     :
**PRECISION MACHINE HYDRAULIC**                      :
**AND CHROME PLATING, INC.**                         :
                                                     :
   **Robert A. Rogers, President**     :
   **1672 Fairmont Ave.**              :
   **Fairmont, WV**                    :
   **26554**                           :
                                                     :
   **Robert A. Rogers, President**     :
   **P. O. Box 347**                   :
   **Worthington, WV 26591**           :
                                                     :
**JOHN DOE DISTRIBUTORS,**                           :
                                                     :
   **Defendants.**                     :

</div>

---

## FIRST AMENDED COMPLAINT

NOW COME Plaintiffs, Scott D. Smith and Marsha Smith, individually, and as guardians on behalf of the minor children, Dakota Scott Smith, Christian A. Smith, Dustin S. Riggs, Sierra A. Riggs, and Marissa D. Maynard, by counsel, pursuant to Rules 8 and 15 of the West Virginia Rules of Civil Procedure, who, for their First Amended Complaint against the Defendants, state as follows:

## GENERAL ALLEGATIONS

1.    The Plaintiff, Scott D. Smith, is a resident of Brooke County, West Virginia.

2

2.      Upon information and belief, Defendant Cook Brothers Trucking, Inc. (hereinafter Cook Brothers) is a corporation organized and existing under the laws of the State of West Virginia and was the independent contractor of Mr. Smith at the time of the incident alleged more specifically herein; in the alternative, a factual dispute exists as to whether Mr. Smith was the employee or independent contractor of Cook Brothers and the jury must decide the issue of Mr. Smith's actual employment status at the time of the incident.  Negligence liability will apply if Mr. Smith was the independent contractor of Cook Brothers at the time of the incident; deliberate intent liability will apply if Scott Smith was the employee of Cook Brothers  at the time of the incident.

3.      Upon information and belief, Defendant 84 Lumber Company (hereinafter 84 Lumber) is a limited partnership organized and existing under the laws of Pennsylvania, otherwise qualified to do business in West Virginia.

4.      Upon information and belief, Defendant James Hardie Siding Products a/k/a James Hardie Building Products, Inc. (hereinafter Hardie Siding) is a corporation organized and existing under the laws of the State of Nevada, not qualified under Title 31D of the West Virginia Code to do business in the State of West Virginia.

5.      Upon information and belief, Defendant McClure-Johnston Company (hereinafter McClure) is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, qualified under Title 31D of the West Virginia Code to do business in the State of West Virginia.

6.      Upon information and belief, Defendant Babcock Lumber Company (hereinafter Babcock) is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, qualified under Title 31D of the West Virginia Code to do business in the State of

3

West Virginia.

7.    Upon information and belief, Defendant Cargotec, Inc. is a corporation organized and existing under the laws of the State of Ohio. It is not qualified under Title 31D of the West Virginia Code to do business in the State of West Virginia.

8.    Upon information and belief, Defendant HIAB (f/k/a Partec Cargotec, a/k/a Hiab AB) (hereinafter "Hiab") is or was a Swedish business entity. Hiab itself is not qualified to do business in the State of West Virginia.

9.    Upon information and belief, the words "U.S. Truck Cranes" appeared on the hand control of the boom which broke on August 25, 2003. Defendant JLG Industries, Inc., a Pennsylvania corporation, purchased U.S. Truck Cranes, Inc. or U.S. Truck Cranes and, upon information and belief, assumed the liability of U.S. Truck Cranes, Inc. or U.S. Truck Cranes. Defendant JLG Industries, Inc. is not qualified to do business in the State of West Virginia.

10.    Upon information and belief, Race Motor Hydraulic Sales & Service f/k/a Race Motor Prentice Sales (Race Motor) is a Pennsylvania business entity not qualified to do business in the State of West Virginia.

11.    Venue is proper in Marshall County pursuant to section 56-1-1 of the West Virginia Code.

12.    The Court has subject matter and personal jurisdiction over this proceeding and the defendants herein.

13.    Upon information and belief, on or about August 25, 2003, Mr. Smith, within the scope of his employment with Cook Brothers and at its behest, drove to the 84 Lumber facility at Beech Bottom, West Virginia.

4

14. Upon information and belief, from the Beech Bottom 84 Lumber facility, Mr. Smith got into a white-cabbed Ford 9000 flat-bed truck with a boom installed on the back and with a decal on the driver's side stating "84 Lumber Delivered by: Cook Brothers Trucking." Hereafter, it is referred to as "the Truck".

15. Upon information and belief, as of August 25, 2003, and at all relevant times prior, the Truck was maintained and used by 84 Lumber and/or Cook Brothers.

16. Upon information and belief, Cook Brothers had purchased the boom located on the back of the Truck approximately ten (10) years ago from Race Motor, a distributor in Pennsylvania.

17. Upon information and belief, Hiab manufactured the boom, as more fully set forth in Count VIII.

18. Upon information and belief, prior to Mr. Smith driving the Truck on August 25, 2003, employees or agents of 84 Lumber loaded and/or supervised the loading of either James Hardie concrete siding or some other type of concrete or cement siding (hereinafter concrete siding) on the boom at the back of the Truck.

19. Upon information and belief, prior to Mr. Smith driving the Truck on August 25, 2003, employees or agents of McClure supervised the loading of the concrete siding on the boom at the back of the Truck.

20. Upon information and belief, Hardie Siding manufactured the concrete siding of the preceding paragraph.

21. Upon information and belief, prior to or on August 25, 2003, Babcock distributed and/or transported the concrete siding from Hardie Siding to McClure.

22. Upon information and belief, McClure transported and/or distributed the concrete

5

siding to 84 Lumber prior to or on August 25, 2003.

23.    Upon information and belief, the concrete siding loaded on the Truck contained approximately two-hundred fifteen (215) pieces of cement siding each measuring twelve (12) feet in length, all of which collectively weighed approximately four-thousand eighty-five (4,085) pounds.

24.    Upon information and belief, on August 25, 2003, as ordered by Cook Brothers and 84 Lumber, Mr. Smith drove from the 84 Lumber facility at Beech Bottom in their Truck loaded with the concrete siding.

25.    Upon information and belief, at approximately 8:40AM, Mr. Smith arrived at a new home site in Belmont County, Ohio.

26.    Upon information and belief, at approximately 8:45AM, Mr. Smith used a hand control to control the boom in order to unload the siding.

27.    Upon information and belief, the hand control had the words, or a similar variation thereof, "U.S. Truck Cranes" written or printed on it.

28.    Upon information and belief, at approximately 8:45AM, while being used to unload the siding, the boom on the Truck made a "bang" sound as it broke.

29.    Upon information and belief, in consequence of the break, the eyes on the hydraulic cylinder busted and ripped out causing the hydraulic jack to fold and slam the load of siding into the back of Mr. Smith.

30.    Upon information and belief, as a result, the load of concrete siding crushed Mr. Smith up against the driver's side of the truck near the tires and fender.

31.    Upon information and belief, there was no warning anywhere on the load of concrete siding regarding the weight of said siding and safe handling procedures nor was there any warning

6

on the boom as to the maximum amount of weight which the boom could hold or otherwise support.

32.    Upon information and belief, as a direct and proximate result of the aforementioned breaking of the boom and the concrete siding slamming into him, Scott D. Smith sustained the following injuries, some or all of which are or may be permanent:

      a.      thoracic compression fracture;

      b.      severe sprains and strains and injury and damage to the bones, joints, muscles, ligaments, tendons, discs, nerves and tissues of the back and spine;

      c.      a pulmonary contusion;

      d.      subcutaneous emphysema;

      e.      facial and ear lacerations;

      f.      an abrasion to his back;

      g.      excruciating pain and chronic pain syndrome;

      h.      numbness in both legs;

      I      severe depression;

      j.      blunt chest injury;

      k.      headache, ataxia, dizziness, lightheadedness, and loss of balance;

      l.      tenderness and pain in left side of rib cage;

      m.      twitching of leg muscles;

      n.      soreness in upper thoracic region;

      o.      bilateral shoulder pain and upper back pain;

      p.      pain with use of left lower extremity and intermittent giving way of left lower extremity;

q.     hypertension

r.     numbness and weakness of left arm and hand;

s.     pain down both arms;

t.     mid and lower back pain with radiation to neck and left shoulder;

u.     chronic thoracic pain;

v.     limited range of motion due to continued thoracic back pain and spasm

w.     other physical and mental injuries to be proven at trial.

33.    Upon information and belief, as a direct and proximate result of the aforementioned breaking and slamming of the boom and load into him, in addition to those alleged above, Scott D. Smith sustained the following damages, some or all of which are or may be continuing:

a.     he has been and will be required to expend large sums of money for medical treatment and care, hospitalization, medical supplies, surgical appliances, rehabilitation and therapeutic treatment, medicines and other attendant services;

b.     he has sustained and will continue to sustain lost earnings, and his earning capacity has been reduced and permanently impaired;

c.     his general health, strength and vitality have been impaired;

d.     he has suffered intense pain, suffering and mental anguish; and

e.     he has been and will in the future be unable to enjoy various pleasures of life that he previously enjoyed.

### COUNT I: Smith v. Cook Brothers Trucking, Inc.

**(A)    NEGLIGENCE**

8

34.   Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

35.   Upon information and belief, at the time of the August, 2003 incident, Scott D. Smith was the independent contractor of Cook Brothers insofar as:

    (i)   Cook Brothers paid Scott on a commission rather than an hourly basis;

    (ii)   Cook Brothers neither controlled nor had the right to control where and when Scott would make deliveries for 84 Lumber;

    (iii)   Scott did not report to Cook Brothers in regard to his deliveries for 84 Lumber.

(A genuine issue of material fact exists as to whether Scott D. Smith was the independent contractor or employee of Cook Brothers. In the event the jury finds he was the employee of Cook Brothers, then Plaintiffs assert, in the alternative, their intentional tort claim.)

36.   Upon information and belief, Cook Brothers Trucking owed Mr. Smith the following duties:

    a. To make sure that the installation of the boom on the truck did not violate industry standards, and state, federal and local rules and regulations;

    b. To not expose Mr. Smith to a defective and unsafe boom with which to work;

    c. To adequately protect Mr. Smith by making sure the boom on the truck was in a safe and non-hazardous condition;

    d. To properly and adequately inform or advise Mr. Smith of the safety risks attenuating the foreseeable use of the boom;

    e. To take all necessary safety precautions to make sure the subject boom

9

could safely lift and move the concrete siding at issue.

37    Upon information and belief, Cook Brothers knew or should have known that the boom was defective and unsafe after having been warned on several occasions about its defective condition by Mr. Smith and potentially others prior to the August 25, 2003 incident.

38.    Upon information and belief, Cook Brothers breached the foregoing duties despite its knowledge or the knowledge it should have had.

39.    Upon information and belief, as a direct and proximate result of the breach of the foregoing duties, Mr. Smith suffered severe injuries and expenses as more fully set forth in paragraphs 32 and 33, supra.

## (B) IN THE ALTERNATIVE, DELIBERATE INTENT

40.    Upon information and belief, by ordering Scott D. Smith to drive the Truck and unload the concrete siding via the unsafe boom, Cook Brothers deliberately and intentionally subjected him to a specific unsafe working condition that existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death to Scott.

41.    Upon information and belief, Cook Brothers had a subjective realization and an appreciation of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by it.

42.    Upon information and belief, the specific unsafe working condition violated a state or federal safety statute, rule or regulation, whether cited or not, or a commonly accepted and well-known safety standard within the industry or business of the employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved.

43.    Upon information and belief, Cook Brothers intentionally exposed its employee, Scott D. Smith, to the specific unsafe working condition.

44.    Upon information and belief, Mr. Smith suffered serious injury as a direct and proximate result of the specific unsafe working condition, said injuries being further exemplified in ¶¶32 & 33.

## COUNT II: NEGLIGENCE

### (Smith v. 84 Lumber Company)

45.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

46.    Upon information and belief, 84 Lumber owed Mr. Smith the following duties:

a.    to make sure that the installation of the boom on the Truck did not violate industry standards, and state, federal and local rules and regulations;

b.    to not expose Mr. Smith to a defective and unsafe boom with which to work;

c.    to adequately protect Mr. Smith by making sure the boom on the Truck was in a safe and non-hazardous condition;

d.    to properly and adequately inform or advise Mr. Smith of the safety risks attenuating the foreseeable use of the boom.

e.    to take all necessary safety precautions to make sure the subject boom could safely lift and move the concrete siding at issue.

47.    Upon information and belief, 84 Lumber knew or should have known that the defective and unsafe boom presented to Mr. Smith a high degree of risk and strong probability of serious injury or death.

48.    Upon information and belief, 84 Lumber breached the foregoing duties despite its

11

knowledge or the knowledge it should have had as alleged in the preceding paragraph.

49.    Upon information and belief, as a direct and proximate result of the breach of the foregoing duties, Mr. Smith suffered severe injuries and expenses as more fully set out in ¶¶32 & 33.

## COUNT III: NEGLIGENCE

### (Smith v. 84 Lumber Company)

50.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

51.    Upon information and belief, as alleged in ¶18, Defendant 84 Lumber loaded or supervised the loading of the concrete siding on the boom at the back of the Truck on or about August 25, 2003.

52.    Upon information and belief, 84 Lumber knew or had reason to know that Scott Smith would be driving the Truck with the load of concrete siding to the new home site.

53.    Upon information and belief, 84 Lumber knew or had reason to know that if the siding was improperly loaded, the siding might affect the boom thereby causing an accident such as the one sustained by Mr. Smith on August 25, 2003.

54.    Upon information and belief, it was foreseeable to 84 Lumber that if the boom was improperly loaded, the siding might affect the boom thereby causing an accident such as the one sustained by Scott D. Smith on August 25, 2003.

55.    Upon information and belief, in loading or supervising the loading of the boom at the back of the Truck with the concrete siding, 84 Lumber owed, among others, duties of care and diligence to Scott Smith.

56.    Upon information and belief, in loading or supervising the loading of the boom at the

back of the Truck with the concrete siding, 84 Lumber breached, among others, the duties of care and diligence it owed to Scott D. Smith.

57.    Upon information and belief, as a proximate and in fact result of the aforesaid breach of duties, Scott D. Smith suffered the injuries and damages more fully described in ¶¶32 & 33.

## COUNT IV: NEGLIGENCE

### (Smith v. James Hardie Siding Products)

58.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

59.    Upon information and belief, Hardie Siding manufactured the concrete siding, referenced in ¶20 and elsewhere, that was located on the Truck on August 25, 2003.

60.    Upon information and belief, Hardie Siding owed a duty to Mr. Smith to include with the concrete siding a statement of the total weight of the siding and how it could be safely handled.

61.    Upon information and belief, Hardie Siding owed a duty to Mr. Smith to include with the concrete siding a statement of warning of danger of overloading machines and/or booms.

62.    Upon information and belief, Hardie Siding breached both of the two said duties by not including a statement regarding the weight, proper handling and a warning with the concrete siding.

63.    Upon information and belief, the breach of any of these duties legally and in fact caused severe injury to Mr. Smith as occasioned by the breaking of the boom on August 25, 2003.

64.    Upon information and belief, the damages suffered by Mr. Smith include those listed in ¶¶32 & 33.

## COUNT V: NEGLIGENCE

### (Smith v. McClure-Johnston Company)

13

65.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

66.    Upon information and belief, as distributor of the Hardie Siding cement or concrete, McClure owed a duty to Mr. Smith to include with the siding a statement of the total weight of the siding and how it could be safely handled.

67.    Upon information and belief, as distributor and/or transporter of the concrete siding, McClure owed a duty to Mr. Smith to include with the concrete siding a statement warning of the risk and dangers of overloading machines and/or booms with the siding.

68.    Upon information and belief, McClure breached these duties by not including the weight, proper handling or a warning with the concrete siding.

69.    Upon information and belief, the breach of any of these duties legally and in fact caused severe injury to Mr. Smith, as more fully set forth in ¶¶32 & 33, and as occasioned by the breaking of the boom on August 25, 2003.

## COUNT VI: NEGLIGENCE

### (Smith v. McClure-Johnston Company)

70.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

71.    Upon information and belief, as alleged in ¶19, McClure supervised the loading of the concrete siding on the boom at the back of the Truck on or about August 25, 2003.

72.    Upon information and belief, McClure knew or had reason to know that Scott Smith would be driving the Truck with the load of concrete siding to the new home site.

73.    Upon information and belief, McClure knew or had reason to know that if the siding was improperly loaded, it might affect the boom thereby causing an incident such as the one sustained by Scott D. Smith on August 25, 2003.

14

74.    Upon information and belief, it was foreseeable to McClure that if the boom was improperly loaded, the siding might affect the boom thereby causing an incident such as the one sustained by Scott D. Smith on August 25, 2003.

75.    Upon information and belief, In supervising the loading of the boom at the back of the Truck with the concrete siding, McClure owed, among others, duties of care and diligence to Scott D. Smith.

76.    Upon information and belief, in taking part in supervising the loading of the boom at the back of the Truck with the concrete siding, McClure breached, among others, the duties of care and diligence it owed to Scott D. Smith.

77.    Upon information and belief, as a proximate and in fact result of the aforesaid breach of duties, Scott D. Smith suffered the injuries and damages more fully described in ¶¶32 & 33.

## COUNT VII: NEGLIGENCE

### (Smith v. Babcock Lumber Company)

78.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

79.    Upon information and belief, as distributor and/or transporter of the Hardie Siding cement or concrete siding, Babcock owed a duty to Mr. Smith to include with it a statement of the total weight of the siding and proper handling procedures.

80.    Upon information and belief, as distributor of the concrete siding, Babcock owed a duty to Mr. Smith to include with the concrete siding a statement warning of the risk and dangers of overloading machines and/or booms with the siding.

81.    Upon information and belief, Babcock breached these duties by not including the weight, proper handling or a warning with the concrete siding.

15

82.    Upon information and belief, the breach of either one of these duties legally and in fact caused severe injury to Mr. Smith, as more fully set forth in ¶¶32 & 33, and as occasioned by the breaking of the boom on August 25, 2003..

## COUNT VIII: STRICT PRODUCTS LIABILITY

### (Smith v. HIAB and Cargotec, Inc.)

83.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

84.    Upon information and belief, Cargotec, Inc. has a business relationship in some capacity with Hiab.

85.    Upon information and belief, by virtue of the business relationship between the two, Cargotec, Inc. became jointly and severally liable along with Hiab for the products liability of the boom; Cargotec, Inc. is therefore jointly and severally liable with Hiab for any products liability as it relates to the boom.

86.    Upon information and belief, the business entity Hiab manufactured in the regular course of its business the boom on the Truck that broke on August 25, 2003.

87.    Upon information and belief, when Hiab marketed the boom after manufacturing it, the boom was unsafe, hazardous, and improperly manufactured for the following reasons:

      a.    the boom contained no safety warnings; and, in arguendo, to the extent it did contain such warnings, they were inadequate warnings to warn of the risk posed to Mr. Smith;

      b.    the boom was defectively designed;

      c.    the boom contained inadequate devices to make it safe;

      d.    the boom contained no warnings as to its limitations when used in a

16

reasonably foreseeable manner; and

e.    the boom contained a manufacturing defect which made it unsafe and

hazardous for its intended and foreseeable use.

88.    Upon information and belief, it was foreseeable to Hiab that the boom would be

installed in a vehicle such as this Truck.

89.    Upon information and belief, the boom did not substantially or significantly alter as

to its physical characteristics in the interim of time between the time of its manufacture by Hiab and

the August 25, 2003 incident.

90.    Upon information and belief, Hiab had reason to know that booms such as the one

that broke on August 25, 2003 would foreseeably be overloaded at times in their regular course of

intended use.

91.    Upon information and belief, Hiab had actual and constructive notice of the

extremely dangerous, hazardous and defective condition of the boom, and willfully, wantonly,

intentionally and outrageously caused and allowed the boom to be placed in the stream of commerce.

92.    Upon information and belief, the defects of the boom more fully set forth in ¶87

legally and in fact caused the boom to break on August 25, 2003.

93.    Upon information and belief, the breaking of the boom legally and in fact caused the

corresponding injuries to Mr. Smith as set forth in ¶¶32 & 33.

94.    Consequently, upon information and belief, Hiab and Cargotec, Inc. are strictly liable

to Mr. Smith for the severe injuries and damages he suffered on August 25, 2003.

## COUNT IX:    STRICT PRODUCTS LIABILITY

### (Smith v. Cargotec, Inc. )

95.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

96.     Upon information and belief, Cook Brothers purchased supplies for the boom from Cargotec, Inc.

97.     Upon information and belief, Cargotec, Inc. manufactured the supplies it sold to Cook Brothers.

98.     Upon information and belief, the products supplied to Cook Brothers which were incorporated into the boom that broke on August 25th were defectively designed and/or manufactured, thereby containing the same defects as those alleged in ¶87 as to the boom.

99.     Upon information and belief, the products never changed significantly or substantially from their time of manufacture by Cargotec, Inc. until the time of the incident on August 25, 2003.

100.    Upon information and belief, the defective design and defective manufacture of the products legally and in fact caused the August 25, 2003 incident and resulting injuries to Mr. Smith as alleged in ¶¶32 & 33.

## COUNT X: STRICT PRODUCTS LIABILITY

### (Smith v. JLG Industries, Inc.)

### (A)

101.    Upon information and belief, the hand control for the boom which broke in August, 2003 had written or printed on it U.S. Truck Cranes.

102.    Upon information and belief, U.S. Truck Cranes manufactured or contributed in the manufacture of the hand control for the boom which broke in August, 2003.

103.    Upon information and belief, when U.S. Truck Cranes manufactured or contributed in the manufacture of the hand control for the boom which broke in August, 2003, the hand control was unsafe, hazardous, and improperly manufactured for the following reasons:

    a.    the hand control was defectively designed;

b.   the boom contained a manufacturing defect which made it unsafe and hazardous for its intended and foreseeable use.

104.   Upon information and belief, it was foreseeable to U.S. Truck Cranes that the hand control would be used in the operation of such booms as the one in question;

105.   Upon information and belief, U.S. Truck Cranes sold, supplied, or distributed the hand control such that it was used in the Truck and/or boom which broke on August 25, 2003.

106.   Upon information and belief, the hand control did not substantially or significantly alter as to its physical characteristics in the interim of time between the time of its manufacture by U.S. Truck Cranes and the August 25, 2003 incident.

107.   Upon information and belief, the defects of the boom more fully set forth above legally and in fact caused the boom to break on August 25, 2003.

108.   Upon information and belief, the breaking of the boom legally and in fact caused the corresponding injuries to Mr. Smith as set forth in ¶¶32 & 33.

109.   Consequently, upon information and belief, U.S. Truck Cranes is strictly liable to Mr. Smith for the severe injuries and damages he suffered on August 25, 2003.

**(B)**

110.   Upon information and belief, subsequent to the design, manufacturer and/or sale of the hand control mechanism, JLG Industries, Inc. purchased the stock, assets, and product lines of "U.S. Truck Cranes, Inc." or "U.S. Truck Cranes," both commonly referred to above as "U.S. Truck Cranes."

111.   Upon information and belief, JLG Industries, Inc. was merely the alter ego of U.S. Truck Cranes and, as such, expressly and/or impliedly agreed to assume the liabilities of U.S. Truck Cranes.

19

112.    Upon information and belief, JLG Industries, Inc. is merely a continuation of U.S. Truck Cranes; JLG Industries, Inc.'s purchase of U.S. Truck Cranes was a merger of U.S. Truck Cranes and JLG Industries, Inc. JLG Industries, Inc. is therefore directly liable to the Plaintiffs to the same extent that U.S. Truck Cranes is or was.

113.    Upon information and belief, JLG Industries, Inc. had certain duties and responsibilities for the safety functions of the hand control mechanism sold by its predecessor, U.S. Truck Cranes.

114.    Upon information and belief, JLG Industries, Inc. negligently, carelessly, and recklessly breached its duties and responsibilities by failing to adequately inspect, provide post marketing instruction and/or warnings and/or maintain the aforesaid hand control mechanism in a safe and properly functioning manner, and Mr. Smith suffered injuries as a direct and proximate cause thereof.

115.    Upon information and belief, by further purchase and acquisition of U.S. Truck Cranes, JLG Industries, Inc. succeeded to any liability of U.S. Truck Cranes as a matter of law, including the liability arising from Mr. Smith's incident in August, 2003 with the breaking of the boom. Such liability exists even to the extent that direct liability, as alleged above, does not.

### COUNT XI:  JOINT VENTURE

### (Smith v. 84 Lumber, McClure, Babcock, and Hardie Siding)

116.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

117.    Upon information and belief, Defendants 84 Lumber, McClure, Babcock, and Hardie Siding comprised a joint venture for the purpose of selling concrete siding in West Virginia.

118.    Upon information and belief, Hardie Siding manufactured concrete or cement siding, Babcock and McClure distributed, transported, and/or delivered the siding, and 84 Lumber

sold the siding, as alleged in prior counts and allegations.

119.    Upon information and belief, after the Hardie siding was manufactured, distributed and sold, the four parties listed above would split the profits.

120.    Upon information and belief, the single business enterprise of the joint venture was the sale of the Hardie siding, including the specific type of siding located on the Truck on August 25, 2003.

121.    Upon information and belief, each of the four parties combined its efforts, time, skill, knowledge, resources, and property, vis-a-vis manufacturing, distributing, delivering and selling the siding in order to receive part of the profit from the sale and, in fact, did receive part of the profit of the sale(s).

122.    Upon information and belief, as a result of this joint venture, if one of the above four named parties is liable for the injuries to Mr. Smith as a result of the breaking of the boom, then all four are jointly and severally liable for Mr. Smith's injuries.

123.    Upon information and belief, to the extent one or more of the above parties is actually not a party to the joint venture, then upon information and belief, the remaining parties were nevertheless still involved in the joint venture of manufacturing, distributing, and selling Hardie siding.

124.    Upon information and belief, joint and several liability should be imposed on each and every one of the members of the above-alleged joint venture to the extent only one is found actually liable to the Plaintiffs.

## COUNT XII: NEGLIGENCE

### (Smith v. Race Motor Hydraulic Sales & Service f/k/a Race Motor Prentice Sales)

125.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

21

126.    Upon information and belief, on or about October 12, 1995, Race Motor Hydraulic Sales & Service f/k/a Race Motor Prentice Sales (hereafter Race Motor) sold to Cook Brothers the boom in question.

127.    Upon information and belief, Race Motor was in the business of buying, selling, repairing and distributing booms similar to or the same as the boom in question.

128.    Upon information and belief, Race Motor owed a duty to all foreseeable users of the boom in question to label the boom as to the maximum weight capacity it could lift.

129.    Upon information and belief, Race Motor owed a duty to all foreseeable users of the boom in question to label the same with safety warnings regarding its intended use.

130.    Upon information and belief, Race Motor breached the foregoing duties insofar as not specifying on the boom either the maximum weight capacity of the boom or safety warnings.

131.    Upon information and belief, as a proximate and direct result of their torts, Plaintiff has suffered injuries more specifically enumerated in ¶¶32 & 33.

### COUNT XIII: STRICT PRODUCTS LIABILITY

**(Smith v. Race Motor Hydraulic Sales & Service f/k/a Race Motor Prentice Sales)**

132.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

133.    Upon information and belief, Race Motor, as a regular distributor of booms such as the one in question, is strictly liable under the doctrine of products liability for the injury to Mr. Smith for the following reasons:

    a.    the boom contained no safety warnings; and, in *arguendo*, to the extent it did contain such warnings, they were inadequate warnings to warn of the risk posed to Mr. Smith;

    b.    the boom was defectively designed;

    c.     the boom contained inadequate devices to make it safe;

    d.     the boom contained no warnings as to its limitations when used in a reasonably

           foreseeable manner; and

    e.     the boom contained a manufacturing defect which made it unsafe and

           hazardous for its intended and foreseeable use.

134.    Upon information and belief, at the time of the August, 2003 incident, the boom was without substantial or significant alteration from its condition when it left Race Motors.

135.    Upon information and belief, as a proximate and direct result of their torts, Plaintiff has suffered injuries more specifically enumerated in ¶¶32 & 33.

## COUNT XIV: LOSS OF CONSORTIUM

### (Marsha Smith v. Defendants)

136.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs in this Count.

137.    Upon information and belief, Plaintiff Marsha Smith (hereafter "Mrs. Smith") is married to Mr. Smith and resides with him.

138.    Upon information and belief, solely as a result of defendants' tortious conduct as alleged in the foregoing paragraphs, Mrs. Smith has suffered and continues to suffer the following damages:

    a.     She has been and will be required to expend large sums of money for her

           husband's surgical and medical care, hospitalization, medical supplies,

           medicines and attendant services;

    b.     She has been and will in the future be deprived of the services, assistance and

           companionship of her husband; and

    c.     other damages to be proven at trial.

139.    Upon information and belief, as part of her loss of consortium claim, Mrs. Smith is not claiming loss of conjugal relations with Mr. Smith.

140.    Consequently, upon information and belief, each and every defendant, including the John Doe Defendant(s), is liable to Mrs. Smith, jointly and severally, for loss of consortium.

### COUNT XV: LOSS OF PARENTAL CONSORTIUM

**(Marsha Smith and Scott Smith, as guardians of the minor children, Dakota Scott Smith (DOB 9/30/98); Christian A. Smith (DOB 9/15/99); Dustin S. Riggs (DOB 1/6/94); Sierra A. Riggs (DOB 2/4/96); and Marissa D. Maynard (DOB 10/25/92))**

#### (A)    The Smith and Riggs Children

141.    Plaintiffs incorporate and reallege all of the foregoing paragraphs in this count.

142.    Plaintiffs Dakota S. Smith and Christian A. Smith are the biological and natural children of plaintiffs, Marsha and Scott Smith.

143.    Plaintiffs Dakota S. Smith and Christian A. Smith have resided with Mr. and Mrs. Smith since their respective births.

144.    Plaintiffs Dustin S. Riggs and Sierra A. Riggs are the biological children of Marsha Smith; the Riggs Plaintiffs are the stepchildren of plaintiff, Scott D. Smith.

145.    The Riggs plaintiffs have lived with plaintiffs Scott Smith and Marsha Smith since early 1996.

146.    Plaintiff Scott Smith supported his biological children and stepchildren at all relevant times prior to the incident in August, 2003.

147.    Both plaintiffs Scott and Marsha Smith provided society, companionship, comfort, guidance, kindly offices, advice, protection, care, and assistance to each of the foregoing minor children prior to August 2003.

148.    Subsequent to the August 2003 incident, due to the severity of Mr. Smith's injuries

24

and the detriment caused to his mental and physical well being, the positive influence he maintained with said minor children, as specified more fully in the preceding paragraph, was diminished to their detriment. Though Mr. Smith loves his children and still offers the positive influences listed above, he is nevertheless diminished in his ability to do so because of the severity of his injuries and their negative effect on his well being.

149.    Further, the said minor children suffered, and continue to suffer, the diminished positive influence which they receive from Mrs. Smith now that Mrs. Smith must perform more chores, work and caring services for her husband and is limited in her time and energy to care and nurture them.

150.    Upon information and belief, there are no other practical consortium-giving relationships available to the said four minor children.

### (B) Marissa D. Maynard

151.    The plaintiff and minor child, Marissa D. Maynard, is the niece of plaintiff, Scott Smith, and over whom he has full custody.

152.    Subsequent to Mr. Smith's August, 2003 injuries, Marissa has come to live Mr. and Mrs. Smith.

153.    Though Mr. and Mrs. Smith provide and have provided society, companionship, comfort, guidance, kindly offices, advice, protection, care, and assistance to Marissa, the quality and quantity thereof would have been substantially increased had Mr. Smith's August, 2003 injuries not occurred.

154.    As such, Marissa is entitled to compensation for the diminution in quality and quantity of society, companionship, comfort, guidance, kindly offices, advice, protection, care, and assistance that she would have otherwise received from Mr. Smith.

155.    Marissa's parental consortium claim also includes entitlement to compensation for

the diminution in quality and quantity of society, companionship, comfort, guidance, kindly offices,

advice, protection, care, and assistance that she would have otherwise received from Mrs. Smith;

because Mrs. Smith has had to perform more chores, work, and caring services for her husband, she

has less time and energy for Marissa's care. Upon information or belief, Marissa has no other

consortium-giving relationships.

**(C)    Loss or impairment of ability to support the minor children**

156.    On the behalf of the five minor children specified above, plaintiff, Scott D. Smith,

claims recovery for the loss or impairment of his pecuniary ability to support them.

## COUNT XVI:  STRICT PRODUCTS LIABILITY & LOSS OF CONSORTIUM:

### (Smith v. The Doe Defendants)

157.    Plaintiffs incorporate and re-allege all of the foregoing paragraphs herein.

158.    Upon information and belief, from Hiab AB and/or Cargotec, the boom passed

to intermediary distributor(s), the John Doe Defendants, from which it then passed to Race Motor.

159.    Upon information and belief, the said intermediary distributor(s) were in the business

of buying, selling, repairing and distributing booms similar to or the same as the boom in question.

160.    Upon information and belief, Defendant(s) Doe negligently and carelessly failed to

exercise the degree of skill, care and learning required of like intermediary distributors in the

labeling of booms as to maximum weight capacity and safety warnings.

161.    Additionally, upon information and belief, the John Doe distributors are strictly liable

under the doctrine of products liability for the injury to Mr. Smith for the following reasons:

a.    the boom contained no safety warnings; and, in *arguendo*, to the extent it did

contain such warnings, they were inadequate warnings to warn of the risk

26

posed to Mr. Smith;

b.    the boom was defectively designed;

c.    the boom contained inadequate devices to make it safe;

d.    the boom contained no warnings as to its limitations when used in a reasonably foreseeable manner; and

e.    the boom contained a manufacturing defect which made it unsafe and hazardous for its intended and foreseeable use.

162.    Upon information and belief, when each of the John Doe distributors passed the boom on to the next distributor and/or Race Motor, the boom left without substantial or significant alteration from its original condition at the time of manufacture.

163.    Upon information and belief, as a proximate and direct result of their torts, Plaintiffs have suffered injuries more specifically enumerated in ¶¶32 & 33.

164.    Further, upon information and belief, each of the said John Doe Defendants are liable for loss of consortium to Mrs. Smith.

**ALTERNATIVE COUNT I:        NEGLIGENT SPOLIATION OF EVIDENCE**

**(Plaintiffs v. Cook Brothers)**

In the event that the Plaintiffs fail in their tort claims against the defendants as a result of the absence of the defective boom parts,

165.    Upon information and belief, Cook Brothers owed the Plaintiffs a duty to preserve evidence arising from the August 25, 2003 accident.

166.    Upon information and belief, Cook Brothers breached said duty by giving possession of the boom to Precision Machine subsequent to the August 25, 2003 accident and instructing Precision Machine not to keep and maintain the defective parts of the boom. Alternatively, Cook Brothers breached

said duty by giving possession of the boom to Precision Machine subsequent to the August 25, 2003 accident and by not instructing Precision Machine to keep and maintain the defective parts of the boom.

167.    Upon information and belief, the said breach caused the Smith Plaintiffs to suffer damages to the extent of not being able to prevail in their underlying tort action.

### ALTERNATIVE COUNT II:    NEGLIGENT SPOLIATION OF EVIDENCE
### (Plaintiffs v. Precision)

In the event that the Plaintiffs fail in their tort claims against the defendants as a result of the absence of the defective boom parts, Plaintiffs allege a negligence spoliation of evidence cause of action against Precision, a West Virginia corporation, as follows:

168.    At the time when Cook Brothers gave the boom and/or its defective parts to Precision, a potential civil action existed on behalf of the Plaintiffs.

169.    Upon information and belief, Precision had actual knowledge of the pending or potential civil action;

170.    Upon information and belief, Precision had a duty to preserve the defective, damaged boom parts.

171.    Upon information and belief, Precision spoliated the said boom parts by disposing of the them.

172.    The said boom parts were vital to the Plaintiffs' ability to prevail in their potential civil action.

173.    As a result of the foregoing spoliation, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs pray for a judgment of compensatory damages against each and every one of the defendants, jointly and severally, for all injuries sustained by each of the Smith plaintiffs as a legal and in fact result of the breaking of the boom on August 25, 2003, be they physical, mental,

28

economic, or otherwise.  In the event that Cook Brothers or any other defendant had actual knowledge

of the dangerous and defective condition of the boom, plaintiffs pray for punitive damages against the

said defendant(s).  Finally, Plaintiffs pray for court costs, prejudgment and post-judgment interest,

attorney fees, and whatever other justiciable remedies this Honorable Court deems proper.

A JURY TRIAL IS DEMANDED ON ALL ISSUES.

SCOTT D. SMITH & MARSHA SMITH,
Plaintiffs

By _____
     Of counsel

Melvin W. Kahle, Esq., WV Bar No. 4743
Frank X. Duff, Esq., WV Bar No.1065
John M. Jurco, Esq., WV Bar No. 9535
Schrader Byrd & Companion, PLLC
The Maxwell Centre, Suite 500
32 - 20th Street
Wheeling, WV 26003
(304) 233-3390

29

## CERTIFICATE OF SERVICE

Service of the foregoing second version of the **First Amended Complaint** was made upon the following

parties by mailing a true copy thereof, by U.S. mail, postage prepaid, on this 3rd day of October, 2005:

David L. Wyant, Esq.
Bailey & Wyant, P.L.L.C.
1219 Chapline Street
Wheeling, WV 26003
Counsel for Cook Brothers

James C. Wright, Esq.
Jacob A. Manning, Esq.
Steptoe & Johnson, PLLC
1233 Main Street
Ste. 3000
P. O. Box 751
Wheeling, WV 26003
Counsel for McClure-Johnston

Chad A. Cicconi, Esq.
Thorp Reed & Armstrong LLP
1233 Main St, Ste. 2001
Wheeling, WV 26003
Counsel for 84 Lumber Company

Richard D. Owen, Esq.
Goodwin & Goodwin, LLP
300 Summers Street, East, Ste. 1500
P.O. Box 2107
Charleston, WV 25328-2107
Counsel for James Hardie

Christopher A. Brumley, Esq.
Flaherty Sensabaugh & Bonasso
200 Capitol Street
P. O. Box 3843
Charleston, WV 25301
Counsel for HIAB

Paul T. Walsh, III, Esq.
Adam M. Barnes, Esq.
Walsh, Collis & Blackmer, L.L.C.
The Gulf Tower
Ste. 2300
707 Grant Street
Pittsburgh, PA 15219
Counsel for Babcock Lumber

Instruction in the cover letter is given as to service on the new defendant parties to this action, i.e., JLG Industries, Inc.; Race Motor Hydraulic Sales; Precision Machine Hydraulic and Chrome Plating, Inc.; and Cargotec, Inc.

SCOTT D. SMITH & MARSHA SMITH,
Plaintiffs

By_____
Of counsel

Melvin W. Kahle, Esq., WV Bar No. 4743
Frank X. Duff, Esq., WV Bar No.1065
John M. Jurco, Esq., WV Bar No. 9535
Schrader Byrd & Companion, PLLC
The Maxwell Centre, Suite 500
32 - 20th Street
Wheeling, WV 26003
(304) 233-3390

31

## IN THE CIRCUIT COURT OF MARSHALL COUNTY, WEST VIRGINIA

SCOTT D. SMITH & MARSHA SMITH,

        Plaintiffs,

                                   CIVIL ACTION NO. 04-C-220K

vs.

COOK BROTHERS TRUCKING, INC.;
84 LUMBER COMPANY, n/k/a 84
LUMBER CO., d/b/a 84 LUMBER
COMPANY LIMITED PARTNERSHIP;
JAMES HARDIE SIDING PRODUCTS;
McCLURE-JOHNSTON COMPANY;
BABCOCK LUMBER COMPANY;
KONE, INC.; HIAB, f/k/a PARTEC
CARGOTEC AND JOHN DOE
DISTRIBUTORS,

        Defendants.

## STIPULATION RE: FIRST AMENDED COMPLAINT

    Now come the plaintiffs, Scott D. Smith and Marsha Smith; and the defendant Cook

Brothers Trucking, Inc., and in regard to Plaintiffs' First Amended Complaint, hereby agree and

stipulate as follows:

1.     On August 5, 2005, oral argument was had as to Plaintiffs' motion for leave to
amend their complaint;

2.     That at the August 5 hearing, the Court deferred ruling on Plaintiffs' attempted
amendment to include a direct negligence claim against Cook Brothers Trucking,
Inc.;

3.     To date, there is no ruling as to Plaintiffs' attempt to include the direct negligence
claim against Cook Brothers Trucking, Inc.;

4.     Other than the direct negligence action claim, the Court ruled on all other issues
surrounding Plaintiffs' amendments to their complaint;

5.   To date, three depositions have been scheduled for November, 2005;

6.   In an attempt to serve the new party defendants prior to the depositions, such that they are able to be present at the same, Plaintiffs will file and serve their First Amended Complaint which includes the negligence claim against Cook Brothers Trucking, Inc. that is presently under consideration by the Court;

7.   Cook Brothers Trucking, Inc. is under no obligation to file or serve an answer to the direct negligence cause of action portion of the First Amended Complaint at any time PRIOR TO the Court's ruling on whether direct negligence may be included against Cook Brothers Trucking, Inc.;

8.   Only in the event that the Court rules that Plaintiffs may include in their First Amended Complaint a direct negligence cause of action against Cook Brothers Trucking, Inc., will Cook Brothers Trucking, Inc. be required to respond to the direct negligence cause of action in the First Amended Complaint.  In this event, Cook Brothers Trucking, Inc. will have thirty (30) days from the date of the Order allowing Plaintiffs their direct negligence cause of action to answer this cause of action.

AGREED TO BY THE FOLLOWING:

David L. Wyant, Esq. (WV Bar #4149)
Bailey & Wyant, PLLC
1219 Chapline Street
Wheeling, WV 26003
Counsel for Defendant Cook Brothers Trucking, Inc.

Melvin W. Kahle, Esq. (WV Bar #4743)
Frank X. Duff, Esq. (WV Bar #1065)
John M. Jurco, Esq. (WV Bar #9535)
Schrader, Byrd & Companion, PLLC
The Maxwell Centre, Suite 500
32 - 20th Street
Wheeling, WV 26003
Counsel for Smith Plaintiffs

Be it so agreed this _3_ day of September, 2005.
October

## CIVIL SUMMONS

## IN THE CIRCUIT COURT OF MARSHALL COUNTY, WEST VIRGINIA

**SCOTT SMITH, ET AL**
####              PLAINTIFF

**VS**                                                    CIVIL ACTION NO.  **04-C-220K**

**JLG INDUSTRIES, INC.**
####            DEFENDANT,

**TO THE ABOVE NAMED DEFENDANT:**

**IN THE NAME OF THE STATE OF WEST VIRGINIA,** you are hereby Summoned and

required to serve upon **MELVIN W. KAHLE**, plaintiff's attorney whose address is

**32-20TH ST., WHEELING, WV 26003**, an answer including any related

counterclaim you may have to the complaint filed against you in the above styled civil action, a

true copy of which is herewith delivered to you. You are required to serve your answer within

**30** Days after service of this summons upon you, exclusive of the day of service. If you fail to

do so, judgment by default will be taken against you for the relief demanded in the complaint

and you will be thereafter barred from asserting in another action any claim you may have which

must be asserted by counterclaim in the above styled civil action.

Dated **OCTOBER 4, 2005**

David R. Eddy Clerk

Marjorie Kubanis Deputy



EXHIBIT D



EXHIBIT E

IN THE CIRCUIT COURT OF MARSHALL COUNTY, WEST VIRGINIA

SCOTT D. SMITH &
MARSHA SMITH,

        Plaintiffs,

v.

                                          Civil Action No. 04-C-220-K
                                          Judge Mark Karl

COOK BROTHERS TRUCKING,
INC., 84 LUMBER COMPANY (a/k/a
84 LUMBER CO.) d/b/a 84 LUMBER
COMPANY LIMITED PARTNERSHIP,
JAMES HARDIE SIDING PRODUCTS,
MCCLURE-JOHNSTON COMPANY,
BABCOCK LUMBER COMPANY,
HIAB AB, CARGOTEC INC.,
JGL INDUSTRIES INC.
and JOHN DOE DISTRIBUTORS,

        Defendants.

## ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANTS, HIAB AB and CARGOTEC INC., TO PLAINTIFFS' FIRST AMENDED COMPLAINT, DEFENDANT'S CROSS-CLAIMS and ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANTS CROSS-CLAIMS AGAINST DEFENDANTS

Comes now defendants, Hiab AB and Cargotec Inc. (hereinafter Hiab and Cargotec), by counsel, Christopher A. Brumley and Robert James, and Flaherty, Sensabaugh & Bonasso, PLLC, and for their Answer and Affirmative Defenses, Defendant's Cross-Claims and Answer and Affirmative Defenses to Cross-Claims Against Defendants state and allege as follows:

### FIRST DEFENSE

Hiab and Cargotec state that the plaintiffs' First Amended Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

In response to the specific numbered paragraphs in the plaintiffs' First Amended Complaint, Hiab and Cargotec, state and answers as follows:

1.    These defendants are without sufficient knowledge or information to form a belief as to the truth or veracity of the allegations contained in Paragraph 1 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

2.    The allegations in Paragraph 2 of the Plaintiffs' First Amended Complaint are not directed at these Defendants, and as such, no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

3.    The allegations in Paragraph 3 of the Plaintiffs' First Amended Complaint are not directed at these Defendants, and as such, no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

4.    The allegations in Paragraph 4 of the Plaintiffs' First Amended Complaint are not directed at these Defendants, and as such, no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

5.    The allegations in Paragraph 5 of the Plaintiffs' First Amended Complaint are not directed at these Defendants, and as such, no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

6.    The allegations in Paragraph 6 of the Plaintiffs' First Amended Complaint are not directed at these Defendants, and as such, no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

2

7.       The allegations in Paragraph 7 of the Plaintiffs' First Amended Complaint are admitted in part and denied in part. The Defendant Cargotec, Inc. admits that it is a corporation organized and existing under the laws of the State of Ohio. The remaining allegations in Paragraph 7 of Plaintiffs' First Amended Complaint constitute conclusions of law and no response is deemed necessary. To the extent a response is deemed necessary, the same are denied and strict proof is demanded at the time of trial.

8.       The allegations in Paragraph 8 of the Plaintiffs' First Amended Complaint are denied.

9.       The allegations in Paragraph 9 of the Plaintiffs' First Amended Complaint are not directed at these Defendants, and as such, no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

10.      The allegations in Paragraph 10 of the Plaintiffs' First Amended Complaint are not directed at these Defendants, and as such, no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

11.      The allegations in Paragraph 11 of Plaintiffs' First Amended Complaint are conclusions of law and no response is deemed necessary. To the extend a response is deemed necessary, the same are denied and strict proof is demanded at the time of trial.

12.      The allegations in Paragraph 12 of Plaintiffs' First Amended Complaint are conclusions of law and no response is deemed necessary. To the extend a response is deemed necessary, the same are denied and strict proof is demanded at the time of trial.

13.      These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 13 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

3

14.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 14 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

15.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 15 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

16.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 16 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

17.     The allegations in Paragraph 17 of Plaintiffs' First Amended Complaint are denied.

18.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 18 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

19.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 19 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

20.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 20 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

21.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 21 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

22.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 22 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

23.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 23 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

24.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 24 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

25.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 25 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

26.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 26 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

27.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 27 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

28.     These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 28 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

29.    These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 29 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

30.    These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 30 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

31.    These defendants are without sufficient knowledge or information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 31 of the First Amended Complaint, and accordingly deny the same and demand strict proof thereof.

32.    These Defendants deny the allegations contained in Paragraph 32 of Plaintiffs' First Amended Complaint, including subparagraphs (a) through (w), and demand strict proof thereof.

33.    These Defendants deny the allegations contained in Paragraph 33 of Plaintiffs' First Amended Complaint, including subparagraphs (a) through (e), and demand strict proof thereof.

## COUNT I: NEGLIGENCE/DELIBERATE INTENT (COOK BROTHERS, INC.)

34-44.    The allegations in Paragraphs 34 through 44 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary.  To the extent a response is deemed necessary, the same are denied.

## COUNT II: NEGLIGENCE (84 LUMBER)

45-49.    The allegations in Paragraphs 45 though 49 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary.  To the extent a response is deemed necessary, the same are denied.

6

## COUNT III: NEGLIGENCE (84 LUMBER)

50-57.  The allegations in Paragraphs 50 though 57 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary.  To the extent a response is deemed necessary, the same are denied.

## COUNT IV: NEGLIGENCE (JAMES HARDIE SIDING PRODUCTS)

·58-64.  The allegations in Paragraphs 58 though 64 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary.  To the extent a response is deemed necessary, the same are denied.

## COUNT V: NEGLIGENCE (MCCLURE-JOHNSTON COMPANY)

65-69.  The allegations in Paragraphs 65 though 69 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary.  To the extent a response is deemed necessary, the same are denied.

## COUNT VI: NEGLIGENCE (MCCLURE-JOHNSTON COMPANY)

70-77.  The allegations in Paragraphs 70 though 77 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary.  To the extent a response is deemed necessary, the same are denied.

## COUNT VII: NEGLIGENCE (BABCOCK LUMBER COMPANY)

78-82.  The allegations in Paragraphs 78 though 82 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary.  To the extent a response is deemed necessary, the same are denied.

## COUNT VIII: STRICT PRODUCTS LIABILITY (HIAB & CARGOTEC)

83.    The allegations in Paragraph 83 of Plaintiffs' First Amended Complaint, including the paragraphs incorporated by reference, are denied.

84.    The allegations in Paragraph 84 of Plaintiffs' First Amended Complaint are admitted.

85.    The allegations in Paragraph 85 of Plaintiffs' First Amended Complaint constitute conclusions of law to which no response is necessary. To the extent a response is necessary, the same is denied.

86.    The allegations in Paragraph 86 of Plaintiffs' First Amended Complaint are denied.

87.    The allegations in Paragraph 87 of Plaintiffs' First Amended Complaint, including subparagraphs (a) through (e) are denied.

88.    The allegations in Paragraph 88 of Plaintiffs' First Amended Complaint are denied.

89.    The allegations in Paragraph 89 of Plaintiffs' First Amended Complaint are denied.

90.    The allegations in Paragraph 90 of Plaintiffs' First Amended Complaint are denied.

91.    The allegations in Paragraph 91 of Plaintiffs' First Amended Complaint are denied.

92.    The allegations in Paragraph 92 of Plaintiffs' First Amended Complaint are denied.

93.    The allegations in Paragraph 93 of Plaintiffs' First Amended Complaint are denied.

94.    The allegations in Paragraph 94 of Plaintiffs' First Amended Complaint are denied.

## COUNT IX: STRICT PRODUCT LIABILITY (CARGOTEC, INC.)

95.    The allegations in Paragraph 95 of Plaintiffs' First Amended Complaint, including the paragraphs incorporated by reference, are denied.

96.    The allegations in Paragraph 96 of Plaintiffs' First Amended Complaint are denied.

97.    The allegations in Paragraph 97 of Plaintiffs' First Amended Complaint are denied.

8

98.    The allegations in Paragraph 98 of Plaintiffs' First Amended Complaint are denied.

99.    The allegations in Paragraph 99 of Plaintiffs' First Amended Complaint are denied.

100.    The allegations in Paragraph 100 of Plaintiffs' First Amended Complaint are denied.

## COUNT X: STRICT PRODUCT LIABILITY (JGL INDUSTRIES, INC.)

101-115.    The allegations in Paragraphs 101 through 115 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

## COUNT XI: JOINT VENTURE (84 LUMBER, MCCLURE, BABCOCK & HARDIE SIDING)

116-124.    The allegations in Paragraphs 116 through 124 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

## COUNT XII: NEGLIGENCE (RACE MOTOR HYDRAULIC SALES & SERVICES)

125-131.    The allegations in Paragraphs 125 through 131 of Plaintiff's First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary. To the extent a response is deemed necessary, the same is denied.

## COUNT XIII: STRICT LIABILITY (RACE MOTOR HYDRAULIC SALES & SERVICES)

132-135.    The allegations in Paragraphs 132 through 135 of Plaintiff's First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary. To the extent a response is deemed necessary, the same is denied.

## COUNT XIV: LOSS OF CONSORTIUM (DEFENDANTS)

136.    The allegations in Paragraph 136 of Plaintiffs' First Amended Complaint, including the paragraphs incorporated by reference, are denied.

137.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 137 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

138.    The allegations in Paragraph 138 of Plaintiffs' First Amended Complaint, including subparagraphs (a) through (c), are denied, and strict proof of the same is demanded.

139.    The allegations of Paragraph 139 of Plaintiff's First Amended Complaint are not contested.

140.    The allegations in Paragraph 140 of the Plaintiffs' First Amended Complaint constitute conclusions of law to which no response is deemed necessary. To the extent a response is deemed necessary, the same are denied and strict proof is demanded at the time of trial.

## COUNT XV: (LOSS OF PARENTAL CONSORTIUM)

141.    The allegations in Paragraph 141 of Plaintiffs' First Amended Complaint, including the paragraphs incorporated by reference, are denied.

142.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 142 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

143.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 143 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

144.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 144 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

145.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 145 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

146.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 146 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

147.    The allegations in Paragraph 147 of Plaintiffs' First Amended Complaint are denied.

148.    The allegations in Paragraph 148 of Plaintiffs' First Amended Complaint are denied.

149.    The allegations in Paragraph 149 of Plaintiffs' First Amended Complaint are denied.

150.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 150 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

151.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 151 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

152.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 152 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

153.    The allegations in Paragraph 153 of Plaintiffs' First Amended Complaint are denied.

154.    The allegations in Paragraph 154 of Plaintiffs' First Amended Complaint are denied.

155.    The allegations in Paragraph 155 of Plaintiffs' First Amended Complaint are denied.

156.    The allegations in Paragraph 156 of Plaintiffs' First Amended Complaint are denied.

11

## COUNT XVI: STRICT LIABILITY/LOSS OF CONSORTIUM

157.    The allegations in Paragraph 157 of Plaintiffs' First Amended Complaint, including the paragraphs incorporated by reference, are denied.

158.    The allegations in Paragraph 158 of Plaintiffs' First Amended Complaint are denied.

159.    These Defendants are without sufficient information to form a belief as to the truth or the veracity of the allegations contained in Paragraph 159 of Plaintiffs' First Amended Complaint, and, accordingly deny the same and demand strict proof thereof.

160-164.    The allegations in Paragraphs 160-164 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

## ALTERNATIVE COUNT I: NEGLIGENT SPOILATION OF EVIDENCE (COOK BROTHERS)

165-167.    The allegations in Paragraphs 165-167 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

## ALTERNATIVE COUNT II: NEGLIGENT SPOILAGE OF EVIDENCE (PRECISION)

168-173.    The allegations in Paragraphs 168-173 of Plaintiffs' First Amended Complaint are not directed at this Defendant and as such no response is deemed necessary. To the extent a response is deemed necessary, the same are denied.

## **THIRD DEFENSE**

Any allegations contained within the plaintiffs' First Amended Complaint which are not specifically admitted herein are denied.

12

## FOURTH DEFENSE

Hiab and Cargotec specifically denies that it or any of its agents or employees were guilty of any negligence or reckless conduct proximately causing or contributing to the alleged injuries and damages complained in the plaintiffs' First Amended Complaint.

## FIFTH DEFENSE

Hiab and Cargotec specifically denies that it or any of its agents or employees were guilty of any act or omission proximately causing or contributing to the alleged injuries or damages sustained by the plaintiffs as contained in the plaintiffs' First Amended Complaint. They also expressly deny the plaintiff's specific claims for strict liability based upon product defect, and additionally raise the defenses of alteration, misuse, state of the art and any other defense that may become applicable through the litigation process.

## SIXTH DEFENSE

This defendant hereby affirmatively asserts as an offset for any settlements made by other entities involving the plaintiffs' alleged injuries, including such sums received or receivable by the plaintiffs under the West Virginia Workers Compensation Act for this incident.

## SEVENTH DEFENSE

To the extent that the accident complained of in the First Amended Complaint was proximately caused by the plaintiff's or other parties failure to exercise due care for his own safety and/or his own contributory/comparative negligence or recklessness, misidentification, misuse of the product, alteration of the product and this defendant affirmatively asserts those defenses.

13

## EIGHTH DEFENSE

This defendant hereby affirmatively asserts those defenses under Rule 8(c) of the West Virginia Rules of Civil Procedure that constitute an avoidance or an affirmative defense which prove applicable and further affirmatively asserts any additional avoidance or affirmative defense, not specifically set out under Rule 8(c), which proves or may prove applicable.

## NINTH DEFENSE

Hiab and Cargotec reserves unto itself the affirmative defense that any award of punitive damages in this case would violate this defendant's rights to due process and equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 3, Section 10 of the West Virginia Constitution, in that:

1.    West Virginia law provides no adequate or meaningful standard or guide, with objective criteria, for fixing, determining or reviewing the amount of a punitive damage award.

2.    Under West Virginia law, the determination whether to award punitive damages is left to the arbitrary discretion of the trier of fact; there is no adequate or meaningful standard or guide for exercising said discretion, nor any reasonable constraints upon the exercise thereof.

3.    No provision of West Virginia law provides any adequate or meaningful standard or guide for determining the nature of the conduct upon which an award of punitive damages may be based, nor any statement of the public policy to be advanced or satisfied in assessment thereof.

4.    No provision of West Virginia law provides adequate procedural safeguards, consistent with the criteria of *Matthew v. Eldridge*, 422 U.S. 319, 96 S. Ct. 893 (1976), for imposition of a punitive damage award, nor for meaningful review or hearing to confirm or determine that such award is not grossly out of proportion to the severity of the offense and have some

14

understandable relationship to compensatory damages, consistent with the criteria of *Pacific Mutual Life Ins. Co. v. Haslip*, 111 S. Ct. 1032, 113 L.Ed. 2d 1 (1991).

5.     The very concept of punitive damages, whereby an award is made to a private plaintiff not by way of compensation, but by way of a windfall incident to punish a defendant, represents the taking of property without due process.

6.     Hiab and Cargotec specifically deny that plaintiffs are entitled to recover punitive damages. Completely absent from the First Amended Complaint is the correct standard (guideposts) for judging the constitutionality of any punitive damage award. See *BMW of North America, Inc. v Gore*, 517 U.S. 559, 116 S.Ct. 1589 (1996); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* 532 U.S. 424, 121 S.Ct. 1678 (2001). Further, any anticipated reference and/or reliance by plaintiffs to "financial circumstances and/or condition" of Boxley as part of the basis to impose punitive damages must be rejected as a basis to uphold any punitive damage award. See *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513 (2003). Not only does "financial" information bear no relationship to the specific harm allegedly suffered by the plaintiffs in this case, general financial information impermissibly invites the jury to assess punitive damages for conduct outside the state of West Virginia. A state may not punish conduct outside its borders and punitive damages may not be based on conduct which does not a have a nexus to the specific harm alleged to be suffered by the plaintiff.

## TENTH DEFENSE

Plaintiff fails to allege facts from which it can reasonably be inferred that this defendant acted with reckless indifference to or conscious disregard for the safety of others sufficient to warrant punitive damages.

<center>15</center>

## ELEVENTH DEFENSE

Insofar as Plaintiff seeks recovery of punitive damages, their claims are barred, in whole or in part, by the Due Process clauses and Fourth, Fifth, Sixth, Eighth and/or Fourteenth Amendments to the Constitution of the United States and the West Virginia Constitution.

## TWELFTH DEFENSE

Hiab and Cargotec specifically denies that it or any of its agents or employees breach any duty or deviated from any reasonable standards of care required under West Virginia law which proximately caused or contributed to the alleged injuries and damages as alleged in the plaintiffs' First Amended Complaint.

## THIRTEENTH DEFENSE

Hiab and Cargotec hereby reserves unto itself the right to assert such claims, whether they be counterclaims, cross-claims, third-party claims or otherwise as investigation and discovery in this case may prove applicable.

## FOURTEENTH DEFENSE

Hiab and Cargotec state that the plaintiffs' alleged injuries and damages were the proximate result of the acts or omissions of persons or entities other than Hiab and Cargotec and over whom Hiab and Cargotec had no control nor any duty to control.

## FIFTEENTH DEFENSE

Hiab and Cargotec denies that it breached any duty owed to the plaintiffs either expressly or impliedly set forth under West Virginia law.

16

## SIXTEENTH DEFENSE

Hiab and Cargotec asserts it right to have percentages of the fault allocated between and among all parties or entities against whom there is any evidence to support a finding of fault and further, hereby asserts its right to offset, contribution and/or indemnity from any such persons or entities.

## SEVENTEENTH DEFENSE

Hiab and Cargotec reserves the right of any and all defenses, including but limited to those set forth in Rule 12(b) of the *West Virginia Rules of Civil Procedure*, should those defenses prove applicable as this case proceeds.

## EIGHTEENTH DEFENSE

Hiab and Cargotec state that it is entitled to the defense of the statute of limitations should it prove applicable.

## NINETEENTH DEFENSE

These Defendants set forth assumption of risk as a bar to Plaintiffs' claims.

## TWENTIETH DEFENSE

If the Plaintiffs sustained injuries or damages as alleged in the Plaintiffs' First Amended Complaint, which these Defendants specifically deny, such injuries or damages were caused, in whole or in part, or contributed to, by actual omissions of others, for whom these Defendants are not legally liable or responsible.

## TWENTY-FIRST DEFENSE

To the extent revealed by discovery or at the time of trial in this case, Plaintiffs' claims against Defendants are barred because the subject product was designed in accordance with the state-of-the

17

-art at the time of the manufacture, complied with the industrial standards, and was manufactured and designed for the use for which it was intended.

## TWENTY-SECOND DEFENSE

The Plaintiffs' claims are barred because the Defendants owed no duty to the Plaintiffs of the type alleged by the Plaintiffs.

## TWENTY-THIRD DEFENSE

The Plaintiffs' claims against these Defendants are barred by the applicable statute of repose.

## TWENTY-FOURTH DEFENSE

To the extent discovery should so reveal, the Plaintiffs' claim against these Defendants are barred by the Plaintiffs' failure to join a necessary or indispensable party without whom this action will not proceed.

## TWENTY-FIFTH DEFENSE

If the Plaintiffs sustained any injuries or damages as alleged in the Plaintiffs' First Amended Complaint, which these Defendants specifically deny, Plaintiffs failed to notify these Defendants of any alleged breach of express or implied warranty within the time required by law, and therefore, any recovery by the Plaintiffs against these Defendants for a breach of express or implied warranty is barred.

## TWENTY-SIXTH DEFENSE

These Defendants effectively disclaimed or excluded any alleged warranties, whether expressed or implied, and the Plaintiffs' claim is therefore barred.

## TWENTY-SEVENTH DEFENSE

To the extent the Plaintiffs allege breach of implied warranty of fitness for a particular purpose, such warranties are barred in whole or in part by the fact that the intended use of the at issue equipment was no different from the ordinary use of such product and therefore, it is not an unusual, non-ordinary purpose.

## TWENTY-EIGHTH DEFENSE

To the extent the Plaintiffs receive or have received reimbursement or other compensation for all or part of the injuries and damages, the amount of any damages they may recover from the Defendants must be diminished to the extent as may be required by law, and/or the Plaintiffs' claims of injuries or damages are subject to collateral estoppel, pursuant to any applicable administrative findings, to the extent revealed by discovery.

## TWENTY-NINTH DEFENSE

If the Plaintiffs suffered any injuries or damages as alleged in the First Amended Complaint, which these Defendants specifically deny, any and all injuries and damages were directly and proximately caused, in whole or in part, or contributed to by the negligence, fault or conduct of others and the Plaintiffs are therefore barred from recovery from these Defendants, or in the alternative, the negligence, fault or other conduct of non-parties involved in the alleged injuries and/or damages of the Plaintiffs must be compared and judgment entered in accordance with the applicable law.

## THIRTIETH DEFENSE

Defendants affirmatively state that Plaintiffs and Defendants are not in privity, therefore, Plaintiffs are precluded from asserting any possible claim based on implied warranty theories against these Defendants or other such contractual theories.

## THIRTY-FIRST DEFENSE

To the extent the product at issue is subject to any state or federal regulations or industrial standards on design, manufacturing, labeling, warning, packaging, advertising, distributing, selling or otherwise related to the product, and to the extent they would apply in any manner to the herein Defendants, then these Defendants have fully complied with the regulations and standards, thereby lowering and/or precluding Plaintiffs' claims.

## THIRTY-SECOND DEFENSE

To the extent the product at issue is subject to any federal regulations or law with regard to design, manufacturing, labeling, warning, packaging, advertising, distributing, selling or otherwise related to the product, such federal regulations and laws preempt any and all state law claims.

## THIRTY-THIRD DEFENSE

If the condition of the product existed, as alleged by the Plaintiffs, it is expressly denied that condition was such that it and the risk thereof, if any, were not hidden or unknown to the Plaintiffs, but were, and should have been, immediately obvious and discernable to the Plaintiffs.

## THIRTY-FOURTH DEFENSE

Any rights of the Plaintiffs or any others to recover against the herein Defendants, which might otherwise exist, are barred and/or limited by the applicable principals of active and passive fault or negligence and/or primary or secondary liability.

20

### THIRTY-FIFTH DEFENSE

Even if Defendants were otherwise liable to the Plaintiffs, which is denied, the wrongful acts or omissions of the third parties, other than these Defendants, constitute a superceding cause which shields these Defendants from liability.

### THIRTY-SIXTH DEFENSE

If the Plaintiffs did suffer any of the harms which they are alleging, they were caused solely by conduct and/or products and devises of third parties other than these Defendants.

### THIRTY-SEVENTH DEFENSE

If these Defendants' conduct or products or devises in any way contributed to the harm complained of by the Plaintiffs, which is expressly denied, the extent of these Defendants' contribution to the harm was so minimal as to be insufficient to establish to a reasonable degree of probability, and thus, it does not constitute a legally recognizable cause of the claimed harm.

### THIRTY-EIGHTH DEFENSE

If any of these Defendants' products or devises or actions caused or contributed to the harm alleged by the Plaintiffs, any rights of the Plaintiffs and/or other entities which might otherwise exist against these Defendants are barred or limited by the failure of the Plaintiffs and/or other entities to use the product or device in an appropriate manner for the designated and/or intended use, and by the failure of the entities to give the Plaintiffs appropriate instructions and/or warnings.

### THIRTY-NINTH DEFENSE

At no time prior to the incident alleged by the Plaintiffs did these Defendants have knowledge of any defects or conditions in the subject product of the type alleged by the Plaintiffs or otherwise.

21

In addition, under the circumstances, these Defendants should not have reason to know of any such alleged defects or conditions, the existence of which are denied.

### FORTIETH DEFENSE

To the extent revealed by discovery, these Defendants plead modifications and/or alterations to the subject equipment act as a bar to the claim.

### FORTY-FIRST DEFENSE

These Defendants state that any injuries and/or damages alleged by the Plaintiffs, which these Defendants continue to deny, were the result of the superceding, intervening, and/or independent causes over which these Defendants had no control and in no way participated.

### FORTY-SECOND DEFENSE

These Defendants state that neither personal nor subject matter jurisdiction are proper over these Defendants.

### FORTY-THIRD DEFENSE

Defendants reserve the right to raise such additional defenses as may become available and/or known through investigation and discovery.

### HIAB AND CARGOTEC'S ANSWERS TO ALL CROSS CLAIMS

1.    Hiab and Cargotec state that all cross claims fail to state a claim upon which relief may be granted.

2.    Hiab and Cargotec state that all claims for contribution will be addressed and assigned to the extent the jury assigns fault to any party. If these defendants are not assigned fault, or if they

enter into a good faith settlement with the plaintiff's, then all claims for contribution against them are dismissed by law.

3.    Hiab and Cargotec state that all claims for express indemnity exist only to the extent that a party has a contract or other written agreement with these defendants. Hiab and Cargotec is not aware of any such agreements, and, therefore denies all such claims.

4.    Hiab and Cargotec state that all claims for implied indemnity exist only to the extent a party is in the chain of distribution for a defective product that caused the alleged injury of the plaintiff. In addition, the obligation of indemnity will rest on the party the imparted any alleged defect on the product. Hiab and Cargotec deny that the product at issue was their product, and therefore, deny that any party is entitled to indemnity from this defendant.

## HIAB AND CARGOTEC'S CROSS CLAIMS AGAINST ALL DEFENDANTS

1.    Hiab and Cargotec hereby express their right to contribution from co-Defendants, Cook Brothers Trucking, Inc., 84 Lumber Company, James Hardie Siding Products, McClure-Johnston Company, Babcock Lumber Company, JGL Industries Inc. and John Doe Distributors, and all other co-Defendants who may hereafter be named in this action.

WHEREFORE, defendant, Hiab and Cargotec Inc., respectfully demands that the plaintiffs' First Amended Complaint against it in this action be dismissed with prejudice; that judgment be entered on behalf of this defendant; that it be awarded the reasonable costs and attorney fees necessarily incurred in the defense of this action; and that this defendant be granted such other relief as may seem appropriate.

23

THIS DEFENDANT DEMANDS A TRIAL BY JURY.

Hiab AB and Cargotec INC.

By Counsel

Robert C. James (ID # 7651)
Christopher A. Brumley (ID # 7697)
FLAHERTY, SENSABAUGH & BONASSO, P.L.L.C.
1225 Market Capitol Street
Post Office Box 6545
Wheeling, West Virginia 26003
(304) 230-6600

24

# IN THE CIRCUIT COURT OF MARSHALL COUNTY, WEST VIRGINIA

SCOTT D. SMITH &
MARSHA SMITH,

      Plaintiffs,

v.

                                      Civil Action No. 04-C-220-K
                                      Judge Mark Karl

COOK BROTHERS TRUCKING,
INC., 84 LUMBER COMPANY (a/k/a
84 LUMBER CO.) d/b/a 84 LUMBER
COMPANY LIMITED PARTNERSHIP,
JAMES HARDIE SIDING PRODUCTS,
MCCLURE-JOHNSTON COMPANY,
BABCOCK LUMBER COMPANY, Hiab and Cargotec
INC., HIAB (f/k/a PARTEC CARGOTEC),
and JOHN DOE DISTRIBUTORS,

      Defendants.

## CERTIFICATE OF SERVICE

    I, Robert C. James, counsel for defendant, Hiab and Cargotec Inc., do hereby certify that the foregoing Answer and Affirmative Defenses of Defendants, Hiab AB and Cargotec, Inc., to Plaintiffs' First Amended Complaint, Defendant's Cross-Claims and Answer and Affirmative Defenses to Defendants Cross-Claims Against Defendants has been served on the following counsel of record, via U.S. regular mail, postage prepaid as follows:

                    Melvin W. Kahle #4742
                    Frank X Duff #1065
                    John M. Jurco #9535
                    Schrader Byrd & Companion PLLC
                    The Maxwell Centre, Suite 500
                    32-20th Street
                    Wheeling, WV 26003
                    *Counsel for Plaintiffs*

David L. Wyant
Bailey & Wyant PLLC
1219 Chapline Street
Wheeling, WV 26003
*Counsel for Cook Brothers Trucking, Inc.*

Paul J. Walsh, III
Adam M. Barnes
Walsh, Collis & Blackmer, L.L.C.
707 Grant Street
Gulf Tower, Suite 2300
Pittsburgh, PA 15219
*Counsel for Babcock Lumber Company*

Jacob A. Manning
James C. Wright
Steptoe & Johnson
1233 Main Street, Suite 3000
Wheeling, WV 26003-0751
*Counsel for McClure-Johnston Company*

Chad A. Cicconi
Thorp Reed & Armstrong, LLP
1233 Main Street, 2001
Wheeling, WV 26003
*Counsel for 84 Lumber*

Jeffrey Burch
Watt, Tieder, Hoffar & Fitzgerald, LLP
2040 Main Street, Suite 300
Irvine, CA 92614

Richard D. Owen
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
P.O. Box 2107
Charleston, WV 25328
*Counsel for James Hardie*

Dated this 25th day of October, 2005.

Robert C. James

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JLG INDUSTRIES, INC. | POWERSCREEN USC, INC., POWERSCREEN INTERNATIONAL PLC, and TEREX CORPORATION |

**(b)** County of Residence of First Listed Plaintiff   **Fulton**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **Jefferson**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) 302-504-7840
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Ave., Suite 750, Wilmington, DE 19801

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332

Brief description of cause:
contractual indemnification

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE  1|25|05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

0 6 - 5 0

Civil Action No. _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___ 3 ___ COPIES OF AO FORM 85.

_____ 1/25/06 _____          _____
(Date forms issued)          (Signature of Party or their Representative)

_____ Phillip Casale _____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action